

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - x
                                :
In re:                          :   Chapter 11
                                :
STONE & WEBSTER, INCORPORATED, :   Case No. 00-2142 (    )
et al.,                         :
                                :   Jointly Administered
          Debtors.              :
                                :
- - - - - - - - - - - - - - - x

**AFFIDAVIT OF THOMAS L. LANGFORD IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY ORDERS**

STATE OF DELAWARE          )
                           )   ss:
COUNTY OF NEW CASTLE       )

   Thomas L. Langford, being duly sworn, states
that the following is true to the best of his knowledge,
information and belief:

   1. I am the Executive Vice President and
Chief Financial Officer of Stone & Webster, Incorporated,
a Delaware corporation and a debtor and debtor-in-posses-
sion in the above-captioned chapter 11 cases ("S&W").  I
have held these positions since June 1997.  Prior to
joining S&W, I served as President and Director of Par-
sons Corporation (formerly known as Ralph M. Parson Corp.



and, later, as The Parson Corp.) ("Parsons").  Alto-
gether, I was employed by Parsons for approximately 26
years, from March 1970, when I joined Parsons as an
Assistant Comptroller through May 1996, when I resigned
as President and Director.  As a result of these various
positions, my review of public documents, and my discus-
sions with the officers and directors of S&W, I am famil-
iar with the Debtors' day-to-day operations, business
affairs and books and records.

2.    As detailed in Section I below, S&W is a
Delaware corporation and a global leader in engineering
construction and consulting services for the power,
process, industrial, transportation, environmental and
government markets.  S&W's consolidated gross revenues
for fiscal year 1999 exceeded $1.2 billion.

3.    On June 2, 2000 (the "Petition Date"),
S&W, and its direct and indirect subsidiaries (collec-
tively, "Stone & Webster" or the "Debtors"), commenced
cases under chapter 11 of title 11 of the United States
Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy
Code"), in the United States Bankruptcy Court for the
District of Delaware.  Stone & Webster intends to con-
tinue in possession of its properties and the management
of its businesses as debtors-in-possession pursuant to

2

sections 1107 and 1108 of the Bankruptcy Code.  In order to enable Stone & Webster to minimize the adverse effects of the chapter 11 filings on its business, Stone & Webster will request various types of relief in "first day" applications and motions (collectively, the "First Day Motions").[1]

4.   I submit this affidavit (the "Affidavit") in support of Stone & Webster's chapter 11 petitions and the First Day Motions in the above-captioned cases. Except as otherwise indicated herein, all facts set forth in this Affidavit are based on my personal knowledge, my discussions with other members of Stone & Webster's senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of Stone & Webster's operations and financial condition.  If I were called upon to testify, I could and would testify competently to the statements set forth herein.  I am authorized to submit this Affidavit.

5.   Part I of this Affidavit describes Stone & Webster's businesses and the circumstances surrounding the commencement of these chapter 11 cases.  In Part II of this Affidavit, I attest to the truth and accuracy of

---

[1]    Capitalized terms not defined herein are used as defined in the respective First Day Motions.

the relevant facts set forth in the First Day Motions
filed concurrently herewith.

I.   BACKGROUND

A.   The Chapter 11 Filing

      6.   On June 2, 2000 (the "Petition Date"),
Stone & Webster filed voluntary petitions in this Court
for reorganization relief under chapter 11 of title 11 of
the United States Code, 11 U.S.C. § 101-1330 (as amended,
the "Code").   Stone & Webster continues to operate its
businesses and manage its properties as debtors and
debtors-in-possession pursuant to Code sections 1107(a)
and 1108.

B.   Stone & Webster's Businesses

      7.   Stone & Webster is principally engaged in
providing professional engineering, construction and
consulting services (the "Engineering, Construction and
Consulting Business").   Additionally, certain Debtor
subsidiaries own and operate fourteen cold storage ware-
housing facilities located primarily in the southeastern
United States (the "Nordic Business") and others own and
operate Stone & Webster office buildings in Houston,
Texas and Schenectady, New York.

      8.   As of December 31, 1999, Stone & Webster
employed approximately 5,300 regular employees.   In

4

addition, at any given time Stone & Webster employs
several thousand craft employees on existing projects.
The number of such employees varies in relation to the
number and size of the projects existing at any particu-
lar time.

The Engineering, Construction and Consulting Business

9.    Stone & Webster provides engineering,
design, construction, and full environmental services for
power, process, governmental, industrial, transportation
and civil works projects.  Stone & Webster also remains
active in the nuclear power business, for utility and
governmental clients, and continues to undertake a sig-
nificant amount of modification and maintenance work on
existing nuclear power plants as well as decommissioning
and decontamination projects.

10.    Stone & Webster's Engineering, Construc-
tion and Consulting Business includes three divisions and
a consulting organization which are responsible for
marketing and executing projects within a sector on a
worldwide basis.  Where appropriate, lump sum contracts
are employed as a means of providing comprehensive ser-
vices.

11.    In fiscal 1999, Stone & Webster's Engi-
neering, Construction and Consulting Business had $1.14

billion in revenues, and an operating loss of $142.5
million.  During that period, Stone & Webster recorded a
loss of $150.1 million in contract related provisions,
primarily due to increases in estimated costs to complete
several lump sum contracts.  Moreover, as of December 31,
1999, the Debtors had contracts in backlog amounting to
$2.6 billion.

The Nordic Business

12.  Stone & Webster's Nordic Business provides
low cost, energy efficient refrigerator and freezer
storage facilities, customized material handling ser-
vices, and blast freezing capacity.  It serves primarily
two groups of customers:  prepared food manufacturers,
who require cold storage and logistics services in their
distribution channels, and poultry producers, who require
blast freezing and storage capacity.  In October of 1999,
the Debtors announced their intention to sell the Nordic
Business, a large part of which was acquired in the
fourth quarter of 1998.

C.   Events Leading to Chapter 11 Filing

13.  Since mid-1996, Stone & Webster has been
restructuring due to problems at the Engineering,
Construction and Consulting Business.  For the last
several years, the Debtors have experienced significant

6

operating losses.  Such losses are the result of many
factors, including a major contract dispute in Saudi
Arabia, a similar unresolved claim in Ghana, lower demand
by energy companies, protracted weakness in the petro-
chemical industry, the lingering effects of the economic
slowdown in Asia, a major market for new process plant
construction, rapid consolidation and reduced spending in
the oil sector and higher than anticipated costs related
to recent lump sum contracts due to the Boston labor
market.  By the second quarter of 1999, Stone & Webster
thus began experiencing liquidity problems, and by the
end of the third quarter of 1999, it had fully drawn the
cash available under its existing credit facility (as
amended or modified, the "Prepetition Credit Facility").
As a consequence, the amount of the Debtors' past due
trade payables increased, in turn causing certain of the
Debtors' vendors and subcontractors to delay work on the
Debtors' projects.

    14.  In November 1999, the Debtors therefore
sought and obtained an agreement with their principal
bank-lending group (the "Prepetition Bank Group") to
expand and extend the Prepetition Credit Facility.  Under
that agreement, the borrowing facility was increased by
$30 million to a maximum of $160 million and the maturity

of the Prepetition Credit Facility was extended through
May 31, 2000.

15. During the fourth quarter of 1999, Stone &
Webster also sought to reduce debt and raise working
capital by selling assets. In that regard, the Debtors
not only sought purchasers for the Nordic Business but
also other assets. As a result, Stone & Webster sold
their Boston, Massachusetts headquarters building for
$187 million, and used $140 million of the proceeds of
such sale to permanently reduce the borrowing facility to
$20 million. The Debtors also received an additional
$15.4 million by selling S&W's treasury stock to the
Employee Retirement Plan. Nonetheless, as of the end of
fiscal 1999, the entire $20.0 million available for
direct borrowings under the Prepetition Credit Agreement
remained outstanding and nearly $90 million of the $100
million letter of credit facility was used.

16. Thus, despite efforts to restructure
operations, sell the Nordic Business and raise working
capital, Stone & Webster continued to experience severe
liquidity problems. Anticipating their inability to pay
down or refinance their Prepetition Credit Facility upon
maturity, in April the Debtors sought and entered into
another agreement with the Prepetition Bank Group, under

which agreement the maturity date of Prepetition Credit Facility was further extended to January 31, 2001. Besides extending the maturity date, that amendment provides, among other things, that the proceeds from a sale of the Nordic Business will be used to repay the outstanding direct borrowings and provide support to the Prepetition Bank Group for the nearly $90 million in outstanding letters of credit.

17.  Finally, in mid- to late April, Stone & Webster discovered a substantial unanticipated cost overrun on a key construction project, and as a result was required to restate its 1999 financial statements to record a provision of $27.5 million to complete work on that project.  In conjunction with that restatement, the Debtors' independent public accountants issued a modified opinion raising questions regarding Stone & Webster's ability to continue as a going concern, which in turn has slowed receipts further exacerbating the Debtors' cash flow problems.

18.  Thus, in late April the Debtors embarked on an aggressive strategy under which they sought alternative financing, strategic mergers and possible additional asset sales.  In that regard, Stone & Webster solicited traditional and nontraditional lenders regard-

9

ing possible interim and long-term financing.  Additionally, the Debtors entered into substantive discussions with possible strategic partners regarding potential transactions involving the sale of not only the Nordic Business but also all or part of its Engineering, Construction and Consulting Business.

19.  These efforts resulted in the Debtors signing a letter of intent with Jacobs Engineering Group Inc. ("Jacobs") regarding a transaction pursuant to which Jacobs would acquire substantially all of Debtors' assets in exchange for Jacobs immediately providing a $50 million secured revolving credit facility (the "Jacobs Credit Facility"), Jacobs assuming substantially all of the Debtors' balance sheet liabilities (including the new Jacobs Facility) and Jacobs paying the Debtors an additional $150 million in cash and stock.  Since entering into the letter of intent in early May, the Debtors have been negotiating the final terms of the agreement with Jacobs, which terms were agreed to by Stone & Webster in the early morning of June 2, 2000.

20.  Accordingly, on that same day, the Debtors commenced these Chapter 11 cases to expeditiously reorganize their operations through a Code section 363 sale of substantially all of their assets to Jacobs or an alter-

10

native bidder.  Given the Debtors' liquidity position,
the Debtors will seek to close the sale with Jacobs or an
alternative bidder within the first four to five weeks of
these cases.

## II.   THE FIRST DAY MOTIONS

21.  In furtherance of the objective of suc-
cessfully and expeditiously reorganizing Stone & Web-
ster's capital structure, they will file a number of
First Day Motions, and respectfully request that the
Court consider entering orders granting such Motions.  I
have reviewed each of the First Day Motions (including
the exhibits thereto) and can attest to the veracity of
the facts set forth therein.  Additionally, I believe
that the relief sought in each of the First Day Motions
is (a) necessary to enable the Debtors to operate in
chapter 11 with a minimum of disruption to its business
or loss of productivity or value and (b) constitutes a
critical element in achieving the Debtors' chapter 11
restructuring objectives.

### A.   Trumbull Services L.L.C.

22.  Stone & Webster has numerous creditors,
potential creditors and parties in interest, to whom
certain notices, including notice of the chapter 11
filing, must be sent.  Trumbull Services L.L.C.

11

("Trumbull") is a data processing firm that specializes in noticing, claims processing and other administrative tasks in chapter 11 cases.  The Debtors wish to engage Trumbull to send out certain designated notices and maintain claims files and a claims register and to serve as a ballot agent with respect to voting of its reorganization plan.  Therefore, the Debtors believe that Trumbull is well-qualified to provide such services and, thus, requests Court approval of Trumbull's retention.

B.    Motion for Order Authorizing Debtor to Mail
      Initial Notices and to File List of Creditors
      (Without Claim Amounts) in Lieu of Matrices

        23.    Stone & Webster has identified thousands of entities to which notice of certain proceedings in these chapter 11 cases may be provided.  The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors and equity security holders that would be entitled to receive the various notices and other documents in this case. Accordingly, Stone & Webster believes that it is in the best interests of their estates and creditors to avoid the costs and risks associated with preparing and filing the matrices and to instead hire Trumbull as claims and noticing agent for these chapter 11 cases.

C.    Motion for Order Granting Additional
      Time to File Schedules and Statements

24.    Stone & Webster has over 37,000 creditors and parties-in-interest and operates their businesses from various locations.  Given the resultant size and complexity of the Debtors' businesses and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial systems, we have not had the opportunity to gather the necessary information to prepare and file schedules and statements of financial affairs.

D.    Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And
      541 Confirming Authority To Pay Prepetition Sales,
      Use And Other Taxes

25.    In the ordinary course of their business, Stone & Webster incurs various taxes, including state and local sales and use tax liabilities ("Sales and Use Taxes") and state, local and federal withholding taxes ("Withholding Taxes").  Before the Debtors' bankruptcy petitions were filed, the Debtors paid their tax obligations in a timely fashion.

26.    Sales and Use Taxes accrue in the daily business practice of the Debtors, and are calculated based upon a statutorily mandated percentage.  In some

cases, Sales and Use Taxes are paid in arrears, once
collected by the Debtors.

      27.  Many jurisdictions, however, require the
Debtors to remit estimated Sales and Use Taxes on a
periodic basis during the month or quarter in which sales
are made.  The Taxing Authority then "trues up" any
deficiency or surplusage on the date on which the taxes
are actually due.

      28.  Withholding Taxes accrue as wages are
earned and are calculated based on a statutorily mandated
percentage of earned wages.  Stone & Webster pays all
federal, state and local Withholding Taxes to the rele-
vant Taxing Authority by check or automated transfer.

E.    Motion For Interim And Final Order Pursuant To 11
     U.S.C. §§ 105, 503(b), 507(a) And 366
     (I) Prohibiting Utilities From Altering, Refusing Or
     Discontinuing Services On Account Of Prepetition
     Invoices And (II) Establishing Procedures For Deter
     <u>mining Requests For Additional Adequate Assurance.</u>

      29.  In the normal course of its business,
Stone & Webster uses electricity, gas, water, telephone,
telecommunications, and other utility services provided
by the Utilities.  The Utilities service the Debtors'
district offices and, critically, the Debtors' various
projects throughout the United States.

30.  Stone & Webster is dependent on the con-
tinuation of all utility services, including telephone,
water, electricity and gas.  For example, maintenance of
telephone service is imperative because the Debtors use
telephones to communicate with customers, vendors and
headquarters and the Debtors' domestic and international
employees.  Continued water service is necessary for
health reasons including the maintenance of sanitary
lavatory facilities for employees.  Finally, maintenance
of gas service is essential to provide heat to certain of
the Debtors' facilities.

31.  Prior to the Petition Date, the Debtors,
for the most part, paid the Utilities' bills consistently
and on a regular basis.  Further, the Debtors are unaware
of any outstanding defaults or arrearages of any signifi-
cance with respect to any bill for utility service.
Thus, Stone & Webster believes that any Utility seeking a
deposit from any of the Debtors is doing so in accordance
with a "per se" policy followed when one of its customers
files a petition for relief under the Code.

F.    Motion For Order (A) Authorizing Payment Of
      Prepetition Wages, Salaries, And Employee Benefits,
      (B) Authorizing Debtors To Continue Employee
      Benefit Plans And Programs Postpetition,
      (C) Confirming That Debtors Are Able To Pay
      Withholding And Payroll-Related Taxes And
      (D) Directing All Banks To Honor Prepetition Checks
      For Payment Of Prepetition Employee Obligations.

        32.   As of the Petition Date, the Debtor's

aggregate workforce consisted of approximately 3,328

employees.   Approximately 91% of these Employees are

employed on a full-time basis, and the remaining 9% of

the Employees are employed on a part-time basis.   Approx-

imately 3% of the Debtor's Employees are covered by

collective bargaining agreements.

        33.   The Debtors also employ, on a project-by-

project basis, a limited number of laborers and/or

skilled craftsmen, as independent contractors to perform

a variety of necessary services (the "Craft Workers").

The services performed by the Craft Workers are important

to the Debtors' business, and the continued provision of

such services is essential to the consummation of the

proposed sale to Jacobs or an alternative bidder.   In

some cases, local law or the terms of the project con-

tract require the Debtors to hire a certain percentage of

local labor and craftsmen.   Thus, to complete projects

where the Craft Workers are utilized, and enable the

16

Debtors to collect the revenues and receivables from such projects, the Debtors must ensure that the Craft Workers remain on site and continue to provide services as needed.

34.    Approximately 31% of the Debtors' workforce is paid by the hour.  Hourly workers are paid on a weekly basis for services rendered during the prior week.  Salaried employees are paid once each month for the work that has been and will be performed during that month.  In two states (New York and Massachusetts), salaried workers are paid for a given month on the twelfth (12th) day of such month.  All other salaried workers are paid on the twenty-fifth (25th) day of each month.  Stone & Webster estimates that, as of the Petition Date, accrued unpaid wages, salaries and withholding taxes aggregate approximately $3.3 million, and that accrued unpaid vacation, holiday, excused leave pay and sick pay aggregate approximately $14 million.[2]

35.    Stone & Webster currently maintains self-insured workers' compensation coverage.  It is critical

_____

[2]    The bulk of this cost consists of accrued unpaid vacation benefits.  The Debtors will be seeking the authority to pay only that portion of accrued unpaid vacation benefits that would receive priority treatment under the Code.

that the Debtors be permitted to continue their workers'
compensation programs and to pay prepetition claims,
assessments and premiums because alternative arrangements
for workers' compensation coverage would almost certainly
be more costly, and the failure to provide coverage may,
in some states, subject the Debtors and/or their officers
to draconian penalties.

36.   Prior to the Petition Date, Stone & Web-
ster also offered the Employees certain benefits, includ-
ing, without limitation, medical, dental, vision, pre-
scription drug, COBRA, basic term life insurance, supple-
mental life insurance, executive life insurance, disabil-
ity salary continuance, employee assistance program,
educational assistance, disability insurance, 401K plans,
pension plans, stock investment program, payments pursu-
ant to garnishment orders, reimbursable business expenses
and miscellaneous other benefits (collectively, the
"Employee Benefits").  The Debtors estimate that accrued,
unpaid prepetition Employee Benefits aggregate approxi-
mately $3.75 million.

37.   If the Debtors fail to pay or honor the
Employees' prepetition benefit, compensation and reim-
bursement amounts in the ordinary course, the Employees
will suffer extreme personal hardship and in many cases

will be unable to pay their basic living expenses.  Such a result obviously would have a negative impact on Employee morale and would likely result in unmanageable turnover.  Stone & Webster believes that any significant deterioration in morale at this time will substantially and adversely impact the Debtors and their ability to reorganize, thereby resulting in immediate and irreparable harm to their estates.

G.    Motion For Order (I) Authorizing The (A) Maintenance
      Of Existing Bank Accounts, (B) Continued Use Of
      Existing Business Forms, (C) Continued Use Of
      Existing Cash Management Systems, And (D) Transfer
      Of Funds Of Non-debtor Wholly-owned Subsidiaries;
      And (II) Waiving, On An Interim And Final Basis,
      The Investment And Deposit Requirements Of
      11 U.S.C. § 345(b).

The Debtors Should Be Granted Authority
To Maintain Their Existing Bank Accounts

        38.  Prior to the commencement of the chapter 11 cases, in the ordinary course of business, Stone & Webster operated a sophisticated cash management systems.  Under these systems, we maintained one hundred twenty-four (124) depository accounts (the "Depository Accounts") and forty-five (45) controlled disbursement accounts (the "Controlled Disbursement Accounts") in the United States and abroad.  The Depository Accounts and the Controlled Disbursement Accounts (collectively, the "Bank Accounts") are fully integrated to manage all cash

19

receipts and disbursements of the Debtors, as well as to
track and control the flow of funds through the various
operating entities.  Attached as Exhibit A to the pro-
posed order for this First Day Motion is a list contain-
ing each of the Bank Accounts, the account numbers for
the Bank Accounts and the address of each bank holding
the Bank Accounts.  The Debtors believe that all of their
domestic Bank Accounts are maintained with FDIC or FSLIC
Insurance in financially stable banking institutions.

39.  Stone & Webster also seeks a waiver of the
United States Trustee's requirement that the prepetition
Bank Accounts be closed and that new postpetition bank
accounts be opened.  If enforced in these cases, such
requirements would greatly disrupt Stone & Webster's
business and impair its efforts to reorganize and pursue
restructuring alternatives that maximize the value of
their estates. In order to avoid such disruption and
possible delays in payments to administrative creditors
and to ensure as smooth a transition into chapter 11 as
possible, I believe it is essential that the Debtors be
permitted to continue to maintain their existing Bank
Accounts and, if necessary, open new accounts, wherever
they are needed.

The Debtors Should Be Granted Authority to Continue
to Use Existing Business Forms and Checks

40.   In order to minimize expenses to the es-
tates, Stone & Webster also requests that it be autho-
rized to continue to use all correspondence, business
forms (including, but not limited to, letterhead, pur-
chase orders, invoices, etc.), without reference to the
Debtors' status as debtors-in-possession.   The Debtors
have, however, already changed the checks to reflect
their status as Debtors-in-Possession.

41.   Parties doing business with the Debtors
undoubtedly will be aware, as a result of the size and
notoriety of these cases, of the Debtors' status as chap-
ter 11 debtors-in-possession.   Changing correspondence
and business forms would be unnecessary and burdensome to
the Debtors' estates and expensive and disruptive to the
Debtors' business operations.

The Debtors Should Be Authorized To Continue
To Use Their Existing Cash Management System

42.   In the ordinary course of business, Stone
& Webster utilizes a substantially integrated, central-
ized cash management system.   Moreover, because the
Debtors' operations are international in scope, the
Debtors utilize both centralized bank accounts as well as

bank accounts located in the various geographic regions in which the Debtors conduct their businesses.

43.   Each of the Debtors maintains individual Depository Accounts.  Payments are made to the Depository Accounts to fund overhead expenses and costs for each project.  Drafts are drawn on the Depository Accounts to satisfy various expenditures, including operating expenses, payment of staff and the purchase of equipment and supplies for projects.

44.   There are two types of Depository Accounts:  (i) those funded by clients ("Client Funded Depository Accounts") and (ii) those funded by the Debtors ("Debtor Funded Depository Accounts").  The form of the Depository Account is determined by a number of factors, including:  (i) the intended expenses to be satisfied by the account; (ii) the existence of a construction or other project; and (iii) the terms of any contract between the Debtors and their clients.  Debtor Funded Depository Accounts are maintained at minimal levels so as to fully maximize the receipts of the Debtors.  Client Funded Depository Accounts receive funds directly from the client of a particular project at times specified by the Debtors' field accountants who determine required expenditures on that project.

45.   The Debtors also maintain Controlled Disbursement Accounts.  With one exception, the Controlled Disbursement Accounts are all maintained at BankBoston, Maine.  The Controlled Disbursement Accounts have a zero balance and are designed to remit payments for payroll of the Debtors and as well as vendor and overhead costs.

46.   When a check is drafted from the Controlled Disbursement Accounts, it is honored by the bank on which the check is drafted.  After all disbursements have been made for a day, the bank holding the Controlled Disbursement Account makes a demand from the respective funding Depository Accounts to satisfy all funds remitted from the Controlled Disbursement Account on that day. The funding Depository Account then satisfies the demand made by the Controlled Disbursement Account.  The Controlled Disbursement Account is then returned to a zero balance.

47.   Most of the funding Depository Accounts are zero balance accounts.  Any surplus remaining in the zero balance Depository Account is then transferred to a particular parent's zero balance Depository Account where the process is repeated until all excess funds are placed into the S&W primary Depository Account. The funds are

23

then transferred out of this primary Depository Account
for overnight investment in overnight repurchase agree-
ments backed by either bank or United States government
securities.

48.   Stone & Webster also maintains numerous
accounts both domestically and internationally as a
result of various tax considerations and state, federal,
and/or international requirements.   These accounts may be
used to make payments to vendors, provide payments for
costs incurred by on-site facilities or remit required
taxes.

49.   The present cash management system facili-
tates cash forecasting and reporting, monitors collection
and disbursement of funds, reduces the potential fraudu-
lent use of the Debtors' funds, and administers the
various bank accounts required to effect the collection,
disbursement, and movement of cash.   It is a highly
automated system and includes the necessary accounting
controls to enable the Debtors, as well as creditors and
the Court to trace funds through the system and ensure
that all transactions are adequately documented and
readily ascertainable.   The Debtors will continue to
maintain detailed records reflecting all funds trans-
ferred.

24

50.  The cash management procedures the Debtors
use constitute their ordinary, usual and essential busi-
ness practices, and are similar to those used by other
major corporate enterprises.  Further, use of the Debt-
ors' centralized cash management system reduces interest
expense by enabling the Debtors to utilize all funds
within the system and minimize their reliance on short-
term borrowing to fund cash requirements.

51.  The operation of the Debtors' businesses
requires that their cash management system continue
during the pendency of these chapter 11 cases.  Requiring
the Debtors to adopt new, segmented cash management
systems at this early and critical stage of their chapter
11 cases would be expensive, would create unnecessary
administrative problems, and would be much more disrup-
tive than productive.  Any such disruption could have a
severe and adverse impact upon the Debtors' prospects for
a successful reorganization through a Code section 364
sale.  Moreover, as a practical matter, because of the
Debtors' complex and widely disbursed organizational
structure, it would not be possible to establish a new
system of accounts and a new cash management and dis-
bursement system without incurring substantial additional
costs and expenses for the Debtors' bankruptcy estates,

25

and significant disruption of the Debtors' business
operations.  Consequently, I believe that the maintenance
of the existing cash management system is not only essen-
tial, but is in the best interest of all creditors and
other parties in interest.

The Debtors Should Be Allowed to Continue Certain
Intercompany Transactions with Non-Debtor Subsidiaries

52.  The Debtors and their wholly-owned non-
debtor subsidiaries (collectively, the "Non-Debtor Sub-
sidiaries") utilize an integrated cash management system.
In the ordinary course of business, the Debtors transfer
funds to the Non-Debtor Subsidiaries on an "as needed"
basis in order to fund and maintain business operations.
The Debtors request authority to continue making such
transfers in the ordinary course of their businesses, and
represent that such transfers may be effectively traced
through their cash management system.

53.  Prior to the Petition Date, the Debtors
and certain Non-Debtor Subsidiaries have provided a
number of services to, and engaged in intercompany finan-
cial transactions with, each other in the ordinary course
of their respective businesses.  Discrete transfers in
the appropriate intercompany accounts are made on account
of the provision of these services.  For example, a non-

26

debtor foreign entity may perform a project for a subsid-
iary of the Debtors.  This transaction is recorded by
each entity as an intercompany obligation and ultimately
satisfied between the entities.

54.  In addition, in the ordinary course of
business, the Debtors are periodically required to infuse
capital into certain of their subsidiaries.  This infu-
sion of capital generally is accomplished pursuant to a
loan.  The Debtors use repayment of these loans as a tax
efficient method of cash management.  Because the Debtors
are part of S&W's integrated business, throughout the
entirety of these transactions, the funds remain within
the spectrum of the Debtors' control, through the control
of S&W.

55.  Stone & Webster believes that the continu-
ation of these and other intercompany services is benefi-
cial to their estates and creditors and, thus, that
corresponding transfers among the appropriate
intercompany accounts (collectively, the "Intercompany
Transactions") should be permitted.  If the Intercompany
Transactions were discontinued, a number of services
presently provided to the Debtors at reasonable or nomi-
nal costs would be disrupted.

56.    At any given time there may be balances due and owing from one Debtor to another.  These balances represent extensions of intercompany credit.  To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.

H.    Motion For An Order (A) Confirming Grant Of Administrative Expense Status To Obligations Arising From Post-petition Delivery Of Goods, (B) Establishing Authority To Pay Certain Expenses In The Ordinary Course Of Business, (C) Authorizing The  Debtors To Return Goods Pursuant To § 546(g)* Of The Bankruptcy Code And (D) Providing For Administrative Expense Treatment For Certain Holders Of Valid Reclamation Claims And Prohibiting Third Parties From Interfering With The Debtors' Delivery Of Goods

57.    In the ordinary operation of the Debtors' businesses, numerous Vendors provide the Debtors with millions of dollars of Goods on a monthly basis.  On a daily basis, truckloads of Goods are in transit and delivered to Stone & Webster's projects and job sites

58.    As of the Petition Date, Stone & Webster had numerous Outstanding Orders with the Vendors for such Goods.  As a result of the Debtors' filing their chapter 11 cases, many of the Vendors may be concerned that delivery or shipment of Goods after the Petition Date

pursuant to a prepetition purchase order will render a
Vendor who makes such shipment a general unsecured credi-
tor of the Debtors' estates.

59.  Accordingly, I believe Vendors may decline
to ship, or may instruct their Shippers not to deliver,
Goods destined for the Debtors unless Stone & Webster
issues substitute purchase orders postpetition or are
granted administrative expense status.

60.  Stone & Webster thus believes that an
order approving returns to Vendors for credit against
their pre-petition claims, subject to the limitations
imposed by any orders of this Court, is in the best
interests of the Debtors' estates because such relief
will enable the Debtors to (i) obtain trade credit and
merchandise return rights that will make it possible for
the Debtors to obtain proper credit for otherwise unsal-
able damaged merchandise, cost-effectively and without
undue financial risk, and (ii) effectively manage inven-
tory, enhancing the Debtors' financial performance, the
value of the assets of the estate and the prospects of a
successful reorganization herein.

I.    Motion For Order Pursuant To 11 U.S.C.
      §§ 105(a) And 363(c) Authorizing Payment
      Of Certain Prepetition Shipping Charges

      61.   In the normal course of its business,
Stone & Webster pays certain commercial common carriers
(the "Shippers") to transport goods and equipment to the
Debtors' various job sites throughout the United States
and the world (all such payments are the "Shipping
Charges").  The Shippers do not have contracts with the
Debtors for the transportation services provided.  In-
stead, Shippers are hired on an as-needed basis and paid
an agreed-upon rate for each delivery.  The Shippers are
generally not paid in advance, but rather invoice the
Debtors for shipping services previously rendered.  As of
the Petition Date, Stone & Webster estimates that out-
standing prepetition Shipping Charges total less than
$1.5 million.

      62.   Stone & Webster seeks to pay the Shipping
Charges for several reasons.  First, if the prepetition
Shipping Charges are not paid, many Shippers may refuse
to perform additional services.  Locating entities to
replace the Shippers will be difficult, if not impossi-
ble.  At the very least, replacing a Shipper will delay
the transport and delivery of goods to the Debtors' job
sites, which may in turn delay the Debtors' ability to

30

complete a particular project and obtain payment for
their services.

63.  Additionally, the Shippers are likely to
assert possessory or other liens on supplies and goods
currently in their possession.  The value of these sup-
plies and goods will likely exceed the amount of out-
standing prepetition Shipping Charges and, thus, the
Debtors believe that most of the Shippers will ultimately
be entitled to be paid in full for the prepetition Ship-
ping Charges.  In any event, irrespective of the validity
of their liens, the mere assertion of possessory or other
liens will delay delivery of goods and equipment to the
Debtors' projects and job sites, thereby irreparably
damaging the Debtors' business.

64.  In return for payment of the Shipping
Charges in the ordinary course of business, Stone &
Webster will require that the Shippers continue to pro-
vide services during the pendency of these chapter 11
cases on the same terms as existed prior to the Petition
Date.

J.    Motion For Order Pursuant To 11 U.S.C. § 105(a)
      Authorizing Debtors To Pay Certain Contractors In
      Satisfaction Of Perfected Or Potential Mechanics',
      Materialmen's Or Similar Liens Or Interests In The
      Ordinary Course Of Business

        65.   In the ordinary course of Stone & Web-
ster's business, it employs a number of mechanics,
tradespersons and contractors (the "Contractors") to
perform a variety of services that would give rise to a
right to payment that might be secured by a mechanic's,
materialmen's or other similar lien.  The Debtors call
upon these Contractors on a daily basis to render their
services at many job sites throughout the United States.
The services provided by these Contractors are necessary
to Stone & Webster's ability to perform the services for
which the Debtors are engaged, and, therefore, these
services are critical to the going-forward operation of
the Debtors' businesses.

        66.   Accordingly, to avoid undue delay and to
facilitate the continued operation of their businesses,
Stone & Webster requests authority to pay and discharge
the prepetition claims (the "Contractor Claims") of the
Contractors to the extent that such Contractor Claims
have given or could give rise to Liens or Interests
against the Debtors' property or the property of the
Debtors' client or clients, regardless of whether such

Contractors have already perfected their interests. However, with respect to each such Contractor Claim (i) the Debtors shall not pay a Contractor Claim unless the Contractor has perfected or, in the Debtors' judgment, is presently capable of perfecting or may be capable of perfecting in the future one or more Liens or Interests in respect of such claim and (ii) the payment of such claim shall be made with a full reservation of rights regarding the extent, validity, perfection or possible avoidance of any Liens or Interests.

      67.  I believe that it is imperative that Stone & Webster honor prepetition obligations to Contractors. As of the Petition Date, a substantial number of Contractors had not been paid for prepetition goods and services.  In light of these nonpayments, certain Contractors have refused to perform ongoing services for the Debtors absent payment.  If a substantial number of the Contractors were to do so, the Debtors might be unable to complete their obligations under contract.  Thus, the Contractors' failure to provide ongoing services would adversely impact the operation of the business and the enterprise value of the Company.

      68.  Paying the Contractor Claims is crucial to the Debtors' business.  In order to successfully achieve

their restructuring objectives, the Debtors must maintain
timely and satisfactorily complete performance at certain
job sites.  The provision of Contractor services is vital
toward this end.

69.  Because certain of the Contractors may not
be party to enforceable agreements and may be unwilling
to do business with the Debtors' postpetition, the Debt-
ors request that the Court authorize the payment of the
Contractors pre- and postpetition claims in the ordinary
course of business to ensure that these essential ser-
vices continue uninterrupted.

70.  The Debtors' failure to pay the Contrac-
tors for prepetition goods and services may result in
many of the Contractors having a right to assert Liens or
Interests against business properties.  Therefore, many
of the Contractors may perfect and assert Liens or Inter-
ests against the Debtors' property, or that of the Debt-
ors' clients, if such Contractors' prepetition claims are
not paid

K.    Motion For Order Pursuant To 11 U.S.C. § 105
      Authorizing Payment Of Prepetition Claims Of
      Critical Trade Creditors

71.  In the ordinary course of business, Stone
& Webster relies on hundreds of different vendors to
supply the various goods, supplies, and equipment uti-

34

lized in the course of the Debtors' businesses.  In addition, the Debtors rely upon numerous service providers and others to support the operating activities of the Debtors.  The Debtors believe that payment of the Prepetition Claims of these and other Critical Trade Creditors is justified on numerous grounds.

Necessity for Payment

72.  Stone & Webster does business with the vast majority of their Critical Trade Creditors without benefit of contracts and, therefore, the Critical Trade Creditors generally are not obliged to do business with the Debtors or to honor particular trade terms for future orders.  As such, failure to pay the Prepetition Claims would likely result in a disruption or cancellation of deliveries of goods and services and, thus, undermine the Debtors ongoing projects.  Even if the Debtors were able to locate suitable replacement suppliers or service provider, or renegotiate with existing Critical Trade Creditors, the disruption in the flow of goods and services to or at the Debtors' job sites and projects would seriously prejudice the Debtors' efforts to consummate the proposed sale transaction with Jacobs.

73.  Even if the Debtors were able to convince Critical Trade Creditors to continue to supply goods and

services to the Debtors absent payment of the Prepetition
Claims, the Critical Trade Creditors will likely agree to
do so only on trade terms much less favorable than cus-
tomary.

74.  The Debtors believe that payment of the
Prepetition Claims is necessary to preserve the value of
their business, the underlying projects and their ongoing
business pending consummation of the proposed sale trans-
action with Jacobs, and to ease the administrative burden
on the Debtors' estates.

Continuation of Prepetition Credit Terms

75.  In return for payment of the Critical
Trade Creditors' claims in the ordinary course of busi-
ness during this case, Stone & Webster will require that
the Trade Creditors provide the Debtors' estates with the
concomitant economic benefit of agreeing to provide goods
and services on normal or customary trade terms or such
other terms that the Debtors deem beneficial to their
estates, (the "Trade Credit") until the Debtors consum-
mate the proposed sale transaction with Jacobs or a
reorganization plan, whichever is earlier.

L.    Motion For Interim And Final Order, Under 11 U.S.C.
      § 105(a) And 362, Prohibiting Certain Project Owners
      From Withholding And Offsetting Payments Due To
      Debtors Or Paying Subcontractors Directly On Account
      Of Prepetition Claims

      76.   Stone & Webster provides site supervision,
general contracting and engineering services under con-
tracts entered into with project owners (the "Project
Owners") pursuant to which the Debtors are typically
required to directly pay subcontractors (the "Subcontrac-
tors") for services rendered.  Under some of the con-
tracts between the Project Owners and Stone & Webster, in
the event the Debtors are late in paying the Subcontrac-
tors, the Project Owners may withhold monthly payments
owed to the Debtors and pay the Subcontractors directly.
Prior to the Petition Date, several Project Owners with-
held amounts owed the Debtors and paid the Subcontractors
directly.  Such actions may, in certain circumstances,
have an immediate and adverse impact on the Debtors' cash
flow.

      77.   Stone & Webster has thus sought authoriza-
tion to implement a Program pursuant to which the Debtors
may pay prepetition claims of the Subcontractors because
their services are integral to the success of the Debt-
ors' reorganization efforts. Simply stated, regarding
payment of subcontractors and with respect to both pre-

and postpetition amounts, there is no reason for the
Project Owners to withhold payments to the Debtors and
pay the Subcontractors directly.

78.  It is essential, therefore, that the
Debtors regain uninterrupted payment from the Project
Owners.  If the Project Owners continue to withhold
monies due under their contracts with the Debtors, the
Debtors will continue to experience severely restricted
cash flow and may be unable to consummate a sale transac-
tion or otherwise reorganize.

M.    Interim Stipulation Regarding Use Of Cash Collateral
      And Adequate Protection

79.  Stone & Webster is directly indebted to
certain lenders (the "Banks") under the Credit Agreement
dated as of July 30, 1999 (as amended, the "Credit Agree-
ment") among Stone & Webster, Bank of America, N.A., as
Agent and Letter of Credit Issuing Bank, HSBC Bank USA,
as Co-Agent, and the Other Financial Institutions Party
Thereto.  The other Debtors are indebted to the Banks
under the Guaranty dated as of July 30, 1999 (the "Guar-
anty") executed or subsequently joined by certain of
Stone & Webster's direct and indirect subsidiaries (the
"Guarantors") and delivered to Bank of America, N.A., as
Agent under the Credit Agreement.  Stone & Webster and

certain of the other Debtors are obligated to the other
Secured Creditors (the "Other Banks") in connection with
certain advised unconfirmed liens of credit (the "Uncom-
mitted Lines") pursuant to which the Other Banks have
extended various letters of credit for the benefit of the
Debtors.  Stone & Webster is also obligated to the Se-
cured Parties under the Bank Intercreditor Agreement and
under the Collateral Documents executed in connection
with the Bank Intercreditor Agreement.

80.  As of the Petition Date, the Debtors were
indebted to the Secured Parties on account of the Secured
Obligations in an aggregate principal amount, including
aggregate exposure on undrawn letters of credit (the
"Prepetition Letters of Credit"), of approximately
$107 million, plus unpaid fees, expenses and accrued
interest as of the Petition Date.  Pursuant to the Col-
lateral Documents, the Collateral Agent holds security
interests in all or substantially all real and personal
property of each of the Debtors.

81.  Accordingly, Stone & Webster requested the
Secured Parties to consent to their use of cash collat-
eral generated in the ordinary course of the Debtors'
businesses and the Secured Parties have agreed to such
use on the terms as set forth in the Interim Stipulation.

In that regard, Stone & Webster has agreed to pay all
postpetition interest, fees and costs, including attor-
neys' fees.

N.    Motion For Interim And Final Order (I) Authorizing
      Debtors To Incur Postpetition Secured Indebtedness,
      (II) Granting Security Interests And Priority
      Pursuant to 11 U.S.C. Section 364, (III) Modifying
      Automatic Stay And (IV) Setting Further Hearing,
      If Necessary

        82.   Stone & Webster is a party to a
prepetition $50 million Revolving Credit Agreement dated
May 9, 2000 (the "Jacobs Credit Facility") between Stone
& Webster, as borrower, and Jacobs.  The Jacobs Credit
Facility is an integral part of the Debtors' sale of
substantially all of their assets to Jacobs.  The Jacobs
Credit Facility provided Stone & Webster with the neces-
sary liquidity to meet payroll obligations and working
capital until such time as the parties agreed upon the
definitive Asset Acquisition Agreement.  As of the Peti-
tion Date, approximately $22 million in aggregate
borrowings was outstanding under the Jacobs Credit Facil-
ity.

        83.   Under the Jacobs Credit Facility's sup-
porting documents (the "Loan Documents"), the Debtors
granted Jacobs a security interest (the "Prepetition
Liens") in substantially all of their tangible and intan-

gible assets (the "Prepetition Collateral"), and through
the Intercreditor Agreement between Jacobs and Bank of
America, N.A., as collateral agent for certain other
lenders under the Collateral Agency and Intercreditor
Agreement dated as of July 30, 1999 (the "Prepetition
Intercreditor Agreement"), Jacobs obtained a first prior-
ity lien in certain equipment, accounts receivable and
other property (the "Jacobs First Priority Collateral").

The Debtors' Decision To<br>
<u>Use Jacobs For The Postpetition Financing</u>

84.    Stone & Webster has determined that the
DIP Facility and the use of the cash collateral are
necessary for the Debtors to operate their businesses in
chapter 11 and for the Debtors to complete a restructur-
ing.  An integral part of that restructuring is the
consummation of the sale to Jacobs or an alternative
bidder (the "Asset Sale").  Without approval of the DIP
Facility, the Debtors will not, absent alternative fi-
nancing, have sufficient cash to fund operations until
they close the Asset Sale.  I believe no such financing
exists.

85.    Prior to entering into the Jacobs Credit
Facility, Stone & Webster sought financing from numerous
potential sources.  These sources included the

41

Prepetition Bank Group as well as traditional asset-based lenders and others.  None agreed to lend to the Debtors on terms that the Debtors thought acceptable and all required priming liens on the existing collateral of the Prepetition Bank Group.  Furthermore, all proposals included the immediate payment of commitment and other fees.  Accordingly, Stone & Webster determined that the Jacobs Credit Facility was the best source of financing because it carried no fees, provided immediate adequate capital and requested a lien position to which the Prepetition Bank Group would consent.  We determined to enter into the Jacobs Credit Facility with the intention of converting that facility into a debtor-in-possession financing facility upon commencement of these cases.

O.    Motion For Order Authorizing Payment Of Prepetition
      Insurance Premium Financing Obligations Pursuant To
      11 U.S.C. §§ 361, 362, 363 And 364

86.  As part of their integrated cash management system, Stone & Webster finances through insurance premium finance companies the payment of premiums on certain insurance policies.  Typically, Stone & Webster pays an initial down payment and monthly installments thereafter to an insurance premium finance company, in exchange for such company's agreement to pay the full

annual insurance premium, in advance, to the Debtors'
insurers.  The Debtors' obligation to pay the finance
company is secured by the unearned or return premium
reserve for such policies (the "Premium Reserve").  The
financed policies include professional liability and
excess liability insurance.  The Debtors have financed
excess liability insurance premiums through AFCO Credit
Corporation ("AFCO") in the aggregate amount of
$763,200.00.  The total monthly premium installment
payment for the policies financed through AFCO is approx-
imately $65,926.00. The Debtors have also financed pri-
mary professional liability insurance premiums through
A.I. Credit Company ("AIC") in the aggregate amount of
$1,050,000.  The total monthly premium installment pay-
ment for the policies financed through AIC is approxi-
mately $89,852.37.

     87.  Stone & Webster believes that maintaining
the subject insurance coverage, and paying the payments
due on account of premium finance agreements, is neces-
sary.  If installments are not paid, over time, the
amount of the unearned premium reserve will decline,
eventually leaving the finance company unsecured.  Thus,
absent authority to make these payments, the finance
company may seek modification of the automatic stay to

cancel the policies.  Such automatic stay litigation
would be expensive and potentially disastrous because the
Debtors are obligated to maintain insurance coverage.
Moreover, the amount at issue is <u>de</u> <u>minimis</u> compared to
the overall size of the Debtors' estates.  Finally, even
if the finance company were unsuccessful in obtaining
stay relief, the effect would be to limit the Debtors'
ability to obtain insurance in the future, which would be
equally disastrous.

### III.   STONE & WEBSTER'S OBJECTIVES

88.  Stone & Webster's goal in these cases is
to reorganize through a sale of substantially all of its
assets to Jacobs or an alternative bidder.  Although the
Company has already taken major steps towards achieving
that goal by reaching a definitive agreement with Jacobs,
there is still much work to be done to close any such
transaction.

89.  Importantly, that transaction minimizes
the loss of value to its business and leaves most credi-
tors and employees unaffected by its restructuring ef-
forts.  The only alternative to this would be liquida-
tion, in which creditors are likely to see little recov-
ery.

IV.  <u>CONCLUSION</u>

In sum, based upon my familiarity with the
Company and its operations, I believe that the relief
requested in the First Day Motions is necessary for the
Debtor to successfully achieve their restructuring objec-
tives, maintain customer and trade creditor support and
preserve its going concern value.  Accordingly, I re-
spectfully request on behalf of the Debtors that the
Court grant the relief requested as being in the best
interests of the Debtor, its estates and its creditors.

Dated:  Wilmington, Delaware
        June 5, 2000

                                    _____
                                    Thomas L. Langford
                                    Chief Financial Officer

Sworn to before me this
day of June __5__ , 2000

_____
Notary Public