IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - x
                                :
In re:                          : Chapter 11
                                :
STONE & WEBSTER, INCORPORATED,  : Case No. 00-02142 (PJW)
    et al.,                     :
                                : Jointly Administered
            Debtors.            :
                                :
- - - - - - - - - - - - - - - - x
```

**NOTICE OF FILING OF DISCLOSURE STATEMENT WITH
RESPECT TO AMENDED JOINT PLAN OF REORGANIZATION OF
THE DEBTORS IN POSSESSION, OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND FEDERAL INSURANCE COMPANY FOR
(I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS
SUBSIDIARIES AND AFFILIATES AND (II) STONE & WEBSTER
ENGINEERS & CONSTRUCTORS, INC. AND CERTAIN
OF ITS SUBSIDIARIES AND AFFILIATES, MARKED TO SHOW
CHANGES FROM APRIL 1, 2003**

PLEASE TAKE NOTICE that on April 22, 2003, the above captioned debtors and debtors-in-possession filed the Disclosure Statement With Respect to Amended Joint Plan of Reorganization of the Debtors in Possession, Official Committee of Unsecured Creditors and Federal Insurance Company for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers & Constructors, Inc. and Cer-

tain of Its Subsidiaries and Affiliates, marked to show

changes from April 1, 2003.

Dated:   Wilmington, Delaware
         April 22, 2003

                        SKADDEN, ARPS, SLATE, MEAGHER
                           & FLOM LLP

                        ___/s/ Jamie L. Edmonson___
                        Gregg M. Galardi (I.D. No. 2991)
                        Eric M. Davis (I.D. No. 3621)
                        Jamie L. Edmonson (I.D. No. 4247)
                        One Rodney Square
                        P.O. Box 636
                        Wilmington, Delaware 19899
                        (302) 651-3000

                        Attorneys for Debtors and
                           Debtors-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re:                                  :     Chapter 11
                                        :
STONE & WEBSTER, INCORPORATED, et al.,  :     Case No. 00-2142 (PJW)
              Debtors.                  :
                                        :     Jointly Administered
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DISCLOSURE STATEMENT WITH RESPECT TO AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS IN POSSESSION, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND FEDERAL INSURANCE COMPANY FOR (I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES AND (II) STONE & WEBSTER ENGINEERS & CONSTRUCTORS, INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Gregg M. Galardi (I.D. No. 2991)
Eric M. Davis (I.D. No. 3621)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

- and -

Edward J. Meehan
1440 New York Avenue, N.W.
Washington, D.C.  20005-2111

Attorneys for Debtors and
Debtors-in-Possession

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATES TO THE AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS-IN-POSSESSION, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND FEDERAL INSURANCE COMPANY FOR (I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES AND (II) STONE & WEBSTER ENGINEERS & CONSTRUCTORS, INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES (THE "PLAN") AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO MAKE A JUDGMENT WITH RESPECT TO, AND DETERMINE HOW TO VOTE ON, THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CLAIMHOLDERS AND INTERESTHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND RULE 3106(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

# EXECUTIVE SUMMARY

Stone & Webster, Incorporated ("SWINC"), Stone & Webster Engineers and Constructors, Inc. ("SWE&C") and certain of their respective subsidiaries and affiliates, debtors and debtors-in-possession (together with SWINC and SWE&C, the "Debtors"), each filed petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), on June 2, 2000. On March 14, 2003, the Debtors filed the Plan, supported and co-proposed by the Official Committee of Unsecured Creditors (the "Creditors' Committee") and Federal Insurance Company, an Indiana corporation ("Federal"), which Plan sets forth how Claims against and Interests in the Debtors will be treated. This Disclosure Statement describes the Debtors' history, significant events occurring in the Debtors' Chapter 11 Cases, a summary and analysis of the Plan, and certain related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the Plan and is qualified in its entirety by the terms and provisions of the Plan. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.** Capitalized terms used in this Executive Summary and not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement and the Plan.

A.    Background

Since the Debtors' sale of substantially all of their assets to Shaw in July 2000 (the "Shaw Sale"), the Official Committee of Equity Interests of SWINC (the "Equity Committee"), the Creditors' Committee, the Debtors and certain creditors such as Federal have been embroiled in various disputes regarding the ultimate distribution of assets and the structure of acceptable plan(s) of reorganization. As a result of those differences, the Debtors, the Equity Committee and the Creditors' Committee each initially filed plans of reorganization. Although there were numerous differences among those plans, the most significant difference was that the Equity Committee proposed a plan of reorganization that contemplated separate plans for each and every individual Debtor, the Creditors' Committee proposed a plan of reorganization that contemplated the substantive consolidation of each Debtor's assets and liabilities into a single consolidated plan for all Debtors, and the Debtors proposed a plan calling for the separate substantive consolidation of SWINC and certain of its subsidiaries and affiliates into a consolidated SWINC estate and SWE&C and certain of its subsidiaries and affiliates into a consolidated SWE&C estate.

After the filing of the three plans and preliminary hearings on their corresponding disclosure statements, the Debtors entered into negotiations with, among others, the Creditors' Committee, the Equity Committee and Federal. As a result of those negotiations, the Debtors, the Creditors' Committee and Federal have settled various disputes and agreed to become joint sponsors and co-proponents of this Plan, which contemplates settlements and compromises regarding substantive consolidation, the treatment of various intercompany claims, and the treatment of Federal's claims in the Chapter 11 Cases.

B.    Summary of the Plan

    1.    Substantive Consolidation of SWINC and SWINC Subsidiaries

    As set forth more fully in the Plan and this Disclosure Statement, the Plan proposes as a compromise and settlement of various disputes and issues raised by, among others, the Debtors, the Equity Committee, the Creditors' Committee, and certain other creditors, including Federal, the substantive consolidation of (i) SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate and (ii) SWE&C and the SWE&C Subsidiaries into the Consolidated SWE&C Estate. Distributions on account of Claims against and Interests in SWINC and the SWINC Subsidiaries will therefore depend only on the consolidated assets and liabilities of the Consolidated SWINC Estate. Moreover, except as otherwise provided herein and in the Plan, distributions on account of Claims against SWE&C and the SWE&C Subsidiaries will depend only on the consolidated assets and liabilities of the Consolidated SWE&C Estate. A list of the Debtor entities comprising each of the Consolidated SWINC Estate and the Consolidated SWE&C Estate is attached hereto as Appendix A.

    The Plan further contemplates that on the Effective Date or as soon thereafter as practicable, (a) each of the SWINC Subsidiaries shall be merged or deemed merged with and into SWINC and (b) the Chapter 11 Cases of the SWINC Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWINC Subsidiaries shall be brought or otherwise commenced in SWINC's Chapter 11 Case. SWINC shall continue to exist and emerge from bankruptcy as Reorganized SWINC after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Plan. Reorganized SWINC will be authorized to engage in any lawful act for which corporations may be organized under the Delaware General Corporation Law ("DGCL"). After emerging from bankruptcy, Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may engage to terminate the Pension Plan or transfer its sponsorship in accordance with applicable law. Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when, and if they arise, Reorganized SWINC has no present intention to engage in business operations and is likely to dissolve under DGCL § 275-282 within the first two (2) years following the Effective Date. Upon such dissolution, it is anticipated that SWINC will receive a substantial Reversion as a result of the Pension Plan being overfunded, which Reversion will benefit Creditors and Interestholders in the manner and as described in the Plan.

    2.    Substantive Consolidation of SWE&C and SWE&C Subsidiaries

    The Plan also contemplates that on the Effective Date or as soon thereafter as practicable, (a) each of the SWE&C Subsidiaries shall be merged or deemed merged with and into SWE&C and (b) the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWE&C Subsidiaries shall be brought or otherwise commenced in SWE&C's Chapter 11 Case.

    The Plan further contemplates that SWE&C and the SWE&C Subsidiaries will liquidate and not conduct any business operations following confirmation and consummation of the Plan. In connection with the liquidation of SWE&C and the SWE&C Subsidiaries, the SWE&C Liquidating

Trust will be formed pursuant to Delaware law and in the discretion of the Creditors' Committee for the benefit of holders of Claims against the Consolidated SWE&C Estate. Upon confirmation and consummation of the Plan, Claims against the Consolidated SWE&C Estate will receive beneficial interests in the SWE&C Liquidating Trust, entitling the holders thereof to receive distributions pursuant to the terms of the Plan as, when and if available, from funds or other assets held by the SWE&C Liquidating Trust. The SWE&C Liquidating Trust will distribute any amounts available for distribution to the holders of Claims against the Consolidated SWE&C Estate in accordance with the Plan. Beneficial interests in the SWE&C Liquidating Trust will not be certificated and will be non-transferable, except by operation of law. The SWE&C Liquidating Trust will terminate on the earlier of (i) the tenth (10) anniversary of the Confirmation Date or (ii) the distribution of all property in accordance with the terms of the SWE&C Liquidating Trust Agreement. SWE&C and the SWE&C Subsidiaries shall be dissolved. If the SWE&C Liquidating Trust Advisory Board deems it necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law.

3.    Pension Plan Reversion

As part of the settlement with respect to Substantive Consolidation, the Proponents also propose to settle certain disputes regarding the potential reversionary interest associated with the overfunded Pension Plan. Specifically, the Plan Proponents believe that the Pension Plan is presently overfunded and that upon termination of the Pension Plan in a state law dissolution of Reorganized SWINC, funds in excess of $30 million will revert to the Debtors' estates after all liabilities of the Pension Plan to Pension Plan participants have been satisfied. These excess assets are defined as the "Reversion" in the Plan. The income tax consequences of the Plan are, however, subject to substantial uncertainty, and no assurances can be made that income tax liability with respect to the Reversion would not materially reduce the recovery to holders of Claims and Interests. The Reversion, net of any tax liability, will therefore become available for distribution to certain holders of Claims and Interests. As part of the litigation over Substantive Consolidation, the Equity Committee contended only holders of Claims and Interests of SWINC are entitled to the Reversion because SWINC is the present sponsor of the Pension Plan. In opposition, the Creditors' Committee contended that the Reversion should be available to holders of Claims and Interests of all Debtors because, among other things, the contributions to the Pension Plan were made by all Debtor entities on behalf of certain of their employees. To avoid further litigation, the Proponents proposed a distribution of the Reversion under the Plan as follows:

> •    In the event Class 9A SWINC Equity Interests votes to accept the Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds of the Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, an equal distribution between the Consolidated SWE&C Estate and the Consolidated SWINC Estate of any Reversion in excess of $30 million.

> •    In the event Class 9A votes to reject the Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds of the

Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, a distribution of seventy-five percent (75%) of any Reversion in excess of $30 million to the Consolidated SWE&C Estate and twenty-five percent (25%) of any Reversion in excess of $30 million to the Consolidated SWINC Estate.

The Proponents believe that this settlement is fair and equitable because, among other things, (i) prior to SWINC becoming the sole legal sponsor of the Pension Plan, each ~~then~~ individual Debtor was a contributing sponsor within the meaning of section 4001(a)(13) of ERISA and (ii) even after SWINC became the legal sponsor, the overfunded Pension Plan was carried on the books and records of SWEC and (iii) Mercer Human Resource Consulting reported on a nonconsolidated basis by operating unit of the Debtors with respect to Pension Plan expenses and assets in addition to reporting on a consolidated basis at the SWINC level in accordance with generally accepted accounting principles.

The Equity Committee contends, however, that there cannot be any serious dispute that SWINC is the sole owner of any surplus in the Pension Plan because (i) since January 1991, the Pension Plan documents have stated that upon termination of the Plan any reversionary interest would be property of SWINC; (ii) under applicable state and federal law the Pension Plan is required to be managed and terminated in accordance with the terms fo the Pension Plan documents; and (iii) the Plan Proponents of the Joint Plan have not cited any legal authority – statutory or case law – to the contrary.

The Equity Committee further contends that the allegation that the Pension Plan overfunding was "carried on the books and records of SWEC" is inaccurate and misleading because (i) the Debtors have produced audited financial statements for SWEC for the calendar years 1995, 1996 and 1997 that show a "prepaid pension cost" asset that is unrelated to any pension plan trust assets or any potential surplus upon termination of the Pension Plan; (ii) those same financial statements and the publicly filed consolidated financial statements of the Debtors contain information sufficient to disclose adequately that all the Debtors were participants in a pension plan with SWINC; and (iii) no specific creditors claim to have reasonably relied or to have been reasonably misled by such public information.

<u>The Plan Proponents disagree with the factual, legal and equitable assertions made by the Equity Committee. Additionally, the Equity Committee has affirmatively rejected the compromise regarding substantive consolidation encompassed in the Joint Plan.</u>

4.    Federal Settlement

As part of the Plan, the Proponents also propose a settlement of various claims filed by Federal. Specifically, Federal initially filed numerous proofs of claim in the Bankruptcy Cases in the amount of $371,505,215.90, of which $55,208,965.23 was ultimately liquidated. The balance of $316,296,205.69 represents unliquidated claims asserted by Federal against, among others, SWINC and SWEC. In addition to asserting claims against each of the primary obligors, Federal also asserted a Claim directly against SWINC pursuant to certain General Indemnity Agreements executed between Federal and SWINC. A significant portion of the Federal Liquidated Claim, in the amount

of $44 million, arises in connection with Federal's payment under certain Payment and Performance Bonds between SWE&C and Federal related to Maine Yankee.

Originally, Federal supported the Equity Committee Plan and opposed the Substantive Consolidation proposed by the Creditors' Committee. Subsequent to the Initial Disclosure Statement Hearing, the Debtors reached an agreement with Federal regarding Substantive Consolidation and the Federal Claims, a settlement that also provides an opportunity for Class 9A SWINC Equity Interests to receive an immediate Cash payment of $0.50 per share. The Federal Settlement includes a settlement of the Lumbermens Claim, which claim exceeds $6 million. The Lumbermens Claim means proof of claim no. 5179 filed by Lumbermens relating to losses suffered by Lumbermens solely in connection with surety bonds, which claim amended and superseded proofs of claim nos. 3300 and 4491. The Federal Settlement resolves only the Lumbermens Claim and does not include any other proof of claim filed by Lumbermens. The Federal Settlement is contingent upon confirmation of the Plan, and will be binding on all interested parties upon approval of the Plan, and absent the Federal Settlement, certain individual Debtors, including SWINC and SWEC could be liable to Federal in an amount that exceeds $80 million.

The principal terms of the Federal Settlement are as follows:

- Federal will hold an Allowed Federal Claim in the amount of $52,113,000 against both the Consolidated SWINC Estate and the Consolidated SWE&C Estate and will be permitted to vote such Allowed Federal Claims as both an Allowed Class 5A Claim and an Allowed Class 5B Claim.

- In addition, Chubb Canada will receive a distribution of the Canadian Cash, which Cash shall be held in trust by Chubb Canada for its use in defending, settling or otherwise resolving the Isobord Litigation. Any Canadian Cash remaining at the conclusion of the Isobord Litigation shall be paid over to the SWE&C Liquidating Trustee to be distributed in accordance with the Plan.

- Upon the allowance of the Federal Claims, Federal will also release any and all Claims for subrogation or other Claims it has or might have against the Consolidated SWINC Estate or the Consolidated SWE&C Estate, including but not limited to, Claims for indemnification, contribution, reimbursement or subrogation arising out of the Isobord Litigation in Canada. Federal shall have complete control of the Isobord Litigation, with complete authority to settle or otherwise resolve the Isobord Litigation without the consent or participation of any of the Debtors. While Federal will waive any Claim against the Consolidated SWINC and SWE&C Estates in connection with the Isobord Litigation, Federal is not agreeing to indemnify SWINC or any other of the Debtors from liability in connection with the Isobord Facility. Furthermore, Federal is also not waiving any of its rights or defenses as surety, either in law, in equity or under the bonds that it might have against Isobord with respect to the

Isobord Facility or any related contract, but in no event will the Allowed Federal Claim exceed $52,113,000 because of the Isobord Litigation.

- In addition, the SWE&C Liquidating Trustee will issue to Federal the Federal Note in the amount of $1.8 million in full satisfaction, settlement, release and discharge of the Class 5B Allowed Federal Claim against SWE&C, which Federal Note shall be deemed satisfied and cancelled upon payment in full of the Class 5A Allowed Federal Claim by the Consolidated SWINC Estate. In the event that the Class 5A Allowed Federal Claim is not paid in full, the SWE&C Liquidating Trustee shall pay Federal cash in the face amount of the Federal Note or such Lesser amount as is necessary for Federal to receive full payment in the amount of $52,113,000 on the Allowed Federal Claims.

- Finally, if Class 9A SWINC Equity Interests vote to accept the Plan, SWINC shall make the Initial Federal Distribution to Federal on account of the Allowed Federal Claim in Class 5A out of which Federal will distribute, in a manner acceptable to Federal, an amount equal to $0.50 per share of Old Securities voting to accept the Plan, which amount cannot exceed $7,113,000, to the Equity Settlement Fund. On the Effective Date or as soon thereafter as practicable, the Cash in the Equity Settlement Fund shall be distributed to holders of Allowed Class 9A SWINC Equity Interests that voted to accept the Plan. Federal will have no right to recoup from either the Consolidated SWINC Estate or the Consolidated SWE&C Estate any portion of the payment made to the Equity Settlement Fund, and the Initial Federal Distribution shall count towards the payment of the Allowed Federal Claim in Class 5A for purposes of determining the SWE&C Liquidating Trustee's liability on the Federal Note.

- In the event Class 9A does not vote to accept the Plan, Federal will retain all rights against the Consolidated SWINC Estate on the Allowed Federal Claim in Class 5A in the amount of $52,113,000 for distribution purposes.

5.    Distributions to Holders of Claims and Interests

Under the Plan, Reorganized SWINC will issue three classes of securities, all as described in more detail below. First, Reorganized SWINC will issue 100 shares of Reorganized SWINC New Common Stock to the SWE&C Liquidating Trustee to be held for the benefit of holders of Claims against the Consolidated SWE&C Estate. As described in more detail below, these shares of Reorganized SWINC New Common Stock will provide the SWE&C Liquidating Trustee with sufficient voting power to approve the dissolution of Reorganized SWINC, which requires a majority vote of stockholders under applicable Delaware law. The SWE&C Liquidating Trustee will not be entitled to transfer or otherwise distribute the Reorganized SWINC New Common Stock, including to the beneficiaries of the SWE&C Liquidating Trust. Second, Reorganized SWINC will issue one share of Reorganized SWINC New Series A Preferred Stock to the SWINC Plan Administrator to be held for the benefit of holders of Claims and Interests against the Consolidated SWINC Estate. The Reorganized SWINC New Series A Preferred Stock will have, upon termination of the Pension Plan

and the liquidation, dissolution and winding up of Reorganized SWINC, a liquidating distribution calculated as follows: (i) from the Reversion either (x) two-thirds of the first $30 million in proceeds ~~produced~~ generated from the Reversion of the Pension Plan plus 50% of any funds ~~produced~~ generated from the Reversion in excess of $30 million or (y) in the event Class 9A SWINC Equity Interests votes to reject the Plan, two-thirds of the first $30 million in proceeds ~~produced~~ generated from the Reversion of the Pension Plan plus twenty-five percent (25%) of any funds ~~produced~~ generated from the Reversion in excess of $30 million; and (ii) 100% of the funds ~~produced~~ generated from the liquidation of any additional assets, other than the Reversion, of Reorganized SWINC (the "Series A Liquidation Preference"). The SWINC Plan Administrator will distribute the Series A Liquidation Preference to the Holders of Allowed SWINC Claims and Interests in accordance with the terms of the Plan and the SWINC Plan Administrator Agreement. Finally, Reorganized SWINC will issue one share of Reorganized SWINC New Series B Preferred Stock to the SWE&C Liquidating Trustee to be held for the benefit of holders of Claims and Interests in the Consolidated SWE&C Estate. Upon termination of the Pension Plan and the liquidation, dissolution and winding up of Reorganized SWINC, and in accordance with the terms of the Plan, holders of Series B Preferred Stock shall be entitled to receive a liquidating distribution calculated from the Reversion as follows: either (i) one-third of the first $30 million in proceeds ~~produced~~ generated from the Reversion plus 50% of any funds ~~produced~~ generated from the Reversion in excess of $30 million or (ii) in the event Class 9A votes to reject the Plan, one-third of the first $30 million in proceeds ~~produced~~ generated from the Reversion plus seventy-five percent (75%) of any funds ~~produced~~ generated from the Reversion in excess of $30 million (the "Series B Liquidation Preference"). The SWE&C Liquidating Trustee will distribute the Series B Liquidation Preference to the Holders of Allowed SWE&C Claims and Interests in accordance with the terms of the Plan and the SWE&C Liquidating Trust Agreement.

Under the Plan, certain Claims are classified as General Administrative Claims. The Plan divides the remaining Claims and Interests into (i) Claims against and Interests in the Consolidated SWINC Estate and (ii) Claims against the Consolidated SWE&C Estate. These Claims and Interests are then further divided into Unclassified Claims against and Classes of Claims Against and Interests in the Consolidated SWINC Estate and the Consolidated SWE&C Estate, respectively.

(a)    Unclassified Claims

*General Administrative Claims.* Claims that are incurred in the ordinary course of business during the Chapter 11 Cases, including, but not limited to, General Professional Fee Claims that are not allocated to either the Consolidated SWINC Estate or the Consolidated SWE&C Estate shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto out of available funds prior to distributions being made to the Consolidated SWINC Estate and the Consolidated SWE&C Estate.

*SWINC Administrative Claims.* Each holder of an Allowed SWINC Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Administrative Claim (a) Cash equal to the unpaid portion of such Allowed SWINC Administrative Claim or (b) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

*SWINC Priority Tax Claims.*  Each holder of an Allowed SWINC Priority Tax Claim shall be entitled to receive on account of such Allowed SWINC Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Priority Tax Claim (i) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed Priority Tax Claim, or (iii) such other treatment as to which SWINC or the SWINC Plan Administrator and such holder shall have agreed upon in writing.

*SWE&C Administrative Claims.*  Each holder of an Allowed SWE&C Administrative Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed SWE&C Administrative Claim (a) Cash equal to the unpaid portion of such Allowed SWE&C Administrative Claim or (b) such other treatment as to which SWE&C or the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

*SWE&C Priority Tax Claims.*  Each holder of an Allowed SWE&C Priority Tax Claim, at the sole option of the SWE&C Liquidating Trustee, shall be entitled to receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Priority Tax Claim (i) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed SWE&C Priority Tax Claim, or (iii) such other treatment as to which SWE&C or the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

(b)    Classified Claims and Interests

The table below summarizes the classification and treatment under the Plan of the principal pre-petition (i) Claims against and Interests in the Consolidated SWINC Estate and (ii) Claims against the Consolidated SWE&C Estate.  The classification and treatment for all Classes are described in more detail in Article IV.F of this Disclosure Statement entitled "Summary of the Plan --Classification and Treatment of Claims and Interests."  This summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Appendix B, and the balance of this Disclosure Statement.

### THE CONSOLIDATED SWINC CLASSES:

**Class Description**                              **Treatment under the Plan**

**Class 1A Secured Claims**

| | | |
|---|---|---|
| **Class 1A.1 SWE&C Setoff Claim** | • | Unimpaired |
| Estimated Allowed Amount: Approx. $190 million | • | On the Effective Date, the Allowed Class 1A.1 SWE&C Setoff Claim held by the Consolidated SWE&C Estate shall be deemed offset against the Class 7B Intercompany Claim held by the Consolidated SWINC Estate resulting in a net Allowed Class 7B Intercompany Claim by the Consolidated SWINC Estate against the Consolidated SWE&C Estate in the approximate amount of $20 million.  As a result, the Allowed Class 1A.1 SWE&C Setoff Claim shall be deemed satisfied in full. |
| **Class 1A.2 SWINC Miscellaneous Secured Claims** | • | Unimpaired |
| Estimated Allowed Amount: Approx. $0 to $3 million | • | Each holder of Allowed Class 1A.2 SWINC Miscellaneous Secured Claims shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 1A.2 SWINC Miscellaneous Secured Claim either (a) Cash equal to the unpaid portion of such Allowed Class 1A.2 SWINC Miscellaneous Secured Claim or (b) such other treatment as the SWINC Plan Administrator and such holder shall have agreed upon in writing. |
| | • | Estimated Recovery: 100% |
| **Class 2A SWINC Other Priority Claims** | • | Unimpaired |
| Estimated Allowed Amount: Approx. $0 to $500,000 | • | Each holder of an Allowed Class 2A SWINC Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2A SWINC Other Priority Claim either (a) Cash equal to the unpaid portion of such Allowed Class 2A SWINC Other Priority Claim or (b) such other treatment as to which the SWINC Plan |

Administrator and such holder shall
have agreed upon in writing.

ₓ

- Estimated Recovery: 100%

**Class 3A SWINC Asbestos Claims**

- Impaired

Estimated Allowed Amount:
Approx. $0 to $125 million

- Each holder of an Allowed Class 3A
SWINC Asbestos Claim shall receive in
full satisfaction, settlement, release and
discharge of and in exchange for such
Allowed Class 3A SWINC Asbestos
Claim (a) its Pro Rata share of the
~~Available~~ Asbestos Trust ~~Cash plus any~~
Assets (set forth in Article VII.L. of the
Plan), subject to the terms and ~~all~~
~~Insurance Proceeds with respect to such~~
~~an Allowed Class 3A~~ conditions of the
Asbestos ~~Claim~~ Trust Agreement or (b)
such other treatment as to which the
Asbestos Trustee and the holder of an
Allowed Class 3A SWINC Asbestos
Claim shall have agreed upon in
writing.

- Estimated Recovery:  50% - 100%

**Class 4A SWINC Convenience
Claims**

- Impaired

Estimated Allowed Amount:
Approx. $0 to $100,000

- Each holder of an Allowed Class 5A
SWINC General Unsecured Claim that
elects to be treated as a Class 4A
SWINC Convenience Claim shall
receive in full satisfaction, release and
discharge of and in exchange for such
Allowed Class 5A SWINC General
Unsecured Claim the lesser of $1000 or
50% of its Allowed Class 5A SWINC
General Unsecured Claim.

Only holders of Class 5A SWINC
General Unsecured Claims who vote in
favor of the Plan may elect to have their

xiii

as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A SWINC Convenience Class Claims, Allowed Class 5A General Unsecured Claims and Allowed Class 7A Subordinated Claims have been satisfied.  On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 9A SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A SWINC Securities Claims) of the ~~and~~ remaining Available Cash paid to the SWINC Plan Administrator as the liquidation preference with respect to the SWINC New Series A Preferred Stock.

Under the Plan, on the Effective Date, all Old Common Stock and Old Common Stock Options in SWINC will be canceled.

- Estimated Recovery: $0 to $.75 per share.

**Class 10A SWINC Subsidiary Interests**

Estimated Allowed Amount: SWINC's investments in SWINC Subsidiaries are approx. $210 million

- Impaired

- On the Effective Date or such other date set by an order of the Court, all Interests in the SWINC Subsidiaries shall be deemed cancelled and the holders of Allowed Class 10A SWINC Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

- Estimated Recovery: 0%

xviii

**CONSOLIDATED SWE&C ESTATE CLASSES:**

| Class Description | Treatment under the Plan |
|---|---|
| **Class 1B SWE&C Miscellaneous Secured Claims** | • Unimpaired |
| Estimated Allowed Amount: Approx. $0 to $3 million | • Each holder of an Allowed Class 1B SWE&C Miscellaneous Secured Claim shall receive either (a) Cash equal to the unpaid portion of such Allowed SWE&C Miscellaneous Secured Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and the holder of such Allowed Class 1B SWE&C Miscellaneous Secured Claim agrees to in writing. |
| | • Estimated Recovery: 100% |
| **Class 2B SWE&C Other Priority Claims** | • Unimpaired |
| Estimated Allowed Amount: Approx. $0 to $500,000 | • Each holder of an Allowed Class 2B SWE&C Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2B SWE&C Other Priority Claim either (a) Cash equal to the unpaid portion of such Allowed Class 2B SWE&C Other Priority Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and the holder of such Allowed SWE&C Other Priority Claim shall have agreed upon in writing. |
| | • Estimated Recovery: 100% |
| **Class 3B - SWE&C Asbestos Claims** | • Impaired |
| Estimated Allowed Amount: Approx. $0 to $125 million | • Each holder of an Allowed Class 3B SWE&C Asbestos Claim shall receive |

xix

in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Class 3B SWE&C Asbestos Claim (a) its Pro Rata share of the ~~Available~~ Asbestos Trust ~~Cash plus any~~ Assets (as set forth in Article VII.L. of the Plan), subject to the terms and ~~all Insurance Proceeds with respect to such Allowed Class 3B SWE&C~~ conditions of the Asbestos ~~Claim~~ Trust Agreement, or (b) such other treatment as to which the Asbestos Trustee and ~~the~~ such holder ~~of an Allowed Class 3B SWE&C Asbestos Claim~~ shall have agreed upon in writing.~~.~~

- Estimated Recovery:  20% - 100%

**Class 4B SWE&C Convenience Claims**

Estimated Allowed Amount: Approx. $0 to $50,000

- Impaired

- Each holder of an Allowed Class 5B SWE&C General Unsecured Claim that elects to be treated as a Class 4B SWE&C Convenience Claim shall receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5B SWE&C General Unsecured Claim the lesser of $1000 or 50% of its Allowed Class 5B SWE&C General Unsecured Claim.

  Only holders of Class 5B SWE&C General Unsecured Claim who vote in favor of the Plan may elect to have their claim treated as a Class 4B SWE&C Convenience Claim.

- Estimated Recovery: 50%

**Class 5B SWE&C General Unsecured Claims**

Estimated Allowed Amount: Approx.

- Impaired

xx

$55 to $300 million

SWE&C General Unsecured Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of, and in exchange for such Allowed Class 5B SWE&C General Unsecured Claim, its Pro Rata share of the Semi-Annual Class 5B Distribution Amount.

- Estimated Recovery: 20% - 50%

**Class 6B SWE&C Intraestate Claims**

- Impaired

Estimated Allowed Amount: Approx. $0 to $100,000

- On the Effective Date or such other date set by an order of the Court, all Allowed Class 6B SWE&C Intraestate Claims shall be deemed waived, released, discharged and cancelled and the holders of Allowed Class 6B SWE&C Intraestate Claims shall not be entitled to and shall not receive or retain any property or interest on account of such Allowed Claims.

- Estimated Recovery: 0%

**Class 7B SWINC Intercompany Claims**

- Impaired

Estimated Allowed Amount: Approx. $210 million

- Holders of Allowed Class 7B SWINC Intercompany Claims shall not receive or retain any distribution on account of such Allowed Class 7B SWINC Intercompany Claim.

- Estimated Recovery: 0%

**Class 8B SWE&C Subordinated Claims**

- Impaired

Estimated Allowed Amount: Approx.

- Each holder of Allowed Class 8B

xxi

| | |
|---|---|
| $0 to $25 million | SWE&C Subordinated Claims shall not receive or retain any distribution on account of such Allowed Class 8B SWE&C Subordinated Claim. |
| | • Estimated Recovery: 0% |
| **Class 9B - SWE&C Subsidiary Interests** | • Impaired |
| Estimated Allowed Amount: Approx. $0 to $230 million | • On the Effective Date or such other date set by an order of the Court, all Interests in the SWE&C Subsidiaries shall be cancelled and the holders of Allowed Class 9B SWE&C Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests. |
| | • Estimated Recovery: 0% |
| **Class 10B - SWE&C Equity Interests** | • Impaired |
| | • On the Effective Date or such other date set by an order of the Court, all Interests in SWE&C shall be cancelled and the holders of Class 10B SWE&C Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests. |
| | • Estimated Recovery: 0% |

C.    Claims Estimates

   1.    *SWINC*

      The estimated recovery to the holders of Claims and Interests relating to SWINC and the SWINC Subsidiaries is based upon the ~~Debtors'~~ Plan Proponents' current estimates of Allowed SWINC Claims and Allowed SWINC Interests.  As of March 1, 2003, the aggregate amount of SWINC Administrative Claims, SWINC Priority Tax Claims, SWINC Other Priority Claims, and the Secured Intercompany Claims against SWINC and the SWINC Subsidiaries, as reflected in the proofs of claim filed by holders of such claims, or in the event no proof of claim was filed, in the Schedules

or, with respect to SWINC Administrative Claims, in the Debtors' books and records, is approximately $3.8million, excluding Claims for which no amounts were specified, unliquidated Claims, amended Claims and duplicative Claims.

As of March 1, 2003, the aggregate amount of SWINC Asbestos Claims, SWINC General Unsecured Claims, SWINC Intraestate Claims, SWINC Subordinated Claims, and SWINC Securities Claims against SWINC and the SWINC Subsidiaries, as reflected in the proofs of claim filed by holders of such claims, or, in the event no proof of claim was filed, in the Schedules, is approximately $550 million, excluding Claims for which no amounts were specified, unliquidated Claims, amended Claims and duplicative Claims.

The aggregate number of Class 9A SWINC Equity Securities issued and outstanding as of the Petition Date is approximately 14.3 million shares.

The Plan Proponents estimate that after the completion of the Claims and Interests reconciliation, and Claims and Interests objection processes currently under way, the amount of Allowed SWINC Administrative Claims, Allowed SWINC Priority Tax Claims, Allowed Other SWINC Priority Claims, and the SWINC Secured Claims (including the SWE&C Setoff Claims) against SWINC and the SWINC Subsidiaries will aggregate between $3.0 million and $4.0 million. The Plan Proponents estimate that the amount of Allowed SWINC Asbestos Claims, Allowed SWINC General Unsecured Claims, Allowed SWINC Intraestate Claims, Allowed SWINC Subordinated Claims, and Allowed SWINC Securities Claims will aggregate between $45 million and $80 million.  To the extent that the actual amount of Allowed SWINC Claims varies from the amount estimated by the Plan Proponents, the recoveries of holders of Allowed Class 3A SWINC Asbestos Claims, Allowed Class 5A SWINC General Unsecured Claims, Allowed Class 7A SWINC Subordinated Claims, Allowed Class 8A Securities Claims and Allowed Class 9A SWINC Equity Interests may be higher or lower than such estimated amounts.

2.    *SWE&C*

As of March 1, 2003, the aggregate amount of SWE&C Administrative Claims, SWE&C Priority Tax Claims, SWE&C Other Priority Claims and SWE&C Miscellaneous Secured Claims against SWE&C and the SWE&C Subsidiaries, as reflected in the proofs of claim filed by holders of such claims, or, in the event no proof of claim was filed, in the Schedules, in the Debtors' books and records or, with respect to SWE&C Administrative Claims, in the Debtors' books and records, is approximately $4.5 $5.1 million, excluding Claims for which no amounts were specified, unliquidated Claims, amended Claims and duplicative Claims.

As of March 1, 2003, the aggregate amount of SWE&C Asbestos Claims, SWE&C General Unsecured Claims, SWE&C Intraestate Claims, SWE&C Intercompany Claims, and SWE&C Subordinated Claims as reflected in the proofs of claim filed by holders of such claims, or, in the event no proof of claim was filed, in the Schedules, is approximately $550 million, excluding Claims for which no amounts were specified, unliquidated Claims, amended Claims and duplicative Claims.

The Plan Proponents estimate that after the completion of the Claims and Interests reconciliation and Claims and Interests objection processes currently under way, the amount of Allowed SWE&C Administrative Claims, Allowed SWE&C Priority Tax Claims, Allowed SWE&C

Other Priority Claims, and Allowed SWE&C Miscellaneous Secured Claims will aggregate between $4 million to $5 million. The Plan Proponents estimate that the amount of Allowed SWE&C Asbestos Claims, Allowed SWE&C General Unsecured Claims, Allowed SWE&C Intercompany Claims, and Allowed SWE&C Subordinated Claims will aggregate between $~~100~~ $50 million and $400 million. To the extent that the actual amount of Allowed SWE&C Claims varies from the amount estimated by the Plan Proponents, the recoveries of holders of Allowed Class 3B SWE&C Asbestos Claims, Allowed Class 5B SWE&C General Unsecured Claims, Allowed Class 7B SWE&C Intercompany Claims and Allowed Class 8B SWE&C Subordinated Claims may be higher or lower than such estimated amounts. Moreover, if Class 5B SWE&C General Unsecured Claims does not vote to accept the Plan, then Class 7B SWE&C Intercompany Claims will not be subordinated. In that event, the estimated recovery for holders of Allowed Claims in Class 5B will be dramatically decreased.

**ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED OR BE EXCEED BY THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE.** The actual recoveries under the Plan by the tax consequences to the Debtors, the Debtors' creditors will be dependent upon a variety of factors including, but not limited to, whether, and in what amount, contingent claims against the Debtors become non-contingent and fixed and whether, and to what extent, Disputed Claims and Disputed Interests are resolved in favor of the Debtors rather than the claimants. Accordingly, no representation can be or is being made with respect to whether each Estimated Percentage Recovery shown in the table above will be realized by the holder of an Allowed Claim or Allowed Interest in any particular Class.

D.      Distributions

Unless otherwise provided in the Plan, distributions with respect to Allowed Claims or Interests shall be made on the later of (i) the Effective Date or (ii) the first Semi-Annual Distribution Date after the date on which a Claim or Interest becomes Allowed and shall be in the amounts and of the type specified in the Plan. In the event that a Claim or Interest becomes an Allowed Claim or Interest after a distribution has been made to an Allowed Claim or Interest in the same class, the holder of such an Allowed Claim will receive it Pro Rata Share of the previous distributions to the holders of Allowed Claims or Interests in the Class in addition to its Pro Rata Share of the Semi-Annual Distribution to that Class of Claims or Interests.

**TABLE OF CONTENTS**

PAGE

EXECUTIVE SUMMARY ......................................................... iv
    A.    Background ............................................................ iv
    B.    Summary of the Plan ................................................. v
          1.    Substantive Consolidation of SWINC and SWINC
               Subsidiaries ........................................... v
          2.    Substantive Consolidation of SWE&C and SWE&C
               Subsidiaries ........................................... v
          3.    Pension Plan Reversion ................................. vi
          4.    Federal Settlement ..................................... vii
          5.    Distributions to Holders of Claims and Interests ........... ix
    C.    Claims Estimates ................................................... xxii
          1.    *SWINC* ............................................... xxii
          2.    *SWE&C* ........................................... ~~xxii~~ xxiii
    D.    Distributions ....................................... ~~xxiii~~ xxiv

I.     INTRODUCTION ........................................................ 1
    A.    Definitions .......................................................... 2
    B.    Notice to Holders of Claims and Interests ........................... 2
    C.    Solicitation Package ............................................... 2
    D.    General Voting Procedures, Ballots, and Voting Deadline ............ 3
    E.    Parties in Interest Entitled to Vote ................................ 3
    F.    Classes Impaired Under the Plan .................................. 3
          1.    SWINC Impaired Classes .............................. 3
          2.    SWE&C Impaired Classes .............................. 4
    G.    Special Voting Procedures for Holders of Equity Securities ......... 5
          1.    Beneficial Owners .................................... 5
          2.    Brokerage Firms, Banks and Other Nominees .............. 6
    H.    Confirmation Hearing and Deadline for Objections to
          Confirmation ................................................ 6

II.    HISTORY OF THE DEBTORS AND COMMENCEMENT OF THE CHAPTER
    11 CASES ........................................................... 8
    A.    Description of the Company's Business Operations .................. 8
          1.    The Engineering, Construction and Consulting Business ...... 8
          2.    The Nordic Business ................................... 8
    B.    Capital Structure of the Debtors ................................. 9
    C.    Corporate Structure of the Company .............................. 9
          1.    Current Corporate Structure ........................... 9
          2.    Board of Directors .................................... 9
          3.    Senior Officers ....................................... 9
          4.    Disclosure of Director and Officer Interests ................ 9
    D.    Summary of Securities Litigation ............................... 10
    E.    Events Leading to Chapter 11 Filings ........................... 11

PAGE

III.   THE CHAPTER 11 CASES .............................................. 12
       A.   First Day Orders ............................................... 12
       B.   Appointment of Creditors' Committee and Equity Committee ........ 13
       C.   Sale of Substantially All of the Debtors' Assets ................... 13
       D.   Chapter 11 Cases Subsequent to the Shaw Sale ................... 14
       E.   Assets from Non-Debtor U.K. Affiliate ........................ 15
       F.   Summary of Claims Process and Bar Date ................... ~~14~~ 15
            1.   Schedules of Statements and Financial Affairs .......... ~~14~~ 15
            2.   Claims Bar Date and Proofs of Claim .................... 15
            3.   The Claims Agent ................................... 15
            4.   Claims Objections and Claims Reconciliation .......... ~~15~~ 16
            5.   Reclassification of Claims ......................... ~~16~~ 17
       G.   Summary of Material Claims Litigation Matters .................. 17
            1.   Maine Yankee ..................................... 17
            2.   Isobord ......................................... ~~17~~ 18
            3.   CanFibre of Riverside ............................ ~~18~~ 19
            4.   CanFibre of Lackawanna ........................... 19
            5.   Ras Tanura ....................................... ~~20~~ 21
       H.   The Equity Committee Plan and the Creditors' Committee Plan ... ~~22~~ 23
            1.   The Equity Committee Plan ........................ ~~22~~ 23
            2.   The Creditors' Committee Plan ..................... ~~23~~ 24

IV.    SUMMARY OF THE PLAN ............................................. ~~23~~ 24
       A.   Overall Structure of the Plan ............................ ~~24~~ 25
       B.   Substantive Consolidation ................................ 25
            1.   General Description .............................. ~~25~~ 26
            2.   Legal Standards for Substantive Consolidation ........ ~~25~~ 26
            3.   The Substantive Consolidation Litigation ............. ~~26~~ 27
            4.   The Bases for Two Substantively Consolidated Estates ... ~~32~~ 33
            5.   The Substantive Consolidation Settlement ............. ~~33~~ 34
       C.   The Federal Settlement ................................... ~~35~~ 36
       D.   Reorganized SWINC and the SWE&C Liquidating Trust ........ ~~37~~ 38
       E.   Classification and Treatment of Claims and Interests ............... 39
            1.   General Administrative Claims ..................... ~~39~~ 40
            2.   Treatment of Claims Against and Interests in the
                 Consolidated SWINC Estate ....................... ~~40~~ 41
            3.   Treatment of Claims Against and Interests in the
                 Consolidated SWE&C Estates ..................... ~~45~~ 46
       F.   Distributions Under the Plan .............................. 50
            1.   Sources of Cash for Plan Distributions ................. 50
            2.   Distributions for Claims or Interests Allowed as of the
                 Effective Date .................................. 51
            3.   Resolution and Treatment of Disputed, Contingent and
                 Unliquidated Claims and Disputed Interests ............ ~~52~~ 53
       G.   Means for Implementation of the Plan ...................... 56
            1.   Merger of Entities ................................ 56

xxvi

PAGE

2.     Continued Corporate Existence; Dissolution of SWE&C
and the SWE&C Subsidiaries ........................ 56
3.     Certificate of Incorporation and By-laws of Reorganized
SWINC ............................................. 56
4.     Directors and Officers of Reorganized SWINC ........... 57
5.     Corporate Action ................................... 57
6.     Cancellation of Securities, Instruments and Agreements
Evidencing Claims and Interests ...................... 57
7.     Issuance of Reorganized SWINC New Common Stock
and Preferred Stock ................................. 57
8.     Effectuating Documents; Further Transactions ............ 61
9.     No Revesting of Assets .............................. 62
10.    Preservation of Rights of Action ...................... 62
11.    Creditors' Committee and Equity Committee ............. 62
12.    Special Provisions Regarding Insured Claims ............ 63

H.   The SWINC Plan Administrator .............................. 64
1.     Appointment ....................................... 64
2.     Rights, Powers and Duties of the SWINC Estate and the
SWINC Plan Administrator .......................... 64
3.     Compensation ...................................... 65
4.     Indemnification .................................... 65
5.     Insurance ......................................... 66

I.   The Asbestos Trust ...................................... 66
J.   The Asbestos Trustee .................................... ~~66~~ 67
1.     Appointment ..................................... ~~66~~ 67
2.     Rights, Powers and Duties of the Asbestos Trustee ......... 67
3.     Compensation of the Asbestos Trustee ................. ~~67~~ 68
4.     Indemnification .................................... 68
5.     Insurance ......................................... 68
6.     Asbestos Insurance Policies .......................... 69

K.   The SWE&C Liquidating Trust ............................ ~~68~~ 69
1.     Appointment of Trustee ............................ ~~68~~ 69
2.     Transfer of SWE&C Liquidating Trust Assets to the
SWE&C Liquidating Trust ......................... ~~68~~ 69
3.     The SWE&C Liquidating Trust ..................... ~~68~~ 69
4.     The SWE&C Liquidating Trust Advisory Board .......... 70

L.   Other Matters .......................................... ~~71~~ 72
1.     Treatment of Executory Contracts and Unexpired Leases . ~~71~~ 72
2.     Bar Dates for Certain Claims ........................ 73
3.     Withholding and Reporting Requirements ............. ~~73~~ 74
4.     Setoffs ........................................... 74
5.     Payment of Statutory Fees .......................... ~~74~~ 75
6.     Amendment or Modification of the Plan .............. ~~74~~ 75
7.     Severability of Plan Provisions ...................... ~~74~~ 75
8.     Successors and Assigns .............................. 75
9.     Plan Supplement ................................... 75

PAGE

        10.     Revocation, Withdrawal or Non-Consummation ........ ~~75~~ 76 |
M.   Retention of Jurisdiction ................................. ~~75~~ 76 |
N.   Conditions To Confirmation and Consummation ............... ~~77~~ 78 |
     1.     Conditions to Confirmation ....................... ~~77~~ 78 |
     2.     Conditions to Effective Date ...................... ~~77~~ 78 |
     3.     Waiver of Conditions ............................... 78
O.   Effect of Plan Confirmation ............................. ~~78~~ 79 |
     1.     Binding Effect .................................. ~~78~~ 79 |
     2.     Releases ....................................... ~~78~~ 79 |
     3.     Discharge of Claims and Termination of Interests .......... 80
     4.     Exculpation and Limitation of Liability .................. 80
     5.     Injunction ..................................... ~~80~~ 81 |
     6.     Treatment of Indemnification Claims ................. ~~81~~ 82 |
     7.     Term of Injunction or Stays .......................... 82

V.     CERTAIN RISK FACTORS TO BE CONSIDERED .......................... ~~82~~ 83 |
    A.   Certain Bankruptcy Considerations ......................... ~~82~~ 83 |
    B.   Claims Estimations ..................................... 83
    C.   Certain Litigation .................................... 83
    D.   Income Taxes ........................................ ~~83~~ 84 |
    E.   Pension Plan ........................................ ~~84~~ 85 |

VI.    APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS .......... ~~85~~ 86 |

VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........... 86
    A.   Tax Consequences to the Debtors ......................... ~~86~~ 87 |
    B.   Tax Consequences to Holders of Claims and Interests ........... ~~87~~ 88 |
    C.   Consequences to Pension Plan ........................... ~~94~~ 95 |
    D.   Importance of Obtaining Professional Tax Assistance ........... ~~95~~ 96 |
    E.   ~~Pension Plan Consequences 95~~ |
F. Importance of Obtaining Professional Tax Assistance ................................. 96 |

VIII.  CONFIRMATION OF THE PLAN ................................... ~~97~~ 96 |
    A.   Acceptance of the Plan ................................. 97
    B.   Feasibility .......................................... 97
    C.   Best Interests Test .................................... 97
    D.   Liquidation Analysis ................................... 98
    E.   Application of the "Best Interests" Test to the Liquidation
       Analysis and the Valuation ............................. 98
    F.   Confirmation Without Acceptance Of All Impaired Classes:  The
       "Cramdown" Alternative ................................. ~~99~~ 98 |

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ................................................... 99
    A.   Continuation of the Bankruptcy Cases .......................... 99
    B.   Alternative Plan(s) ................................... ~~100~~ 99 |

PAGE

C.    Confirmation of the Equity Committee Plan . . . . . . . . . . . . . . . . . . . . . 100
D.    Liquidation under Chapter 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

X.    RECOMMENDATION AND CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

## APPENDICES

APPENDIX A   LIST OF DEBTOR ENTITIES COMPRISING THE CONSOLIDATED SWINC ESTATE AND THE CONSOLIDATED SWE&C ESTATE

APPENDIX B   JOINT PLAN OF REORGANIZATION OF DEBTORS-IN -POSSESSION, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND FEDERAL INSURANCE COMPANY WITH RESPECT TO (I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES AND (II) STONE & WEBSTER ENGINEERS & CONSTRUCTORS, INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES

APPENDIX C   LIQUIDATION ANALYSIS

           Appendix C-1:   Liquidation Analysis for Consolidated SWINC Estate and Consolidated SWE&C Estate

           Appendix C-2:   Liquidation Analysis for Each Debtor

APPENDIX D   SUBSTANTIVE CONSOLIDATION SETTLEMENT CASH FUNDING ANALYSIS

<u>APPENDIX E</u>   <u>INCURRED PROFESSIONAL FEE SUMMARY BY ESTATE</u>

## I.  INTRODUCTION

Stone & Webster, Incorporated ("SWINC"), Stone & Webster Engineers and Constructors, Inc. ("SWE&C"), and their subsidiaries and affiliates that are debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (together with SWINC and SWE&C, the "Debtors" or the "Company") and co-proponents the Official Committee of Unsecured Creditors (the "Creditors' Committee") and Federal Insurance Company, an Indiana corporation ("Federal", and together with the Debtors and the Creditors' Committee, the "Plan Proponents"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Amended Joint Plan of Reorganization of Debtors in Possession, Official Committee of Unsecured Creditors and Federal Insurance Company for (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers & Constructors, Inc. and Certain of its Subsidiaries and Affiliates dated ~~March 14~~ April 22, 2003 (the "Plan"), which Plan was filed with the United States Bankruptcy Court for the District of Delaware (the "Court"), a copy of which is attached as Appendix B hereto.

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition history and significant events that have occurred during the Debtors' Chapter 11 Cases. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE ARTICLE IV -"SUMMARY OF THE PLAN."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE DEBTORS' LIQUIDATION OR PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING TAX OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

A.      Definitions

        Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

B.      Notice to Holders of Claims and Interests

        This Disclosure Statement is being transmitted to certain holders of Claims and Interests for the purpose of soliciting votes on the Plan and to others for informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against or Interest in the Debtors to make a reasonably informed decision with respect to the Plan before exercising their right to vote to accept or to reject the Plan.

        On ~~April~~ May __, 2003, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Claims against and Interests in the Debtors to make an informed judgment about the Plan. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, NOR AN ENDORSEMENT OF THE PLAN BY THE COURT.

        WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS OR IMPAIRED INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

        THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made until distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

C.      Solicitation Package

        Accompanying this Disclosure Statement are copies of (i) the Plan (Appendix B hereto); (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); and (iii) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan. If you did not receive a Ballot in your package and believe that

you should have, please contact the Voting Agent named below at the address or telephone number set forth in the next subsection.

D.      General Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. To accept or reject the Plan, you must complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided so that it is **RECEIVED by the Voting Deadline (as defined below).**

Each Ballot has been coded to reflect the Class of Claims or Interests in which you are voting. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. The Ballot(s) you were provided were based upon the Debtors' review of the proofs of claims filed in this case and the classification of Claims included in the Debtors' Amended Schedules and Statements. See Article III.E.1. If you believe you received the wrong Ballot or did not receive a Ballot for a Class in which you hold a Claim or Interest, please contact the Voting Agent named below at the address or telephone number set forth in the next subsection.

E.      Parties in Interest Entitled to Vote

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

F.      Classes Impaired Under the Plan

1.      SWINC Impaired Classes

Classes 3A, 4A, 5A, 7A, 8A, and 9A are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims or Interests is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. By operation of law, Classes 6A and 10A are deemed to have rejected the Plan and therefore are not entitled to vote to accept or reject the Plan.

3

2.      SWE&C Impaired Classes

Classes 3B, 4B, 5B and 7B are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims or Interests is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. By operation of law, Classes 6B, 8B, 9B and 10B are deemed to have rejected the Plan and therefore are not entitled to vote to accept or reject the Plan.

FOR HOLDERS OF CLASS 3A, 5A, 7A, 8A, 3B, AND 5B CLAIMS, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RETURNED TO THE ADDRESS IN THE PRE-ADDRESSED ENVELOPE PROVIDED, IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ACCOMPANYING THE BALLOT AND RECEIVED NO LATER THAN ~~MAY 14~~ AUGUST 1, 2003 AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY TRUMBULL SERVICES L.L.C. (THE "CREDITOR VOTING AGENT") AT THE ADDRESS LISTED ON THE BALLOT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED.

FOR HOLDERS OF CLASS 9A SWINC EQUITY INTERESTS, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RETURNED TO THE ADDRESS ON THE PRE-ADDRESSED ENVELOPE PROVIDED. YOUR BALLOT (IF PREVALIDATED) OR THE MASTER BALLOT CAST ON YOUR BEHALF MUST BE RECEIVED NO LATER THAN ~~MAY 14~~ AUGUST 1, 2003 AT 4:00 P.M. EASTERN TIME BY INNISFREE M&A (THE "SECURITIES VOTING AGENT") AT THE ADDRESS LISTED ON THE BALLOT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED.

In addition to voting to accept or reject the Plan, holders of Claims in Class 5A SWINC General Unsecured Claims and Class 5B SWE&C General Unsecured Claims have the right to elect to have their Allowed Claim in Class 5A or Class 5B treated as an Allowed Convenience Claim in Class 4A or Class 4B, respectively. There are no separate Class 4A or Class 4B Ballots. To make such an election, the holder of a Class 5A General Unsecured Claim or Class 5B General Secured Claim must check the box on their respective Ballot to show that the holder has elected treatment as a Convenience Claim. Absent checking the box on the Ballot, the holder of a Class 5A or Class 5B Claim shall be deemed to have elected not to be treated as a Convenience Claim.

If you have any questions about the procedure for voting your Claim or Interest or with respect to the packet of materials that you have received, please contact the Creditor Voting Agent at the following address and phone number:

> Stone & Webster Incorporated
> c/o Trumbull Services LLC
> P.O. Box 673
> Windsor, Connecticut  06095-9718
> (860) 687-3917

If you have any questions about the procedure for voting your Class 9A SWINC Equity Interest, please contact the Equity Voting Agent at the following address and phone number:

4

Stone & Webster Incorporated
c/o Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York  10022
(877) 750-2689

If you wish to obtain, at your own expense unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Creditor Voting Agent or the Equity Voting Agent, as appropriate.

G.      Special Voting Procedures for Holders of Equity Securities

The record date for determining which holders of Old Securities in SWINC are entitled to vote on the Plan is ~~March 31~~ May 20, 2003.  The indenture trustees, agents, or servicers, as the case may be, for the Old Securities will not vote on behalf of the holders of such Old Securities. Holders must submit their own Ballots.

1.      Beneficial Owners

(a)      Any beneficial owner holding Old Securities as record holder in its own name should vote on the Plan by completing and signing the enclosed Ballot and returning it directly to the Securities Voting Agent on or before the Voting Deadline using the enclosed  self-addressed, stamped envelope.

(b)      Any beneficial owner holding Old Securities in "street name" through a brokerage firm, bank, trust company, or other nominee should vote on the Plan by one of the following two methods (as selected by the Nominee):

(i)      Complete and sign the enclosed beneficial owner Ballot. Return the Ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process the Ballot and return it to the Securities Voting Agent by the Voting Deadline.  If no self-addressed, stamped envelope was enclosed for this purpose, contact the Voting Agent for instructions; or

(ii)      Complete and sign the Pre-Validated Ballot (as defined below) provided to you by your bank, brokerage firm, trust company or other nominee.  Return the Pre-Validated Ballot to the Securities Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Securities Voting Agent a master ballot (the "Master Ballot") that reflects the vote of such beneficial owner.

If any beneficial owner owns Old Securities through more than one broker, bank, or other nominee, such beneficial owner may receive multiple mailings containing the Ballots.  Each such beneficial owner should execute a separate Ballot for each block of Old Securities that it holds

5

through any particular nominee and return each Ballot to the respective nominee in the return envelope provided therewith.  Beneficial owners who execute multiple Ballots with respect to Old Securities held through more than one nominee must indicate on each Ballot the names of ALL such other nominees and the additional amounts of such Old Securities so held and voted.  If a beneficial owner holds a portion of the Old Securities through a nominee and another portion as a record holder, such owner should follow the procedures described in subparagraph (1)(a) above to vote the portion held of record and the procedures described in subparagraph (1)(b) above to vote the portion held through a nominee or nominees.

       2.        Brokerage Firms, Banks and Other Nominees

An entity (other than a beneficial owner) which is the registered holder of Old Securities should vote on behalf of the beneficial owners of such Old Securities by (i) immediately distributing a copy of the Disclosure Statement and accompanying materials, all appropriate Ballots, and self-addressed return envelopes to all beneficial owners for whom it holds such securities, (ii) collecting completed Ballots from its beneficial owners, and (iii) completing a Master Ballot compiling the votes and other information from the Ballots so collected, and (iv) transmitting such Master Ballot to the Securities Voting Agent on or before the Voting Deadline.  Such entity may also pre-validate a ballot by completing all information to be entered on the Ballot (the "Pre-Validated Ballot") and forwarding the Pre-Validated Ballot to the beneficial owner for voting.  A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of such party.

H.     Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Bankruptcy Code section 1128 and Bankruptcy Rule 3017(c), the Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") to commence on ~~May 20~~ August 27, 2003 at 9:30 a.m., prevailing Eastern Time, before the Honorable Peter J. Walsh, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court, 824 N. Market Street, Wilmington, Delaware 19801. The Court has directed that objections, if any, to confirmation of the Plan must be filed with the clerk of the Bankruptcy Court and served so that they are *RECEIVED* on or before ~~May 9~~ August 15, 2003, at 4:00 p.m. Eastern Time by:

*Counsel to the Debtors:*

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
Attn:  Gregg M. Galardi, Esq.
       Eric M. Davis, Esq.

6

*Counsel to the Creditors' Committee*:

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York  10103-0002
Attn:  Anthony J. Princi, Esq.
        Lorraine S. McGowen, Esq.


- and -

KLETT, ROONEY, LIEBER & SCHORLING
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
Attn:  Adam G. Landis, Esq.

*Counsel to Federal:*

MANIER & HEROD
One Nashville Place
Suite 2200
150 Fourth Avenue North
Nashville, Tennessee  37219-2494
Attn:  J. Michael Franks
        Sam H. Poteet, Jr.
        Thomas T. Pennington


- and -

DUANE MORRIS LLP
1100 North Market Street
Suite 1200
Wilmington, Delaware  19801-1246
Attn:  Michael R. Lastowski

*Counsel to the Equity Committee:*

BELL BOYD & LLOYD LLC
70 West Madison Street
Chicago, Illinois  60602
Attn:  Carmen H. Lonstein, Esq.


- and -

BIFFERATO, BIFFERATO & GENTILOTTI
1308 Delaware Avenue
Wilmington, Delaware  19899
Attn:  Ian Connor Bifferato, Esq.

7

*United States Trustee*:

OFFICE OF THE UNITED STATES TRUSTEE
844 North King Street
Wilmington, Delaware 19801
Attn: Julie Compton, Esq.

The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.  HISTORY OF THE DEBTORS AND COMMENCEMENT OF THE CHAPTER 11 CASES

A.      Description of the Company's Business Operations

As of the Petition Date, the Company was principally engaged in providing professional engineering, construction and consulting services (the "Engineering, Construction and Consulting Business"). Additionally, certain of the Company's subsidiaries owned and operated fourteen cold storage warehousing facilities located primarily in the southeastern United States (the "Nordic Business") and others owned and operated Stone & Webster office buildings in Houston, Texas and Schenectady, New York.

1.      The Engineering, Construction and Consulting Business

The Company provided engineering, design, construction, consulting and full environmental services for power, process, governmental, industrial, transportation and civil works projects. The Company also remained active in the nuclear power business for utility and governmental clients, and continued to undertake a significant amount of modification and maintenance work on existing nuclear power plants as well as decommissioning and decontamination projects.

The Construction and Consulting Business included three divisions and a consulting organization which were responsible for marketing and executing projects on a worldwide basis. Where appropriate, lump-sum contracts were entered into with customers as a means of providing comprehensive services for a fixed price, thereby assuming more risk and making the Company more attractive to the customer.

In fiscal 1999, the Engineering, Construction and Consulting Business had $1.14 billion in revenues, and an operating loss of $142.5 million. Included within the operating loss were contract-related provisions of approximately $150.1 million required to complete a number of lump-sum projects. The contract revenue value included in the Company's backlog, as of December 31, 1999, amounted to $2.6 billion.

2.      The Nordic Business

The Company's Nordic Business provided low-cost, energy-efficient refrigerator and freezer storage facilities, customized material handling services, and blast freezing capacity. It served primarily two groups of customers: prepared food manufacturers that require cold storage and

8

logistics services in their distribution channels, and poultry producers that require blast freezing and storage capacity. In October of 1999, the Company announced their intention to sell the Nordic Business, a large part of which was acquired in the fourth quarter of 1998.

B.    Capital Structure of the Debtors

        As of the Petition Date, there were approximately 17,731,488 shares of common stock of SWINC issued, of which 14,226,005 shares were outstanding with 3,505,483 shares held in treasury. In connection with the Shaw Sale, the Debtors paid off both their post-petition financing facility and the balance of their prepetition credit facility.

C.    Corporate Structure of the Company

        1.    Current Corporate Structure

        The Debtors, as of the Petition Date, operated two distinct lines of business, ~~Engineering & Construction~~ engineering and construction and cold storage with numerous subsidiary companies within each group. Many of the domestic U.S. companies are also debtors being administered within the Chapter 11 Cases. The Debtors also operated various real estate and development companies, which were wholly owned subsidiaries. Presently, the Debtors are winding up all of their business operations.

        2.    Board of Directors

        The current Board of Directors of SWINC consists of:

            Peter M. Wood, Chairman
            Donna Bethell
            Frank J. A. Cilluffo

        The current Board of Directors for SWE&C, the SWE&C Subsidiaries and the SWINC Subsidiaries consists of:

            Peter M. Wood, Chairman
            James P. Carroll

        3.    Senior Officers

            James P. Carroll, President and Chief Restructuring Officer
            Patrick Connolly, Secretary

        4.    Disclosure of Director and Officer Interests

        Each of the SWINC Directors is a shareholder of SWINC. Mr. Wood is the beneficial owner of 6,491 shares of SWINC common stock, of which 1,015 shares are held in a deferred account pursuant to the SWINC's Director Deferral Plan; Ms. Bethell is the beneficial owner of 2,171 shares of SWINC common stock; and Mr. Cilluffo, reporting for himself and Cilluffo Associates, L.P., Zenith Associates, L.P., Frank and Irja Cilluffo Foundation and Edward C. Myers collectively owns 667,871 shares of SWINC common stock. Mr. Cilluffo has disclaimed beneficial

9

ownership of the 560,400 shares held by Cilluffo Associates, L.P. and the 105,800 shares held by Zenith Associates, L.P., except to the extent of his pecuniary interests in the securities. He has also disclaimed beneficial ownership of 10,000 shares held by the Frank and Irja Cilluffo Foundation, and those shares are not included in the above total. Each of the Directors has also filed proofs of claim against the Debtors in the Chapter 11 Cases. Mr. Wood seeks payment of certain director's fees, recovery of the value of the shares held pursuant to the SWINC Director Deferral Plan as described above, reimbursement for certain expenses and indemnification and contribution for certain liabilities in excess of available insurance. Ms. Bethell and Mr. Cilluffo both seek payment of certain director's fees, reimbursement for certain expenses and indemnification and contribution for certain liabilities in excess of available insurance.

Mr. Carroll is the beneficial owner of 10,000 shares of SWINC common stock. Mr. Carroll has filed a proof of claim in the Chapter 11 Cases in which he seeks indemnification and contribution for certain liabilities in excess of available insurance. Mr. Carroll also filed a statement of cure claim against the Debtors in respect of certain contractual obligations, which claim has since been withdrawn.

D.    Summary of Securities Litigation

SWINC is a defendant in In re Stone & Webster, Inc. Securities Litigation (00-CV-10974-RCL), a purported securities class action lawsuit in the United States District Court for the District of Massachusetts (the "Massachusetts Court"). The lawsuit began as four purported securities class action lawsuits filed in or about May 2000: Everson v. Stone & Webster, Inc. et al. (00-CV-11008-RCL); Blank v. Stone & Webster, Inc. et al. (00-CV-10926-RCL); Dubois v. Stone & Webster, Inc. et al. (00-CV-10883-RCL); and Brody v. Stone & Webster, Inc. et al. (00-CV-10874-RCL) (collectively, the "Class Action Lawsuits"). In addition, two securities class action lawsuits which make similar allegations were filed against H. Kerner Smith and Thomas Langford, but not SWINC: Mandelbaum v. Smith et al. (00-CV-11126-RCL) and Hanson v. Smith et al. (00-CV-11183-RCL). On or about July 25, 2000, SWINC notified the Massachusetts Court that, pursuant to Bankruptcy Code section 362, the Class Action Lawsuits are subject to the automatic stay applicable to proceedings against a debtor in bankruptcy and the assets of the debtor in bankruptcy.

On September 25, 2000, the Massachusetts Court granted a motion to consolidate the six lawsuits. On January 4, 2001, a Consolidated and Amended Class Action Complaint (the "Amended Complaint") was filed. The Amended Complaint added PricewaterhouseCoopers, LLP as a defendant, and alleged that SWINC violated federal securities laws pursuant to Sections 10(b) and 18 of the Securities and Exchange Act of 1934 by, among other things, making materially false and misleading statements or omissions regarding SWINC's financial condition prior to SWINC's announcements relating to its decision to revise its 1999 financial statements. The class period for the Amended Complaint is January 22, 1998 through May 8, 2000. Plaintiffs seek an unspecified amount of compensatory damages plus costs and attorney fees. The defendants other than SWINC filed motions to dismiss the Amended Complaint. On March 28, 2003, the Massachusetts Court entered its memorandum and order granting in part and denying in part the defendants' motions to dismiss (the "Memo and Order"). By the Memo and Order, the court granted the motion of PricewaterhouseCoopers, LLP to dismiss all counts. With respect to the motions of H. Kerner Smith and Thomas Langford, the court granted the motions to dismiss with respect to certain counts, but denied the motions to the extent the allegations in the Amended Complaint allegedly relate to ~~allegedly~~ false or misleading statements in connection with the Form 10-Q for the fiscal quarter ending June 30, 1999 and the related earnings release issued on July 26, 1999.

10

Based on current information, the Debtors believe that Plaintiffs' claims are without merit and intend to defend against the Class Action Lawsuits vigorously. Although Plaintiffs have not yet quantified their alleged damages, the Debtors also believe that a recovery, if any, by Plaintiffs would likely fall within the limits of applicable insurance coverage. To the extent the Class Action Lawsuits results in an Allowed Claim in excess of such insurance, such Allowed Claims would be Class 8A SWINC Securities Claims.

E.      Events Leading to Chapter 11 Filings

Prior to the Petition Date, the Company experienced significant operating losses, and in the second quarter of 1999, the Company began experiencing liquidity problems. By the end of the third quarter of 1999, the Company had fully drawn the cash available under its existing credit facility (as amended or modified, the "Prepetition Credit Facility"). As a consequence, the amount of the Company's past due trade payables increased, in turn causing certain of the Company's vendors and subcontractors to delay work on the Company's projects.

In October 1999, the Company was notified that it was in violation of the debt covenants of its Prepetition Credit Facility. In November 1999, the Company therefore sought and obtained a waiver of these covenants and an agreement with their principal bank-lending group (the "Prepetition Bank Group") to expand and extend the Prepetition Credit Facility. Under that agreement, the borrowing facility was increased by $30 million to a maximum of $160 million and the maturity of the Prepetition Credit Facility was extended through May 31, 2000. As part of this agreement, SWINC agreed to market the Nordic Business and to sell its principal headquarters in Boston, the proceeds of which were to be used to pay down the fixed debt. As a result, the Company sold its Boston, Massachusetts headquarters building for $187 million, and used $140 million of the proceeds of such sale to permanently reduce the borrowing facility to $20 million. The Company also raised additional capital through bulk sale of one million shares of SWINC's common stock held in treasury to the Pension Plan for $15.4 million. As of the end of fiscal 1999, the entire $20 million available for direct borrowings under the Prepetition Credit Agreement ~~remained outstanding~~ had been drawn down and nearly $90 million of the $100 million letter of credit facility was used and the borrowing was limited to the amount ~~then outstanding~~ not yet utilized. In addition, the Prepetition Bank Group clearly stated its desire not to extend the facility beyond the May expiration date.

Thus, although the Company had relieved its immediate liquidity concerns, the Company immediately began the search for a longer term credit arrangement. During this period, the sale of Nordic did not progress as planned. As a result, the Company sought and entered into another agreement with the Prepetition Bank Group, under which agreement the maturity date of the Prepetition Credit Facility was further extended to January 31, 2001. In addition to extending the maturity date, that amendment provided, among other things, that the proceeds from a sale of the Nordic Business would be used to repay the outstanding direct borrowings and provide support to the Prepetition Bank Group for the nearly $90 million in outstanding letters of credit.

In mid- to late April 2000, however, the Company discovered a substantial unanticipated cost overrun on a key construction project, and as a result was required to restate its 1999 financial statements to record a provision of $27.5 million to complete work on that project. In conjunction with that restatement, the Company's independent public accountants issued a modified opinion raising questions regarding the Company's ability to continue as a going concern, which in turn slowed customer receipts, further exacerbating the Company's cash flow problems.

11

In late April and early May 2000, the Company embarked on an aggressive strategy under which it sought alternative financing, strategic mergers and possible additional asset sales. The Company stepped up its efforts to solicit traditional and nontraditional lenders regarding possible interim and long-term financing. Additionally, the Company entered into substantive discussions with possible strategic partners regarding potential transactions involving the sale of not only the Nordic Business but also all or part of its Engineering, Construction and Consulting Business.

In early May 2000, these efforts resulted in the Company signing a letter of intent with Jacobs Engineering Group Inc. ("Jacobs") regarding a transaction pursuant to which Jacobs would acquire substantially all of the Company's assets in exchange for $150 million in cash and stock; Jacobs would immediately provide a $50 million secured revolving credit facility (the "Jacobs Credit Facility"); and the assumption of substantially all of the Debtors' balance sheet liabilities (including the new Jacobs Credit Facility). Subsequent to entering into the letter of intent, the Company negotiated the final terms of the asset purchase agreement with Jacobs in the early morning of June 2, 2000.

### III.   THE CHAPTER 11 CASES

On June 2, 2000 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. At that point, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under Bankruptcy Code section 362. The Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. The Court has jointly administered the Debtors' bankruptcy cases for procedural purposes only.

A.     First Day Orders

On the first day of the Chapter 11 Cases, the Debtors filed several motions seeking certain relief by virtue of so-called "first day orders." The first day orders facilitated the transition between the Debtors' prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.

The first day orders in the Chapter 11 Cases authorized, among other things:

- joint administration of each of the Debtors' bankruptcy cases;

- the employment and compensation of professionals utilized by the Debtors in the ordinary course of business;

- the retention of bankruptcy-related professionals and establishment of payment procedures for such professionals;

- the continued maintenance of the Debtors' bank accounts, continued use of existing business forms and continued use of the Debtors' existing cash management system;

- payments to employees of accrued prepetition wages, salaries and benefits;

12

- continued utility service during the pendency of the Chapter 11 Cases;

- payment of prepetition sales, use and other taxes;

- payment of certain prepetition shipping charges;

- postpetition financing and use of cash collateral;

- the implementation of a program to pay valid prepetition mechanics', materialmens' or other similar liens filed by various contractors against the Debtors' properties;

- payment of prepetition claims of critical trade vendors;

- confirmation that the Debtors' undisputed obligations arising from postpetition delivery of goods will have administrative expense priority status, administrative expense treatment for certain holders of valid reclamation claims, and authority to pay certain expenses in the ordinary course of business; and

- payment of prepetition insurance premium financial obligations.

B.    Appointment of Creditors' Committee and Equity Committee

On June 14, 2000, the United States Trustee appointed the Creditors' Committee in these cases. The current members of the Creditors' Committee are Canfibre of Riverside, Inc. c/o Canfibre Goup, Ltd. ("Canfibre"), MDC Systems, Inc. ("MDC Systems"), and Harbourview Electric, Ltd. ("Harbourview"). Pursuant to a settlement between the Debtors and Canfibre, Canfibre holds an allowed general unsecured claim in the amount of $3,500,000 against SWEC. MDC Systems, Inc. filed Proof of Claim numbers 4524 and 5010, each in the amount of $447,407.85 against SWINC; no objections have been filed to those claims. Pursuant to a settlement between the Debtors and Harbourview, Harbourview holds an allowed general unsecured claim in the amount of $1,200,000 against SWEC.

On June 26, 2000, the United States Trustee appointed an equity committee (the "Equity Committee"). The current members of the Equity Committee are Dimensional Fund Advisor's, Harold Rickles, and Grace Brothers, LTD. The members of the Equity Committee hold _____, _____ and _____, respectively of Interests in the Debtors.

No trustee or examiner has been appointed in any of these Cases. The Debtors anticipate that an order will be entered in the near future appointing Stuart Maue Mitchell & James, Ltd. as the fee examiner in these Cases.

C.    Sale of Substantially All of the Debtors' Assets

On June 2, 2000, the Debtors entered into an asset purchase agreement (the "Jacobs Agreement") with Jacobs. Pursuant to the Jacobs Agreement, Jacobs agreed to purchase substantially all of the Debtors' assets for (i) $25.0 million in cash, plus (ii) shares of common stock of Jacobs

13