having a market value of $125.0 million. Jacobs also agreed to assume certain liabilities of the Debtors and assume certain executory contracts and unexpired leases.

In order to implement the Jacobs Agreement, on June 7, 2000, the Debtors filed a Motion for Order (I) Approving (A) Asset Purchase Agreement for Sale Of Substantially all of the Assets of the Debtors, (B) Bidding Procedures in Connection with the Sale and (C) Termination Fee in Connection Therewith, (II) Authorizing Sale of Assets Free and Clear of Liens, Encumbrances, and Interests, (III) Determining that Such Sale is Exempt from Any Stamp, Transfer, Recording, or Similar Tax, (IV) Authorizing the Rejection or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (V) Granting Related Relief (the "Sale Motion"). Through the Sale Motion, the Debtors sought to sell substantially all of their assets to Jacobs or another bidder submitting a higher or better bid acceptable to the Debtors at the auction (the "Auction") scheduled for July 7, 2000. On June 23, 2000, the Court approved the bidding procedures.

Shaw timely submitted a qualified bid, including an agreement (the "Shaw Agreement") substantially in the form of the Jacobs Agreement, and an Auction took place on July 6 and 7, 2000. At the conclusion of the Auction, the Debtors, the Creditors' Committee and the Equity Committee determined that Shaw submitted the highest and best bid at the Auction. Under the final terms of the Shaw Agreement reached at the Auction, Shaw agreed to purchase substantially all of the Debtors' assets for (i) $37.0 million in cash, plus (ii) shares of common stock of Shaw having a July 7, 2000 market value of $105.0 million. Shaw also agreed to assume certain liabilities of the Debtors and certain executory contracts and unexpired leases. Hearings on the Sale Motion took place on July 7, 2000 and July 12, 2000. Thereafter, on July 13, 2000, the Court entered an order approving the Shaw Agreement, as modified on the record at the Auction and the hearings on the Sale Motion. On July 14, 2000, the Company closed the sale of substantially all of its assets to Shaw's designee, SWINC Acquisition Three, Inc.

D.    Chapter 11 Cases Subsequent to the Shaw Sale

Under the Shaw Agreement, Shaw and the Debtors entered into a registration rights agreement with respect to the Shaw common stock received by the Debtors as part of the consideration for the sale of substantially all of the Debtors' assets. After the July 14, 2000 closing, the price of the Shaw common stock increased dramatically. Shaw therefore determined to access the markets and sell shares of its common stock in a registered offering. Under the registration rights agreement, the Debtors were entitled to exercise "piggy-back" rights in the event Shaw registered its stock. Accordingly, on September 27, 2000, the Debtors filed the Motion for Order Pursuant to 11 U.S.C. § 363(b)(1) Authorizing Debtors to Sell Shaw Group Stock Pursuant to Asset Purchase Agreement and Registration Rights Agreement (the "Stock Sale Motion"). Under the Stock Sale Motion, the Debtors sought authority to sell the Shaw common stock held by the Debtors at a price no less than $50 a share. Once authorization was obtained and the Shaw common stock registered, the Debtors sold the Shaw common stock for $131.6 million.

Pursuant to the terms of the Shaw Agreement, the purchase price for the Debtors' assets was subject to adjustment based on a final determination of the Debtors' working capital as of the date of the sale (the "Final Working Capital"). Under the Shaw Agreement, if the Final Working Capital was in excess of the base working capital set forth in the Shaw Agreement (the "Base Working Capital"), then Shaw was required to pay the Debtors an additional sum equal to a percentage of the amount by which the Final Working Capital exceeds the Base Working Capital. If the Final Working Capital was less than the Base Working Capital, the Debtors were required to pay

Shaw a sum equal to a percentage of the amount by which the Base Working Capital exceeded the Final Working Capital.  Rather than incur the expense and expend limited resources preparing the audited closing balance sheet, the Debtors sought approval of a letter agreement (the "Letter Agreement") among the Debtors and Shaw approving a settlement of disputes with respect to the Shaw Agreement.  By order dated December 18, 2000, the Court approved the Letter Agreement.  Generally, the Letter Agreement provided that the Debtors were relieved of their obligation to prepare and provide Shaw with a Closing Balance Sheet, a Purchase Price Adjustment Schedule or other information required under Section 2.05(c) of the Shaw Agreement.  Both parties were relieved of any obligation to make an Adjustment Amount payment.  The Letter Agreement also established deadlines for the Debtors and Shaw to review and determine each party's respective liability with respect to disputed filed cure claims and filed proofs of claim.  Saudi American Bank disputes whether either Shaw or the Debtors met the deadlines set forth in the Letter Agreement.  The Plan Proponents contend that those deadlines were met.

E.      Assets from Non-Debtor U.K. Affiliate

            In connection with the recovery of estate assets, the Debtors received dividends and a return of invested capital from its non-debtor U.K. affiliate.  As a result, on March 25, 2003, the Debtors received $25.5 million into the estates.

F.      Summary of Claims Process and Bar Date

        1.      Schedules of Statements and Financial Affairs

            The Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") with the Court on July 14, 2000.  Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.  The Consolidated Schedules and Statements were filed on a consolidated basis and, thus, scheduled all Claims against all of the Debtor entities.  The Debtors will file filed amended Schedules of Assets substantially contemporaneous with or shortly after the Disclosure Statement Hearing on April 2, 2003 (as amended, the "Amended Schedules").

        2.      Claims Bar Date and Proofs of Claim

            On July 18, 2000, the Court established the general deadline for filing proofs of claim against the Debtors (the "Bar Date") as August 25, 2000.  Additionally, on September 12, 2000, the Court established the deadline for governmental units to file proofs of claim against the Debtors (the "Government Bar Date") as November 29, 2000.  As of March 14, 2003, 5,177 proofs of claim had been filed asserting approximately $9.8 billion in claims and 383 statements of cure claims asserting approximately $292 million in claims.  The bar date for creditors scheduled on the Amended Schedules is April 23, 2003.

        3.      The Claims Agent

            In connection with the commencement of the Chapter 11 Cases, the Debtors retained Trumbull Services, L.L.C. (the "Claims Agent") for the purpose of, among other things, maintaining the Claims Registry in the Chapter 11 Cases and providing certain notices to Creditors,

Interestholders and other parties-in-interest. The Claims Agent may be reached at the following address and phone number:

> Stone & Webster Incorporated
> c/o Trumbull Services, L.L.C.
> P.O. Box 673
> Windsor, CT 06095-9718
> (860) 687-3917

4.      Claims Objections and Claims Reconciliation

The Debtors have been reviewing, analyzing and resolving Claims on an ongoing basis as part of the Claims reconciliation process. The Debtors filed ten (10) omnibus objections to proofs of claim and scheduled amounts, including omnibus objections to certain Claims that are liabilities of Shaw as well as objections to numerous Claims, and have also settled various Claims in reduced allowed amounts. In addition, the Creditors' Committee, the Equity Committee and Shaw have each filed omnibus objections to proofs of claim and scheduled amounts, as well as objections to certain individual claims. In the Debtors' omnibus claims objections, the Debtors objected to certain duplicative claims, certain procedurally defective or otherwise incorrect or invalid proofs of claim, certain claims that are no longer liabilities of the Debtors on the basis that such claims have been assumed by Shaw or do not appear on the Debtors' books and records, certain claims that have previously been satisfied or settled, and certain late filed claims. Additionally, the Creditors' Committee's omnibus claims objections have sought to disallow certain duplicate, procedurally defective, or otherwise incorrect or invalid proofs of claim. The Equity Committee's omnibus objections have sought to disallow certain duplicate, procedurally defective or otherwise incorrect or invalid proofs of claim, as well as reclassify certain proofs of claim to proofs of interest as well as certain proofs of claim to other Debtor entities. In the Shaw objections, Shaw objected to a series of Claims that had been paid or satisfied by the Debtors during the Chapter 11 Cases, including mechanics' lien claims, employee wage and benefit claims, claims relating to real property leases and bank claims. As of March 14, 2003, the Court had entered orders disallowing approximately 2,900 proofs of claim and statements of cure claims, thereby eliminating asserted liabilities aggregating approximately $710 million.

There are additional omnibus and individual objections to Claims pending, representing an additional approximately 600 claims and representing several hundred million dollars. The Debtors anticipate that additional omnibus and individual Claims objections will be filed in the near future, including in advance of the deadline for holders of Claims to return Ballots accepting or rejecting the Plan, and that the effect of certain objections could be to prohibit certain Claim holders from voting absent the Court's temporary allowance of such Claims for voting purposes.

As a result of these efforts, substantial progress has been made in (a) reconciling the amount and classification of outstanding Claims and (b) asserting and prosecuting objections to Claims. In addition, the Debtors have, among other things, (i) identified Claims or categories of Claims for future resolution and (ii) identified existing or potential claims disputes.

Through these various activities, the Debtors, in consultation with the Plan Proponents, have developed estimates of Allowed Claims and Interests in each Class established under the Plan. The Debtors have prepared these estimates based primarily on the following: (a) the

outcome of Claim reconciliations and Claim objections to date, (b) projections based on anticipated future Claim reconciliations and Claim objections, (c) the comparison of asserted Claims against the Debtors' books and records, (d) the Debtors' experience in reconciling Claims prior to and following the commencement of the Chapter 11 Cases, (e) the historical experience of the Debtors' professionals in other chapter 11 cases, (f) an analysis of the litigation risks associated with Disputed Claims, and (g) other legal and factual analyses unique to particular types of Claims.

Notwithstanding the ongoing Claims reconciliation process, the actual ultimate aggregate amount of Allowed Claims may differ significantly from the estimates set forth in Article II, "Overview of the Plan." Accordingly, the amount of the Pro Rata distribution that will ultimately be received by any particular holder of an Allowed Claim or Interest may be adversely affected by the outcome of the Claims resolution process.

  5.  Reclassification of Claims

Throughout the Claims reconciliation process and especially in connection with formulating procedures for the soliciting of acceptances and rejections on the Plan, the Debtors also undertook an extensive and thorough review of the Filed and Scheduled Claims to determine whether they were registered against the Debtor or Debtors who had the underlying liability. As a result, ~~substantially contemporaneous with or shortly after the Disclosure Statement Hearing, the Debtors will be filing~~ the Debtors filed the Amended Schedules that, in part, reclassify Claims previously Scheduled against SWINC as Claims against a SWINC Subsidiary, SWE&C or a SWE&C Subsidiary (the "Reclassified Scheduled Claims"). Additionally, the Debtors anticipate Filing non-substantive objections (the "Reclassification Objections") seeking to reclassify for voting purposes only certain Filed Claims as Claims against a Debtor other than the Debtor listed in the Claims Registry (the "Reclassified Filed Claims"). Importantly, absent a response from the holder of a Claim or Interest, the holder of Reclassified Scheduled Claims or Reclassified Filed Claims will receive a Ballot and only be entitled to vote in the Class of Claims or Interests listed in the Amended Schedules and the Reclassification Objections. Additionally, absent a response or objection, holders of Reclassified Scheduled Claims shall only be entitled to receive a distribution in the Class of Claims or Interests listed in the Amended Schedule.

~~F~~ G.  Summary of Material Claims Litigation Matters

During the Chapter 11 Cases to date, the Debtors commenced or were involved in a number of lawsuits. An explanation of the material litigation matters is summarized below.

  1.  Maine Yankee

The Debtors have been or are engaged in three litigation matters involving Maine Yankee. Effective August 1998, Stone & Webster Engineering Corporation ("SWEC") and Maine Yankee entered into a contract for the decommissioning of Maine Yankee's nuclear power plant in Wiscasset, Maine (the "Decommissioning Agreement"). The Decommissioning Agreement was priced in excess of $250 million. SWE&C and, later, SWINC executed guarantees of SWEC's performance. On May 4, 2000, Maine Yankee purported to terminate the Decommissioning Agreement because of SWEC's alleged insolvency and certain alleged performance-related defaults. Maine Yankee filed proofs of claim against ~~SWEC~~ SWE&C, SWINC, and SWEC in the amount of $78.2 million. After a series of preliminary matters, which among other results, yielded a decision that capped Maine Yankee's claims at $65 million, an eight-day proceeding was held to address the

Maine Yankee claims (the "Claims Litigation"). The Debtors challenged all grounds for termination, Maine Yankee's interpretation of the scope of work in the Decommissioning Agreement, and Maine Yankee's calculation of damages. After post-trial briefing, the Court took the matters under advisement. By order and opinion issued May 30, 2002, the Court held that Maine Yankee damages recoverable from ~~SWEC~~ SWE&C, SWINC and SWEC, jointly and severally, in the amount of $20.8 million ($64.8 million less $44 million previously paid by Federal under Federal's settlement with Maine Yankee). The Court also estimated Maine Yankee's allowable claim in the ~~SWEC~~ SWE&C, SWINC and SWEC bankruptcy cases at a total of $20.8 million.

Subsequent to the Claims Litigation, SWEC filed suit (the "SWEC Suit") against Maine Yankee for affirmative recovery of damages for out-of-scope work that SWEC performed but for which Maine Yankee did not compensate SWEC, for in-scope work that SWEC performed but for which Maine Yankee did not compensate SWEC, and for the failure to pay the termination-for-convenience fees. In total, through the SWEC Suit, SWEC seeks recovery of more than $7 million. ~~SWEC~~ SWE&C, SWINC, and SWEC also sued to subordinate any allowed Maine Yankee claim to all other unsecured claims because of Maine Yankee's inequitable conduct during and after the performance of the Decommissioning Agreement.

     2.     Isobord

Isobord Enterprises Inc. ("Isobord") sued Stone & Webster Canada, Ltd. ("SWCL"), a non-Debtor entity, and SWEC, among other parties, in the Superior Court of Justice in Ontario, Canada, for CN$150,000,000 in June 2000, and filed a proof of claim in SWEC's bankruptcy for the same amount in August 2000, alleging breach of contract against SWCL and SWEC as SWCL's guarantor. Isobord's claims arise out of a December 24, 1996 contract with SWCL in which SWCL agreed to build by January 10, 1999, a facility to manufacture straw-based particle board using a process technology developed and patented by Isobord and another company named Kvaerner Panel Systems GmbH ("Kvaerner"). Although construction of the facility proceeded, the facility was unable to meet the guarantees SWCL made in its contract with Isobord due to certain problems with the manufacturing process. Isobord, Kvaerner, and SWCL attempted to solve these process problems until Isobord terminated SWCL's right to work at the facility on May 4, 2000. SWCL and SWEC are defending both the Canadian and bankruptcy proceedings by arguing that the facility failed to meet the contractual guarantees because of problems with the manufacturing process, which the contract renders the sole responsibility of Isobord and Kvaerner. In addition, SWCL and SWEC argue that Isobord did not give proper notice of alleged defaults before the purported termination and did not properly invoke SWEC's performance guarantee and that, in any event, the contract caps any damages at 33% of the guaranteed maximum price, as defined in the contract. On February 3, 2003, the Bankruptcy Court granted the Debtors partial summary judgment on the damages cap theory. Under the Debtors' computation of the 33% damages cap, Isobord's maximum possible claim is CN$36,590,755.41 less unpaid contract funds due and owing to SWCL of approximately CN $5.9 million.

Recently, the Debtors reached an agreement in principle with Isobord to settle Isobord's claims against the Debtors. Under the agreement, Isobord will withdraw all of its claims against SWEC in these bankruptcy cases and in the Canadian proceedings, without prejudice to Isobord's rights to pursue its claims against the other parties in the Canadian proceedings, including Chubb Insurance Company of Canada, an affiliate of Federal, and SWCL. If the agreement between Isobord and the Debtors is consummated, Isobord will have no claims against any of the Debtors in

18

these bankruptcy cases.  The agreement is contingent upon the confirmation of the Joint Plan, and if the Joint Plan is not confirmed, the agreement may be null and void.

      3.      CanFibre of Riverside

            On or about April 1, 1997, CanFibre of Riverside Inc. ("CanFibre Riverside") and SWEC entered into a contract (the "EPC Contract") for the engineering, procurement, and construction of a medium density fibreboard facility in Riverside, California (the "Facility").  Under the terms of the EPC Contract, SWEC was to design, engineer, supply, install, construct, start-up, and commission the Facility.  In return, CanFibre was to pay SWEC the fixed price of $70,000,000.  On or about April 1, 1997, CanFibre Riverside and Stone & Webster Operating Corporation ("SWOC") entered into a contract for the operation and maintenance of the Facility (the "OM Contract").  Under the terms of the OM Contract, Stone & Webster Operating Corporation ("SWOC") was to perform certain operational and maintenance services with respect to the Facility.  In return, CanFibre Riverside was to pay SWOC for certain reimbursable costs.  On January 28, 2000, CanFibre Riverside purported to terminate the EPC Contract.  CanFibre Riverside subsequently purported to terminate the OM Contract.

            On or about August 25, 2000, CanFibre Riverside filed a proof of claim (the "CanFibre Claim") against SWEC asserting a general unsecured claim in an amount in excess of $31,500,000 for an alleged breach of the EPC Contract and various other contract and tort causes of action.  On October 24, 2000, CanFibre Riverside filed a petition for bankruptcy protection.  On July 3, 2001, SWEC commenced an adversary proceeding in the Chapter 11 Cases against CanFibre, seeking turnover of estate property and damages arising out of the EPC Contract.  On or about May 8, 2001, SWEC filed a proof of claim against CanFibre Riverside in the CanFibre Riverside bankruptcy case asserting a secured claim in the amount of $26,198,138.50 for breach of the EPC Contract, turnover of estate property, and execution upon a mechanic's lien SWEC had secured and filed on the Facility, as well as other causes of action arising out of the EPC Contract.  Moreover, on or about October 23, 2001, SWOC filed a proof of claim against CanFibre Riverside in the CanFibre Riverside bankruptcy case asserting a general unsecured claim in excess of $2,000,000.00 for CanFibre Riverside's breach of the OM Contract, as well as other causes of action arising out of the OM Contract.

            After extensive negotiations among the Debtors and CanFibre Riverside, the Debtors and CanFibre Riverside achieved a global settlement of all of their claims against each other arising out of the EPC Contract, the OM Contract, and litigation over a proposed sale of CanFibre's assets.  The settlement provided in pertinent part as follows: (i) SWEC made a one-time cash payment to CanFibre Riverside's bondholders in the amount of $500,000 and (ii) the CanFibre Claim was allowed in the amount of $3,500,000 against SWEC.  The Bankruptcy Court entered an order approving the settlement on November 20, 2001.

      4.      CanFibre of Lackawanna

            CanFibre of Lackawanna LLC ("CanFibre Lackawanna") filed a proof of claim against SWEC on August 24, 2000, seeking in excess of $22,500,000, subsequently informally asserted to be over $27 million (the "CanFibre Lackawanna Claim").  The CanFibre Lackawanna Claim sought to recover the costs allegedly incurred by CanFibre Lackawanna to complete the facility (the "Lackawanna Facility") and for other alleged damages.  On June 26, 2001, SWEC objected to the CanFibre Lackawanna Claim (the "Objection") and filed a complaint against CanFibre

Lackawanna (the "Complaint"). By its Complaint, SWEC sought declaratory relief and damages in excess of $16,390,197.20 for unpaid invoices and out-of-scope work performed by SWEC on the Lackawanna Facility. Additionally, SWEC sought damages due to CanFibre Lackawanna's draw of a $3.5 million letter of credit posted by SWEC for the benefit of the Facility as well as damages related to certain unpaid invoices submitted by SWOC pursuant to the OM Contract entered into between SWOC and CanFibre Lackawanna..

The CanFibre Lackawanna Claim and the Complaint arose from the EPC Contract between SWEC and CanFibre Lackawanna. The EPC Contract was originally executed on December 15, 1997, and was subsequently amended and re-executed on September 15, 1998. Pursuant to the EPC Contract, SWEC agreed to engineer, procure, and construct the Lackawanna Facility in Lackawanna, New York. In consideration, CanFibre Lackawanna agreed to pay SWEC a lump sum price of $71,500,000. On May 2, 2000, CanFibre Lackawanna purported to terminate the EPC Contract. According to CanFibre Lackawanna, its decision was based on SWEC's alleged inability to pay its debts, and SWEC's alleged failure to pay certain subcontractors and vendors in a timely manner.

SWEC and CanFibre Lackawanna settled the CanFibre Lackawanna Claims, the Objection, and the Complaint. The Bankruptcy Court approved the settlement on May 21, 2002. Pursuant to the settlement, (i) CanFibre Lackawanna will have an allowed bankruptcy Claim in the amount of $2,600,000, (ii) SWEC will make a one-time cash payment to CanFibre Lackawanna in the amount of $300,000, (iii) if any mechanics' liens that relate to goods and/or services provided prior to May 2, 2000, are not expunged by SWEC by the end of September 2002, CanFibre will have an additional allowed Claim up to $1,000,000 to resolve the remaining mechanics' liens, and (iii) the Debtors will own a five percent equity interest in CanFibre ~~of~~ Lackawanna ~~LLC~~. Left unresolved by the Settlement are certain proofs of claim and adversary proceedings filed against SWEC by various subcontractors for work related to the Lackawanna Facility. SWEC had also initiated adversary proceedings against certain of these subcontractors, the most significant of which are described below. <u>As discussed below, the claims of CanFibre Lackawanna have been reduced by $1,200,000 in connection with the Debtors' settlement of claims with Harbourview Electric, Ltd. ("Harbourview").</u>

In addition to litigating with CanFibre Lackawanna, SWEC litigated with subcontractors and suppliers on the CanFibre Lackawanna project. More specifically, SWEC brought numerous lawsuits, counterclaims or otherwise objected to the claims of several dozen subcontractors and suppliers. The Debtors have resolved all of these claims. Among the largest of these claims are the claims asserted among SWEC, Harbourview ~~Electric, Ltd. ("Harbourview")~~ and Maschinenfabrik J. Dieffenbacher GmbH & Co. ("Dieffenbacher").

Harbourview was an electrical subcontractor for the CanFibre Lackawanna project. Harbourview filed a proof of claim against SWEC on August 24, 2000, in the amount of $2,528,751.95 asserting that it was a beneficiary of a trust under New York Lien Law. Following informal discovery, Harbourview subsequently reduced its proof of claim to $1,897,179.75. On April 27, 2001, again relying on New York Lien Law, Harbourview initiated a class action against SWEC and unnamed "John Does" for itself and purportedly all other unpaid subcontractors. On February 12 and 24, 2002, respectively, Debtors filed their Answer and then First Amended Answer and Counterclaims denying liability under New York Lien Law, and seeking recovery of $648,876.61 in preference payments to Harbourview and reduction or elimination of Harbourview's claim. After extensive negotiations and formal discovery, SWEC and Harbourview settled all of their claims. The settlement provides, in pertinent part, as follows: (i) SWEC will make a one-time cash payment of

five hundred seventy-five thousand dollars ($575,000) to Harbourview; and (ii) Harbourview will have one allowed claim, deemed filed solely against SWEC, in the amount of one million two hundred thousand dollars ($1,200,000) to be contributed by CanFibre Lackawanna from claims previously authorized by the Bankruptcy Court. CanFibre Lackawanna's claims are accordingly being reduced by the full amount of this allowed claim at no net difference to the Debtors' estates.

Dieffenbacher supplied certain equipment for the CanFibre Lackawanna Facility. On August 18, 2000, Dieffenbacher filed proofs of claim against SWINC and SWEC in the amounts of $616,114.21, in connection with the Riverside, Lackawanna and Isobord Facilities. On October 13, 2000, Dieffenbacher amended its proofs of claim increasing the amount sought to $900,811.81. Following informal discovery, this amount was later reduced by Dieffenbacher to $494,057.08. On November 13, 2001, Dieffenbacher filed a complaint against SWEC seeking $488,572.53, in connection with the CanFibre Lackawanna project, which Dieffenbacher asserted was subject to a statutory trust arising under New York Lien Law. On February 21, 2002, SWEC filed counterclaims against Dieffenbacher, seeking, among other things, $90,337.86 for expenses allegedly incurred to modify the equipment supplied by Dieffenbacher for the CanFibre Lackawanna project, $341,629.84 for expenses allegedly incurred to modify equipment supplied by Dieffenbacher for the CanFibre Riverside project, and an order declaring that Dieffenbacher must indemnify SWEC for all costs due to defects in the equipment supplied by Dieffenbacher for the CanFibre Lackawanna project. After extensive negotiations, SWEC and Dieffenbacher settled all of their claims. The settlement provides, in pertinent part, as follows: (i) Dieffenbacher will be allowed one general unsecured claim against SWEC in the amount of one hundred thirty thousand dollars ($130,000), and (ii) SWEC will make a one-time cash payment of two hundred forty-five thousand dollars ($245,000) to Dieffenbacher. SWEC has already made the payment pursuant to the settlement.

     5.     Ras Tanura

(a) Abdullah Bugshan. On May 31, 1980, SWEC and Abdullah Said Bugshan & Brothers ("AB&B") formed Bugshan Stone & Webster Company Limited ("BS&W"), a Saudi limited liability company, which later entered into an agreement with the Saudi Arabian Oil Company ("Saudi Aramco") for the engineering, procurement, and construction of the Ras Tanura Oil Refinery Utilities Upgrade Package #2 Project (the "Ras Tanura Project") in Saudi Arabia. On August 24, 1994, BS&W subcontracted to Mohammad Al-Mo'jil Group ("MMG") various construction work relating to the Ras Tanura Project (the "MMG Contract"). During the course of MMG's performance, MMG failed to act in accordance with approved schedules and other terms of the MMG Contract, and, consequently, in June and July 1997, BS&W terminated portions of MMG's scope of work under the MMG Contract. Through arbitration (the "Arbitration"), MMG sought $62 million in damages from BS&W for added expenses and duties incurred on the Ras Tanura Project as a result of alleged delays and other wrongdoing attributable to BS&W. On or about May 21, 2001, the arbitrator entered judgment against BS&W for approximately $51 million. The Debtors understand that the arbitral award in favor of MMG was later reversed by a Saudi court. Neither BS&W nor AB&B has made any payment to MMG.

On August 23, 2000, AB&B filed a contingent Claim for reimbursement or contribution against SWEC (the "Original AB&B Claim") alleging that SWEC is liable for at least 50% of any judgment that might result from the then-pending Arbitration and for costs incurred in defending against the Arbitration. On or about July 13, 2001, AB&B amended its proof of claim (the "Amended AB&B Claim"), which supersedes the Original AB&B Claim and contains specific dollar amounts reflecting the final arbitral award and the costs AB&B allegedly incurred in the defense of

21

the Arbitration. Neither BS&W nor MMG has filed a proof of claim against SWEC or any affiliated Debtor. AB&B has not filed a proof of claim on behalf of MMG pursuant to Bankruptcy Rule 3005.

The Debtors filed an objection to the Original AB&B Claim and to the Amended AB&B Claim on August 1, 2001. The bases of the Debtors' objection were that SWEC is not liable to AB&B for contribution to any award in Saudi Arabia against BS&W in favor of MMG because AB&B had not paid any such award, thus establishing a right of contribution, and because such an award would not be enforceable against AB&B or SWEC in any event.

The Debtors and AB&B have been in negotiations regarding the settlement of AB&B's claims against SWEC. These settlement negotiations involve Saudi Aramco, as described in part 5(c) below. At an omnibus hearing in the Debtors' bankruptcy cases conducted on October 3, 2002, the Debtors, AB&B, and Saudi Aramco read the terms of a tentative settlement agreement into the record. Since that time, the parties' negotiations have not resulted in a final settlement agreement, and there is no assurance a final settlement agreement will materialize. If the Debtors are unable to finalize a settlement agreement with AB&B and Saudi Aramco, litigation among the parties should be expected.

(b) Saudi American Bank. In order to meet mobilization and general operating costs for the Ras Tanura Project, BS&W applied to the Saudi American Bank ("SAMBA") for a credit facility and several letters of credit. In order to induce SAMBA to extend credit to BS&W, SWEC guaranteed 50% of BS&W's obligations to SAMBA under a letter of guarantee dated October 11, 1994 (the "Guarantee"). On or about August 24, 2000, SAMBA filed one proof of claim and one cure claim (the "SAMBA Claims") against SWEC alleging that under the Guarantee, SWEC had outstanding financial obligations under certain letter of credit agreements (the "Letters of Credit") issued to BS&W, and under a certain promissory note (the "Promissory Note") executed by BS&W in favor of SAMBA in connection with a $35 million revolving credit facility granted by SAMBA to BS&W (the "Ras Tanura Loan"). SAMBA further alleged that SWEC had independently undertaken to pay down a one-half portion of the balance on the Ras Tanura Loan in a December 22, 1998 letter to SAMBA.

Specifically, the SAMBA Claims purported to state a claim against SWEC for $6,728,549, allegedly representing the remainder of SWEC's guaranteed-one-half portion of the balance on the Ras Tanura Loan. Additionally, the SAMBA Claims purported to state a contingent $140,430 claim against SWEC based upon an unpaid 1997 presentment of a Letter of Credit granted by SAMBA to BS&W. Finally, the SAMBA claims purported to state a contingent $730,843 claim against SWEC based upon the outstanding balances on expired Letters of Credit granted by SAMBA to BS&W.

The Debtors filed and later amended a complaint against SAMBA to avoid and recover preferential transfers in the amount of $1.3 million, to avoid and recover fraudulent transfers in the amount of $6.5 million, to avoid and recover an unauthorized postpetition transaction in the amount of $325,000, to avoid and recover improper setoffs in the amount of $975,000, to recover damages for violations of the automatic stay, to disallow the SAMBA Claims, to reduce the SAMBA Claims to the present value of $6.4 million as of the Petition Date, and/or to estimate part of the SAMBA Claims at $0. The Debtors obtained partial summary judgment disallowing SAMBA's $730,843 claim against SWEC based upon the outstanding balances on the expired Letters of Credit. Under a scheduling order entered by the Court in the SAMBA litigation the case is scheduled to go to trial on the remaining claims beginning on May 14, 2003.

(c) Saudi Aramco. On May 31, 2002, the Debtors commenced an adversary proceeding (the "Aramco Proceeding") against Saudi Aramco related to the Ras Tanura Project. Specifically, the Debtors sought a declaratory judgment that SWINC is not liable to Saudi Aramco by virtue of a SWINC guarantee of BS&W's performance of its contract with Saudi Aramco for the Ras Tanura Project (the "Ras Tanura Contract"). Additionally, SWEC sought indemnification from Saudi Aramco for amounts for which SWEC, as a shareholder of BS&W, might become liable as a result of claims brought against BS&W by MMG, as described in part 5(a) above. SWEC also sought damages for Saudi Aramco's breach of the Ras Tanura Contract and a turnover of accounts receivable related to the Ras Tanura Contract by Saudi Aramco. On September 25, 2002, Saudi Aramco filed a motion to dismiss the Aramco Proceeding, and on September 27, 2002, Saudi Aramco filed a motion to determine that the Saudi-Aramco Proceeding is a non-core proceeding and a motion to withdraw the reference.

Settlement negotiations among Saudi Aramco, the Debtors, and AB&B for the final resolution of all claims among these entities have been pending. During the pendency of settlement negotiations, the Aramco Proceeding is stayed by stipulation of the parties. As described in part 5(a) above, the Debtors, AB&B, and Saudi Aramco read the terms of a tentative settlement agreement into the record on October 3, 2002. Since that time, the parties' negotiations have not resulted in a final settlement agreement, and there is no assurance that a final settlement agreement will materialize. If the Debtors are unable to finalize a settlement agreement with AB&B and Saudi Aramco, litigation among the parties should be expected.

G H.    The Equity Committee Plan and the Creditors' Committee Plan

Due to the circumstances surrounding these cases, the Debtors allowed the exclusive periods to file a plan and solicit acceptances to expire.

1.    The Equity Committee Plan

On June 15, 2001, the Equity Committee filed the Plan of Reorganization of the Official Committee of Equity Holders of Stone & Webster Incorporated. Subsequently, on September 17, 2001, the Equity Committee filed a disclosure statement in connection with the Equity Committee Plan (the "Equity Committee Plan"), which disclosure statement was subsequently modified on April 5, 2002, April 15, 2002, and March 14, 2003 (the "Equity Committee Disclosure Statement").

As originally filed in 2001 (and as subsequently amended in April of 2002), the Equity Committee Plan provided for a nonconsolidating plan, in which all 73 Debtor entities were treated as separate entities and holders of claims against and interests in each of the 73 Debtor entities would be required to look solely from the assets of the appropriate Debtor entity for payment of their claims or interests. Importantly, at the time it filed its original plan, the Equity Committee asserted that there was neither a factual nor a legal basis for substantive consolidation of any of the Debtors entities, a premise that the Equity Committee, a position that the Equity Committee has vigorously litigated for nearly two years in these Chapter 11 Cases.

In the amended Equity Committee Plan filed on March 14, 2003, the Equity Committee abandoned its insistence upon a nonconsolidating plan in favor of a consolidating plan that creates two estates for voting and distribution purposes, and, thus, is similar in some respects to the Plan proposed by the Plan Proponents. Specifically, the Equity Committee Plan, as amended on

23

March 14, 2003, is premised upon the partial consolidation of the Debtors into a consolidated SWINC estate and a consolidated SWE&C estate. The Equity Committee Plan, however, does not contemplate the sharing of the Pension Plan Reversion between the consolidated estates, which the Equity Committee asserts is neither legally nor factually appropriate. Rather, the Equity Committee Plan proposes to have the entire Pension Plan Reversion remain at the consolidated SWINC estate, allowing for a larger distribution to SWINC equity holders, while providing for a minimal recovery to those creditors of the consolidated SWE&C estate.

Finally, although proposing a two-pot consolidating plan, the Equity Committee purports to reserve its right to appeal any order denying the Equity Committee's motion for summary judgment (the "Summary Judgment Motion") on the Substantive Consolidation Motion, and to appeal any "order confirming a plan which provides for substantive consolidation." The Debtors will vigorously assert that in light of the Equity Committee's pursuit of a "two-pot" plan, the Equity Committee has waived or is estopped from pursuing any such appeals.

> 2.      The Creditors' Committee Plan

On August 11, 2001, the Creditors' Committee filed its Disclosure Statement with Respect to the Consolidated Liquidation Plan Proposed by Official Committee of Unsecured Creditors of Stone & Webster, Incorporated and its Debtor Subsidiaries (the "Creditors' Committee Disclosure Statement"). The Creditors' Committee filed its Second Amended Creditors' Committee Disclosure Statement on April 12, 2002. As Exhibit A to the Creditors' Committee Disclosure Statement, the Creditors' Committee attached its Plan of Liquidation (the "Creditors' Committee Plan"). The Court held hearings on the Disclosure Statements filed with respect to the Creditors' Committee Plan, the Equity Committee Plan and the Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization of (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineering & Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Initial Disclosure Statement Hearings"); however, no order was ever entered approving the adequacy of any disclosure statement. Subsequent to the Initial Disclosure Statement Hearings, the Creditors' Committee entered into an agreement with the Debtors and Federal and is now a co-proponent of the Plan.

## IV.  SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX B.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

24

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, ON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES, REORGANIZED SWINC, THE SWINC PLAN ADMINISTRATOR, THE SWE&C LIQUIDATING TRUSTEE AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN, THE SWINC PLAN ADMINISTRATOR AGREEMENT, THE SWE&C LIQUIDATING TRUST AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN, THE SWINC PLAN ADMINISTRATOR AGREEMENT, THE SWE&C LIQUIDATING TRUST AGREEMENT, AND SUCH OTHER OPERATIVE DOCUMENTS ARE CONTROLLING.

A.    Overall Structure of the Plan

By the Plan, the Plan Proponents seek to compromise and settle various disputes and issues raised by, among others, the Debtors, the Equity Committee and the Creditors' Committee and certain creditors, including Federal, regarding substantive consolidation and the allocation of the Sale Proceeds, overfunding in the Pension Plan and various intercompany claims among the Debtors. If approved, such compromises and settlements will have a significant impact on recoveries to holders of Claims and Interests, and all parties are urged to read the Plan, Disclosure Statement and all exhibits attached thereto carefully. The primary dispute the Plan Proponents seek to settle in the Plan is the dispute as to whether the Debtors' individual Estates should be substantively consolidated and, if so, to what extent. Under the Equity Committee Plan <u>originally filed by the Equity Committee on</u> , no consolidation occurs and each Debtor Estate and its respective assets is separately liable for Claims against that Debtor's Estate. Under the Creditors' Committee Plan <u>originally filed on June 15, 2001</u>, all of the Debtors' Estates were substantively consolidated and, thus, all of the Debtors' assets were available to satisfy all of the Debtors' liabilities. Under this Plan as well as the Debtors' previously proposed plan of reorganization, (i) the Estates of SWINC and the SWINC Subsidiaries will be substantively consolidated into the Consolidated SWINC Estate and (ii) the Estates of SWE&C and the SWE&C Subsidiaries will be substantively consolidated into the Consolidated SWE&C Estate. A list of the Debtor entities comprising each of the Consolidated SWINC Estate and the Consolidated SWE&C Estate is attached hereto as Appendix A. Moreover, the Plan contemplates what the Plan Proponents believe to be an equitable distribution of the Cash received by the Debtors and non-Debtor subsidiaries and affiliates from the Shaw Sale and the subsequent liquidation of their remaining assets and the Reversion of the overfunded Pension Plan. As a result, distributions on account of Claims against and Interests in SWINC and the SWINC Subsidiaries will depend only on the assets and liabilities of the Consolidated SWINC Estate and distributions on account of Claims against SWE&C and the SWE&C Subsidiaries will depend only on the assets and liabilities of the Consolidated SWE&C Estate as such assets and liabilities are determined in accordance with the Plan and the settlements embodied therein.

B.    Substantive Consolidation

For administrative, substantive and certain equitable reasons, the Plan Proponents seek confirmation of the Plan which is predicated upon the substantive consolidation of the Estates of SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate and the Estates of SWE&C and the SWE&C Subsidiaries into the Consolidated SWE&C Estate. Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the

Plan, the Plan Proponents seek Court approval of the provisions of the Plan as a good faith compromise and settlement of all claims or controversies relating to the issue of substantive consolidation and the Substantive Consolidation Litigation. The Plan will serve as, and will be deemed to be, a motion for entry of an order pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 section (i) substantively consolidating the Estates of SWINC and the SWINC Subsidiaries and (ii) substantively consolidating the Estates of SWE&C and the SWE&C Subsidiaries.

     1.     General Description

     Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on reorganization plans. There is no statutory authority specifically authorizing substantive consolidation. The authority of a bankruptcy court to order substantive consolidation is derived from its general equitable powers under Bankruptcy Code section 105(a), which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code. Nor are there statutorily prescribed standards for substantive consolidation. Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.

     2.     Legal Standards for Substantive Consolidation

     The propriety of substantive consolidation must be evaluated on a case-by-case basis. In deciding whether to consolidate, in the past courts relied on the presence or absence of certain "elements" that are similar to factors relevant to piercing the corporate veil under applicable state law. More recent cases, however, while not ignoring these elements, have applied a less mechanical approach. Thus, the extensive list of elements and factors frequently cited and relied upon by some courts in determining the propriety of substantive consolidation are variations of two critical factors, namely (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, or (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. Under the so-called Eastgroup test, which is an equitable test, a proponent of substantive consolidation must show that (1) there is substantial identity between the entities sought to be consolidated and (2) that consolidation is necessary to avoid some harm or realize some benefit. Once the proponent of substantive consolidation makes this showing, a presumption arises that creditors have not relied solely on the credit of one of the entities involved, and the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated and (2) it will be prejudiced by substantive consolidation.

     Regardless of which of the two similar but not identical tests are utilized for determining the propriety of substantive consolidation, the "elements" enumerated in earlier cases remain relevant, but not necessarily dispositive, as to whether substantive consolidation should be granted. These elements include:

> • the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

26

- the presence or absence of consolidated financial statements among the entities to be consolidated;

- the commingling of assets and business functions among the entities to be consolidated;

- the unity of interests and ownership among the various entities;

- the existence of parent and intercorporate guarantees on loans to the various entities; and

- the transfer of assets to and from the various entities without formal observance of corporate formalities.

3.    The Substantive Consolidation Litigation

(a)    The Creditors' Committee Substantive Consolidation Motion

In August 2000, the Creditors' Committee filed a motion seeking substantive consolidation of the Debtors' estates (the "Substantive Consolidation Motion"). In support of the Substantive Consolidation Motion and throughout these Chapter 11 Cases, the Creditors' Committee has maintained that the facts and circumstances surrounding the historical business operations of SWINC and the Subsidiary Debtors support combining the Debtors' assets and liabilities in connection with any plan of liquidation and distribution to creditors and interest holders.

In the Substantive Consolidation Motion, the Creditors' Committee has argued that SWINC and most of its 72 Subsidiary Debtors used the same name, and did not routinely distinguish among themselves when dealing with creditors, referring to all Debtors as "Stone & Webster" or using SWINC as a proxy for Subsidiary Debtors. Additionally, in public documents the Debtors frequently described their various business interests as "divisions" or "segments" or SWINC, rather than describing them as "subsidiaries." In further support of substantive consolidation, the Creditors' Committee argued that SWINC and the Subsidiary Debtors historically had issued consolidated financial statements and filed consolidated tax returns, and that the Debtors provided only consolidated financial statements to their largest creditors.

Additionally, the Creditors' Committee contended that SWINC, the ultimate parent of all other 72 Debtors, and its Subsidiary Debtors maintained common officers and other employees paid by SWEC during the final years before the Debtors commenced the Chapter 11 Cases. These shared employees, paid by SWEC, performed human resources, accounting, legal and risk management services for the benefit of all of the Debtors. Similarly, the Creditors' Committee contends, accounting firms, law firms, engineers, consultants and insurers rendered services to all of the Debtors paid for by SWEC, without being reimbursed by the other Debtors for their proportionate share for these services. In that regard, the Creditors' Committee challenged the accuracy of the Debtors' intercompany accounts. The Creditors' Committee also argued that the Subsidiary Debtors had common directors consisting largely, if not entirely, of their common officers, who acted at the behest of SWINC in carrying out SWINC's policies and directives. In fact, the Creditors' Committee contended that on at least one occasion, SWINC and its Subsidiary Debtors implemented a fundamental change in corporate structure and form, without first fulfilling proper corporate authorization.

27

The Creditors' Committee has also argued that the Debtors' centralized cash management system provides further support for substantive consolidation. Under this system, virtually all of each Debtors' funds were moved into and through centralized accounts on an as-needed basis to meet the short and long term cash requirements of all of the Debtors. Although the Debtors contend that as an outgrowth of this centralized cash management system, intercompany liabilities routinely were recorded by and between SWINC and the Subsidiary Debtors (and by and between the Subsidiary Debtors themselves) in the ordinary course of the Debtors' business, the Creditors' Committee challenged the accuracy of the intercorporate accounts and the Debtors' ability to keep and reconcile these accounts. Moreover, the Creditors' Committee contended that the Debtors never disclosed to potential and existing creditors the amount or identity of any intercorporate liabilities, and that parties considering extending credit to any particular Stone & Webster entity could not have been aware of the magnitude of alleged liabilities that the Debtors' books now reflect.

The Creditors' Committee has also asserted that each of the Debtors transferred product, services or liabilities to other Debtors on a regular basis, that these transfers were not reflected on the Debtors' books at arm's-length pricing, and that the Debtors could not then and cannot now verify that the amounts showing on the Debtors' books and records reflect balances that would exist if transactions between the Debtors had been appropriately recorded for purposes of separate company reporting. Due to the volume of transactions between SWINC and the Subsidiary Debtors, as well as the significant passage of time, the Creditors' Committee argued that it would be extraordinarily time consuming and prohibitively expensive to determine on an Estate by Estate basis the adjustments needed to approximate intercorporate balances reasonably. Even then there could be no assurance that the end product would be a fair approximation of such balances due to: (a) numerous uncertainties with respect to available historical knowledge and support documentation; and (b) complexities such as extensive acquisition and disposition activity by the Debtors.

The Creditors' Committee also based its Substantive Consolidation Motion on the fact that Shaw paid one purchase price for all of the Debtors' assets, and, at the time of the purchase and sale, there was no allocation of the purchase price among the various Debtors. In that regard, Shaw acquired both tangible and intangible assets, and the Creditors' Committee contends that valuing numerous contracts assumed by Shaw from SWEC and other Subsidiary Debtors is virtually impossible and, in any event, likely to be a prohibitively expensive process. Accordingly, the Creditors' Committee has argued that substantive consolidation is required to ensure that the sale proceeds are distributed equitably among the Debtors' creditors and interest holders.

        (b)      The Equity Committee Response

In order to resolve the Equity Committee objection to this Disclosure Statement, the Plan Proponents include the following language, which was drafted for inclusion by the Equity Committee.

The Equity Committee opposed the relief sought by the Creditors' Committee in the Substantive Consolidation Motion, namely to consolidate all of the Debtors' estates into one single estate. In opposing the Substantive Consolidation Motion, the Equity Committee made two basic arguments. First, that as a matter of law, substantive consolidation as an equitable remedy is no longer available in chapter 11 bankruptcy proceedings. The Bankruptcy Court disagreed with that argument in its November 14, 2002 Order at Docket 3564 (the "November 14 Order") holding that substantive consolidation would be permissible as part of a plan under chapter 11 of the Bankruptcy

Code. The Equity Committee has preserved its right to appeal the November 14, Order at such time as it becomes a final order.

The Equity Committee also contended that, even if substantive consolidation were a permissible equitable remedy in chapter 11 proceedings, there would be no legal or factual basis to order substantive consolidation of any of the Debtor Subsidiaries. Since the fall of 2001, the Equity Committee has proposed a plan of liquidation, which treated each of the seventy-three (73) Debtors as separate corporate entities.

On March 14, 2003, the Equity Committee filed its amended Equity Plan and related Equity Disclosure Statement. Both the Equity Plan and the Joint Plan proposed by the Plan Proponents propose the creation of two consolidated estates: the Consolidated SWINC Estate and the Consolidated SWE&C Estate. The companies allocated to each consolidated estate under the Joint Plan and the Equity Plan are identical. Thus, the Equity Committee contends that there is no longer any dispute regarding whether two separate consolidated estates should be formed.

The primary difference between the Equity Plan and the Joint Plan is that the Joint Plan would transfer between $21.9 and $27.9 million in value from the Consolidated SWINC Estate to the Consolidated SWE&C Estate "in settlement" of disputes concerning whether the Consolidated SWINC Estate should be further consolidated with the Consolidated SWE&C Estate.

The Equity Committee vigorously disputes that any further substantive consolidation would be necessary or appropriate under applicable law between the Consolidated SWINC Estate and the Consolidated SWE&C Estate. In particular, the Equity Committee believes that the payment of funds by the Consolidated SWINC Estate to the Consolidated SWE&C Estate is unreasonable and not justifiable under the facts of the Debtors' cases or applicable law. In the view of the Equity Committee, any further substantive consolidation between the two proposed consolidated estates would depend largely upon an analysis of the relationship between the Debtors included in the Consolidated SWINC Estate, on the one hand, and the Debtors included in the Consolidated SWE&C Estate, on the other hand. The Equity Committee contends that such an analysis would demonstrate that no further consolidation would be necessary or appropriate as between the Consolidated SWINC Estate and the Consolidated SWE&C Estate. Indeed, the Equity Committee believe that, contrary to the assertions made by the Creditors' Committee, the overwhelming evidence will demonstrate that each of the Debtors: (i) has assets and liabilities that are readily ascertainable; (ii) observed corporate formalities under applicable state law; (iii) engaged in business as a separate corporate entity; and (iv) maintained detailed financial accounting systems that were audited and tested each year by outside auditors, including PricewaterhouseCoopers and its predecessors in interest, including adequate accounting for all third party and intercompany financial transactions in accordance with generally accepted accounting principles.

It is the view of the Equity Committee that the following facts make it clear that there is no legal or factual basis to further substantively consolidate the Consolidated SWINC Estate or any of its assets with the Consolidated SWE&C Estate: (i) there has been no commingling of funds between the Debtors, as all cash transfers between the Debtors were tracked in detail at all times through a cash management system, a common and accepted business practice among multi-tiered affiliated corporations; (ii) the Debtors have maintained contemporaneous records of intercompany transactions and continue to maintain such detailed records as a part of the Debtors' cash management system; and (iii) even though the Debtors had certain common officers and

directors, each of the Debtors maintained corporate formalities, including maintaining minutes and records of separate board meetings.

The Plan Proponents of the Joint Plan believe that the transfer of $21.9 to $27.9 million of the Pension Plan Reversion from SWINC to the SWE&C Subsidiaries is justified because certain of the SWE&C Subsidiaries may have claims against the Reversion. The Equity Committee contends, however, that there cannot be any serious dispute that SWINC is the sole owner of any surplus in the Pension Plan because (i) since January 1991, the Pension Plan documents have stated that upon termination of the Plan any reversionary interest would be property of SWINC; (ii) under applicable state and federal law the Pension Plan is required to be managed and terminated in accordance with the terms fo the Pension Plan documents; and (iii) the Plan Proponents of the Joint Plan have not cited any legal authority – statutory or case law – to the contrary.

The Equity Committee further contends that the allegation that the Pension Plan overfunding was "carried on the books and records of SWEC" is inaccurate and misleading because (i) the Debtors have produced audited financial statements for SWEC for the calendar years 1995, 1996 and 1997 that show a "prepaid pension cost" asset that is unrelated to any pension plan trust assets or any potential surplus upon termination of the Pension Plan; (ii) those same financial statements and the publicly filed consolidated financial statements of the Debtors contain information sufficient to disclose adequately that all the Debtors were participants in a pension plan with SWINC; and (iii) no specific creditors claim to have reasonably relied or to have been misled by such public information.

The Equity Committee also believes that the consolidation arguments contained in the Joint Plan are inconsistent with the Debtors' own prior admissions. Specifically, SWINC and two of the largest operating subsidiaries in the Consolidated SWE&C Estate, namely SWEC and SWMC, successfully litigated their corporate separateness before the Chapter 11 Cases were filed in certain litigation pending in the United States District Court for the Southern District of New York (the "New York Court"). Stone and Webster Management Consultants, Inc. and Stone & Webster Incorporated v. Travelers Indemnity Company, No. 94 Civ. 6619, 1996 U.S. Dist. Lexis 4852 (S.D.N.Y. April 16, 1996) (the "Travelers Litigation"). In the Travelers Litigation, Travelers Indemnity Company ("Travelers") contended that a certain notice to SWEC constituted notice to SWINC and SWMC under a theory of agency under New York law. The New York Court, after reviewing numerous affidavits submitted by the senior management and executives of SWEC, SWMC and SWINC, containing factual assertions as to their corporate separateness, noted that the theory for corporate agency under New York law is the same as the test for piercing the corporate veil. The New York Court accepted the factual assertions made in the affidavits submitted by SWEC, SWMC and SWINC as to their corporate separateness, finding that they had separate management, personnel and legal staff. The New York Court granted partial summary judgment in favor of SWMC and SWINC determining that an earlier notice to SWEC could not be imputed to SWINC and SWMC and holding that Travelers was obligated to defend certain litigation against SWMC and SWINC under existing insurance policies. The Equity Committee contends that the affidavits submitted on behalf of SWEC, SWMC and SWINC in the Travelers Litigation constitute evidentiary admissions of their corporate separateness, binding on the Debtors.

While the Plan Proponents agreed to include the above language at the Equity Committee's request, the Plan Proponents disagree with the factual, legal and equitable assertions made therein. Additionally, the Equity Committee has affirmatively rejected the compromise regarding substantive consolidation encompassed in the Plan.

30

For additional information regarding the Equity Committee's position, please refer to the Equity Disclosure Statement.

(c)     Debtors' Response

The Debtors also responded to the Substantive Consolidation Motion. In connection with substantive consolidation, the Debtors argued that the facts, circumstances and equities do not justify substantive consolidation into one single estate. Instead, the Debtors contend as a reasonable compromise and settlement of the dispute over substantive consolidation that, pursuant to Bankruptcy Code section 1123(a)(5)(C) and upon confirmation of a plan of reorganization, SWINC and the 72 Subsidiary Debtors should be substantively consolidated into two estates – the Consolidated SWINC Estate and the Consolidated SWE&C Estate. The Debtors base their position on at least three significant facts: (i) the legal sponsor of the Pension Plan is SWINC; (ii) the Nordic operating division ("Nordic") was marketed separately for sale; and (iii) at least some significant creditors appeared to rely on the separate financial wherewithal of SWINC and SWE&C.

With respect to the Pension Plan, the Debtors agree that SWINC is presently the sole sponsor, however, prior to SWINC becoming the sole legal sponsor of the Pension Plan, each individual Debtor was a sponsor and, even after SWINC became the sole legal sponsor, the overfunded Pension Plan was carried on the books and records of SWEC. Moreover, Mercer Human Resources Consulting reported on a nonconsolidated basis by operating unit of the Debtors with respect to the Pension Plan the expenses and assets, in addition to reporting on a consolidated basis at the SWINC level in accordance with generally accepted accounting principles.

Additionally, the Debtors believe it is significant that before the Petition Date, the Debtors separately solicited the sale of the Nordic. During this solicitation process, the Debtors eventually received bids for the purchase of Nordic. None of these bids were finalized before the Petition Date. However, when the Debtors entered into the asset purchase agreement with Jacobs, Nordic was initially carved out of the transaction, and during the postpetition sale process, the Debtors received a firm bid in excess of $75 million from a third party. At the auction, Shaw purchased Nordic as part of the overall transaction with the Debtors. As a consequence of the transaction with Shaw, substantially, if not all creditors of Nordic were paid in full. It is for these reasons that the Debtors believe that excess proceeds from the sale to Shaw could be allocated to the sale of the Nordic operating division and be made available to SWINC, as the direct parent of Nordic, either as a payment of outstanding intercompany obligations owed to SWINC or as a dividend.

Finally, the Debtors also believe that the other significant fact supporting substantive consolidation into two estates is that major creditors of the Debtors appeared to rely on the separate financial wherewithal of SWINC and SWE&C. For example, Maine Yankee contracted with SWEC concerning the decommission of Maine Yankee's nuclear power plant in Wiscasset, Maine. Main Yankee sought and obtained from SWE&C, and later SWINC, guaranties with respect to SWEC's performance. In addition, Federal filed proofs of claim against SWE&C, S&W Construction and Rocky Flats Engineers and Constructors, LLC, as primary obligors on various agreements with Federal. In addition, Federal also asserted a claim directly against SWINC arising out of the direct claims against the primary obligors pursuant to certain General Indemnity Agreements executed between Federal and SWINC.

(d)     Creditors' Committee Response

31

The Creditors' Committee has argued that notwithstanding that the ~~Equity Committee's position that the~~ Pension Plan documents make the overfunded Pension Plan solely a SWINC asset, ~~the Equity Committee's position that~~ the Pension Plan was carried on SWEC's balance sheets as a SWEC asset, and, thus, to the extent that any creditor could or did obtain separate financial statements for SWEC, the overfunded Pension Plan appeared to be a SWEC asset. ~~The Debtors'~~ SWINC's consolidated financial statements recognized the overfunded Pension Plan as an asset of the consolidated entities, without disclosing to creditors that SWINC claimed to have the sole entitlement to the overfunding. Moreover, the Creditors' Committee has alleged that for the last several years before the Debtors filed their bankruptcy petitions, SWINC had no employees and did not contribute to the Pension Plan and Subsidiary Debtors paid all Pension Plan expenses. Accordingly, the Creditors' Committee has argued that substantive consolidation is nonetheless required to ensure that the overfunded portion of the Pension Plan would be distributed to the Debtors' creditors and interest holders on an equitable basis.

Furthermore, the Creditors' Committee maintains, notwithstanding the Debtors' marketing efforts with respect to Nordic, that sale proceeds attributable to the Debtors' cold-storage business, Nordic, should be consolidated with all other Debtors' assets. In support of its view, the Creditors' Committee argues that SWINC purported to purchase Nordic in 1998 for approximately $80 million, merging a pre-existing SWINC subsidiary, Commercial Cold Storage, Inc., into Nordic, and that this purchase and merger was funded through bank loans obtained with the guarantee of each Subsidiary Debtor, including SWEC. Thus, the Creditors' Committee contends that all Subsidiary Debtors bore the responsibility and liability for paying off the loans, as well as the risk of loss if SWINC, a non-operating entity, were unable to make payments on the loans. Additionally, the Creditors' Committee challenges the alleged intercompany loans between Nordic and SWINC. For these and other reasons, the Creditors' Committee asserts that as a matter of equity, SWINC cannot then deny the ~~sale~~ proceeds to the Subsidiary Debtors' creditors when they bore the risk of the Nordic purchase.

(e)     The PBGC's Response

The Pension Benefit Guaranty Corporation ("PBGC") also filed a response to the Substantive Consolidation Motion. In its response, the PBGC argued that substantive consolidation, in a plan of reorganization or otherwise, is not appropriate against parties such as the PBGC who hold joint and several claims against multiple debtors. As such, the PBGC believes that a portion of the assets from the Consolidated SWE&C Estates sufficient to cover any potential claims of the PBGC with respect to the Pension Plan should be excluded from any substantive consolidation proposed by the Plan.

(f)     Court Opinion

On November 14, 2002, the Bankruptcy Court issued its memorandum opinion denying the Equity Committee's motion for summary judgment on the Substantive Consolidation Motion. The Bankruptcy Court rested its opinion on two principal grounds. First, the Bankruptcy Court found that long-standing judicial precedent, including Supreme Court precedent, supports a bankruptcy court's power to substantively consolidate two or more debtors. The Bankruptcy Court cited as an example the Supreme Court decision in Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215 (1941), and further noted that the roots of substantive consolidation extend back to the Bankruptcy Act of 1898, 11 U.S.C. §§ 1 et seq. (1976) (repealed 1978) and were acknowledged by the drafters of the Bankruptcy Code in 1978. Second, the Bankruptcy Court found clear statutory

32

authority within the Bankruptcy Code itself for substantive consolidation. Specifically, the Bankruptcy Court held that Bankruptcy Code section 1123(a)(5)(C) authorizes a plan to substantively consolidate a debtor with one or more debtors, even where such consolidation is not done in accordance with state law. Thus, the Court held that it has the statutory authority to confirm a plan that contains a provision substantively consolidating the estates of two or more debtors. The Bankruptcy Court made no determination, however, whether substantive consolidation of the Debtors' estates is warranted in these cases.

      4.      The Bases for Two Substantively Consolidated Estates

Based on the above and many other facts and circumstances, the Plan Proponents have determined that the risks, uncertainty, expense and delay associated with continued litigation support the settlement embodied in the Plan. The Plan recognizes that substantive consolidation in some form is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases. The Creditors' Committee, the Debtors and Federal believe that the Plan's proposed substantive consolidation into two entities is a fair and equitable means of consolidating the Debtors, while protecting the interests of creditors who bargained for guarantees from SWINC. The compromises and settlements that comprise the Plan allow for a potential return to equity security holders while accounting for the risk that the Court may not agree with the position of any party on the grounds for or lack of grounds to support substantive consolidation. Specifically, the Creditors' Committee, the Debtors and Federal believe that substantive consolidation as provide for in the Plan is appropriate under the circumstances because, among other things:

      1.      The operations, business functions and financial records of the Debtors were substantially commingled, such that the assets and liabilities of the Debtors' Estates are intertwined.

      2.      A separate winding down of the Debtors' Estates would entail the segregation of the commingled assets and liabilities. The exercise of disentangling the prior transactions of the individual Debtor entities, even if it could be accomplished, would be an unproductive and inequitable task that would be harmful to creditors due to the prohibitive costs and resultant delays associated with such a task.

      3.      Substantive consolidation will provide for the most equitable distribution to Creditors and Interestholders. There is no identifiable Estate in the Chapter 11 Cases that has a discrete group of creditors holding Claims only against that Estate.

      4.      Substantive consolidation will maximize the overall return to holders of Allowed Claims and Interests because it will avoid and eliminate the significant administrative costs and expenses that otherwise would be associated with the difficult and potentially infeasible task of liquidating each of the Debtors' Estates separately.

In addition, the Plan, through its various settlements and compromises, will provide the holders of the Class 9A SWINC Equity Interests, if they vote to accept the Plan, with an immediate and guaranteed payment of $.50 per share out of the Equity Settlement Fund. Moreover, holders of the Class 9A SWINC Equity Interests could receive additional distributions once all assets

of the Consolidated SWINC Estate are liquidated and holders of Allowed SWINC Claims and paid in full. Absent the Plan, however, there is no guarantee that owners of common stock in SWINC would receive any distribution on account of their equity interests or, if there were to be a distribution, when such distribution would occur.

      5.      The Substantive Consolidation Settlement

To avoid continued litigation with respect to Substantive Consolidation and related issues regarding the Pension Plan Reversion, the Proponents propose the Plan, which provides, among other things, that upon the Effective Date, two separate consolidated estates will be created.

      (a)      The Substantive Consolidation of SWINC and the SWINC Subsidiaries

On the Effective Date, the Estates of SWINC and the SWINC Subsidiaries shall be substantively consolidated as follows: (i) the SWINC Subsidiaries shall be merged with and into SWINC, with the surviving corporation being Reorganized SWINC, (ii) all Intercompany Claims by, between and among SWINC and the SWINC Subsidiaries shall be forgiven and eliminated, (iii) all assets and liabilities of the SWINC Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWINC, (iv) any obligation of SWINC or one of the SWINC Subsidiaries and all guarantees thereof by SWINC or one of the SWINC Subsidiaries shall be deemed to be one obligation of SWINC, and (v) each Claim filed, or to be filed or allocated against SWINC or a SWINC Subsidiary shall be deemed filed only against SWINC and shall be deemed a single Claim against and a single obligation of SWINC. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of SWINC and the SWINC Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWINC or the SWINC Subsidiaries as to the obligations of SWINC or one of the SWINC Subsidiaries shall be released and of no further force and effect.

      (b)      The Substantive Consolidation of SWE&C and the SWE&C Subsidiaries

The Plan contemplates and is also predicated upon the substantive consolidation of the Estates of SWE&C and the SWE&C Subsidiaries for the purposes of all actions associated with confirmation and consummation of the Plan. On the Effective Date, the Estates of SWE&C and the SWE&C Subsidiaries shall be substantively consolidated as follows: (i) all assets and liabilities of the SWE&C Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWE&C, (ii) all Intercompany Claims by, between and among SWE&C and the SWE&C Subsidiaries shall be forgiven and eliminated, (iii) any obligation of SWE&C or one of the SWE&C Subsidiaries and all guarantees thereof by SWE&C or one of the SWE&C Subsidiaries shall be deemed to be one obligation of SWE&C, (iv) each Claim filed, or to be filed or allocated against SWE&C and/or a SWE&C Subsidiary shall be deemed filed only against SWE&C and shall be deemed a single Claim against and a single obligation of SWE&C, and (v) all Interests in SWE&C or any SWE&C Subsidiary shall be cancelled and the holders thereof shall not be entitled to any distribution. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of SWE&C and the SWE&C Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWE&C or one of the SWE&C Subsidiaries as to the obligations of SWE&C or one of the SWE&C Subsidiaries shall be released and of no further force and effect.

(c)    The Pension Plan Reversion

Pursuant to Bankruptcy Rule 9019, under the Plan and as part of the Substantive Consolidation Settlement, the Proponents also propose to settle certain disputes regarding the potential reversionary interest associated with the overfunded Pension Plan. Specifically, the Plan Proponents believe that the Pension Plan is presently overfunded and that upon termination of the Pension Plan in a state law dissolution of Reorganized SWINC, funds in excess of $30 million net of taxes, after all liabilities of the Pension Plan to Pension Plan participants have been satisfied, will revert to the Debtors' estates and become available for distribution to holders of Claims and Interests. As part of the Substantive Consolidation Litigation, the Equity Committee has asserted that holders of Claims against and Interests in SWINC (and any successor of SWINC) are entitled to the entire amount of the Reversion because SWINC is legal sponsor of the Pension Plan and thus has sole ownership of any Reversion. In response, the Creditors' Committee has asserted that the Reversion should be available to pay the holders of Claims against SWE&C and the SWE&C Subsidiaries and only after that would a distribution be made to holders of Equity Interests in SWINC because, among other things, the contributions to such Pension Plan were made primarily by SWE&C on behalf of certain of its employees. To avoid further litigation as to the Reversion, and as part of the Substantive Consolidation and Federal Settlement, the Proponents propose to settle all disputes regarding the Pension Plan and the Reversion as follows:

1.    In the event Class 9A SWINC Equity Interests votes to accept the Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds (2/3) of the Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third (1/3) of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, an equal distribution between the Consolidated SWE&C Estate and the Consolidated SWINC Estate of any Reversion in excess of $30 million.

2.    In the event Class 9A votes to reject the Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds (2/3) of the Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third (1/3) of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, a distribution of seventy-five percent (75%) of any Reversion in excess of $30 million to the Consolidated SWE&C Estate  and twenty-five percent (25%) of any Reversion in excess of $30 million to the Consolidated SWINC Estate.

The Proponents believe that such a settlement is fair and equitable because, among other things, (i) prior to SWINC becoming the sole legal sponsor of the Pension Plan, each then individual Debtor was a contributing sponsor within the meaning of section 4001(a)(13) of ERISA and (ii) even after SWINC became the legal sponsor, the overfunded Pension Plan was carried on the books and records of SWEC and (iii) Mercer Human Resources Consulting reported on a nonconsolidated basis by operating unit of the Debtors with respect to Pension Plan expenses and assets in addition to reporting on a consolidated basis at the SWINC level in accordance with general accepted accounting principles.

The PBGC contends that the Plan should provide the following provision with respect to the Pension Plan:

> In the event that the Pension Plan does not qualify for termination in a standard termination under 29 U.S.C. § 1341, Reorganized SWINC will execute a commitment under 29 C.F.R. § 4021.21(b)(1) to make the Pension Plan sufficient for all its benefit liabilities. The Disputed Claims Reserve will be funded sufficiently to meet that commitment.

The Proponents do not agree with the PBGC's contention and do not believe such a provision would be appropriate as part of the Plan.

C.     The Federal Settlement

On February 18, 2002, Federal filed numerous proofs of claim in the Bankruptcy Cases, including proofs of claim 5177 and 5178 amending its prior claims against SWINC and SWEC in the amount of $371,505,215.90, of which $55,208,965.23 was liquidated (the "Federal Liquidated Claims"). The balance of $316,296,205.69 represents unliquidated claims asserted by Federal against, among others, SWINC and SWEC and, (the "Federal Unliquidated Claims" and, together with the Federal Liquidated Claims, the "Federal Claims"). Attached to the Federal Claim is a schedule with supporting documentation setting forth the payments made by Federal which comprise the amount of the Federal Claim (the "Federal Claim Schedule"). As set forth in the Federal Claim Schedule, the Federal Liquidated Claim arises from six separate agreements, four of which are between Federal and SWE&C as the primary obligor, one between Federal and S&W Construction, and the other between Federal and Rocky Flats Engineers and Constructors, LLC, as the respective primary obligors. In addition to asserting claims against each of the primary obligors, Federal also asserted a Claim directly against SWINC pursuant to certain General Indemnity Agreements executed between Federal and SWINC. A significant portion of the Federal Liquidated Claim, in the amount of $44 million, arises in connection with Federal's payment under certain Payment and Performance Bonds between SWEC and Federal related to Maine Yankee.

Originally, Federal supported the Equity Committee Plan and opposed the Substantive Consolidation proposed by the Creditors' Committee. Subsequent to the Initial Disclosure Statement Hearing, the Debtors reached an agreement with Federal regarding Substantive Consolidation and the Federal Claims, a settlement that also provides an opportunity for holders of Allowed Class 9A SWINC Equity Interests to receive an immediate Cash payment of $0.50 per share. The Federal Settlement includes a settlement of the Lumbermens Claim, which claim exceeds $6 million. The Lumbermens Claim means proof of claim no. 5179 filed by Lumbermens relating to losses suffered by Lumbermens solely in connection with surety bonds, which claim amended and superseded proofs of claim nos. 3300 and 4491. The Federal Settlement resolves only the Lumbermens Claim and does not include any other proof of claim filed by Lumbermens. The Federal Settlement is contingent upon confirmation of the Plan, and will be binding on all interested parties upon approval of the Plan, and absent the Federal Settlement, certain individual Debtors, including SWINC and SWEC could be liable to Federal in an amount that exceeds $80 million.

The terms of the Federal Settlement are as follows:

1.     Federal will hold an Allowed Federal Claim in the amount of $52,113,000 against both the Consolidated SWINC Estate and the Consolidated

SWE&C Estate in Class 5A and Class 5B, respectively, and will be permitted to vote such Allowed Federal Claims in such Classes. In addition, Chubb Canada will receive a distribution of the Canadian Cash, which Cash shall be held in trust by Chubb Canada for its use in defending, settling or otherwise resolving the Isobord Litigation. Any Canadian Cash remaining at the conclusion of the Isobord Litigation shall be paid over to the SWE&C Liquidating Trustee to be distributed in accordance with the Plan.

2.    The Allowed Federal Claim in the amount of $52,113,000 will include a settlement of the Lumbermens Claim, which claim exceeds $6 million.

3.    Effective upon the allowance of the Federal Claims, Federal will be deemed to waive and release any and all Claims for subrogation or other Claims it has or might have against the Consolidated SWINC Estate or the Consolidated SWE&C Estate, including but not limited to, Claims for indemnification, contribution, reimbursement or subrogation arising out of the Isobord Litigation in Canada. Chubb Canada will report to the SWINC Plan Administrator periodically on the use of the Canadian Cash. Federal shall have complete control of the Isobord Litigation, with complete authority to settle or otherwise resolve the Isobord Litigation without the consent or participation of any of the Debtors. While Federal will waive any Claim against the Consolidated SWINC and SWE&C Estates in connection with the Isobord Litigation, Federal is not agreeing to indemnify SWINC or any other of the Debtors from liability in connection with the Isobord Facility. Furthermore, Federal is also not waiving any of its rights or defenses as surety, either in law, in equity or under the bonds that it might have against Isobord with respect to the Isobord Facility or any related contract, but in no event will the Allowed Federal Claim exceed $52,113,000 because of the Isobord Litigation.

4.    On the Effective Date or as soon thereafter as practicable, the SWE&C Liquidating Trustee will issue to Federal the Federal Note in the amount of $1.8 million in full satisfaction, settlement, release and discharge of the Allowed Federal Claim in Class 5B SWE&C General Unsecured Claim, which Federal Note shall be deemed satisfied and cancelled upon payment in full of the Allowed Federal Claim in Class 5A by the Consolidated SWINC Estate. In the event that the Allowed Federal Claim in Class 5A is not paid in full, the SWE&C Liquidating Trustee shall pay Federal cash in the face amount of the Federal Note or such Lesser amount as is necessary for Federal to receive full payment in the amount of $52,113,000 on the Allowed Federal Claims.

5.    In the event Class 9A SWINC Equity Interests votes to accept the Plan, SWINC shall make the Initial Federal Distribution to Federal on account of the Allowed Federal Claim in Class 5A out of which Federal will distribute, in a manner acceptable to Federal, an amount equal to $0.50 per share of Old Securities voting to accept the Plan, which amount cannot exceed $7,113,000, to the Equity Settlement Fund. On the Effective Date

or as soon thereafter as practicable, the Cash in the Equity Settlement Fund shall be distributed to holders of Allowed Class 9A Equity Interests that voted to accept the Plan. Federal will have no right to recoup any portion of the payment made to the Equity Settlement Fund from either the Consolidated SWINC Estate or the Consolidated SWE&C Estate, and the Initial Federal Distribution shall count towards the payment of the Allowed Federal Claim in Class 5A and collection of the Federal Note.

6.      In the event Class 9A SWINC Equity Interests does not vote to accept the Plan, Federal will retain all rights against the Consolidated SWINC Estate on the Allowed Federal Claim in Class 5A in the amount of $52,113,000 for distribution purposes.

D.      Reorganized SWINC and the SWE&C Liquidating Trust

The Plan provides that on the Effective Date or as soon thereafter as practicable, (a) each of the SWINC Subsidiaries shall be merged or deemed merged with and into SWINC and (b) the Chapter 11 Cases of the SWINC Subsidiaries shall be closed, following which any and all proceedings that were brought or could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWINC Subsidiaries shall be prosecuted, brought or otherwise commenced in SWINC's Chapter 11 Case.

Furthermore, under the Plan, SWINC will emerge from bankruptcy and shall continue to exist as Reorganized SWINC after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Plan. Reorganized SWINC will be authorized to engage in any lawful act for which corporations may be organized under the DGCL. Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may terminate the Pension Plan or transfer its sponsorship in accordance with applicable law. Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when, and if they arise, Reorganized SWINC has no present intention to engage in business operations and likely will dissolve under DCGL §§ 275-282 of the Delaware General Corporations Law.

The Plan also provides that on the Effective Date or as soon thereafter as practicable, (a) each of the SWE&C Subsidiaries shall be merged or deemed merged with and into SWE&C and (b) the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed, following which any and all proceedings that were brought, could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWE&C Subsidiaries shall be prosecuted, brought or otherwise commenced in SWE&C's Chapter 11 Case.

Furthermore, under the Plan, on the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved. If necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law.

SWE&C and the SWE&C Subsidiaries are liquidating, and they will not be conducting any business operations following confirmation and consummation of the Plan. In connection with the liquidation of SWE&C and the SWE&C Subsidiaries, the SWE&C Liquidating Trust will be formed for the benefit of holders of Claims against the Consolidated SWE&C Estate. Upon confirmation and consummation of the Plan, Claims against the Consolidated SWE&C Estate will receive beneficial interests in the SWE&C Liquidating Trust, entitling the holder thereof to receive distributions, as, when and if available, of funds or other assets held by the SWE&C Liquidating Trust. The SWE&C Liquidating Trust will distribute any amounts available for distribution to the holders of Claims against the Consolidated SWE&C Estate in accordance with the Plan. Beneficial interests in the SWE&C Liquidating Trust will not be certificated and will be non-transferrable, except by operation of law. The SWE&C Liquidating Trust will terminate on the earlier of (i) the tenth (10) anniversary of the Confirmation Date or (ii) the distribution of all property in accordance with the terms of the SWE&C Liquidating Trust Agreement.

Under the Plan, Reorganized SWINC will issue three classes of securities. First, Reorganized SWINC will issue 100 shares of Reorganized SWINC New Common Stock to the SWE&C Liquidating Trustee to be held for the benefit of holders of Claims against the Consolidated SWE&C Estate. As described in more detail below, these shares of Reorganized SWINC New Common Stock will provide the SWE&C Liquidating Trustee with sufficient voting power to approve the dissolution of Reorganized SWINC, which requires a majority vote of stockholders under applicable Delaware law. The SWE&C Liquidating Trustee will not be entitled to transfer or otherwise distribute the Reorganized SWINC New Common Stock, including to the beneficiaries of the SWE&C Liquidating Trust. Second, Reorganized SWINC will issue one share of Reorganized SWINC New Series A Preferred Stock to the SWINC Plan Administrator to be held for the benefit of holders of certain Claims against and Interests in the Consolidated SWINC Estate. The Reorganized SWINC New Series A Preferred Stock will have a liquidation preference equal to (i) from the Reversion either (x) two-thirds (2/3) of the first $30 million of funds ~~produced~~ generated from the Reversion of the Pension Plan plus 50% of any funds ~~produced~~ generated from the Reversion in excess of $30 million or (y) in the event that Class 9A SWINC Equity Interests votes to reject the Plan, twenty-five percent (25%) of any funds ~~produced~~ generated from the Reversion in excess of $30 million; and (ii) 100% of the funds ~~produced~~ generated from the liquidation of any additional assets, other than the Reversion, of Reorganized SWINC. Finally, Reorganized SWINC will issue one share of Reorganized SWINC New Series B Preferred Stock to the SWE&C Liquidating Trustee to be held for the benefit of holders of Claims against SWE&C. The Reorganized SWINC New Series B Preferred Stock will have an aggregate liquidation preference equal to either (i) one-third (1/3) of the first $30 million in proceeds ~~produced~~ generated from the Reversion plus 50% of any funds ~~produced~~ generated from the Reversion in excess of $30 million or (ii) in the event Class 9A SWINC Equity Interests votes to reject the Plan, seventy-five percent (75%) of any funds ~~produced~~ generated from the Reversion in excess of $30 million.

Upon the anticipated dissolution of Reorganized SWINC pursuant to the DGCL, any amounts available for distribution will be distributed in accordance with the liquidation preferences set forth in New Series ~~a~~ A and B Preferred Stock. There can be no assurance, however, that the amounts available for distribution upon any dissolution of Reorganized SWINC will be sufficient to fully satisfy these obligations.

E.    Classification and Treatment of Claims and Interests

Bankruptcy Code section 1122 requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Plan Proponents believe that they have complied with such standard. If the Court finds otherwise, however, it could deny confirmation of the Plan if the Claimholders and Interestholders affected do not consent to the treatment afforded them under the Plan.

The Proponents believe that they have classified all Claims and Interests in compliance with the requirements of Bankruptcy Code section 1122, and that the Plan provides the best and most prompt possible recovery to the holders of Claims and Interests. If a Claimholder or Interestholder challenges such classification of Claims or Interests and the Court finds that a different classification is required for the Plan to be confirmed, the Proponents, to the extent permitted by the Court, intend to make such modifications to the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Court for confirmation. UNLESS SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.

Procedures for the distribution of Cash pursuant to the Plan, including matters that are expected to affect the timing of the receipt of distributions by holders of Claims in certain Classes and that could affect the amount of distributions ultimately received by such holders, are described in Article IV.G - "SUMMARY OF THE PLAN - Distributions Under the Plan."

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified.

1.      General Administrative Claims

General Administrative Claims are Claims that are incurred in the ordinary course of business during the Chapter 11 Cases that are not allocated to either the Consolidated SWINC Estate or the Consolidated SWE&C Estate shall be paid in the ordinary course of business in accordance to the terms and conditions of any agreements relating thereto out of available funds prior to distributions being made to the Consolidated SWINC Estate and the Consolidated SWE&C Estate.

(a)      General Professional Fee Claims

General Professional Fee Claim are Administrative Claims for compensation of Professionals or other entities for professional services rendered or expenses incurred in the Chapter 11 Cases on or before the Effective Date. All payments to Professionals for Professional Fee Claims will be made in accordance with the procedures established in the

Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

    2.    Treatment of Claims Against and Interests in the Consolidated SWINC Estate

        (a)    Unclassified Claims

            (i)    SWINC Administrative Claims

The Plan provides that SWINC Administrative Claims, if any, are unimpaired.

SWINC Administrative Claim means a Claim against SWINC or a SWINC Subsidiary for payment of an administrative expense of a kind specified in Bankruptcy Code sections 503(b) or 1114(e)(2) and entitled to priority pursuant to Bankruptcy Code section 507(a)(1), including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the SWINC Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930 and (d) all Allowed Claims pursuant to a Final Order of the Court under Bankruptcy Code section 546(c)(2)(A).

As of March 1, 2003, the books and records of SWINC and the SWINC Subsidiaries reflected unpaid SWINC Administrative Claims in the approximate amount of $3.8 million, consisting of primarily accrued but unpaid professional fees (the total amount of the professional fees already paid total ~~$17.0~~ $16.0 million and includes fees paid to professionals retained under Bankruptcy Code sections 327(a) and (e) and professionals retained in the ordinary course pursuant to court order). Assuming confirmation in ~~May~~ August of 2003, SWINC and the SWINC Subsidiaries estimate that the aggregate amount of Allowed SWINC Administrative Claims in their Chapter 11 Cases, including, among other things, professional fees previously paid pursuant to the Professional Fee Order, will be approximately ~~$27.5~~ $27.6 million.

Each holder of an Allowed SWINC Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Administrative Claim (a) Cash equal to the unpaid portion of such Allowed SWINC Administrative Claim or (b) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

            (ii)    SWINC Priority Tax Claims

SWINC Priority Tax Claim means a Claim against SWINC or a SWINC Subsidiary that is entitled to priority pursuant to Bankruptcy Code section 507(a)(8).

The Plan provides that Priority Tax Claims, if any, are unimpaired. Each holder of an Allowed SWINC Priority Tax Claim shall be entitled to receive on account of such Allowed SWINC Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Priority Tax Claim, (i) equal Cash payments

made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed Priority Tax Claim, or (iii) such other treatment as to which SWINC or the SWINC Plan Administrator and such holder shall have agreed upon in writing.

      (b)      Unimpaired Classes

      (i)      Class 1A:  Secured Claims

      (1)      Class 1A.1 SWE&C Setoff Claim

SWE&C Setoff Claim means the Intercompany Claim of the Consolidated SWE&C Estate against the Consolidated SWINC Estate.  Under the Plan, on the Effective Date the Class 1A.1 SWE&C Setoff Claim held by the Consolidated SWE&C Estate shall be deemed offset against the Class 7B SWINC Intercompany Claim by the Consolidated SWINC Estate, resulting in a net Allowed Class 7B SWINC Intercompany Claim in the approximate amount of $20 million   As a result, the Allowed Class 1A.1 SWE&C Setoff Claim shall be deemed satisfied in full.

      (2)      Class 1A.2 Miscellaneous Secured Claims

Miscellaneous Secured Claims means all Secured Claims against SWINC or any SWINC Subsidiary other than the SWE&C Setoff Claim.  Under the Plan, on the Effective Date, each holder of an Allowed Class 1A.2 SWINC Miscellaneous Secured Claims shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 1A.2 SWINC Miscellaneous Secured Claim either (a) Cash equal to the unpaid portion of such Allowed Class 1A.2 SWINC Miscellaneous Secured Claim or (b) such other treatment as the SWINC Plan Administrator and such holder shall have agreed upon in writing.

      (ii)      Class 2A SWINC Other Priority Claims

SWINC Other Priority Claim means a Claim against SWINC or any SWINC Subsidiary entitled to priority pursuant to Bankruptcy Code section 507(a) other than a SWINC Administrative Claim or SWINC Priority Tax Claim.  Under the Plan, each holder of such an Allowed Class 2A SWINC Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2A SWINC Other Priority Claim (a) Cash equal to the unpaid portion of such Allowed Class 2A SWINC Other Priority Claim or (b) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

      (c)      Impaired Classes of Claims and Interests

      (i)      Class 3A SWINC Asbestos Claims

SWINC Asbestos Claims means ~~(a) any claim or demand whenever and wherever arising or~~ all Asbestos Claims asserted against SWINC or the SWINC

42

Subsidiaries, ~~their predecessors, successors, or their present or former officers, directors or employees and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured, or unsecured), whenever and wherever arising or asserted, of SWINC or the SWINC Subsidiaries, their predecessors, successors, or their present or former officers, directors or employees (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) and (b) for, relating to, or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury or damages (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Chapter 11 Cases, (x) caused or allegedly caused, in whole or in part, directly or indirectly, (i) by asbestos or asbestos-containing products sold, installed, or removed by SWINC or the SWINC Subsidiaries, (ii) by services, actions, or operations provided, completed or taken by SWINC or the SWINC Subsidiaries in connection with asbestos or asbestos-containing products, or (y) caused or allegedly caused by asbestos for which SWINC or the SWINC Subsidiaries are otherwise liable under any applicable law, whether or not arising or allegedly arising, directly or indirectly, from acts or omissions of SWINC or the SWINC Subsidiaries, their predecessors, subsidiaries, or their present or former officers, directors or employees.~~

Under the Plan, as of the Effective Date, liability, if any, for all Asbestos Claims against SWINC or the SWINC Subsidiaries shall be automatically and without further act or deed be deemed assumed by and shall be the sole responsibility of the Asbestos Trust. Each holder of an Allowed Class 3A SWINC Asbestos Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 3A SWINC Asbestos Claim (a) its Pro Rata share of the ~~Available~~ Asbestos ~~Cash and all Insurance Proceeds with respect to such Allowed Class 3A~~ Trust Assets (set forth in Article VII.L of the Plan), subject to the terms and conditions of the Asbestos ~~Claim~~ Trust Agreement or (b) ~~or~~ such other treatment as to which the Asbestos Trustee and the holder of such Allowed Class 3A Asbestos Claim shall have agreed upon in writing.

Under the Plan, Allowed Class 3A SWINC Asbestos Claims are characterized as impaired because the Proponents are unable to determine whether the Available Asbestos Trust Cash plus any Insurance Proceeds with respect to a specific Allowed Class 3A SWINC Asbestos Claim will be adequate to pay all Allowed Class 3A SWINC Asbestos Claims in full. In over 15 years of liquidating Asbestos Claims, the Asbestos Insurance Coverage available to the Debtors has been more than adequate to satisfy such claims. Under a pre-petition arrangement with the Asbestos Insurance Carriers, the Debtors also agreed to contribute a certain percentage towards the liquidation and indemnification of Asbestos Claims. In addition, SWEC entered into two pre-petition settlement agreements (as more specifically defined in the Plan, the "Weitz & Luxenberg Agreements") with the law firm of Weitz & Luxenberg, P.C., that relate to pending and future asbestos-related personal injury cases. The Debtors will assume the Weitz & Luxenberg Agreements in connection with the Plan. To date, the amount of cash funds paid out by the Debtors in connection with Asbestos Claims is less than the amount to be contributed by the Debtors to the Asbestos Trust. The Proponents believe, ~~however~~ therefore, based on the Debtors' historical liability for Asbestos Claims and an understanding of the Asbestos Insurance Coverage, that the holder of Class 3A Allowed Asbestos claims will receive from the Available Asbestos Trust Cash and the Insurance Proceeds at least the same percentage recovery as they would receive if they held Allowed Claims in Class 5A General Unsecured Claims and as much as the holder would be entitled to under the Weitz & Luxenberg Agreements. Accordingly, the Proponents of the Plan have characterized the Class 3A Asbestos Claims as impaired and seek a vote of the Class 3A to bind all members of Class 3A

43

SWINC Asbestos Claims to the treatment of such Claims proposed in the Plan.  In the event ~~Certain of the Asbestos Insurance Carriers argue~~ that the ~~Plan fails to provide adequate means for the performance of the Debtors' ongoing obligations required to maintain~~ Proponents are unable to confirm the Plan with the Class 3A SWINC Asbestos ~~Insurance Coverage, such as receipt of service of process and payment of the continuing costs of maintaining their corporate records. As such, these Asbestos Insurance Carriers contend it is possible that the Debtors' Asbestos Insurance Coverage may become unavailable or severely limited so that the rights of holders of Allowed Asbestos Claims whose claims would ordinarily be covered by Insurance Proceeds would be negatively affected. It is also the position of these Asbestos Insurance Carriers that the failure of~~ Claims, the Proponents reserve their right to modify the Plan to ~~provide adequate means for performance of the Debtors' ongoing obligations, including cooperation in the defense effort and payment for the storage and retrieval of records might void the Asbestos Insurance Carriers' obligation to defend or to provide the indemnity needed to pay the claims of those holders of Allowed Asbestos~~ seek confirmation of a Plan wherein the Class 3A SWINC Asbestos Claims are combined with and treated the same as Class 5A SWINC General Unsecured Claims ~~who would otherwise receive Insurance Proceeds. The Proponents dispute the contentions made by these Asbestos Insurance Carriers~~.

(ii)     Class 4A SWINC Convenience Claims

SWINC Convenience Claims are Allowed SWINC General Unsecured Claims that elect to receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5A SWINC General Unsecured Claim, the lesser of $1,000 or 50% of their Allowed Class 5A SWINC General Unsecured Claims. Under the Plan, on the Effective Date, each holder of an Allowed Class 5A SWINC General Unsecured Claim that elects to be treated as a holder of a Class 4A SWINC Convenience Class Claim shall receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5A SWINC General Unsecured Claim, the lesser of $1,000 or 50% of its Allowed Class 5A SWINC General Unsecured Claim.  Only holders of Class 5A SWINC General Unsecured Claims who vote in favor of the Plan may elect to have their claim treated as a Class 4A SWINC Convenience Claim.

(iii)     Class 5A SWINC General Unsecured Claims

SWINC General Unsecured Claim means a Claim against SWINC that is not a SWINC Administrative Claim, SWINC Priority Tax Claim, SWINC Other Priority Claim, SWINC Secured Claim, SWINC Securities Claim, SWINC Asbestos Claim, SWINC Convenience Claim, SWINC Intraestate Claim, or SWINC Subordinated Claim. Under the Plan, on the Effective Date, each holder of an Allowed Class 5A SWINC General Unsecured Claim shall receive its Pro Rata share of the Initial Class 5A Distribution Amount.  On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 5A SWINC General Unsecured Claim shall receive its Pro Rata share of the Semi-Annual Class 5A Distribution Amount.  SWINC Guaranty Claims will not be Allowed SWINC General Unsecured Claims until the underlying Claim for which there is a Guaranty (the "Primary Claim") is fixed and determined and a final distribution from SWE&C, a SWE&C Subsidiary or other obligator has been made on the Primary Claim.

(iv)     Class 6A SWINC Intraestate Claims

SWINC Intraestate Claim means an Intercompany Claim between SWINC and any SWINC Subsidiary.  Under the Plan, in connection with, and as a result of, the substantive consolidation of SWINC and the SWINC Subsidiaries into the Consolidated SWINC

44

Estate, all Class 6A SWINC Intraestate Claims shall be forgiven and cancelled as of the Effective Date and the holders of Class 6A Consolidated SWINC Intraestate Claims shall not be entitled to and shall not receive or retain any property or interest on account of such Claims.

(v)        Class 7A SWINC Subordinated Claims

Subordinated SWINC Claim means a Subordinated Claim against SWINC or any SWINC Subsidiary subordinated pursuant to a Final Order under Bankruptcy Code section 510(c).  Under the Plan, upon the payment in full of the Allowed Class 4A SWINC Convenience Class Claims and the Allowed Class 5A SWINC General Unsecured Claims or as soon thereafter as is practicable, each holder of an Allowed Class 7A SWINC Subordinated Claim shall receive its Pro Rata share of the Initial Class 7A Distribution Amount, if any.  On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 7A SWINC Subordinated Claim shall receive its Pro Rata share of the Semi-Annual Class 7A Distribution Amount.

(vi)        Class 8A SWINC Securities Claims

SWINC Securities Claim means (a) any claim or demand whenever and wherever arising or asserted against SWINC or any SWINC Subsidiary, their predecessors, successors, or their present or former officers, directors or employees and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured, or unsecured), whenever and wherever arising or asserted, of SWINC or any SWINC Subsidiary, their predecessors, successors, or their present or former officers, directors or employees (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) and (b) for, relating to, or arising by reason of, directly or indirectly, the ownership of Old Securities, including, but not limited to, any Claim subject to subordination under Bankruptcy Code section 510(b).

Under the Plan, upon the payment in full of Allowed  Class 4A SWINC Convenience Class Claims, Allowed Class 5A SWINC General Unsecured Claims, and Allowed Class 7A SWINC Subordinated Claims, each holder of an Allowed Class 8A SWINC Securities Claim ~~shall receive its Pro Rata share~~(less any insurance proceeds actually received and retained by such holder in respect of such Allowed Class 8A SWINC Securities Claim) <u>shall receive its Pro Rata share (as diluted by Allowed Class 9A SWINC Equity Interests)</u> of (i) the remaining Available Cash in the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the SWINC Plan Administrator as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A SWINC Convenience Class Claims, Allowed Class 5A SWINC General Unsecured Claims and Allowed Class 7A SWINC Subordinated Claims have been satisfied.  On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 8A SWINC Securities Claim shall receive its Pro Rata share (as diluted by Allowed Class 9A SWINC Equity Interests) of the remaining Available Cash in the SWINC Disputed Claims Reserve and remaining Available Cash paid to the SWINC Plan Administrator as the liquidation preference with respect to the SWINC New Series A Preferred Stock.  Upon receipt by the holder of an Allowed Class 8A SWINC Securities Claim of any amounts distributed under the Plan in respect of such claim, such holder shall be deemed to have assigned to the SWINC Plan Administrator all rights of the holder to recover such amounts from the applicable insurer.

(vii)        Class 9A SWINC Equity Interests

45

SWINC Equity Securities means, collectively, the Old Common Stock and the Old Common Stock Options. In the event that Class 9A SWINC Equity Interests vote to accept the Plan, then on the Effective Date, or as soon thereafter as practicable, each holder of an Allowed SWINC Equity Interest that votes to accept the Plan shall receive $0.50 per share of Old Common Stock held by such holder from the Equity Settlement Fund. In addition, upon the payment in full of the Allowed Class 5A SWINC General Unsecured Claims, the Allowed Class 4A SWINC Convenience Class Claims, and the Allowed Class 7A SWINC Subordinated Claims, each holder of an Allowed Class 9A SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A SWINC Securities Claims) of (i) the remaining Available Cash in the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the SWINC Plan Administrator as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A SWINC Convenience Class Claims, Allowed Class 5A SWINC General Unsecured Claims and Allowed Class 7A SWINC Subordinated Claims have been satisfied. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 9A SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A SWINC Securities Claims) of the remaining Available Cash paid to the SWINC Plan Administrator as the remaining liquidation preference with respect to the SWINC New Series A Preferred Stock.

In the event that Class 9A SWINC Equity Interests vote to reject the Plan, then, upon the payment in full of the Allowed Class 4A SWINC Convenience Class Claims, the Allowed Class 5A SWINC General Unsecured Claims, and the Allowed Class 7A SWINC Subordinated Claims, each holder of an Allowed Class 9A SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A SWINC Securities Claims) of (i) the remaining Available Cash in the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the SWINC Plan Administrator as a liquidation preference with respect to the SWINC New Series A Preferred Stock afer all Allowed Class 4A SWINC Convenience Class Claims, Allowed Class 5A General Unsecured Claims and Allowed Class 7A Subordinated Claims have been satisfied.. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 9A SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A SWINC Securities Claims) of the  and remaining Available Cash paid to the SWINC Plan Administrator as the liquidation preference with respect to the SWINC New Series A Preferred Stock.

Under the Plan, on the Effective Date, all Old Common Stock and Old Common Stock Options will be canceled on the Effective Date.

(viii)      Class 10A SWINC Subsidiary Interests

SWINC Subsidiary Interest means any and all Interests in a SWINC Subsidiary. Under the Plan, in connection with, and as a result of, the substantive consolidation of SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate, all Interests in the SWINC Subsidiaries shall be deemed cancelled as of the Effective Date and the holders of Class 10A SWINC Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

3.      Treatment of Claims Against and Interests in the Consolidated SWE&C Estates

(a)      Unclassified Claims

46

(i)    SWE&C Administrative Claims

SWE&C Administrative Claim means a Claim against SWE&C or any SWE&C Subsidiary for payment of an administrative expense of a kind specified in Bankruptcy Code sections 503(b) or 1114(e)(2) and entitled to priority pursuant to Bankruptcy Code section 507(a)(1), including, but not limited to, (a) the actual, necessary, costs and expenses, incurred after the Petition Date, of preserving the SWE&C Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930 and (d) all Allowed Claims pursuant to a Final Order of the Court under Bankruptcy Code section 546(c)(2)(A).

As of March 1, 2003, the books and records of SWE&C and the SWE&C Subsidiaries reflected unpaid SWE&C Administrative Claims in the approximate amount of $4.5 million, consisting of primarily accrued but unpaid professional fees (the total amount of professional fees already paid total $20.0 $20.5 million and includes fees paid to professionals retained under Bankruptcy Code sections 327(a) and (e) and professionals retained in the ordinary course pursuant to court order). Assuming confirmation in May August of 2003, SWE&C and the SWE&C Subsidiaries estimate that the aggregate amount of Allowed SWE&C Administrative Claims in their Chapter 11 Cases, including, among other things, professional fees previously paid pursuant to the Professional Fee Order, will be approximately $34.5 $36.7 million.

Under the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the first Semi-Annual Distribution Date after the date an Administrative Claim becomes an Allowed SWE&C Administrative Claim, each holder of an Allowed SWE&C Administrative Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed SWE&C Administrative Claim (a) Cash equal to the unpaid portion of such Allowed SWE&C Administrative Claim or (b) such other treatment as to which SWE&C and/or the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

(ii)    SWE&C Priority Tax Claims

SWE&C Priority Tax Claim means a Claim against SWE&C or a SWE&C Subsidiary that is entitled to priority pursuant to Bankruptcy Code section 507(a)(8).

Under the Plan, each holder of an Allowed SWE&C Priority Tax Claim, at the sole option of the SWE&C Liquidating Trustee, shall be entitled to receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Priority Tax Claim, (i) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed SWE&C Priority Tax Claim, or (iii) such other treatment as to which the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

(b)      Unimpaired Classes of Claims and Interests

(i)      Class 1B SWE&C Miscellaneous Secured Claims

SWE&C Miscellaneous Secured Claims means all Secured Claims against SWE&C or any SWE&C Subsidiary.  The Plan provides that on the Effective Date, each holder of Allowed Class 1B SWE&C Miscellaneous Secured Claims shall receive either (a) Cash equal to the unpaid portion of such Allowed SWE&C Miscellaneous Secured Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and the holder of such Allowed Class 1B SWE&C Miscellaneous Secured Claim agree to in writing.

(ii)     Class 2B SWE&C Other Priority Claims

SWE&C Other Priority Claim means a Claim against SWE&C or any SWE&C Subsidiary entitled to priority pursuant to Bankruptcy Code section 507(a) other than a SWE&C Administrative Claim or SWE&C Priority Tax Claim.  Under the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the first Semi-Annual Distribution Date after the date such Class 2B SWE&C Other Priority Claim becomes an Allowed Class 2B SWE&C Other Priority Claim, each holder of an Allowed Class 2B SWE&C Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2B SWE&C Other Priority Claim (a) Cash equal to the unpaid portion of such Allowed Class 2B SWE&C Other Priority Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

(c)      Impaired Classes of Claims and Interests

(i)      Class 3B SWE&C Asbestos Claims

SWE&C Asbestos Claim means ~~(a) any claim or demand whenever and wherever arising or~~ all Asbestos Claims asserted against SWE&C or any SWE&C Subsidiary~~, their predecessors, successors, or their present or former officers, directors or employees and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured, or unsecured), whenever and wherever arising or asserted, of SWE&C or any SWE&C Subsidiary, their predecessors, successors, or their present or former officers, directors or employees (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) and (b) for, relating to, or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury or damages (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Chapter 11 Cases, (x) caused or allegedly caused, in whole or in part, directly or indirectly, (i) by asbestos or asbestos-containing products sold, installed, or removed by SWE&C or any SWE&C Subsidiary, (ii) by services, actions, or operations provided, completed or taken by SWE&C or any SWE&C Subsidiary in connection with asbestos or asbestos-containing products, or (y) caused or allegedly caused by asbestos for which SWE&C or any SWE&C Subsidiary are otherwise liable under any applicable law, whether or not arising or allegedly arising, directly or indirectly, from acts or omissions of SWE&C or any SWE&C Subsidiary, their predecessors, subsidiaries, or their present or former officers, directors or employees~~.  Under the Plan, as of the

48

Effective Date, liability, if any, for all Asbestos Claims against SWE&C or the SWE&C Subsidiaries shall be automatically and without further act or deed assumed by and shall be the sole responsibility of the Asbestos Trust.  Each holder of an Allowed Class 3B SWE&C Asbestos Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 3B SWE&C Asbestos Claim (a) its Pro Rata share of the Asbestos ~~Cash and all Insurance Proceeds with respect to such Allowed Class 3B~~ Trust Assets (set forth in Article VII.L. of the Plan), subject to the terms and conditions of the Asbestos ~~Claim~~ Trust Agreement or (b) or such other treatment as to which the Asbestos Trustee and such holder shall have agreed upon in writing.

Under the Plan, Allowed Class 3B SWE&C Asbestos Claims are characterized as impaired because the Proponents are unable to determine whether the Available Asbestos Trust Cash plus any Insurance Proceeds with respect to a specific Allowed Class 3B SWE&C Asbestos Claim will be adequate to pay all Allowed Class 3B SWE&C Asbestos Claims in full.  In over 15 years of liquidating Asbestos Claims, the Asbestos Insurance Coverage available to the Debtors has been more than adequate to satisfy such claims.  Under a pre-petition arrangement with the Asbestos Insurance Carriers, the Debtors also agreed to contribute a certain percentage towards the liquidation and indemnification of Asbestos Claims.  In addition, SWEC entered into two pre-petition settlement agreements (as more specifically defined in the Plan, the "Weitz & Luxenberg Agreements") with the law firm of Weitz & Luxenberg, P.C., that relate to pending and future asbestos-related personal injury cases.  The Debtors will assume the Weitz & Luxenberg Agreements in connection with the Plan.  To date, the amount of cash funds paid out by the Debtors in connection with Asbestos Claims is less than the amount to be contributed by the Debtors to the Asbestos Trust.  The Proponents believe, ~~however~~ therefore, based on the Debtors' historical liability and an understanding of the Asbestos Insurance Coverage, that the holder of Class 3A Allowed Asbestos claims will receive from the Available Asbestos Trust Cash and the Insurance Proceeds at least the same percentage recovery as they would receive if they held Allowed Claims in Class 5A General Unsecured Claims and as much as the holder would be entitled to under the Weitz & Luxenberg Agreements.  Accordingly, the Proponents of the Plan have characterized the Class 3A Asbestos Claims as impaired and seek a vote of the Class 3A to bind all members of Class 3B SWE&C Asbestos claims to the treatment of such Claims proposed in the Plan.  In the event ~~Certain of the Asbestos Insurance Carriers argue~~ that the ~~Plan fails to provide adequate means for the performance of the Debtors' ongoing obligations required to maintain~~ Proponents are unable to confirm the Plan with the Class 3B SWE&C Asbestos ~~Insurance Coverage, such as receipt of service of process and payment of the continuing costs of maintaining their corporate records. As such, these Asbestos Insurance Carriers contend it is possible that the Debtors' Asbestos Insurance Coverage may become unavailable or severely limited so that the rights of holders of Allowed Asbestos Claims whose claims would ordinarily be covered by Insurance Proceeds would be negatively affected. It is also the position of these Asbestos Insurance Carriers that the failure of~~ Claims, the Proponents reserve their right to modify the Plan to ~~provide adequate means for performance of the Debtors' ongoing obligations, including cooperation in the defense effort and payment for the storage and retrieval of records might void the Asbestos Insurance Carriers' obligation to defend or to provide the indemnity needed to pay the claims of those holders of Allowed Asbestos~~ seek confirmation of a Plan wherein the Class 3B SWE&C Asbestos Claims are combined with and treated the same as Class 5B SWE&C General Unsecured Claims ~~who would otherwise receive Insurance Proceeds. The Proponents dispute the contentions made by these Asbestos Insurance Carriers~~.

(ii)    Class 4B SWE&C Convenience Claims

49

SWE&C Convenience Claims are Allowed SWE&C General Unsecured Claims that elect to receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5B SWE&C General Unsecured Claim, the lesser of $1,000 or 50% of their Allowed Class 5B SWE&C General Unsecured Claims. Under the Plan, on the Effective Date, each holder of an Allowed Class 5B SWE&C General Unsecured Claim that elects to be treated in Class 4B shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5B SWE&C General Unsecured Claim, the lesser of $1,000 or 50% of its Allowed Class 5B SWE&C General Unsecured Claim. Only holders of Class 5B SWE&C General Unsecured Claims who vote in favor of the Plan may elect to have their claim treated as a Class 4B SWE&C Convenience Claim.

(iii)    Class 5B SWE&C General Unsecured Claims

SWE&C General Unsecured Claim means a Claim against SWE&C that is not a SWE&C Administrative Claim, SWE&C Priority Tax Claim, SWE&C Other Priority Claim, SWE&C Miscellaneous Secured Claim, SWE&C Asbestos Claim, SWE&C Intraestate Claim, SWE&C Intercompany Claim, SWE&C Convenience Claim, SWE&C Securities Claim, or SWE&C Subordinated Claim.

The Plan provides that on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the first Semi-Annual Distribution Date after such Class 5B SWE&C General Unsecured Claim becomes an Allowed Class 5B SWE&C General Unsecured Claim, each holder of an Allowed Class 5B SWE&C General Unsecured Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5B SWE&C General Unsecured Claim its Pro Rata share of the Semi-Annual Class 5B Distribution Amount.

(iv)    Class 6B SWE&C Intraestate Claims

SWE&C Intraestate Claim means an Intraestate Claim between SWE&C and any SWE&C Subsidiary. Under the Plan, in connection with and as a result of the substantive consolidation of SWE&C and the SWE&C Subsidiaries into the Consolidated SWE&C Estates, all Class 6B SWE&C Intraestate Claims shall be eliminated and the holders of Class 6B SWE&C Intraestate Claims shall not be entitled to and shall not receive or retain any property or interest on account of such Claims.

(v)    Class 7B SWINC Intercompany Claims

Class 7B consists of the Intercompany Claims of SWINC or any SWINC Subsidiaries against the Consolidated SWE&C Estate after giving effect to the SWE&C Setoff Claim.

Under the Plan, holders of Class 7B SWINC Intercompany Claims shall not receive or retain any distribution on account of such Allowed Class 7B SWINC Intercompany Claim.

(vi)    Class 8B SWE&C Subordinated Claims

50

Subordinated SWE&C Claim means a claim against SWE&C or any SWE&C Subsidiary subordinated pursuant to a Final Order under Bankruptcy Code section 510(c). The Plan provides that holders of Allowed Class 8B SWE&C Subordinated Claims shall not receive or retain any distribution on account of such Class 8B SWE&C Subordinated Claim.

    (vii)  Class 9B SWE&C Subsidiary Interests

SW&C Subsidiary Interest means any and all Interests in a SWE&C Subsidiary. Under the Plan, in connection with, and as a result of, the substantive consolidation of SWE&C and the SWE&C Subsidiaries, on the Effective Date or such other date set by an order of the Court, all Interests in the SWE&C Subsidiaries shall be eliminated and the holders of Class 9B SWE&C Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

    (viii)  Class 10B SWE&C Interests

SWE&C Interest means(a) the legal, equitable, contractual and other rights of any Person with respect to the Old Common Stock, Old Common Stock Options or any other equity or membership interest in SWE&C or any SWE&C Subsidiary and (b) the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing. Under the Plan, in connection with, and as a result of, the substantive consolidation of SWE&C and the SWE&C Subsidiaries, on the Effective Date or such other date set by an order of the Court, all Interests in SWE&C shall be eliminated and the holders of Class 10B SWE&C Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

F.  Distributions Under the Plan

The SWINC Disbursing Agent shall make all distributions required under the Plan on account of Claims against and Interests in the Consolidated SWINC Estate. If the SWINC Disbursing Agent is an independent third party designated by the SWINC Plan Administrator to serve in such capacity, then the SWINC Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from SWINC on terms acceptable to the SWINC Plan Administrator. The SWINC Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.

The SWE&C Disbursing Agent shall make all distributions required under the Plan on account of Claims against the Consolidated SWE&C Estate. If the SWE&C Liquidating Trust Disbursing Agent is an independent third party designated by the SWE&C Liquidating Trust to serve in such capacity, then the SWE&C Liquidating Trust Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the SWE&C Liquidating Trust on terms acceptable to the SWE&C Liquidating Trust. The SWE&C Liquidating Trust Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.

Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor shall determine in its sole discretion.

1.    Sources of Cash for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the SWINC Plan Administrator and the SWINC Disbursing Agent, as the case may be, to make payments pursuant to the Plan to holders of the Claims against and Interests in SWINC, the SWINC Subsidiaries or the Consolidated SWINC Estates shall be obtained from (i) the Cash balances of SWINC and the SWINC Subsidiaries, including Cash from the market value allocation of the Sale Proceeds, and (ii) the liquidation of the remaining non-Cash assets, if any, of SWINC, the SWINC Subsidiaries and the Consolidated SWINC Estates and (iii) the liquidation of the remaining non-Cash assets, if any, of SWINC and the SWINC Subsidiaries.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the SWE&C Liquidating Trustee and the SWE&C Liquidating Trust Disbursing Agent, as the case may be, to make payments pursuant to the Plan to holders of Claims against SWE&C, the SWE&C Subsidiaries or the SWE&C Liquidating Trust shall be obtained from (i) the Cash balances of SWE&C and the SWE&C Subsidiaries, including Cash from the market value allocation of the Sale Proceeds, (ii) proceeds derived from the repayment of the Reorganized SWINC Note, and (iii) the liquidation of the remaining non-Cash assets, if any, of SWE&C and the SWE&C Subsidiaries.

2.    Distributions for Claims or Interests Allowed as of the Effective Date

Except as otherwise provided in the Plan or as ordered by the Court, distributions to be made on account of Claims or Interests that are Allowed Claims or Allowed Interests as of the Effective Date shall be made on the Effective Date. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Claims or Interests that first become Allowed Claims or Allowed Interests after the Effective Date shall be made on the first Semi-Annual Distribution Date following the date on which the Claim or Interest was Allowed unless otherwise provided in the terms and conditions of the SWINC Plan Administrator Agreement, the SWE&C Liquidating Trust Agreement, the Asbestos Trust Agreement, Articles IV, VII and IX of the Plan, or any contract, instrument or other agreement created in connection with the Plan.

(a)    Interest on Claims or Interests

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Interest shall not accrue or be paid upon any Disputed Claim or Disputed Interest in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

(b)    Notification Date for Distributions to Holders of Equity Interests

52

At the close of business on the Distribution Notification Date, the transfer ledgers for the Old Securities shall be closed, and there shall be no further changes in the record holders of the Old Securities. Neither the SWINC Plan Administrator nor the SWINC Disbursing Agent shall have any obligation to recognize any transfer of such Old Securities occurring after the Distribution Notification Date and shall be entitled instead to recognize and deal for all purposes with only those record holders as of the close of business on the Distribution Notification Date.

(c)    Fractional Dollars; De Minimus Distributions

Notwithstanding any other provision of the Plan, the SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall (i) not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (ii) have no obligation to make a distribution on account of an Allowed Claim from any Reserve or account (a) to any holder of an Allowed Claim if the aggregate amount of all distributions authorized to be made from all such Reserves or accounts on the particular Distribution Date in question is less than $1,000,000 or (b) to a specific holder of an Allowed Claim if the amount to be distributed to that holder on the particular Distribution Date (1) does not constitute a final distribution to such holder and (2) is less than $100.00.

(d)    Delivery of Distributions

Distributions to holders of Allowed Claims or Allowed Interests shall be made at the addresses set forth in the Amended Schedules unless such addresses are superseded by proofs of claim or interest or transfers of claim filed pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent as the case may be, has been notified in writing of a change of address).

If the distribution to any holder of an Allowed Claim or Allowed Interest is returned to the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent is notified in writing of such holder's then-current address. Undeliverable and unclaimed distributions shall be set aside or, in the case of a Cash distribution, deposited in a segregated, interest-bearing account, designated as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable or is claimed.

(e)    Surrender of Securities or Instruments

On or before the Effective Date, or as soon as practicable thereafter, each holder of an instrument evidencing an Interest on account of Old Securities (as to each, a "Certificate") shall surrender such Certificate to the SWINC Disbursing Agent and such Certificate shall be cancelled; *provided, however*, that the surrender and cancellation of such Certificates pursuant to or under the Plan shall in no way impair or affect the right of any holder to pursue any claims against non-Debtors in any of the Securities Actions. No distribution of property shall be made to or on behalf of any such holder unless and until such Certificate is received by the SWINC Disbursing Agent or the unavailability of such Certificate is reasonably established to the satisfaction