of the SWINC Disbursing Agent. Any such holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the SWINC Disbursing Agent prior to the second (2nd) anniversary of the Effective Date, shall be deemed to have forfeited all rights and interests in respect of such Certificate and shall not participate in any distribution and all property in respect of such forfeited distribution, including interest accrued thereon, shall revert to the SWINC Plan Administrator for the benefit of the Claimholders and Interestholders of SWINC notwithstanding any federal or state escheat laws to the contrary.

3.    Resolution and Treatment of Disputed, Contingent and Unliquidated Claims and Disputed Interests

(a)    Prosecution of Objections

Except as otherwise provided in the Plan or any contract, instrument or other agreement created in connection with the Plan, no later than the SWINC Claims Objection Deadline (unless extended by an order of the Court), the SWINC Plan Administrator shall have the exclusive authority to file objections to Claims against or Interests in the Consolidated SWINC Estate with the Court and serve such objections upon the holders of each of the Claims or Interests to which objections are made. Nothing contained in the Plan, however, shall limit the right of the SWINC Plan Administrator to object to Claims against or Interests in the Consolidated SWINC Estate, if any, filed, amended or reclassified after the SWINC Claims Objection Deadline. Subject to the limitations set forth in the SWINC Plan Administrator Agreement and Article VII.K.6 of the Plan, the SWINC Plan Administrator shall be authorized to, and shall, resolve all Disputed Claims against or Disputed Interests in the Consolidated SWINC Estate by withdrawing or settling such objections thereto, or by litigating to judgment in the Court or such other court having jurisdiction the validity, nature and/or amount thereof.

Except as otherwise provided in the Plan or any contract, instrument or other agreement created in connection with the Plan, no later than the SWE&C Claims Objection Deadline (unless extended by an order of the Court), the SWE&C Liquidating Trustee shall have the exclusive authority to file objections to Claims against or Interests in the Consolidated SWE&C Estate with the Court and serve such objections upon the holders of each of the Claims against or Interests in the Consolidated SWE&C Estate to which objections are made. Nothing contained in the Plan, however, shall limit the right of the SWE&C Liquidating Trustee to object to Claims against or Interests in the Consolidated SWE&C Estate, if any, filed or amended after the SWE&C Claims Objection Deadline. Subject to the limitations set forth in the SWE&C Liquidating Trust Agreement and Article VII.N of the Plan, the SWE&C Liquidating Trustee shall be authorized to, and shall, resolve all Disputed Claims against or Disputed Interests in the Consolidated SWE&C Estate by withdrawing or settling such objections thereto, or by litigating to judgment in the Court or such other court having jurisdiction the validity, nature and/or amount thereof.

(b)    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or the Disputed Interest, or some portion thereof, has become an Allowed Claim or Allowed Interest. All Guaranty Claims are

deemed Disputed Claims until the amount of any deficiency in payment by the primary obligor is fixed and determined and no distribution will be made on a Guaranty Claim until the holder of such claim has received the entire payment or distribution that it will receive from the primary obligor.

(c)    Reserves

On the Effective Date or as soon thereafter as practicable, the following Reserves will be established and funded:

(i)    General Administrative Claims Reserve

On the Effective Date, there shall be created and funded with Cash, a General Administrative Claims Reserve in the amount of $11.6 $11.1 million, to be used to pay under the Plan Allowed General Administrative Claims including General Professional Fee Claims. In the event that any Cash remains in the General Administrative Claims Reserve after the payment in full of General Administrative Claims, such amount shall be distributed 50% to the SWINC Disputed Claims Reserve and 50% to the SWE&C Disputed Claims Reserve.

(ii)    The SWINC Professional Fee Reserve

On the Effective Date, there shall be created and funded with Cash, the SWINC Professional Fee Reserve in the amount of $2 million to be used to pay Allowed Professional Fee Claims held by (i) counsel and any advisers to the Equity Committee and (ii) any professionals working exclusively on behalf of SWINC or any SWINC Subsidiary. In the event that any Cash remains in the SWINC Professional Fee Reserve after payment of the Allowed SWINC Professional Fee Claims, such Cash shall be distributed to the SWINC Disputed Claims Reserve.

(iii)    SWINC Operating Reserve

On the Effective Date, there shall be created and funded with Cash, a SWINC Operating Reserve in the amount of $3 million, which amount shall be used to pay the administrative and other costs and expenses associated with the Consolidated SWINC Estate, including all fees and expenses of the SWINC Plan Administrator, and its professionals. In the event that Cash in the SWINC Operating Reserve is exhausted, the SWINC Plan Administrator, in his or her sole discretion, has the right to obtain such additional Cash from the SWINC Disputed Claims Reserve so as to replenish the SWINC Operating Reserve. In the event that any Cash remains in the SWINC Operating Reserve after the final resolution of all Claims Against or Interests in the Consolidated SWINC Estate, such Cash shall be distributed to the SWINC Disputed Claims Reserve for distributions under the Plan.

(iv)    The SWINC Disputed Claims Reserve

On the Effective Date, there shall be created and funded with Cash, a SWINC Disputed Claims Reserve from Cash in the amount of $45.6 $44.5 million, which amount will be used to pay (i) the holders of Allowed Class 4A SWINC Convenience Claims in full, (ii) the holders of Allowed Class 5A SWINC General Unsecured Claims their Pro Rata share of the Disputed Claims Reserve until all such Claims are paid in full, (iii) the holders of Allowed Class 7A SWINC Subordinated Claims their Pro Rate Share of the Disputed Claims Reserve remaining after holders in Class 4A and Class 5A have been paid in full, and (iv) the holders of Allowed Class 8A SWINC

Securities Claims and Allowed Class 9A SWINC Equity Interests their Pro Rata share of the Disputed Claims Reserve remaining after holders in Allowed Class 7A SWINC Subordinated Claims have been paid in full. The SWINC Disputed Claims Reserve shall be supplemented from time to time with Cash or other property received by the SWINC Plan Administrator from recoveries on claims or causes of action, dispositions of property or receipt of unused funds in Reserves distributable to the SWINC Disputed Claim Reserve.

(v)       The SWE&C Professional Fee Reserve

On the Effective Date, there shall be created and funded with Cash, the SWE&C Professional Fee Reserve in the amount of $1.5 million to be used to pay Allowed SWE&C Professional Fee Claims held by (i) counsel and any advisers to the Creditors' Committee and (ii) any professionals working exclusively on behalf of SWE&C or any SWE&C Subsidiary. In the event that any Cash remains in the SWE&C Professional Fee Reserve after payment of all Allowed SWE&C Professional Fee Claims, such Cash shall be distributed to the SWE&C Disputed Claims Reserve.

(vi)      SWE&C Operating Reserve

On the Effective Date, there shall be created and funded with Cash, a SWE&C Operating Reserve in the amount of $3 million, which amount shall be used to pay the administrative and other costs and expenses associated with the Consolidated SWE&C Estate, including all fees and expenses of the SWE&C Liquidating Trustee and its professionals. In the event that Cash in the SWE&C Operating Reserve is exhausted, the SWE&C Liquidating Trustee, in his or her sole discretion, has the right to obtain such additional Cash from the SWE&C Disputed Claims Reserve so as to replenish the SWE&C Operating Reserve. In the event that any Cash remains in the SWE&C Operating Reserve after the final resolution of all Claims Against of Interests in the Consolidated SWE&C Estate, such Cash shall be distributed to the SWE&C Disputed Claims Reserve for distributions under the Plan.

(vii)     The SWE&C Disputed Claims Reserve

On the Effective Date, there shall be created and funded with Cash, a SWE&C Disputed Claims Reserve in the amount of $5.9 $5.2 million, which amount will be used as follows: (i) first, to pay the holders of Allowed Class 4B SWE&C Convenience Claims in full, and (ii) second, to pay the holders of Allowed Class 5B SWE&C General Unsecured Claims their Pro Rata share of the SWE&C Disputed Claims Reserve until all such Claims are paid in full. The SWE&C Disputed Claims Reserve shall be supplemented from time to time with Cash and other property received by the SWE&C Liquidating Trustee from recoveries on claims or causes of action, dispositions of property, the receipt of unused funds from Reserves established under the Plan and distributable to the SWE&C Disputed Claims Reserve.

(d)       Distributions After Allowance

The SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall make payments and distributions from the appropriate Reserves to the holder of any Disputed Claim that has become an Allowed Claim or Allowed Interest, on the first Semi-Annual Distribution Date following the date that such Disputed Claim becomes an Allowed

56

Claim. Such distributions shall be made in accordance with the Plan, the SWINC Plan Administrator Agreement, or the SWE&C Liquidating Trust Agreement, as the case may be.

G.    Means for Implementation of the Plan

    1.    Merger of Entities

        On the Effective Date or as soon thereafter as practicable, (a) each of the SWINC Subsidiaries shall be merged or deemed merged with and into SWINC and (b) the Chapter 11 Cases of the SWINC Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWINC Subsidiaries shall be brought or otherwise commenced in SWINC's Chapter 11 Case.

        On the Effective Date or as soon thereafter as practicable, (a) each of the SWE&C Subsidiaries shall be deemed merged with and into SWE&C and (b) the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWE&C Subsidiaries shall be brought or otherwise commenced in SWE&C's Chapter 11 Case.

    2.    Continued Corporate Existence; Dissolution of SWE&C and the SWE&C Subsidiaries

        SWINC shall continue to exist as Reorganized SWINC after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Plan. Pursuant to the Amended Certificate of Incorporation and By-Laws of Reorganized SWINC, Reorganized SWINC will be authorized to engage in any lawful activity for which corporations may be organized under the DGCL. After emerging from bankruptcy, Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may terminate the Pension Plan or transfer its sponsorship in accordance with applicable law. Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when and if they arise, Reorganized SWINC has no present intention of engaging in business operations and will likely dissolve pursuant to the DGCL within two years following confirmation set forth herein.

        On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved. If necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law.

    3.    Certificate of Incorporation and By-laws of Reorganized SWINC

        The certificate of incorporation and by-laws of SWINC shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The certificate of incorporation of Reorganized SWINC shall be amended to, among other things: (a) authorize 1,000 shares of Reorganized SWINC New Common Stock, $0.01 par value per share, (b) authorize 100 shares of Reorganized SWINC New Series A Preferred Stock, $0.01 par value per share, (c) authorize 100 shares of Reorganized SWINC New Series B Preferred Stock, $0.01 par value per share, and (d)

pursuant to Bankruptcy Code section 1123(a)(6), add (i) a provision prohibiting the issuance of non-voting equity securities, and, if applicable, (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. The forms of the documents relating to the Amended Certificate of Incorporation and By-laws of Reorganized SWINC shall be in substantially the form annexed to the Plan as Plan Exhibits E and F, respectively.

    4.      Directors and Officers of Reorganized SWINC

On the Effective Date, the members of the board of directors and executive officers of SWINC and each of the SWINC Subsidiaries shall be deemed to have resigned. From and after the Effective Date, the board of directors of Reorganized SWINC shall consist of three (3) directors: (1) Mr. James Carroll, who will serve as the Chairman; (2) a director designated by Federal; and (3) a director designated by the Equity Committee. From and after the Effective Date, Mr. Carroll shall serve as the president and chief executive officer of Reorganized SWINC and Mr. Patrick Connolly shall serve as the secretary of Reorganized SWINC. The Directors and Officers of Reorganized SWINC initially will be compensated under the same terms as they were compensated during the Debtors' Chapter 11 cases and in accordance with those agreements approved by the Bankruptcy Court during the pendency of the Chapter 11 Cases.

    5.      Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further action by stockholders, creditors, or directors of the Debtors.

    6.      Cancellation of Securities, Instruments and Agreements Evidencing Claims and Interests

Except as otherwise provided in the Plan and in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date (a) the Old Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor shall be deemed cancelled, and, in the case of the Old Securities, shall be retired and shall cease to exist and (b) the obligations of the Debtors under any agreement, indenture or certificate of designations governing the Old Securities and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor shall be deemed released.

    7.      Issuance of Reorganized SWINC New Common Stock and Preferred Stock

On the Effective Date or as soon thereafter as practicable, Reorganized SWINC shall issue for distribution in accordance with the terms of the Plan, (i)(A) the Reorganized SWINC New Series A Preferred Stock to the SWINC Plan Administrator to be held for the benefit of Holders of Allowed Claims and Interests in accordance with the terms of the Plan and the SWINC Plan Administrator Agreement and (B) the Reorganized SWINC New Series B Preferred Stock to the

SWE&C Liquidating Trustee to be held for the benefit of Holders of Allowed Claims and Interests in accordance with the terms of the Plan and the SWE&C Liquidating Trust Agreement and (ii) the Reorganized SWINC New Common Stock to the SWE&C Liquidating Trustee. The issuance of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock shall be exempt from registration under applicable securities laws pursuant to Section 4(2) of the Securities Act. All such shares of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock shall be, when issued pursuant to and in accordance with the terms of the Plan, duly authorized, validly issued, fully paid and nonassessable.

Pursuant to the terms of the SWE&C Liquidating Trust Agreement, the SWINC Plan Administrator Agreement and the securities themselves, the SWE&C Liquidating Trustee and the SWINC Plan Administrator have agreed not to transfer or otherwise dispose of the Reorganized SWINC New Common Stock, the Reorganized SWINC New Series A Preferred Stock and the Reorganized SWINC New Series B Preferred Stock, respectively. In no event will the Reorganized SWINC New Common Stock be distributed to the beneficial owners of the SWE&C Liquidating Trust and the shares of Reorganized SWINC New Common Stock will not be deemed to be assets of the SWE&C Liquidating Trust. Accordingly, none of the securities to be issued by Reorganized SWINC under the Plan will be transferrable.

Set forth below are the material terms of the securities to be issued by Reorganized SWINC under the Plan, including the Reorganized SWINC New Common Stock, the Reorganized SWINC New Series A Preferred Stock, and the Reorganized SWINC New Series B Preferred Stock.

(a)    Reorganized SWINC New Common Stock

The principal terms of the Reorganized SWINC New Common Stock to be issued by Reorganized SWINC under the Plan are as follows:

| | |
|---|---|
| Authorization . . . . . . . . . . . . . . . . | 1,000 shares. |
| Initial Issuance . . . . . . . . . . . . . . . . . . . . | 100 shares. |
| Par Value . . . . . . . . . . . . . . . . . . . | $.01 per share. |
| Listing . . . . . . . . . . . . . . . . . . . . . | None. |
| Voting Rights . . . . . . . . . . . . . . . . | One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Series A Preferred Stock and  Reorganized SWINC New Series B Preferred Stock. The SWE&C Liquidating Trustee has granted an irrevocable proxy to the Board of Directors of Reorganized SWINC for the limited purpose of permitting the Board to vote the shares of Reorganized SWINC New Common Stock, at its discretion, in favor of the dissolution of Reorganized SWINC. |

Transfer
Restrictions . . . . . . . . . . . . . . . . .    Not transferable.

Preemptive
Rights . . . . . . . . . . . . . . . . . . . . . .    None.

(b)    Reorganized SWINC New Series A Preferred Stock

The principal terms of the Reorganized SWINC New Series A Preferred Stock to
be issued by Reorganized SWINC under the Plan are as follows:

Authorization . . . . . . . . . . . . . . . .    100 shares.

Initial Issuance . . . . . . . . . . . . . . .    1 share.

Par Value . . . . . . . . . . . . . . . . . . .    $.01 per share.

Listing . . . . . . . . . . . . . . . . . . . . .    None.

Ranking . . . . . . . . . . . . . . . . . . . .    Senior to the Reorganized SWINC New Common Stock and
all other series of Preferred Stock that subsequently may be
issued by Reorganized SWINC.  Except as to the liquidation
preference, the Reorganized SWINC New Series A Preferred
Stock and Reorganized SWINC New Series B Preferred
Stock rank equally.

Liquidation
Preference . . . . . . . . . . . . . . . . . .    Upon termination of the Pension Plan and the liquidation,
dissolution and winding up of Reorganized SWINC, and in
accordance with the terms of the Plan, holders of Series A
Preferred Stock shall be entitled to receive a liquidating
distribution calculated as follows: (i) from the Reversion
either (x) two-thirds of the first $30 million of funds
~~produced~~ generated from the Reversion of the Pension Plan
plus, if the Reversion exceeds $30 million, 50% of any funds
~~produced~~ generated from the Reversion in excess of $30
million or (y) in the event Class 9A votes to reject the Plan,
two-thirds of the first $30 million of funds ~~produced~~
generated from the Reversion of the Pension Plan plus, if the
Reversion exceeds $30 million, twenty-five percent (25%) of
any funds ~~produced~~ generated from the Reversion in excess
of $30 million; and (ii) 100% of the funds ~~produced~~
generated from the liquidation of any additional assets, other
than the Reversion, of Reorganized SWINC (the "Series A
Liquidation Preference").  The SWINC Plan Administrator
will distribute the Series A Liquidation Preference to the
Holders of Allowed SWINC Claims and Interests in
accordance with the terms of the Plan and the SWINC Plan
Administrator Agreement.

60

| | |
|---|---|
| Dividends .................... | Holders of Series A Preferred Stock are entitled to participate ratably in any dividends declared on the Reorganized SWINC New Common Stock, when, as and if declared by the Board of Directors of Reorganized SWINC. |
| Redemption ................. | Non-Redeemable. |
| Board Designations ................. | None. |
| Voting Rights ................ | One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Common Stock and Reorganized SWINC New Series B Preferred Stock. |
| Transfer Restrictions .................. | Not transferable. |
| Preemptive Rights ...................... | None. |

(c)    Reorganized SWINC New Series B Preferred Stock

The principal terms of the Reorganized SWINC New Series B Preferred Stock to be issued by Reorganized SWINC under the Plan are as follows:

| | |
|---|---|
| Authorization ................ | 1,000 shares. |
| Initial Issuance .................... | 1 share. |
| Par Value ................... | $.01 per share. |
| Listing ..................... | None. |
| Ranking .................... | Senior to the Reorganized SWINC New Common Stock and all other series of Preferred Stock that subsequently may be issued by Reorganized SWINC.  Except as to the liquidation preference, the Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock rank equally. |
| Liquidation Preference ................... | Upon termination of the Pension Plan and the liquidation, dissolution and winding up of Reorganized SWINC, and in accordance with the terms of the Plan, holders of Series B Preferred Stock shall be entitled to receive a liquidating distribution calculated from the Reversion as follows: either (i) one-third of the first $30 million of funds ~~produced~~ |

61

generated from the Reversion plus, if the Reversion exceeds $30 million, 50% of any funds ~~produced~~ generated from the Reversion in excess of $30 million or (ii) in the event Class 9A votes to reject the Plan, one-third of the first $30 million of funds ~~produced~~ generated from the Reversion of the Pension Plan plus, if the Reversion exceeds $30 million, seventy-five percent (75%) of any funds ~~produced~~ generated from the Reversion in excess of $30 million  (the "Series B Liquidation Preference").  The SWE&C Liquidating Trustee will distribute the Series B Liquidation Preference to the Holders of Allowed SWE&C Claims and Interests in accordance with the terms of the Plan and the SWE&C Liquidating Trust Agreement.

Dividends . . . . . . . . . . . . . . . . . .   Holders of Reorganized SWINC New Series B Preferred Stock are entitled to participate ratably in any dividends declared on the Reorganized SWINC New Common Stock, when, as and if declared by the Board of Directors of Reorganized SWINC.

Redemption  . . . . . . . . . . . . . . . .   Non-Redeemable.

Board
Designations . . . . . . . . . . . . . . . .   None.

Voting Rights . . . . . . . . . . . . . . .   One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Common Stock and Reorganized SWINC New Series A Preferred Stock.

Transfer
Restrictions . . . . . . . . . . . . . . . . .   Not transferable.

Preemptive
Rights . . . . . . . . . . . . . . . . . . . . .   None.

8.      Effectuating Documents; Further Transactions

The chairman of the Reorganized SWINC board of directors, president, chief financial officer, or any other appropriate officer of Reorganized SWINC shall be authorized to execute, deliver, file, or record such contracts, instruments, release, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of Reorganized SWINC shall be authorized to certify or attest to any of the foregoing actions.

The SWE&C Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, release, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and

62

conditions of the Plan. The secretary or assistant secretary appointed by the SWE&C Liquidating Trustee shall be authorized to certify or attest to any of the foregoing actions.

      9.      No Revesting of Assets

          On or following the Effective Date, the property of the Estates of SWINC and the SWINC Subsidiaries (except for any obligations and/or reversionary interest in the Pension Plan and the rights to Cash in the amount of $2 million) shall remain or become the property of the Consolidated SWINC Estate and shall continue to be subject to the jurisdiction of the Court following confirmation of the Plan until distributed to holders of Allowed Claims and Allowed Interests in accordance with the provisions of the Plan, the SWINC Plan Administrator Agreement and the Confirmation Order. The Consolidated SWINC Estate shall invest Cash in the amount of $2 million in Reorganized SWINC on the Effective Date, which Cash shall be held by Reorganized SWINC, free and clear of all Claims and Interests, except as specifically provided for in the Plan. Reorganized SWINC shall succeed SWINC as the "contributing sponsor" of the Pension Plan for all purposes, including under ERISA section 4001(a)(13), and shall succeed SWINC as the "employer" maintaining the Pension Plan for all purposes, including under ERISA section 4044(d).

          On or following the Effective Date, the property of the Estates of SWE&C and the SWE&C Subsidiaries shall remain or become the property of the SWE&C Liquidating Trust and shall continue to be subject to the jurisdiction of the Court following confirmation of the Plan until distributed to holders of Allowed Claims in accordance with the provisions of the Plan, the SWE&C Liquidating Trust Agreement and the Confirmation Order.

      10.     Preservation of Rights of Action

          Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Consolidated SWINC Estate and the SWE&C Liquidating Trust shall retain the Litigation Claims, including but not limited to the Litigation Claims listed on Exhibit B annexed to the Plan and those Litigation Claims against any Person or Entity hereinafter arising or discovered and regardless of when the facts giving rise to such Litigation Claims arose or existed. The SWINC Plan Administrator, on behalf of SWINC, the SWINC Subsidiaries and the Consolidated SWINC Estate, shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any and all of the Litigation Claims that SWINC, the SWINC Subsidiaries, their Estates or the Consolidated SWINC Estate may hold against any Person or Entity. The SWE&C Liquidating Trustee, on behalf of SWE&C, the SWE&C Subsidiaries, and the SWE&C Liquidating Trust shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any and all of the Litigation Claims that SWE&C, the SWE&C Subsidiaries, their Estates or the SWE&C Liquidating Trust may hold against any Person or Entity. The failure of the Debtors to list a claim, right of action, suit or proceeding on Plan Exhibit B shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding all such claims, rights of action, suits or proceedings are being expressly reserved.

      11.     Creditors' Committee and Equity Committee

          (a)     Dissolution of Creditors' Committee

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103, and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Creditors' Committee members and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the Fee Order and the Confirmation Order and the Plan.

(b)    Dissolution of Equity Committee

The Equity Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Equity Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Equity Committee's attorneys, accountants and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Equity Committee members and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the Fee Order the Confirmation Order and the Plan.

12.    Special Provisions Regarding Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim against SWINC, a SWINC Subsidiary, SWE&C or a SWE&C Subsidiary, shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; *provided, however,* that the maximum amount of any distribution under the Plan on account of an Allowed Insured Claim (except for Allowed Asbestos Claims) shall be limited to an amount equal to the amount of Allowed Insured Claim minus any insurance proceeds actually received and retained by such holder in respect of such Allowed Insured Claim. Nothing in Article VII of the Plan shall (x) constitute a waiver of any claim, right, or cause of action the Debtors may hold against any Person, including the Debtors' insurance carriers or (y) is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to any distribution such holder may receive pursuant to the Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the estate to which they are entitled, with the exception of the provisions contained in the stipulated agreement between SWINC and the Secretary of Labor, United States Department of Labor, filed by the Debtors on or about February 26, 2002. Upon receipt by the holder of an Allowed Insured Claim of any amounts distributed under the Plan in respect of such claim, such holder shall be deemed to have assigned to the SWINC Plan Administrator all rights of the holder to recover such amounts from the applicable insurer.

The Plan will not expand the scope of or alter in any other way the insurers' obligations under their policies, and the insurers shall retain any and all defenses to coverage that they may have. The Plan shall not operate as a waiver of any other claims the insurers have asserted

64

or may assert in proofs of claim filed in the Debtors' bankruptcy cases or the Debtors' rights as to those claims.

Each of the insurers retains any and all of its rights, at its own expense, to commence and participate in any contested matters and other related proceedings concerning asbestos claims, including objections to and requests for relief from the automatic stay with respect to any such claims, until the Debtors' bankruptcy cases are closed.

H.    The SWINC Plan Administrator

1.    Appointment

From and after the Confirmation Date, Mr. James P. Carroll shall serve as the SWINC Plan Administrator pursuant to the SWINC Plan Administrator Agreement and the Plan, until death, resignation, discharge or the appointment of a successor SWINC Plan Administrator in accordance with the SWINC Plan Administrator Agreement.

2.    Rights, Powers and Duties of the SWINC Estate and the SWINC Plan Administrator

The Consolidated SWINC Estate shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Plan. Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, such rights, powers and duties, which shall be exercisable by the SWINC Plan Administrator on behalf of the Consolidated SWINC Estate pursuant to the Plan and the SWINC Plan Administrator Agreement, shall include, among others:

(a)    investing the Cash of the Consolidated SWINC Estate, including, but not limited to, the Cash held in the Reserves in (i) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (ii) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (iii) any other investments that may be permissible under (a) Bankruptcy Code section 345 or (b) any order of the Court entered in the Debtors' Chapter 11 cases;

(b)    calculating and paying all distributions to be made under the Plan, the SWINC Plan Administrator Agreement and other orders of the Court to holders of Allowed Claims against and Interests in the Consolidated SWINC Estate;

(c)    employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of the Consolidated SWINC Estate;

(d) objecting to Claims or Interests filed against the Consolidated SWINC Estate;

(e) seeking estimation under Bankruptcy Code section 502(c) of contingent or unliquidated claims filed against the Consolidated SWINC Estate;

(f) seeking determination of tax liability of the Consolidated SWINC Estate under Bankruptcy Code section 505;

(g) exercising all powers and rights, and taking all actions, contemplated by or provided for in the SWINC Plan Administrator Agreement;

(h) voting the shares of Reorganized SWINC New Series B Preferred Stock in connection with any matter submitted to a vote of the stockholders of Reorganized SWINC; and

(i) taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the SWINC Plan Administrator Agreement.

3. Compensation

The SWINC Plan Administrator shall be compensated from the SWINC Operating Reserve pursuant to the terms of the SWINC Plan Administrator Agreement. The initial compensation of the SWINC Plan Administrator will be the same as the compensation paid to Mr. James P. Carroll as previously approved by the Bankruptcy Court during the Chapter 11 Cases. Any professionals retained by the SWINC Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the SWINC Operating Reserve. The payment of the fees and expenses of the SWINC Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Court, except that, upon the request of any party in interest or the SWINC Plan Administrator, the Court, after notice and hearing, may alter the amount, terms or conditions of the SWINC Plan Administrator's compensation.

4. Indemnification

SWINC, the SWINC Subsidiaries, the Consolidated SWINC Estates and Reorganized SWINC shall, to the fullest extent permitted by the applicable laws of the jurisdiction in which each such entity is incorporated or otherwise organized, indemnify and hold harmless the SWINC Plan Administrator (in his capacity as such) and the agents, representatives, professionals and employees of the SWINC Plan Administrator (collectively the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to SWINC, the SWINC Subsidiaries and their Estate(s) or the implementation or administration of the Plan and the Reorganized SWINC Plan Administrator Agreement if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of SWINC, the SWINC Subsidiaries and their Estate(s), as the case may be, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. To the extent SWINC, the SWINC

66

Subsidiaries, their Estate(s) or Reorganized SWINC indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the SWINC Plan Administrator in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid out of the SWINC Operating Reserve. The indemnification provisions of the SWINC Plan Administrator Agreement shall remain available to and be binding upon any future SWINC Plan Administrator or the estate of any decedent SWINC Plan Administrator and shall survive the termination of the SWINC Plan Administrator Agreement.

     5.     Insurance

     The SWINC Plan Administrator shall be authorized to obtain all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, SWINC, the SWINC Subsidiaries, and the Consolidated SWINC Estate including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Consolidated SWINC Estate and (ii) the liabilities, duties and obligations of the SWINC Plan Administrator and its agents, representatives, employees or independent contractors under the SWINC Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the SWINC Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the SWINC Plan Administrator Agreement.

     6.     Authority to Object to Claims and Interests and to Settle Disputed Claims

     Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims against them and/or claims that they may have against other Persons. The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to (i) the SWINC Plan Administrator pursuant to Articles VII.K of the Plan, or (ii) the SWE&C Liquidating Trustee pursuant to Articles VII.N of the Plan.

I.     The Asbestos Trust

     On the Effective Date, and pursuant to the terms of the Asbestos Trust Agreement, the Debtors shall transfer to the Asbestos Trust Cash in the amount of $4.0 $4.5 million and an Allowed Class 5B Claim in the amount of $1.0 million for distribution to holders of Allowed Asbestos Claims and to pay the reasonable and necessary costs and expenses associated with administering the Asbestos Trust, any litigation related to the liquidation, resolution, settlement or compromise of the Asbestos Claims or any litigation related to the resolution, settlement or compromise regarding Asbestos Insurance Issues. The Asbestos Trustee shall liquidate all On the Effective Date, and pursuant to the terms of the Asbestos Trust Agreement, the Debtors shall transfer to the Asbestos Trustee all of their rights with respect to, among other things, indemnification, contribution or reimbursement under the insurance policies issued by the Asbestos Insurance Carriers (but not the policies themselves) and all of their rights under any other policies that provide coverage for Asbestos Claims (but not those policies themselves), but only to the extent of such coverage under those policies. Notwithstanding anything to the contrary herein, the Debtors or their respective successors and assigns under this Plan shall retain any and all rights under policies issued by the Asbestos Insurance Carriers or the policies providing coverage for Asbestos Claims with respect to coverage for any Claims other than Asbestos Claims. The Asbestos Trust shall terminate ten (10)

~~years after the Effective Date~~ remain in existence until dissolved by the Asbestos Trustee, and upon termination ~~of the Asbestos Trust~~, any remaining assets of the Asbestos Trust shall revert and be paid over to the SWE&C Liquidating ~~Trustee~~ Trust.

J.      The Asbestos Trustee

      1.      Appointment

From and after the Effective Date, Mr. James Carroll shall serve as the Asbestos Trustee pursuant to the Plan, until death, resignation, discharge or the appointment of a successor Asbestos Trustee. The Asbestos Trustee shall have and perform all duties, responsibilities, rights and obligations set forth in the Asbestos Trust Agreement.

      2.      Rights, Powers and Duties of the Asbestos Trustee

The Asbestos Trustee shall retain and have all the rights, powers and duties necessary to carry out his responsibilities under the Plan and the Asbestos Trust Agreement. Such rights, powers and duties, which shall be exercisable by the Asbestos Trustee on behalf of the Debtors pursuant to the Plan and the Asbestos Trust Agreement, shall include, among others:

      (a)      maintaining any Unclaimed Distribution Reserve for the benefit of the holders of Allowed Asbestos Claims;

      (b)      investing Cash in the Asbestos Trust in (i) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (ii) money market deposit accounts, checking accounts, savings accounts, certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (iii) any other investments that may be permissible under (x) Bankruptcy Code section 345 or (y) any order of the Court entered in the Debtors' Chapter 11 Cases;

      (c)      calculating and paying of all distributions to be made under the Plan, the Asbestos Trust Agreement, and other orders of the Court, to holders of Allowed Asbestos Claims that have become undisputed, non-contingent, and liquidated claims;

      (d)      employing, supervising and compensating professionals, if any, necessary to represent the interests of and serve on behalf of the Asbestos Trust;

      (e)      objecting to, defending against and settling Asbestos Claims, and seeking estimation of contingent or unliquidated Asbestos Claims under Bankruptcy Code section 502(c);

      (f)      dissolving the Asbestos Trust;

      (g)      exercising all powers and rights, and taking all actions, contemplated by or provided for in the Asbestos Trust Agreement;

      (h)      taking any and all other actions necessary or appropriate to implement the provisions of the Asbestos Trust Agreement; ~~and~~

(i)        making and filing any tax returns for the Asbestos Trust;

(j)        taking any actions necessary to ensure that the Asbestos Insurance Carriers will receive timely notice of any Asbestos Claim or demand including, without limitation, taking action to maintain the corporate existence of one or more of the Debtors;

(k)        entering into one or more coverage in place agreements with the Asbestos Insurance Carriers on terms satisfactory to the Asbestos Trustee or take other appropriate action with respect to insurance provided by the Asbestos Insurance Carriers; and

(l)        taking any actions necessary to ensure the preservation of the Debtors' documents to the extent such documents may be necessary to the defense of Asbestos Claims, including, without limitation, the entry into long-term storage agreements with respect to such documents.

3.        Compensation of the Asbestos Trustee

The Asbestos Trustee shall be compensated pursuant to the terms of the Asbestos Trust Agreement. Any professionals retained by the Asbestos Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Asbestos Trust. The payment of the fees and expenses of the Asbestos Trustee and his retained professionals, if any, shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

4.        Indemnification

The Asbestos Trust shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Asbestos Trustee (in his capacity as such) and the Asbestos Trustee's and the Asbestos Trust's agents, representatives, professionals, and employees (collectively, the "Indemnified Parties"), from and against and in respect to any and all liabilities, losses, damages, claims, costs, and expenses, including but not limited to attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Asbestos Trust or the implementation or administration of the Plan and the Asbestos Trust Agreement, if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Asbestos Trust, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. To the extent that the Asbestos Trust must indemnify and hold harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Asbestos Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid out of the Asbestos Trust. The indemnification provisions of the Asbestos Trust Agreement shall remain available to and be binding upon any future Asbestos Trustee or the estate of any decedent Asbestos Trustee and shall survive the termination of the Asbestos Trust Agreement.

5.        Insurance

The Asbestos Trustee shall be authorized to obtain all reasonably necessary insurance coverage for himself, his agents, representatives, employees and independent contractors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Asbestos Trust and (ii) the liabilities, duties, and obligations of the Asbestos Trustee and his agents, representatives, employees, independent contractors under the

Asbestos Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Asbestos Trustee, remain in effect for a reasonable period (not to exceed five years) after the termination of the Asbestos Trust Agreement.

6.      Asbestos Insurance Policies

The Plan shall not expand the scope of, the amount of, or alter in any other way the Asbestos Insurance Carriers' obligations under their policies.  The Plan shall not operate as a waiver of certain proofs of claim filed by the Asbestos Insurance Carriers in the Chapter 11 Cases, *provided, however,* that to the extent such Claims relate to Asbestos Claims, the Asbestos Insurers' Claims are deemed satisfied in full, except for claims by Travelers Insurance Company and its affiliates for premiums under retrospectively rated insurance policies issued to the Debtors.

K.      The SWE&C Liquidating Trust

1.      Appointment of Trustee

A person designated by Creditors' Committee prior to the Confirmation Date shall serve as the SWE&C Liquidating Trustee pursuant to the SWE&C Liquidating Trust Agreement and the Plan, until death, resignation, discharge or the appointment of a successor SWE&C Liquidating Trustee in accordance with the SWE&C Liquidating Trust Agreement.  The SWE&C Liquidating Trustee shall have and perform all duties, responsibilities, rights and obligations set forth in the SWE&C Liquidating Trust Agreement.

2.      Transfer of SWE&C Liquidating Trust Assets to the SWE&C Liquidating Trust

On the Effective Date, SWE&C, the SWE&C Subsidiaries and their Estates shall transfer and shall be deemed to have irrevocably transferred to the SWE&C Liquidating Trust, for and on behalf of the beneficiaries of the SWE&C Liquidating Trust, the SWE&C Liquidating Trust Assets.

3.      The SWE&C Liquidating Trust

(a)     Without any further action of the directors of SWE&C or the SWE&C Subsidiaries, on the Effective Date, the SWE&C Liquidating Trust Agreement, substantially in the form annexed to the Plan as Exhibit C, shall become effective.  The SWE&C Liquidating Trustee shall accept the SWE&C Liquidating Trust and sign the SWE&C Liquidating Trust Agreement on the Effective Date and the SWE&C Liquidating Trust will then be deemed created and effective.

(b)     The SWE&C Liquidating Trustee shall have full authority to take any steps necessary to administer the SWE&C Liquidating Trust Agreement, including, without limitation, the duty and obligation (i) to liquidate SWE&C Liquidating Trust Assets, (ii) to make distributions therefrom to holders of Allowed Claims against SWE&C and the SWE&C Subsidiaries, (iii) to maintain any Reserves on behalf of and for the benefit of the beneficiaries of the SWE&C Liquidating Trust, (iv) to vote the shares of Reorganized SWINC New Common Stock in connection with any matter

70

submitted to a vote of the stockholders of Reorganized SWINC, and (v) if authorized by majority vote of those members of the SWE&C Liquidating Trust Advisory Board authorized to vote, to pursue and settle any Disputed Claims against or Disputed Interests in SWE&C and the SWE&C Subsidiaries. The SWE&C Liquidating Trustee shall not at any time, whether on behalf of the SWE&C Liquidating Trust, SWE&C, the SWE&C Subsidiaries, or their Estates, continue or engage in the conduct of trade or business, and no part of the SWE&C Liquidating Trust or the proceeds, revenue or income therefrom shall be used or disposed of by the SWE&C Liquidating Trustee in the furtherance of any business.

(c)     All costs and expenses associated with the administration of the SWE&C Liquidating Trust, including those rights, obligations and duties described in Article VI.N of the Plan, shall be the responsibility of and paid by the SWE&C Liquidating Trust.

(d)     The SWE&C Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "SWE&C Liquidating Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of the Plan including, without limitation, the liquidation and distribution of SWE&C Liquidating Trust Assets.

(e)     The Debtors intend that the SWE&C Liquidating Trust will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations. Accordingly, it is intended that the transfer of the SWE&C Liquidating Trust Assets to the SWE&C Liquidating Trust shall be treated, for federal income tax purposes, as a deemed transfer of the SWE&C Liquidating Trust Assets to the beneficiaries of the SWE&C Liquidating Trust for all purposes of the IRC, followed by a deemed transfer of such assets by such beneficiaries to the SWE&C Liquidating Trust. The SWE&C Liquidating Trust shall be considered a "grantor" trust, and the beneficiaries of the SWE&C Liquidating Trust shall be treated as the grantors and the deemed owners of the SWE&C Liquidating Trust.

(f)     The SWE&C Liquidating Trustee shall be responsible for filing all federal, state and local tax returns for the SWE&C Liquidating Trust.

(g)     The SWE&C Liquidating Trust shall terminate on the earlier of (i) the tenth (10) anniversary of the Confirmation Date or (ii) the distribution of all property in accordance with the terms of the SWE&C Liquidating Trust Agreement.

4.     The SWE&C Liquidating Trust Advisory Board

The SWE&C Liquidating Trust Advisory Board shall be comprised of three (3) members selected by the Creditors' Committee prior to the Confirmation Hearing. The members of the SWE&C Liquidating Trust Advisory Board initially will be compensated under the same terms as

they have been compensated during the pendency of these Chapter 11 Cases or in accordance with the SWE&C Liquidating Trust Agreement.

The SWE&C Liquidating Trustee shall consult regularly with the SWE&C Liquidating Trust Advisory Board when carrying out the purpose and intent of the SWE&C Liquidating Trust. Members of the SWE&C Liquidating Trust Advisory Board shall be entitled to compensation in accordance with the SWE&C Liquidating Trust Agreement and to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the SWE&C Liquidating Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the SWE&C Trust Advisory Board and their compensation to the extent provided for in the SWE&C Liquidating Trust Agreement shall be payable by the SWE&C Liquidating Trust.

(a)     In the case of an inability or unwillingness of any member of the SWE&C Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the SWE&C Trust Advisory Board. If any position on the SWE&C Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the SWE&C Liquidating Trustee without the requirement of a vote by the other members of the SWE&C Trust Advisory Board.

(b)     Upon the certification by the SWE&C Liquidating Trustee that all SWE&C Liquidating Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the SWE&C Liquidating Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(c)     The SWE&C Liquidating Trust Advisory Board may, by majority vote, authorize the SWE&C Liquidating Trustee to invest the corpus of the SWE&C Liquidating Trust in prudent investments other than those described in Bankruptcy Code section 345.

(d)     The SWE&C Liquidating Trust Advisory Board may remove the SWE&C Liquidating Trustee in its discretion. In the event the requisite approval is not obtained, the SWE&C Liquidating Trustee may be removed by the Court for cause shown. In the event of the resignation or removal of the SWE&C Liquidating Trustee, the SWE&C Liquidating Trust Advisory Board shall, by majority vote, designate a person to serve as successor SWE&C Liquidating Trustee.

(e)     Notwithstanding anything to the contrary in the Plan, neither the SWE&C Liquidating Trust Advisory Board nor any of its members, designees, counsel, financial advisors or any duly designated agent or representative of any such party shall be liable for the act, default or misconduct of any other member of the SWE&C Liquidating Trust Advisory Board, nor shall any member be liable for anything other than such members' own gross negligence or willful misconduct. The SWE&C Liquidating Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or

72

other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions. If the SWE&C Liquidating Trust Advisory Board determines not to consult with its counsel, accountants or other professional, it shall not be deemed to impose any liability on the SWE&C Liquidating Trust Advisory Board, or its members and/or designees.

(f)     The SWE&C Liquidating Trust Advisory Board shall govern its proceedings through the adoption of by-laws, which the SWE&C Liquidating Trust Advisory Board may adopt by majority vote. No provision of such by-laws shall supersede any express provision of the Plan.

## L.     Other Matters

### 1.     Treatment of Executory Contracts and Unexpired Leases

Under Bankruptcy Code section 365, the Debtors have the right, subject to court approval, to assume or reject any executory contract or unexpired lease. If the Debtors reject an executory contract or unexpired lease that was entered into before the Petition Date, the contract or lease will be treated as if it had been breached on the date immediately preceding the Petition Date, and the other party to the agreement will have a General Unsecured Claim for damages incurred as a result of the rejection. In the case of rejection of employment severance agreements and real property leases, damages are subject to certain limitation imposed by Bankruptcy Code sections 365 and 502.

(a)     Rejected Contracts and Leases

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, each of the prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, shall be deemed rejected by the applicable Debtor effective on the Confirmation Date and subject to the occurrence of the Effective Date, unless such contract or lease (i) previously (a) shall have been assumed or rejected by the Debtors (including, but not limited to, those executory contracts and unexpired leases assumed and assigned to Shaw) or (b) shall have expired or terminated pursuant to its own terms, or (ii) is listed on the schedule of assumed contracts and leases attached as Exhibit G to the Plan; *provided, however*, that neither the inclusion by the Debtors of a contract or lease in Plan Exhibit G nor anything contained in Article X of the Plan shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder. The Confirmation Order shall constitute an order of the Court approving the rejections described in Article X of the Plan, pursuant to Bankruptcy Code section 365, as of the Confirmation Date.

(b)     Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease pursuant to Article X.A of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the SWINC Plan Administrator, the SWE&C Liquidating Trust or their respective successors

73

or properties unless a proof of Claim is filed and served on the Debtors and counsel for the Debtors within thirty (30) days after service of a notice of entry of the Confirmation Order or such other date as prescribed by the Court.

(c)     Assumed Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Debtors shall assume (and assign, as the case may be) each of the executory contracts and unexpired leases listed on Plan Exhibit G. Any monetary amounts by which each executory contract and unexpired lease to be assumed under the Plan may be in default shall be satisfied, under Bankruptcy Code section 365(b)(1), by Cure on the Effective Date or as soon thereafter as practicable. In the event of a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtors or any assignee of the Debtors to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption or assignment, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption and, as the case may be, assignment. The Confirmation Order shall constitute an order of the Court approving the assumptions (as assignments, as the case may be) described in Article X.C of the Plan, pursuant to Bankruptcy Code section 365, as of the Effective Date.

(d)     Pension Plan

The Pension Plan shall be assumed pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), to the extent it is executory. The Plan does not purport to release or affect any causes of action pursuant to ERISA concerning the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster and the Employee Investment Plan of Stone & Webster, Incorporated and Participating Subsidiaries, or limit any potential claim of the Secretary of Labor, United States Department of Labor, pursuant to the stipulated agreement between SWINC and the Secretary of Labor, United States Department of Labor, filed by the Debtors on or about February 26, 2002.

(e)     Indemnification Obligations

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, any and all indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law shall be rejected as of the Effective Date of the Plan, to the extent executory.

2.     Bar Dates for Certain Claims

(a)     Administrative Claims

The Confirmation Order will establish an Administrative Claims Bar Date for filing Administrative Claims, which date will be sixty (60) days after the Confirmation Date (the "Administrative Claims Bar Date"). Holders of asserted Administrative Claims, except for Professional Fee Claims, not paid prior to the Effective Date shall submit requests for payment of

74

Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of the Confirmation Date to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth such date and constitute notice of this Administrative Claims Bar Date. The Debtors, the SWINC Plan Administrator and the SWE&C Liquidating Trustee, as the case may be, shall have ninety (90) days (or such longer period as may be allowed by order of the Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims.

        (b)        Professional Fee Claims; Substantial Contribution Claims

        All Persons requesting compensation or reimbursement of Professional Fee Claims pursuant to Bankruptcy Code section 327, 328, 330, 331, 503(b) or 1103 for services rendered to the Debtors prior to the Effective Date (including requests under Bankruptcy Code section 503(b)(4) by any Professional or other entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve on the SWINC Plan Administrator and the SWE&C Liquidating Trustee an application for final allowance of compensation and reimbursement of expenses no later than ninety (90) days after the Confirmation Date, unless otherwise ordered by the Court (the "Professional Fee Bar Date"). Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the SWINC Plan Administrator, the SWE&C Liquidating Trustee and the requesting Professional or other entity no later than sixty (60) days after the Professional Fee Bar Date (or such longer period as may be allowed by order of the Court).

        3.        Withholding and Reporting Requirements

        In connection with the Plan and all distributions thereunder, the SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions shall be subject to any such withholding and reporting requirements. The SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

        4.        Setoffs

        The SWINC Plan Administrator and the SWE&C Liquidating Trustee may, pursuant to Bankruptcy Code section 553 or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the SWINC Plan Administrator or the SWE&C Liquidating Trustee, as the case may be, of any such claim that the Debtors may have against such holder.

        Unless otherwise authorized by a Final Order, any holder of a Claim must assert any setoff rights against a Claim by a Debtor against such entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor notwithstanding any statement to the contrary in a proof of claim or any other pleading or document filed with the Bankruptcy Court or delivered to the Debtors.

    5.      Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the Confirmation Hearing, shall be paid on the Effective Date, and neither the Debtors, their Estates, the SWINC Plan Administrator nor the SWE&C Liquidating Trustee shall thereafter be liable for the payment of any additional fees under 28 U.S.C. § 1930, other than with respect to the Chapter 11 Cases of SWINC and SWE&C.

    6.      Amendment or Modification of the Plan

The Plan Proponents may alter, amend, or modify the Plan or any Plan Exhibits under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Plan Proponents may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

    7.      Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Court to be invalid, void or unenforceable, the Court, at the request of any Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

    8.      Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity.

    9.      Plan Supplement

Any and all exhibits, lists or schedules not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than the deadline for objection to the Plan, May 9, 2003. Upon its filing, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours. Claimholders and Interestholders may obtain a copy of the Plan Supplement upon written request to Debtor in accordance with Article XIII.H of the Plan. The Plan Proponents explicitly reserve the right to modify or make additions to or subtractions from any schedule to the Plan and to modify any exhibit to the Plan prior to the Confirmation Hearing.

10.    Revocation, Withdrawal or Non-Consummation

The Plan Proponents reserve the right, to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Plan Proponents revoke or withdraw the Plan or if Confirmation or Consummation does not occur, then, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (b) prejudice in any manner the rights of such Debtors or any other Person, or (c) constitute an admission of any sort by the Debtors or any other Person.

M.    Retention of Jurisdiction

Pursuant to Bankruptcy Code sections 105(a) and 1142 and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    Hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(c)    Hear and determine all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor may be liable, including, if necessary, the nature or amount of any required Cure of the liquidation or allowance of any Claims arising therefrom;

(d)    Ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

(e)    Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

(f)    Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Court including, without limitation, the Confirmation Order;

(i)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code sections 330, 331 503(b), 1103 and 1129(a)(4), *provided, however,* that from and after the Effective Date the payment of fees and expenses of the Professionals of Reorganized SWINC shall be made in the ordinary course of business and shall not be subject to the approval of the Court;

(j)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k)     Hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(l)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

(m)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n)     Hear and determine all disputes or other matters arising in connection with the interpretation, implementation or enforcement of the Asset Purchase Agreement and the Sale Order;

(o)     Hear and determine disputes with respect to compensation of the SWE&C Liquidating Trustee and his professional advisors;

(p)     Hear and determine disputes with respect to compensation of the SWINC Plan Administrator and his professional advisors;

(q)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(r)    Enter a final decree closing the Chapter 11 Cases.

N.    Conditions To Confirmation and Consummation

1.    Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date: (a) the entry of an order finding that the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125 and (b) the proposed Confirmation Order shall be in a form and substance reasonably acceptable to the Plan Proponents.

2.    Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article XII.C of the Plan:

(a)    The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Plan Proponents and shall:

(i)    authorize and direct the Plan Proponents to take all actions necessary or appropriate to enter into, implement, and consummate the instruments, releases, and other agreements or documents created in connection with the Plan;

(ii)    authorize the issuance of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock; and

(iii)    provide that the Reorganized SWINC New Common Stock, the Reorganized SWINC New Series A Preferred Stock and the Reorganized SWINC New Series B Preferred Stock issued under the Plan are exempt from registration under the Securities Act 1933, as amended, pursuant to Section 4(2) of the Securities Act.

(b)    All Plan Exhibits shall be in form and substance reasonably acceptable to the Plan Proponents and shall have been executed and delivered.

(c)    All actions, documents and agreements necessary to implement the Plan shall have been effectuated or executed.

3.    Waiver of Conditions

Each of the conditions set forth in Articles XII.A and XII.B of the Plan, may be waived in whole or in part by the Plan Proponents, without any other notice to parties in interest or the Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation or the Effective Date may be asserted by the Debtors or Reorganized SWINC regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or Reorganized SWINC). The failure of the Debtors or Reorganized SWINC to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

79

O.      Effect of Plan Confirmation

        1.      Binding Effect

        The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims and Interests, and their respective successors and assigns.

        2.      Releases

                (a)     Releases by the Debtors

                        On the Effective Date, each of the Debtors shall release unconditionally (i) the SWE&C Liquidating Trustee, (ii) the SWE&C Liquidating Trust Disbursing Agent, (iii) the SWINC Disbursing Agent, (iv) the SWINC Plan Administrator, (v) their respective directors and officers, advisors, accountants, investment bankers, consultants, and attorneys and (vi) the respective advisors, accountants, investment bankers, and attorneys of any of the foregoing, solely in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or Reorganized SWINC under the Plan and the contracts, instruments, releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or after the Petition Date and prior to or on the Effective Date and in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement.

                        On the Effective Date, each of the Debtors and their Estates shall release unconditionally those present and former directors, which directors served only as directors and not as officers of any of the Debtors, in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or Reorganized SWINC under the Plan and the contracts, instruments, releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place prior to or on the Effective Date that could have been asserted by or on behalf of any of the Debtors or their Estates against such current and former directors.

                (b)     Releases by Holders of Claims and Interests

                        On the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, in consideration for the obligations of the Debtors and Reorganized SWINC under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, each entity (other than a Debtor) that has held, holds or may hold a Claim or Interest (except for holders of Asbestos Claims), as applicable, will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the Debtors' or Reorganized SWINC's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or

contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place at any time on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement that such entity has, had or may have against (i) the Debtors, and, solely in their respective capacities as such.(ii) the SWE&C Liquidating Trustee, (iii) the SWE&C Liquidating Trust Disbursing Agent, (iv) the SWINC Disbursing Agent, (v) and the SWINC Plan Administrator; *provided, however,* that the Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries.

(c)     Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including, but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Article XIII.B of the Plan, *provided, however,* that the Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries.

3.     Discharge of Claims and Termination of Interests

Pursuant to Bankruptcy Code section 1141(d)(1), Confirmation will discharge Claims against and Interests in SWINC and the SWINC Subsidiaries and no holder of a Claim against or Interest in SWINC or any SWINC Subsidiary may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against Reorganized SWINC, SWINC, a SWINC Subsidiary, their respective successors or their respective property, except as expressly provided in the Plan.

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against SWE&C and the SWE&C Subsidiaries; *provided, however,* that no holder of a Claim against SWE&C or the SWE&C Subsidiaries may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, SWE&C, the SWE&C Subsidiaries, the Consolidated SWE&C Estate, their respective successors or their respective property, except as expressly provided in the Plan.

4.     Exculpation and Limitation of Liability

Neither the Debtors nor any of their respective present or former officers and directors (who were officers and directors on the Petition Date), advisors or attorneys shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, shareholders, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission

occurring on or after the Petition Date in connection with, relating to, or arising out of, the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence and except with respect to any claim against a fiduciary of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries with respect to the Pension Plan or such other plan, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan, *provided, however,* that the Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries.

>    5.    Injunction

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against SWINC, a SWINC Subsidiary or the Consolidated SWINC Estate ~~(except for holders of Allowed Asbestos Claims)~~ or an Interest in SWINC or a SWINC Subsidiary or the Consolidated SWINC Estate are (a) permanently enjoined from taking any of the following actions against the Estate of SWINC, the Estates of the SWINC Subsidiaries, the SWINC Plan Administrator, the Consolidated SWINC Estates, Reorganized SWINC, or any of their property on account of any such Claims or Interests and (b) preliminarily enjoined from taking any of the following actions against SWINC, a SWINC Subsidiary, the Consolidated SWINC Estate, Reorganized SWINC, or their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the SWINC or the SWINC Subsidiaries; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however,* that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan, *and provided, further, however,* that the Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries.

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against SWE&C or the SWE&C Subsidiaries ~~(except for holders of Allowed Asbestos Claims)~~ or an Interest in SWE&C or the SWE&C Subsidiaries are (a) permanently enjoined from taking any of the following actions against the Estate of SWE&C, the Estates of the SWE&C Subsidiaries, the SWE&C Liquidating Trustee, or any of their property on account of any such Claims or Interests and (b) preliminarily enjoined from taking any of the following actions against SWE&C, the SWE&C Subsidiaries or their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing attaching, collecting or

recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the SWE&C or the SWE&C Subsidiaries; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however*, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan, *and provided, further, however*, that the Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Allowed Interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Article XIII.E of the Plan.

    6.        Treatment of Indemnification Claims

Notwithstanding DGCL § 145 or any other state or local statute or rule, all existing indemnification and other similar obligations of any of the Debtors to its officers and directors relating to actions or inactions as of the Petition Date are rejected, to the extent executory, as of the Effective Date as provided for in the Plan.

On August 24, 2000, H. Kerner Smith, the former President, Chief Executive Officer and Director of SWINC filed a proof of claim against the Debtors' estates seeking indemnification, contribution and reimbursement from SWINC (the "Smith Indemnification Claim") for certain expenses and contingent liabilities arising as a result of claims made against Mr. Smith as an officer and director of SWINC (the "D&O Claims").

On December 18, 2001, the Debtors filed their Second Omnibus Objection to Claims, which seeks, in part, to disallow and expunge the Smith Indemnification Claim on the grounds that it is contingent and unliquidated.

On February 1, 2002, Mr. Smith filed a Response to the Debtors' Second Omnibus Objection to Claims (the "Smith Response"), requesting that the Bankruptcy court allow the Smith Indemnification Claim unless and until the D&O Claims are resolved and Mr. Smith has in fact been indemnified fully through insurance. Alternatively, Mr. Smith requested that the Bankruptcy Court defer ruling on the Debtors' objection to the Smith Indemnification Claim pending final resolution of the D&O Claims. The Bankruptcy Court has not yet heard argument on the Debtors' Second Omnibus Objection to Claims or the Smith Response thereto.

Mr. Smith objects to the characterization and proposed treatment of the Smith Indemnification Claim under the Plan, and the parties reserve all rights and remedies they may have in regard to the Smith Indemnification Claim and any objections thereto.

    7.        Term of Injunction or Stays

With respect to SWINC, the SWINC Subsidiaries, SWE&C and the SWE&C Subsidiaries all injunctions or stays provided for in the Chapter 11 Cases under section 105, 362 or

524 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Estate(s) of SWINC and the SWINC Subsidiaries, SWE&C and the SWE&C Subsidiaries has been distributed.

## V.  CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of Impaired Claims and Interests who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

A.      Certain Bankruptcy Considerations

Even if all Impaired voting classes vote to accept the Plan, and with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Court may exercise substantial discretion and may choose not to confirm the Plan.  Bankruptcy Code section 1129 requires, among other things, that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  See Article IX.  Although the Debtors believe that the Plan will meet such a test, there can be no assurance that the Court will reach the same conclusion.  See Appendix C-1 annexed hereto for a liquidation analysis of the Consolidated SWINC Estate and the Consolidated SWE&C Estate and Appendix C-2 for a liquidation analysis of each of the Debtors.

B.      Claims Estimations

There can be no assurance that the estimated amount of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual allowed amounts of Claims and Interests may vary from those estimated herein.

C.      Certain Litigation

Although the Debtors believe that the Litigation Claims are valid, if the Debtors are unsuccessful in prosecuting such claims the SWINC Plan Administrator or the SWE&C Liquidating Trustee may not recover any assets for distribution under the Plan.  Litigation is inherently uncertain and there can be no guarantee of any outcome.  The SWINC Plan Administrator or the SWE&C Liquidating Trustee may decide that the best hope for recovery lies in settling the Litigation Claims.  Such settlements may be significantly less than the damages which were caused and/or the transfers to be recovered.  For these reasons, the recoveries in connection with the Litigation Claims could change materially over time.

In addition, there are other claims, lawsuits, disputes with third parties, investigations  and administrative proceedings against the Debtors relating to matters in the ordinary course of their business activities which could materially adversely affect the Debtors' reorganization.

D.    Income Taxes

Income tax liability with respect to the transactions contemplated by the Plan may materially reduce the recovery to holders of Claims and Interests.  The Debtors anticipate that they will recognize a significant amount of income as a result of the Plan, including as a result of the Reversion.  In general, income may be offset by net operating loss carryforwards ("NOLs").  Whether the Debtors and Reorganized SWINC will have sufficient NOLs to offset the income recognized, and whether any such NOLs would be available to offset such income, is subject to substantial uncertainty.  Claims in bankruptcy by the IRS are given priority over all unsecured Claims, and any income not offset by NOLs will be subject to income taxation, materially reducing the recovery to holders of unsecured Claims and Interests.

The Debtors believe that they and Reorganized SWINC will under go an "ownership change" (within the meaning of IRC § 382), which, but for the exception described below, would substantially eliminate their ability to offset income and gains recognized after the Effective Date with NOLs generated before the Effective Date.  Under an exception to this "section 382 limitation," items of built-in income (i.e., economically accrued but unrealized income) may be generally be offset by pre-change losses without limitation, if (i) such items are attributable to pre-change periods but recognized after an ownership change and (ii) the corporation undergoing an ownership change has a net unrealized built-in gain (generally, if the fair market value of its qualifying assets exceeds its basis in those assets) (a "NUBIG").  It is uncertain, however, whether the Debtors and Reorganized SWINC will have a NUBIG on the Effective Date.  If they do not have a NUBIG, and if, as anticipated, the Debtors and Reorganized SWINC are treated as incurring an ownership change, they would be unable to use any pre-change NOLs to offset income recognized as a result of the Plan, including as a result of the Reversion.  No assurances can be made in this regard, and even if the Debtors and Reorganized SWINC take the position that they are entitled to use pre-change NOLs to offset income recognized as a result of the Plan (including the Reversion), the IRS may assert, and a court may sustain, a different position.  If Reorganized SWINC is unable to utilize pre-change NOLs to offset income from Plan (including the Reversion), the recovery by holders of unsecured Claims and Interests would be materially reduced or eliminated.

The Debtors or Reorganized SWINC may also be treated as having constructively liquidated, for federal income tax purposes, prior to the dates of their actual liquidations, eliminating their NOLs and causing holders of Claims and Interests to recognize taxable gain or loss at the time of such constructive liquidation.  Holders of Claims and Interests may also be treated as directly receiving and recognizing income recognized after the date of constructive liquidation (including as a result of the Reversion) that otherwise would have been treated as accruing to the Debtors or Reorganized SWINC.  Such income would not be offset by the Debtors' or Reorganized SWINC's NOLs.  In addition, some aspects of the Plan could cause holders of Claims and Interests to recognize income without a corresponding receipt of cash with which to pay the associated tax liability and may prevent holders from using deductions to which the Debtors or Reorganized SWINC would have been entitled.  Certain income may be recognized by holders of Claims and Interests regardless of their tax basis in their Claims and Interests, and regardless of whether a holder otherwise recognizes an overall loss as a result of the Plan.  For a fuller discussion of the income tax risks associated with the Plan, see the section entitled "Certain Federal Income Tax Consequences of the Plan."

No opinion of counsel has been or will be sought or obtained, and no rulings or determinations of the IRS or any other taxing authorities have been sought or obtained, with respect to any income tax matters relating to the Plan.  Accordingly, no assurances may be made that the income

tax consequences of the Plan could not have material adverse effects on holders of Claims and Interests.

E.    Pension Plan

After the Effective Date, Reorganized SWINC intends to commence a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282. Reorganized SWINC then intends to undertake to terminate the Pension Plan with a date of plan termination ("DOPT") that falls during the pendency of the Delaware dissolution proceeding. After satisfying all liabilities of the Pension Plan to Pension Plan participants and beneficiaries, Reorganized SWINC may take a distribution of any residual assets, defined as the Reversion in the Plan, of the Pension Plan.

As of ~~June 1, 2001~~ December 31, 2002, the Pension Plan's enrolled actuary estimated that the Pension Plan had a substantial Reversion. Whether the Reversion will exist at a future date, and, if so, in what amount, will be determined by the appreciation or depreciation of Pension Plan assets, prevailing market annuity purchase rates, interest rates used to determine various benefits under the Pension Plan, mortality and other demographic experience, Pension Plan provisions and the interpretation of those provisions, and other factors. Accordingly, no assurances can be given regarding the existence or amount of the Reversion. Moreover, termination of the Pension Plan is subject to governmental review and approval. No assurance is given that approval will be obtained.

If Reorganized SWINC receives the Reversion, in addition to any income tax consequences that may result, the amount of the reversion will be subject to taxation under IRC § 4980. Unless one of the exceptions set forth in IRC § 4980 applies, IRC § 4980 imposes a tax of 50 percent of the amount of any employer reversion from a tax-qualified plan. If one of the exceptions applies, then the IRC § 4980 tax rate is 20 percent.

One of the exceptions that results in a 20 percent IRC § 4980 tax rate applies in the case of "an employer who, as of the termination date of the qualified plan, is in bankruptcy liquidation under chapter 7 of title 11 of the United States Code or in similar proceedings under State law." A dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 should constitute such a "similar" proceeding under state law and, therefore, termination of the Pension Plan with a DOPT that falls during the Delaware dissolution proceeding should result in a 20 percent tax rate under IRC § 4980. There can be no assurance that the IRS will agree with this position, however. The IRS could conclude that a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 is not sufficiently "similar" to a bankruptcy liquidation under chapter 7 of title 11 of the United States Code to warrant a 20 percent tax rate under IRC § 4980. Or, the IRS could disregard the form of the Delaware dissolution proceeding because it follows a Chapter 11 reorganization, which, unlike a Chapter 7 liquidation or similar state law dissolution proceeding, does not qualify for the exception noted above to the 50 percent IRC § 4980 tax.

The Debtors may seek a private letter ruling from the IRS regarding the IRC § 4980 tax rate that would apply to Reorganized SWINC's receipt of the Reversion. No assurances are given, however, that the IRS will rule favorably or in advance of the date that holders of a Claim or Interest must vote on the proposed Plan. In particular, the IRS could rule unfavorably, could decline to rule, could insist that any such ruling request be submitted only by Reorganized SWINC as the affected taxpayer (and therefore after the Effective Date), or could otherwise not rule until after the Effective Date.

86

## VI. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

No registration statement will be filed under the Securities Act or any state securities laws with respect to the issuance or subsequent transfer of the Reorganized SWINC New Series A Preferred Stock, the Reorganized SWINC New Series B Preferred Stock or the Reorganized SWINC New Common Stock under the Plan. The Debtors believe that Section 4(2) of the Securities Act and various provisions of state securities law exempt from federal and state securities registration requirements the offer and sale of such securities pursuant to the Plan. Section 4(2) of the Securities Act provides an exemption from the registration requirements of the Securities Act for transactions by an issuer not involving any public offering. Given that Reorganized SWINC will be issuing securities to only three holders, each of whom is sophisticated and familiar with the operations of Reorganized SWINC and the terms of the Plan, the Debtors believe that the issuance of securities contemplated by the Plan will not constitute a public offering and will therefore be exempt from registration pursuant to Section 4(2) of the Securities Act. Subsequent transfers of the securities to be issued under the Plan are not permitted.

It is not currently expected that Reorganized SWINC will become subject to the periodic reporting and other requirements of the Exchange Act as a result of the consummation of the Plan. Reorganized SWINC intends to assess facts and circumstances, including the amount of assets held by Reorganized SWINC and the number of holders of its securities, as they exist following consummation of the Plan and, with the advice of counsel, will make a determination regarding whether compliance with the periodic reporting and other requirements of the Exchange Act is necessary or appropriate. In the event that Reorganized SWINC determines that compliance is required, Reorganized SWINC will file with the SEC a Registration Statement on Form 10 or another appropriate registration statement form and otherwise comply with the requirements of the Exchange Act.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain material United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal consequences of the Plan for holders of Claims or Interests who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been or will be sought or obtained with respect to any tax consequences of the Plan. Except possibly with respect to the IRC § 4980 consequences discussed below, no rulings or determinations of the IRS or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Interest. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the IRC, Treasury Regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to differing interpretations or change (possibly with retroactive effect).

Except to a limited extent, the following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims or Interests that are, or hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, persons who received their Stock pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding certificates that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes. **Each holder of a Claim or Interest is strongly urged to consult its own tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

A.    Tax Consequences to the Debtors

It is anticipated that, for federal income tax purposes, Reorganized SWINC will recognize substantial income as a result of the reversion of the residual assets of the Pension Plan. This income may, however, generally be offset by net operating losses and net operating loss carryovers ("NOLs"). The Debtors hope that they and Reorganized SWINC will each have sufficient NOLs available, for federal income tax purposes, to offset all or substantially all of their anticipated income from the transactions contemplated by the Plan (although some liability for federal alternative minimum tax may remain, as discussed below). This belief is, however, subject to substantial uncertainty, as described below. If any of the Debtors or Reorganized SWINC do not have sufficient NOLs available to offset the income recognized, any remaining income will be subject to income taxation, which may materially reduce the recovery to holders of Claims and Interests.

It is possible that any of the Debtors or Reorganized SWINC could be treated as having constructively liquidated, for federal income tax purposes, prior to its actual liquidation. Under this treatment, the constructively liquidated corporation's NOLs would be eliminated and any gain recognized in the constructive liquidation of a subsidiary would reduce its parent's NOLs. A premature constructive liquidation could therefore reduce or eliminate the ability of the Debtors or Reorganized SWINC to offset taxable income with such NOLs, thereby materially reducing or eliminating the amounts available for distribution to holders of Claims and Interests.

It is also possible that the ability of the Debtors or Reorganized SWINC to utilize NOLs could be substantially reduced or eliminated as a result of an ownership change. When a corporation undergoes an ownership change, the IRC generally limits its (and its subsidiaries') ability to utilize historic NOLs and net unrealized built-in losses ("NUBILs"). An "ownership change" is generally defined as a more than 50 percentage point change in equity ownership, measured by value, during the shorter of (1) the three-year period ending on each date on which such change in ownership is tested or (2) the period beginning on the day after the corporation's most recent ownership change. As a general rule, the limit on a corporation's ability to use its pre-change NOLs and NUBILs equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" (4.61% for March, 2003). As a result, an ownership change would, except as described below, substantially eliminate the Debtors' and Reorganized SWINC's ability to use pre-change NOLs to offset income realized after an ownership change. There is an exception, however, under which items of built-in income (i.e., economically accrued but unrealized income) may be offset by pre-change losses without limitation, if (i) such items are attributable to pre-change periods but recognized after an ownership change and (ii) the corporation

undergoing an ownership change has a net unrealized built-in gain ("NUBIG") on the date of the ownership change.  A corporation generally has a NUBIG if on the date of an ownership change the fair market value of its qualifying assets exceeds its basis in those assets.  The Debtors believe that they will likely incur an ownership change as a result of the Plan.  Nevertheless, the Debtors also believe that the income from the reversion of the Pension Plan assets attributable to pre-change periods should qualify as built-in income for purposes of the exception described above.  It is uncertain, however, whether the Debtors and Reorganized SWINC will have a NUBIG on the Effective Date.  If they do not have a NUBIG, and if, as anticipated, the Debtors and Reorganized SWINC are treated as incurring an ownership change, they would be unable to use any pre-change NOLs to offset income recognized as a result of the Plan, including as a result of the Reversion.  The Debtors and Reorganized SWINC will continue to analyze these issues and decide whether to take the position that it can use pre-change NOLs to offset income recognized as a result of the Plan, including as a result of the Reversion.  No assurances can be made in this regard, and even if the Debtors and Reorganized SWINC take the position that they are entitled to use pre-change NOLs to offset income recognized as a result of the Plan (including the Reversion), the IRS may assert, and a court may sustain, a different position.  If Reorganized SWINC is unable to utilize pre-change NOLs to offset income from Plan (including the Reversion), the recovery by holders of unsecured Claims and Interests would be materially reduced or eliminated.

A corporation may incur alternative minimum tax liability even where NOLs and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Debtors and Reorganized SWINC will be liable for the alternative minimum tax.

B.      Tax Consequences to Holders of Claims and Interests

The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Allowed Claims and Interests (including the character, timing and amount of income, gain or loss or deduction recognized) will depend upon, among other things, (1) the manner in which a holder acquired a Claim or Interest; (2) the length of time the Claim or Interest has been held; (3) whether the Claim or Interest was acquired at a discount; (4) whether the holder has taken a bad debt or other deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the holder has previously included accrued but unpaid interest with respect to the Claim; (6) the holder's method of tax accounting; and (7) whether the Claim is an installment obligation for United States federal income tax purposes.  Therefore, holders of Claims or Interests should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

Amounts treated as interest or dividend income (and certain other types of ordinary income) for federal income tax purposes will generally constitute taxable, ordinary income to a holder, regardless of whether the holder otherwise recognizes an overall loss as a result of the Plan.  In addition, a holder may be required to recognize certain types of income, including as a result of accrued but unpaid dividends or interest, imputed interest or "original issue discount" without a corresponding receipt of cash.

For purposes of the following discussion, a "United States holder" is a holder of an Allowed Claim or Interest that is (1) a citizen or individual resident of the United States, (2) a partnership or corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able

89

to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person. A "Non-United States holder" is a holder that is not a United States holder.

        Also for purposes of the following discussion, the "Initial Distribution Amount" and the "Semi-Annual Distribution Amount" are, as applicable, the Pro-Rata share of amount of cash and the fair market value (determined as of the date of receipt) of the Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock received by a holder of a Claim or Interest, in each case at the time of the Effective Date, Initial Distribution, Semi-Annual Distribution or receipt of the Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock, as applicable. For federal income tax purposes and for purposes of the discussion below, the SWINC Claims Administrator's receipt of Reorganized SWINC New Series A Preferred Stock and the Liquidating Trustee's receipt of Reorganized SWINC New Series B Preferred Stock will be treated as a receipt by the holder of a Claim or Interest for whose benefit such stock is received.

        i.        Allocation of Plan Distributions Between Principal and Interest

        To the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that, for income tax purposes, such distribution shall be allocated (to the extent permitted) first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. No assurances can be made in this regard. If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, a holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the holder's method of accounting.

        ii.        Consequences to Holders of Allowed SWINC Asbestos Claims and SWE&C Asbestos Claims (Classes 3A and 3B) ("Asbestos Claims")

        Depending on the nature and origin of an Asbestos Claim, its character in the hands of the holder, and whether the holder has already claimed a deduction or loss with respect to such Claim, any gain or loss with respect to the receipt of Cash and Insurance Proceeds in respect of such Claim pursuant to the Plan will generally be treated as capital gain or loss or ordinary income or deduction or excluded from gross income under Code section 104. Capital losses may generally offset only capital gains, although individuals may, to a limited extent, offset ordinary income with capital losses. A holder of an Asbestos Claim may be subject to taxation, under the "open transaction" or "closed transaction" methods described below, on its Pro Rata share of the Asbestos Claims. In addition, holders may be subject to other special tax rules that affect the character, timing and amount of any income, gain, loss or deduction. Accordingly, holders of Asbestos Claims are urged to consult their own tax advisors regarding the tax consequences of the Plan to them.

        iii.        Consequences to Holders of Allowed SWINC and SWE&C Convenience Claims, SWINC and SWE&C General Unsecured Claims, SWINC Subordinated Claims and SWINC Securities Claims (Classes 4A, 4B, 5A, 5B, 7A and 8A)

        A holder of an Allowed Class 4A SWINC Convenience Claim or an Allowed Class 4B SWE&C Convenience Claim (i.e., a holder of an Allowed Class 5A SWINC General Unsecured Claim

90

or an Allowed Class 5B SWE&C General Unsecured Claim that elects to be treated in Class 4A or 4B, respectively) will generally recognize a taxable gain or loss, in the taxable year of the Effective Date, equal to the difference, if any, between (1) the amount received in respect of its Claim, and (2) the holder's adjusted tax basis in its Claim.

The receipt by a holder of its Pro-Rata share of Distribution Amounts, Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock in respect of the holder's Class 5A or 5B General Unsecured Claim, Class 7A SWINC Subordinated Claim or Class 8A SWINC Securities Claim will generally be a taxable transaction for United States federal income tax purposes, and may also be a taxable transaction for applicable state, local and foreign income tax purposes. The timing and amount of taxable gain or loss are, however, subject to some uncertainty.

Under the "closed transaction" method, a holder of a Class 5A or 5B General Unsecured Claim, a Class 7A SWINC Subordinated Claim or Class 8A SWINC Securities Claim should generally recognize gain or loss in the taxable year of the Effective Date equal to the difference, if any, between (1) the sum of (a) such holder's Pro-Rata share of any Initial Distribution Amount, (b) such holder's Pro-Rata share of any Semi-Annual Distribution Amounts received in the taxable year of the Effective Date and (c) the fair market value, determined on the Effective Date, of such holder's Pro-Rata share of all Semi-Annual Distribution Amounts to be received in subsequent taxable years, over (2) such holder's adjusted tax basis in its Claim.

Under the "open transaction" method, such a holder should generally recognize gain (but not loss) with respect to such Claim, in each taxable year, beginning with the Effective Date, equal to the difference, if any, between (1) the cumulative total of any Initial and Semi-Annual Distribution Amounts received through the end of such taxable year, over (2) the sum of (a) such holder's tax basis in its Claim and (b) the cumulative total of the Initial and Semi-Annual Distribution Amounts already taken into account with respect to such Claim under the holder's method of accounting. Under this method, a holder should generally be required to defer its recognition of any loss with respect to its Claim until the taxable year in which it receives its final Semi-Annual Distribution Amount or shares of Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock. Under Regulations issued by the Treasury Department, the "open transaction" method should be employed only if the fair market value of the deferred Semi-Annual Distribution Amounts cannot be reasonably ascertained. The Regulations caution that the fair market value of future payments would generally not be ascertainable only in "rare and extraordinary cases."

Under both the "closed transaction" and "open transaction" methods, a portion of each deferred payment received more than six months after the Effective Date may be treated as imputed interest, and a holder of an Allowed Class 5A or 5B General Unsecured Claim, Class 7A SWINC Subordinated Claim or Class 8A SWINC Securities Claim may be required to include such interest as taxable ordinary income, under such holder's method of accounting, regardless of whether the holder otherwise realizes an overall loss as a result of the Plan. A holder whose Claim represents a debt Claim and that recognizes a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date, the taxable year in which it receives its final Semi-Annual Distribution Amount or in a prior taxable year.

As discussed above, the character of income or loss with respect to a Claim as ordinary or capital will depend on a number of factors, including the origin and nature of such Claim. Generally, if the Claim is a capital asset in the hands of a holder, the gain or loss will be capital gain or loss, and will be long-term capital gain or loss if the holder's holding period with respect to its Claim is more than

one year on the Effective Date. However, any gain recognized will generally be treated as ordinary income to the extent that Initial or Semi-Annual Distribution Amounts or Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock are received in respect of accrued interest, market discount or dividends that have not previously been taken into account under such holder's method of accounting. The holding period for Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock received by a holder of a Claim pursuant to the Plan will generally begin on the day after the Effective Date.

It is possible that any of the Debtors or Reorganized SWINC may be treated as having constructively liquidated, for federal income tax purposes, before the date of its actual liquidation. In such a case, any income or gain recognized after the date of the constructive liquidation would be treated as received and recognized directly by holders of Claims and Interests. Such holders would not be entitled to offset such income or gain with the Debtors' or Reorganized SWINC's NOLs. Such holders could also recognize income without a corresponding receipt of cash with which to satisfy their income tax liability. In addition, such holders may not be able to offset any such income or gains with deductions or losses that otherwise would have accrued to the Debtors or Reorganized SWINC after the date of a constructive liquidation, and may recognize taxable income or gain regardless of whether they otherwise recognize an overall loss as a result of the Plan.

        iv.    Consequences to Holders of SWINC Equity Securities (Class 9A)

Although not free from doubt, SWINC believes that the receipt of Reorganized SWINC New Series A Preferred Stock and Available Cash in respect of SWINC Equity Securities pursuant to the Plan should generally be treated as a "recapitalization" for United States federal income tax purposes. If the receipt is so treated, then, except as discussed below, a holder of a SWINC Equity Security should recognize gain (but not loss) with respect to the SWINC Equity Security surrendered pursuant to the Plan, in an amount equal to the lesser of (1) the amount of gain realized (i.e., the excess of the amount of Available Cash and the fair market value of the Reorganized SWINC New Series A Preferred Stock received by the holder, over the holder's adjusted tax basis in its SWINC Equity Security) or (2) the amount of Cash received by the holder of the SWINC Equity Security. Except as discussed below, any such gain recognized should generally be treated as capital gain, and taken into account under either the "closed transaction" or the "open transaction" method described above. In addition, except as discussed below, such a holder's aggregate tax basis in the Reorganized SWINC New Series A Preferred Stock received pursuant to the Plan should be equal to the aggregate tax basis in its SWINC Equity Securities surrendered in exchange therefor, decreased by the amount of Available Cash received and increased by the amount of any gain recognized. A holder's holding period for its Reorganized SWINC New Series A Preferred Stock received pursuant to the Plan should generally include the holding period of its SWINC Equity Securities surrendered in exchange therefor.

If the receipt of Reorganized SWINC New Series A Preferred Stock and Available Cash in respect of SWINC Equity Securities pursuant to the Plan is not treated as a recapitalization, then such receipt would be treated as a taxable transaction for federal income tax purposes. Accordingly, a holder of SWINC Equity Securities would generally recognize gain or loss, if any, on the fair market value of the Reorganized SWINC New Series A Preferred Stock and the amount of Available Cash received, under either the "closed transaction" or the "open transaction" method described above. A holder's holding period with respect to Reorganized SWINC New Series A Preferred Stock would begin on the day after the Effective Date.

A holder who receives its Pro-Rata share of Reorganized SWINC New Series A Preferred Stock or Available Cash in respect of accrued but unpaid dividends, if any, will recognize ordinary income upon such receipt in an amount equal to the fair market value of such Reorganized SWINC New Series A Preferred Stock (determined on the Effective Date) and the amount of Available Cash not previously taken into account under the holder's method of accounting with respect to such accrued but unpaid dividend, regardless of whether such holder otherwise recognizes a taxable loss as a result of the Plan. The holding period for Reorganized SWINC New Series A Preferred Stock received in respect of such accrued but unpaid dividends will begin on the day after the Effective Date.

If holders of Allowed Class 9A Equity Securities vote to accept the Plan, holders of Reorganized SWINC Series A Preferred Stock will receive a greater amount than if they had voted to reject the Plan (the "Overage") and holders of Class 9A Equity Securities will receive an interest in, and distributions from, the Equity Settlement Fund. Any Overage received by a holder of a SWINC Equity Security should be treated as either (i) additional consideration received in respect of such SWINC Equity Security pursuant to the Plan or (ii) a separate payment in the nature of a fee for accepting the Plan. If the Overage is treated as additional consideration received in respect of the SWINC Equity Security, the Overage will be added to the amount realized in computing gain or loss in the manner described above. If the Overage or income from the Settlement Fund is treated as a separate fee, a holder of a SWINC Equity Security would likely recognize ordinary income in an amount equal to the Overage and/or its Pro Rata share of income from the Settlement Fund, regardless of whether such holder otherwise recognizes an overall loss as a result of the Plan. The Debtors intend to take the position that the Overage should be treated as additional consideration received in respect of SWINC Equity Securities and that income recognized as a result of the Settlement Fund will be treated as a fee and taxable as ordinary income. No assurances can be made in this regard.

If any of the Debtors or Reorganized SWINC is treated as having constructively liquidated, for federal income tax purposes, before the date of its actual liquidation, a Pro Rata share of any income or gain recognized after the date of the constructive liquidation would be treated as received and recognized directly by holders Class 9A Equity Securities. Such holders would not be entitled to offset such income or gain with the Debtors' or Reorganized SWINC's NOLs. Such holders could also recognize income without a corresponding receipt of cash with which to satisfy their income tax liability. In addition, such holders may not be able to offset any such income or gains with deductions or losses that otherwise would have accrued to the Debtors or Reorganized SWINC after the date of a constructive liquidation, and may recognize taxable income or gain regardless of whether they otherwise recognize an overall loss as a result of the Plan.

A portion of the consideration received on each Semi-Annual Distribution Date that is more than six months after the Effective Date may be treated as imputed interest, taxable as ordinary income under the holder's method of accounting.

v.    Consequences of Liquidation of Reorganized SWINC

Upon the liquidation of Reorganized SWINC, each beneficial holder of Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock will generally recognize gain or loss equal to the difference, if any, between (1) such holder's Pro Rata share of the liquidation proceeds of Reorganized SWINC and (2) such holder's aggregate adjusted tax basis in its beneficial interest in the stock surrendered in exchange therefor. Any such

gain or loss will generally be capital gain or loss, and will be long-term capital gain or loss if the holder's holding period for its shares (including a tacked holding period relating to a share of SWINC Equity Securities, as discussed above) is more than one year on the date of liquidation.

As discussed above in Section IV.a, it is possible that SWINC or Reorganized SWINC could be treated as having constructively liquidated, for federal income tax purposes, prior the actual liquidation of Reorganized SWINC. In that case, a beneficial holder of SWINC Equity Securities, Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock would be subject to the treatment described in the preceding paragraph with respect to shares of Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock at the time of such constructive liquidation. In addition, if SWINC or Reorganized SWINC is treated as having constructively liquidated before receiving the reversion of the Pension Plan assets, holders of Claims and Interests may be treated as having received the reversion directly and would be taxable on such receipt. In such a case, holders receiving such amounts would not be entitled to utilize Reorganized SWINC's NOLs to offset income from such receipt. In addition, such income would likely be treated as ordinary and thus would generally not be offset by capital losses (except to a limited extent in the case of individuals) or basis.

            vi.       Consequences of the SWE&C Liquidating Trust, the Asbestos Trust, and the Equity Settlement Fund

Under the IRC, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury regulations have been issued, no Treasury regulations have been promulgated to address the tax treatment of such funds in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. Depending on the facts and the relevant law, such funds could be treated as grantor trusts, separately taxable trusts, or otherwise.

The Debtors presently intend to treat (1) the assets held in the Asbestos Trust and SWE&C Liquidating Trust, respectively, (the "Liquidating Trust Assets") as held by a grantor trust with respect to which the holders of SWE&C Claims are treated as the grantors, and (2) the assets held in the Equity Settlement Fund (the "Equity Settlement Fund Assets") as held by a grantor trust with respect to which holders of Class 9A Interests are treated as the grantors. Accordingly, it is anticipated that holders of SWE&C Claims will be subject to current taxation on any earnings generated by the Liquidating Trust Assets and that holders of Class 9A SWINC Equity Interests will be subject to current taxation on any earnings generated by the Equity Settlement Fund Assets. There can be no assurance that the IRS will respect the foregoing treatment. For example, the IRS may characterize any or all of the trusts as grantor trusts for the benefit of holders of Claims, the Debtors or Reorganized SWINC, or as otherwise owned by and taxable to holders of Claims or the Debtors or Reorganized SWINC. Alternatively, the IRS could characterize any or all of the trusts as so-called "complex trusts" subject to a separate entity level tax on its earnings, except to the extent that such earnings are distributed during the taxable year. Due to the possibility that the amounts of the consideration received by a holder of a SWE&C Claim may increase or decrease, a holder of a SWE&C Claim could be prevented from recognizing a loss until the time at which there are no assets remaining in the Liquidating Trust or the Liquidating Trust is terminated.

If the amounts held in Asbestos Trust are treated as held by a grantor trust with respect to which holders of SWE&C Claims are treated as the grantors, then they will recognize additional gain as a result of the transfer of funds to the Asbestos Trust, either under the "open

transaction" or "closed transaction" methods described above. Under the closed transaction method, holders of SWE&C Claims would recognize ordinary income or capital gain as a result of the transfer, in the taxable year of the Effective Date, without a corresponding receipt of cash. Holders of SWE&C Claims may be entitled to a deduction or capital loss in the year in which amount are paid to holders of Asbestos Claims, but the ability to claim such a deduction or capital loss is uncertain.

As discussed above under the heading "Consequences of Liquidation of Reorganized SWINC," if any of the Debtors is treated as constructively liquidated before the date of its actual liquidation, or if the Reversion is treated as received directly by the SWE&C Liquidating Trust, the amounts distributable to holders of Claims and Interests could be materially reduced or eliminated or such holders themselves could be taxable on the deemed receipt by the SWE&C Liquidating Trust. In such a case, holders receiving such amounts would not be entitled to utilize the Debtors' NOLs to offset income from such receipt. In addition, such income would likely be treated as ordinary and thus would generally not be offset by capital losses (except to a limited extent in the case of individuals) or basis.

Holders of Asbestos Claims and SWE&C Claims are urged to consult their own tax advisors regarding the potential United States federal income tax treatment of the Trusts and the consequences to them of such treatment (including the effect on the computation of a holder's income, gain or loss in respect of its Claim, the subsequent taxation of any distributions from the Trusts, and the possibility of taxable income without a corresponding receipt of cash or property with which to satisfy the tax liability).

vii.    Consequences to Non-United States Holders

The United States federal income tax consequences of the Plan for a Non-United States holder generally depend on the nature and origin of the holder's Claim or Interest. Except as discussed below, a Non-United States holder that holds its Claim or Interest as a capital asset should generally not be subject to United States federal income tax with respect to Reorganized SWINC New Series A Preferred Stock, Reorganized SWINC New Series B Preferred Stock, cash or an interest in the SWE&C Liquidating Trust received in respect of its Claim or Interest pursuant to the Plan unless, among other things, (a) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (b) in the case of an individual, such holder is present in the United States for 183 days or more during the taxable year of the Effective Date and certain other requirements are met. A Non-United States holder may, however, be subject to United States federal withholding tax and information reporting with respect to cash and the fair market value of Reorganized SWINC New Series A Preferred Stock or Reorganized SWINC New Series B Preferred Stock received in respect of accrued interest, market discount, accrued but unpaid dividends or the portion of Semi-Annual Distributions treated as interest.

viii.    Information Reporting and Backup Withholding

Certain payments, including payments of interest, payments of cash in respect of Claims, SWINC Equity Securities and other payments and distributions pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes

within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

A Non-United States holder that receives payments or distributions pursuant to the Plan will generally not be subject to backup withholding, provided that such holder furnishes certification of its status as a Non-United States holder (and any other required certifications), or is otherwise exempt from backup withholding. Generally, such certification is provided on IRS Form W-8BEN. Information reporting may apply to amounts received by a Non-United States holder.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

C.    Consequences to Pension Plan

After the Effective Date, Reorganized SWINC intends to commence a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282. Reorganized SWINC then intends to undertake to terminate the Pension Plan with a DOPT that falls during the pendency of the Delaware dissolution proceeding. After satisfying all liabilities of the Pension Plan to Pension Plan participants and beneficiaries, Reorganized SWINC may take a distribution of any Reversion.

As of ~~June 1, 2001~~ December 31, 202, the Pension Plan's enrolled actuary estimated that the Pension Plan had a substantial Reversion. Whether the Reversion will exist at a future date, and, if so, in what amount, will be determined by the appreciation or depreciation of Pension Plan assets, prevailing market annuity purchase rates, interest rates used to determine various benefits under the Pension Plan, mortality and other demographic experience, Pension Plan provisions and the interpretation of those provisions, and other factors. Accordingly, no assurances can be given regarding the existence or amount of the Reversion.

If Reorganized SWINC receives the Reversion, in addition to any income tax consequences that may result, the amount of the reversion will be subject to taxation under IRC section 4980. Unless one of the exceptions set forth in IRC § 4980 applies, IRC § 4980 imposes a tax of 50 percent of the amount of any employer reversion from a tax-qualified plan. If one of the exceptions applies, then the IRC § 4980 tax rate is 20 percent.

One of the exceptions that results in a 20 percent IRC § 4980 tax rate applies in the case of "an employer who, as of the termination date of the qualified plan, is in bankruptcy liquidation under chapter 7 of title 11 of the United States Code or in similar proceedings under State law." A dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 should constitute such a "similar" proceeding under State law and, therefore, termination of the Pension Plan with a DOPT that falls during the Delaware dissolution proceeding should result in a 20 percent tax rate under IRC § 4980. There can be no assurance that the IRS will agree with this position, however. The IRS could conclude that a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 is not sufficiently "similar" to a bankruptcy liquidation under chapter 7 of title 11 of the United States Code to warrant a 20 percent tax rate under IRC § 4980. Or, the IRS could disregard the form of the Delaware dissolution proceeding because it follows a Chapter 11

96

reorganization, which, unlike a Chapter 7 liquidation or similar state law dissolution proceeding, does not qualify for the exception noted above to the 50 percent IRC § 4980 tax.

The Debtors may seek a private letter ruling from the IRS regarding the IRC § 4980 tax rate that would apply to Reorganized SWINC's receipt of the Reversion. No assurances are given, however, that the IRS will rule favorably or in advance of the date that holders of a claim or interest must vote on the proposed Plan of Reorganization. In particular, the IRS could rule unfavorably, could decline to rule, could insist that any such ruling request be submitted only by Reorganized SWINC as the affected taxpayer (and therefore after the Effective Date), or could otherwise not rule until after the Effective Date.

D.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN  AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

E.    ~~Pension Plan Consequences~~

~~After the Effective Date, Reorganized SWINC intends to commence a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282. Reorganized SWINC then intends to undertake to terminate the Pension Plan with a DOPT that falls during the pendency of the Delaware dissolution proceeding. After satisfying all liabilities of the Pension Plan to Pension Plan participants and beneficiaries, Reorganized SWINC may receive the Reversion.~~

~~As of June 1, 2001, the Pension Plan's enrolled actuary estimated that the Pension Plan had a substantial Reversion. Whether the Reversion will exist at a future date, and, if so, in what amount, will be determined by the appreciation or depreciation of Pension Plan assets, prevailing market annuity purchase rates, interest rates used to determine various benefits under the Pension Plan, mortality and other demographic experience, Pension Plan provisions and the interpretation of those provisions, and other factors. Accordingly, no assurances can be given regarding the existence or amount of the Reversion.~~

~~If Reorganized SWINC receives the Reversion, in addition to any income tax consequences that may result, the amount of the Reversion will be subject to taxation under IRC § 4980. Unless one of the exceptions set forth in IRC § 4980 applies, IRC § 4980 imposes a tax of 50 percent of the amount of any employer reversion from a tax-qualified plan. If one of the exceptions applies, then the IRC § 4980 tax rate is 20 percent.~~

~~One of the exceptions that results in a 20 percent IRC § 4980 tax rate applies in the case of "an employer who, as of the termination date of the qualified plan, is in bankruptcy liquidation under chapter 7 of title 11 of the United States Code or in similar proceedings under State law." A dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 should constitute~~

97

~~such a "similar" proceeding under State law and, therefore, termination of the Pension Plan with a DOPT that falls during the Delaware dissolution proceeding should result in a 20 percent tax rate under IRC § 4980. There can be no assurance that the IRS will agree with this position, however. The IRS could conclude that a dissolution proceeding in the Chancery Court of Delaware under DGCL §§ 275-282 is not sufficiently "similar" to a bankruptcy liquidation under chapter 7 of title 11 of the United States Code to warrant a 20 percent tax rate under IRC § 4980. Or, the IRS could disregard the form of the Delaware dissolution proceeding because it follows a Chapter 11 reorganization, which, unlike a Chapter 7 liquidation or similar state law dissolution proceeding, does not qualify for the exception noted above to the 50 percent IRC § 4980 tax.~~

~~The Debtors may seek a private letter ruling from the IRS regarding the IRC § 4980 tax rate that would apply to Reorganized SWINC's receipt of the Reversion. No assurances are given, however, that the IRS will rule favorably or in advance of the date that holders of a claim or interest must vote on the proposed Plan of Reorganization. In particular, the IRS could rule unfavorably, could decline to rule, could insist that any such ruling request be submitted only by Reorganized SWINC as the affected taxpayer (and therefore after the Effective Date), or could otherwise not rule until after the Effective Date.~~

~~F.~~ Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN  AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VIII.  CONFIRMATION OF THE PLAN

The Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan has properly classified Claims and Interests, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code, (d) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by Bankruptcy Code section 1125 has been made, (f) the Plan has been accepted by the requisite votes of all classes of creditors (except to the extent that "cramdown" is available under Bankruptcy Code section 1129(b)), (g) the Plan is in the "best interests" of all holders of Claims or Interests in an Impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in Bankruptcy Code section 1114, at the level established at any time prior to Confirmation pursuant to Bankruptcy Code sections 1114(e)(1)(B) or 1114(g), for the duration of the period that the Debtors have obligated themselves to provide such benefits.

A.      Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interest vote to accept the Plan, under certain circumstances.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but forth that purpose only counts those who actually vote to accept or reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Under Bankruptcy Code section 1126(d), a Class of Interest has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan.

B.    Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of the Plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. Since SWINC and the SWINC Subsidiaries intend to liquidate their remaining assets pursuant to the Plan, the ability of SWINC to make the distributions described in the Plan does not depend on its future earnings. Since SWE&C and the SWE&C Subsidiaries intend to liquidate their remaining assets pursuant to the Plan, the ability of SWE&C to make the distributions described in the Plan does not depend on its future earnings. Accordingly, the Plan Proponents believe that the Plan is feasible and meets the requirements of Bankruptcy Code section 1129(a)(11).

C.    Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires that a bankruptcy court find that the plan is in the "best interests" of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interest have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its chapter 11 case (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the

99

pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of their equity interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection claims.

Once the court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distribution to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interest of creditors and equity security holders.

D.      Liquidation Analysis

In order to determine the amount of liquidation value available to creditors, the Debtors, with the assistance of their financial advisor, FTI Consulting Services, prepared a liquidation analysis, annexed hereto as Appendix C (the "Liquidation Analysis").

E.      Application of the "Best Interests" Test to the Liquidation Analysis and the Valuation

It is impossible to determine with any specificity the value each creditor or interestholder will receive as a percentage of its Allowed Claim or Allowed Interest. This difficulty in estimating the value of recoveries is due to, among other things, the inherent uncertainty with respect to recoveries on Litigation Claims, the net amount of the reversionary interest in the Pension Plan and the claims reconciliation process.

Notwithstanding the difficulty in quantifying recoveries to holders of Allowed Claims and Allowed Interests with precision, the Plan Proponents believe that the financial disclosures and projections contained herein imply a greater or equal recovery to holders of Claims and Interests in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

F.      Confirmation Without Acceptance Of All Impaired Classes: The "Cramdown" Alternative

Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if it is not accepted by all impaired classes of Claims and Interests, as long as at least one impaired Class of Claims has accepted it. The Court may confirm the Plan notwithstanding the rejection of an Impaired Class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has rejected, or is deemed to have rejected the Plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of unsecured claims that rejects a plan, if, among other things, the plan provides (a) that each holder of a claim in the rejecting class will receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that no holder of a claim or interest that is junior to the claims of such rejecting class will receive or retain under the Plan any property on account of such junior claim or interest.

100

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interest of such rejecting class will receive or retain under the Plan any property on account of such junior interest.

Because holders of Class 6A Consolidated SWINC Intraestate Claims, Class 10A SWINC Subsidiary Interest, Class 6B SWE&C Intraestate Claims, Class 7B Intercompany Claims of SWINC or any SWINC Subsidiaries, Class 8B SWE&C Subsidiary Claims, Class 9B SWE&C Subsidiary Interests, and Class 10B SWE&C Equity Interests are receiving no distribution on account of such Claims and Interest under the Plan, their votes are not being solicited and they are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Accordingly, the Plan Proponents are seeking confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to such Classes and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of Claims and Interests the potential for the greatest realization of the Debtors' assets and, therefore, is in the best interest of such holders.

If the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases, (b) formulation of an alternative plan or plans of reorganization, (c) confirmation of the Equity Plan or (d) liquidation under chapter 7 of the Bankruptcy Code.

A.    Continuation of the Bankruptcy Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. The Debtors are not a going concern.

B.    Alternative Plan(s)

If the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve a reorganization and continuation of the Debtors' business.

The Plan Proponents believe that the Plan, as described herein enables holders of Claims and Interests to realize the greatest possible value under the circumstances, and that as compared to any alternative plan of reorganization, the Plan as the greatest chance to be confirmed and consummated.

C.    Confirmation of the Equity Committee Plan

The Equity Committee has filed an alternative plan of reorganization and/or liquidation. In the event the Court approves the Equity Committee Disclosure Statement and allows

the Equity Committee to solicit with respect to its plan, holders of Claims and Interests will be asked to vote to accept or reject the Equity Committee Plan. If more than one plan is confirmable under Bankruptcy Code section 1129, the Court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

D.      Liquidation under Chapter 7

        If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against and Interests in the Debtors.

        The Plan Proponents believe that a liquidation in chapter 7 would result in (i) significant dely in distributions to all creditors who would have received a distribution under the Plan and (ii) diminished recoveries for certain classes of creditors.

## X. RECOMMENDATION AND CONCLUSION

THE DEBTORS, THE CREDITORS' COMMITTEE, AND FEDERAL BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND THEIR CREDITORS.  The Plan provides for an equitable and early distribution to creditors.  The Debtors, the Creditors' Committee, and Federal believe that any alternative confirmation of the Plan, such as liquidation under Chapter 7, could result in significant delays, litigations, and costs, as well as a reduction in the distributions to holders of certain Classes of Claims and Interests.  FOR THESE REASONS, THE DEBTORS, THE CREDITORS' COMMITTEE, AND FEDERAL URGE YOU TO RETURN YOUR BALLOT AND VOTE TO ACCEPT THE PLAN.

Dated: Wilmington, Delaware
April + 22, 2003

STONE & WEBSTER, INCORPORATED, et al.
Debtors and Debtors-in-Possession
By: /s/ James P. Carroll
Name: James P. Carroll
Title: President & Chief Restructuring Officer

FEDERAL INSURANCE COMPANY

By: /s/ Wayne Walton
Name: Wayne Walton
Title: _____

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
STONE & WEBSTER, INC., et al., Debtors and
Debtors-in-Possession

By: /s/ Bayard Graf
Name: Bayard Graf
Company: MDC Systems Name:
Title: Chairperson, Official Committee of Unsecured Creditors


   /s/ Gregg M. Galardi
Gregg M. Galardi (I.D. No. 2991)
Eric M. Davis (I.D. No. 3621)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Debtors and
  Debtors-in-Possession

Anthony Princi, Esq.
Lorraine S. McGowen, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103

     - and -


  /s/ Adam G. Landis
Adam G. Landis (I.D. No. 3407)
KLETT, ROONEY, LIEBER
 & SCHORLING PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801

Attorneys for the Official Committee
 of Unsecured Creditors


J. Michael Franks
Sam H. Poteet, Jr.
Thomas T. Pennington
MANIER & HEROD
150 4th Avenue North, Suite 2200
Nashville, Tennessee 37219
(615) 244-0030

     -and-


  /s/ Michael R. Lastowski
Michael R. Lastowski (I.D. No. 3892)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
(302) 657-4900

Attorneys for Federal Insurance
 Company

APPENDIX A

LIST OF DEBTOR ENTITIES COMPRISING THE CONSOLIDATED SWINC
ESTATE AND THE CONSOLIDATED SWE&C ESTATE

APPENDIX B

JOINT PLAN OF REORGANIZATION OF DEBTORS IN POSSESSION,
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND
FEDERAL INSURANCE COMPANY WITH RESPECT TO
(I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF
ITS SUBSIDIARIES AND AFFILIATES AND(II) STONE & WEBSTER ENGINEERS &
CONSTRUCTORS, INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES

APPENDIX C

LIQUIDATION ANALYSIS

APPENDIX C-1

LIQUIDATION ANALYSES FOR CONSOLIDATED SWINC ESTATE
AND CONSOLIDATED SWE&C ESTATE

APPENDIX C-2

LIQUIDATION ANALYSES FOR EACH ~~OF THE 73~~ DEBTOR ~~ENTITIES~~ <u>ENTITY</u>

APPENDIX D

SUBSTANTIVE CONSOLIDATION SETTLEMENT
CASH FUNDING ANALYSIS`

<u>APPENDIX E</u>

<u>INCURRED PROFESSIONAL FEE SUMMARY BY ESTATE</u>

------------------ COMPARISON OF HEADERS ------------------

-HEADER 1-
PAGE

------------------ COMPARISON OF FOOTERS ------------------

-FOOTER 1-
â

-FOOTER 2-
~~329158.16A~~ 335642.05-Wilmington S1A