## In the United States Bankruptcy Court
## For the District of Delaware

In re                                    : Chapter 11
                                         :
Stone & Webster, Inc.                    :
                          Debtor(s)      : Bankruptcy No. 00-2142 (PJW)
_____  :
The Shaw Group, Inc.                     :
                          Plaintiff      :
           v.                            :
Next Factors, Inc.,                      :
                          Defendant      : Advs. No. 01-6661 (SR)
_____

# <u>Opinion</u>

By: Stephen Raslavich, United States Bankruptcy Judge.

**<u>Background</u>.**

The above adversary action arises in the Chapter 11 Bankruptcy case of Stone & Webster, Inc., et al. (Stone & Webster") In its complaint the Plaintiff, the Shaw Group, Inc., ("Shaw") seeks a declaratory judgment on a variety of issues, including 1) a determination as to the amount and rightful owner of a certain claim against Shaw, and 2) a declaration that upon payment of the liquidated claim to its rightful owner, any and all other related claims asserted against Shaw for interest and attorneys fees are invalid.  The Complaint was filed on September 25, 2001.

Following a mediation, the ownership issue was resolved. The owner of the claim at issue is acknowledged to be Next Factors, Inc. ("Next Factors").  The remaining issues in the litigation are unresolved; although, as will be discussed not all

outstanding issues will be determined herein.

As might be expected in an adversary proceeding between two non-debtors that has been pending for over 5 years, the case has a rather involved procedural history. Piecing together the chronology and relevant facts is made somewhat difficult by the circumstances under which the litigation comes before this Court.[1]

The instant dispute stems from Shaw's purchase of substantially all of the assets of Stone & Webster in the year 2000. The consideration for the purchase consisted of cash and an assumption of liabilities. Stone & Webster, although primarily in the engineering and construction business,

---

[1] As discussed, *infra,* the main bankruptcy case originated in the District of Delaware and is presided over by the Honorable Peter J. Walsh. On August 10, 2006, at a pretrial conference in this adversary proceeding, Judge Walsh raised the question of recusal, after noting that in the parties' proposed pretrial order the Defendant had identified Christopher J. Sontchi, a recently appointed Bankruptcy Judge in the District of Delaware, as a witness and had designated his 91 page deposition for inclusion in the record. Judge Walsh elaborated on his need to recuse himself in a letter to counsel dated August 15, 2006. In this letter he indicated that he had discussed the issue with Chief Bankruptcy Judge Mary Walrath, who agreed that Judge Walsh's rationale re: the recusal issue would extend to the other judges of the Delaware Bankruptcy Court. Pursuant to 28 U.S.C. § 292(b) Chief Judge Walrath requested that the Chief Judge of the Circuit assign this adversary proceeding to a judge in another District. Chief Circuit Judge Anthony J. Sirica accommodated this request and designated the Chief Bankruptcy Judge of the Eastern District of Pennsylvania, the Honorable Diane W. Sigmund, to serve in the District of Delaware and preside over this litigation, with authority on her part, however, to refer the matter to another judge in this District as she deemed appropriate. In furtherance of that authorization, and following a random assignment policy, the case was transferred to the undersigned.

apparently owned a subsidiary that operated cold storage
warehouses.  One such subsidiary was an entity known as Nordic
Refrigerated Services, LP ("Nordic Refrigerated").

In 1999 Coastal Foods, Inc. ("Coastal") contracted with
Nordic Refrigerated to store various lots of frozen shrimp at the
latter's warehouse in Atlanta, Georgia.  During that year
discrepancies were found to exist between the records of Coastal
and Nordic Refrigerated and the results of a physical inventory
of the shrimp actually at the warehouse.  A quantity of shrimp
was determined to be missing.

Coastal was insured by Gulf Insurance Company ("Gulf") for
such an event and was apparently paid $118,358.99 pursuant to the
underlying policy.  An entity known as Xabeque LLC ("Xabeque")
subsequently claimed that it was the transferee of Gulf's
subrogation claim against Nordic Refrigerated.

Stone & Webster filed its bankruptcy case on June 2, 2000.
On or about July 14, 2000, it scheduled the claim in question as
belonging to Xabeque, and being in the undisputed, liquidated and
non-contingent amount of $125,358.99.[2]

Gulf disputed the alleged transfer of its claim to Xabeque
and filed its own proof of claim in the unsecured, non-
prioritized amount of $118,358.99.  Prior thereto, however, Gulf

---

[2] This figure apparently represents the adjusted Coastal claim
after adding back the policy's deductible.

had in fact transferred its claim to Next Factors, which filed two separate proofs of claim on its own behalf, each in the unsecured, non-prioritized amount of $125,358.99. Next Factors also filed a third proof of claim relating to the missing shrimp in an amount which cannot be determined from the record before the Court. The parties agree that all four claims relate to the subject of this litigation and they have chosen to denominate the claim at issue as the "Xabeque Claim." The Court will do likewise. As noted above, all disputes relative to ownership of the Xabeque claim have been resolved in favor of Next Factors.

Prior to paying Coastal, Gulf had hired an insurance adjusting firm named Matthews, Mattson & Kelley Ltd., (the "Matthews Firm") to investigate the loss. The assignment was performed by J. Roger Parry. The Matthews Firm prepared a report, dated March 6, 2000, which is appended to the proof of claim filed by Gulf (the "Matthews Report"). The parties agree that Mr. Parry concluded that there was no explanation for the loss. (See Stipulated Fact No. 11 - Joint Pretrial Order)

Next Factors is in the business of acquiring claims in bankruptcy proceedings throughout the country. It purchased 63 claims in the Stone & Webster case, including the Xabeque Claim. The Xabeque Claim is one of the liabilities which Shaw assumed as part of the consideration for its purchase of the assets of Stone & Webster.

4

In the main Stone & Webster bankruptcy case, the Court had
approved an agreement between the Debtors and Shaw under which
Shaw was to identify disputes as to the amount of assumed
liabilities on or before January 15, 2001, and was to file claim
objections, if any, on or before January 31, 2001.  Shaw did not
file an objection to the Xabeque Claim by that date.  However, on
January 30, 2001, Shaw did file a First Omnibus Objection to
various claims.  The omnibus objection contained an explicit
reservation of rights to file additional objections, as follows:

> Shaw expressly reserves the right to amend,
> modify or supplement this Objection, and to
> file additional objections to the claims or
> any other claims (filed or not) that may be
> asserted against Shaw. Should one or more of
> the grounds of objection stated in this
> Objection be overruled, Shaw reserves its
> rights to object to the proofs of claim on
> any other ground that bankruptcy and
> nonbankruptcy law permits.

On April 17, 2001, Shaw filed a Second Omnibus Objection to
claims which included an objection to the Xabeque Claim.  The
Second Omnibus Objection also contained a reservation of rights
to file further objections.  The proposed orders approving both
omnibus objections recited that the entry of the Orders was
"without prejudice to Shaw's right to object to any other proofs
of claim or interests filed in these Chapter 11 cases."  The
proposed orders with respect to both omnibus objections were
signed on May 22, 2001.

Shaw based its objection to the Xabeque Claim on a contention that the claim had been "settled at closing." Subsequently, Shaw determined that the Xabeque Claim had not been "settled at closing," and abandoned its objection.  Several months later Shaw initiated this adversary action.

In its complaint Shaw contested the amount of the Xabeque Claim on the basis 1) that the claim lacked supporting documentation, and 2) that the claims was based on Coastal's costs for the missing shrimp, but failed to take into account a contractual limitation on lost product under the warehouse agreements between Coastal and Nordic Refrigerated.  In the latter respect, Shaw maintains that the reverse side of the warehouse receipts for the six lots of frozen shrimp unaccounted for contained the following language:

> If goods are damaged or lost through negligence of the warehouseman, the lesser of reasonable wholesale market price or storer's cost at Atlanta, Georgia of the goods on the date of the discovery of damage or loss shall be the measure of damages, but in no case shall the liability of the warehouseman exceed fifty cents (50 cents) per pound unless excess value is declared by the storer at the time the goods are stored.  This request must be made in writing.  Rates quoted are on the basis of this maximum liability and in the event a storer desires to declare an excess value, proportionate rates to cover the added liability on the part of the warehouseman will be assessed on both Handling and Storage.

Shaw asserts that Coastal never declared "excess value," and

that any liability on its part for the missing shrimp was
therefore capped at 50 cents per pound.  As noted above, Shaw
sought, inter alia, a declaration as to the proper amount of the
Xabeque claim.[3]

In its Answer to the Complaint, Next Factors included as a
first affirmative defense, the following:

> Defendant asserts that the relief sought
> in the Complaint by Plaintiff has been,
> waived in full or in part, by Plaintiff's
> conduct and/or action(s) in connection with
> the claims asserted by Defendant.
> Alternatively, Defendant asserts that the
> Plaintiff is estopped from seeking the relief
> sought in the Complaint, in full or in part,
> by Plaintiff's conduct and/or action(s) in
> connection with the claims asserted by
> Defendant.

Next Factors subsequently filed a Motion for Summary
Judgment that was based in part on the above affirmative defense,
and in part on its contention that under applicable Georgia law
Shaw was barred from limiting its liability for an unexplained
loss.  Judge Walsh denied Next Factors' Motion for Summary
Judgment in an Opinion and Order dated December 16, 2005.

In his decision, Judge Walsh, inter alia, rejected all of
Next Factors' arguments that principles of waiver and/or estoppel
barred Shaw from objecting to the Xabeque Claim after January 31,

---

[3]  Shaw specifically asserted the limitation of liability issue
at Paragraph 14 of its complaint.  Next Factors responded with a
general denial which read "defendant lacks knowledge or information
sufficient to form a belief as to the truth or falsity of the
allegations contained in paragraph 14 of the Complaint."

2001. Judge Walsh additionally held that the underlying transaction was governed by Georgia law, and that under Georgia law a warehouse receipt may validly cap damages for a loss. He noted, however, that any such cap would be ineffective if the warehouseman converted the property for his use, citing the following relevant statutory language:

> (1) A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such cars in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.
>
> (2) Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the warehouse's tariff, if any. No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.
>
> (3) Reasonable provisions as to the time and manner of presenting claims and instituting actions based on the bailment may be included in the warehouse receipt or tariff.

GA. CODE ANN. § 11-7-203 (2005) (emphasis added in opinion)

8

Next Factors sought to invoke the conversion exception, arguing that Georgia law required the Court to presume a conversion of the shrimp because the loss could not be explained. Judge Walsh rejected this argument, concluding instead that the transaction was a bailment, and that under such circumstances Georgia law created a rebutable presumption of negligence upon proof of loss by a depository for hire. Conversely, he held that Next Factors bore the burden of proving a conversion of the shrimp, as opposed to negligence by the bailee, a burden which he determined Next Factors had failed to meet.

Shortly before issuing his decision on Next Factors' Motion for Summary Judgement, Judge Walsh issued another Order of significance for present purposes. Next Factors apparently has taken the position that alleged improper conduct by Shaw, together with Shaw's failure to pay the Xabeque Claim and other claims purchased by Next Factors, has given rise to a claim on the part of Next Factors against Shaw for incidental damages, including, without limitation, interest and attorneys fees, which in the aggregate approximate 2.7 million dollars.

In response to this, Shaw filed a Motion in Limine in which it argued that Next Factors had failed to provide any computation of the alleged damages as required by F.R.C.P. 26(a)(1)[4]

---

[4]    The Proof of Claim filed by Next Factors relative to the
(continued...)

Consequently, said Shaw, Next Factors should be precluded from presenting any evidence of such damages in this adversary proceeding. At a hearing on the Motion held December 1, 2005, the parties and the Court mutually agreed that any issues as to incidental damages and the payment of other claims owned by Next Factors should be heard upon separate application to be filed in the main bankruptcy case. and that Next Factors would be precluded from presenting any evidence of such alleged incidental damages herein. (See Transcript hearing 12-1-05, pages 26-37). This decision was memorialized in an order of Court dated December 5, 2005.

This Court held a pretrial conference call with counsel for the parties on September 14, 2006. Much, although not all, of the foregoing history was discussed. During the call it was determined that the issues in this adversary proceeding had been considerably narrowed by virtue of the resolution of the ownership issue and the ruling on Shaw's Motion in Limine. At this point the issue *sub judice* is simply liquidation of the Xabeque Claim. This issue, however, subsumes two separate questions upon which the parties disagree. The first is the quantity of shrimp that went missing and the second goes to the

---

[4](...continued)
Xabeque Claim included a footnote which made demand for such damages, ostensibly limited to the Xabeque Claim, although there is no such limiting language.

existence and enforceability of the contractual waiver of damages beyond 50 cents per pound of missing shrimp.

Upon inquiry by the Court, counsel advised that neither party intended to present live testimony in connection with this matter, and that the evidentiary record would consist entirely of documents and trial depositions. The Court thereupon entered a scheduling order on September 26, 2006, which provided for transmittal of the record and the submission of briefs. The parties' reply briefs have been received and the matter is thus ripe for determination. Consistent with the Court's verbal advices on September 14, 2006, the Court will not reconsider matters previously adjudicated by Judge Walsh, and this matter will be governed in accordance with the terms of the parties' proposed joint pretrial order, which was submitted pursuant to an Order of Judge Walsh dated March 27, 2006, but apparently not signed by him prior to his recusal.

Before turning to its discussion, the Court is constrained to observe that the disposition of an otherwise seemingly straightforward dispute is made considerably the more complex by reason of a plethora of objections interposed by the parties (mainly Next Factors) to the admissibility of the evidence offered by the other. By way of example, Shaw, for instance, notes that Next Factors has objected to the admission of _every_ exhibit which Shaw has offered. In making this observation, the

Court notes likewise Judge Walsh's observation in his letter to counsel dated August 15, 2006 that this adversary proceeding has been very contentious, and that in his view the parties had expended resources far out of proportion to the amount of the disputed claim.  This suggests the possible existence of an agenda distinct from the resolution of the instant dispute. Needless to say, if so, that would be distressing. Notwithstanding, the Court will address, as necessary, the multitude of issues presented.

**Discussion.**

At the outset a brief review of the law applicable to the allowance of a claim against a bankruptcy estate seems appropriate.[5]

The filing of a proof of claim constitutes *prima facie* evidence of the validity of the claim.  11 U.S.C. § 502(a). However, once an objecting party submits sufficient evidence to place the claimants entitlement at issue, the burden of going forward with the evidence to sustain the claim shifts to the claimant or its assignee.  The burden of persuasion is always on

---

[5]  The Court recognizes that technically this is not a claim objection but a request for a declaratory judgment.  Still, the principles applicable to the allowance of claims inform the outcome because, as a practical matter, this lawsuit is the functional equivalent of a claim objection, inasmuch as Shaw is asking the Court to liquidate and allow the Xabeque Claim in other than its filed amount.

the claimant to establish its entitlement to its claim.    As our

Circuit Court has explained:

> The burden of proof for claims brought in the
> bankruptcy court under 11 U.S.C.A. § 502(a)
> rests on different parties at different
> times. Initially, the claimant must allege
> facts sufficient to support the claim. If
> averments in his filed claim meet this
> standard of sufficiency, it is "*prima facie*"
> valid. In re Holm, 931 F.2d 620, 623 (9th
> Cir.1991) (quoting 3 L. King, *Collier on
> Bankruptcy,* § 502.02, at 502-22 (15th ed.
> 1991)). In other words, a claim that alleges
> facts sufficient to support a legal liability
> to the claimant satisfies the claimant's
> initial obligation to go forward. The burden
> of going forward then shifts to the objector
> to produce evidence sufficient to negate the
> *prima facie* validity of the filed claim. It
> is often said that the objector must produce
> evidence equal in force to the *prima facie*
> case. *Id.; see* In re Windsor Communications
> Group, Inc., 45 B.R. 770, 773
> (Bankr.E.D.Pa.1985). In practice, the
> objector must produce evidence which, if
> believed, would refute at least one of the
> allegations that is essential to the claim's
> legal sufficiency. If the objector produces
> sufficient evidence to negate one or more of
> the sworn facts in the proof of claim, the
> burden reverts to the claimant to prove the
> validity of the claim by a preponderance of
> the evidence. *See* In re WHET, Inc., 33 B.R.
> 424, 437 (Bankr.D.Mass.1983). The burden of
> persuasion is always on the claimant. *Holm,*
> 931 F.2d at 623 (quoting *Collier* § 502.02, at
> 502-22); *Windsor Communications,* 45 B.R. at
> 773.

In re Allegheny Intern., Inc., 954 F.2d 167, 173-74 (3d
Cir.1992).

As an initial matter, Shaw argues that Next Factors' proofs

of claim relating to the Xabeque Claim all fail to allege facts

sufficient to support a legal basis for its claim, because Next
Factors' claims simply state an amount and attach no
documentation.  Shaw acknowledges however that the claim in
question is the Xabeque Claim filed by Gulf and <u>that</u> claim did
have accompanying documentation.  As a result, Shaw does not
seriously maintain that the initial burden of going forward with
evidence to challenge the amount of the claim rested with Shaw.

As previously noted, Shaw's position is that, quantity
aside, the Xabeque Claim is subject to a cap of 50 cents per
pound of missing shrimp.  Next Factors disagrees. That question,
however, would seem to have been disposed of in the December 16,
2005 Memorandum Opinion of Judge Walsh.  Next Factors again
disagrees, arguing that Judge Walsh was merely opining on
"Georgia law generally" when he held 1)that damages may validly
be limited by a term in a warehouse receipt, and 2) that Georgia
law created a presumption of negligence (rebuttable) on the part
of a warehouseman once a loss is proven and absent proof of
conversion.  Judge Walsh, says Next Factors, did not construe the
specific limitation of liability language in the contracts at
issue herein.  Hence, says Next Factors, this remains an open
issue.

The Court, for its part, rejects this notion.  Indeed, any
fair reading of the December 16, 2005 memorandum opinion leads
one to the opposite conclusion.  That is to say that, in his

14

opinion, Judge Walsh clearly addressed himself to whether <u>in this particular litigation</u> the Xabeque Claim was subject to a 50 cent cap.  He concluded that it was, given that there was no proof of conversion, and denied Next Factors' Motion for Summary Judgement.

For instance, at page 11 of his opinion, Judge Walsh wrote:

> The final issue here is whether Next's claim is capped by a warehouse receipt, which provides that claims for the lost frozen shrimp shall not exceed $.50 per pound.

Again at page 13 of this opinion, Judge Walsh wrote:

> <u>In this case, the warehouse receipt provides as follows</u>:

> > If goods are damaged or lost through negligence of the warehouseman, the lesser of reasonable wholesale market price of storer's cost at Atlanta, Georgia of the goods on the date of discovery of damage or loss shall be the measure of damages, but in no case shall the liability of the warehouseman exceed fifty cents (50 cents) per pound unless excess value is declared by the storer at the time the goods are stored

(Advs. Doc. #72, p.21) (Emphasis added)

In order to conclude that Judge Walsh was not addressing himself to the heart of the matter, one must assume that Judge Walsh was about the business of issuing an improper advisory opinion on an abstract or hypothetical question that might or

might not have any relevance to the litigation before him.[6]  That is a highly doubtful proposition with no support in the record. The Court notes that in its summary judgement memorandum of law Next Factors referred to the limitation of liability clause as "alleged," and further that in its summary judgment reply brief Next Factors purported to reserve its right to contest the text of the warehouse receipt at trial.  Those insertions were gratuitous, self serving and accomplished nothing.  There is no escaping the fact that the text of Judge Walsh's opinion is not dicta, it is not couched in language of speculation or conjecture, and it is not advisory in nature.  On the contrary, his writing is quite explicit on the point at issue.

That being the case, it appears to this Court that the question of a 50 cent cap on the Xabeque Claim is settled as the law of the case.[7]  As noted in a leading treatise:

> The law of the case doctrine states that
> "when a court decides upon a rule of law,
> that decision should continue to govern the
> same issues in subsequent stages in the same

---

[6]  The constitutional limitation of federal jurisdiction to actual cases and controversies stands as a direct prohibition to the issuance of advisory opinions.  *Armstrong World Industries, Inc. vs Adams*, 961 F.2d 405, 410 (3d Cir. 1992)

[7]  When a case is transferred from a Court in one District to a Court in another, the transferee Court may give law of the case effect to a determination made by the originating Court. *See Christianson vs Colt Industries Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed. 2d 811 (1988).

> case." Arizona v. California, 460 U.S. 605,
> 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318
> (1983), rehearing denied 462 U.S. 1146, 103
> S.Ct. 3131, 77 L.Ed.2d 1381 (1983). The
> doctrine grew out of the need to "maintain
> consistency and to avoid reconsideration of
> matters once decided during the course of a
> single continuing lawsuit." 18 C. Wright, A.
> Miller & E. Cooper, Federal Practice &
> Procedure § 4478, at 788 (West 1981). The
> doctrine "promotes the finality and
> efficiency of the judicial process by
> 'protecting against the agitation of settled
> issues.' " Christianson v. Colt Industries
> Operating Corp., 486 U.S. 800, 816, 108 S.Ct.
> 2166, 2177, 100 L.Ed.2d 811 (1988).

Case law teaches that revisitation of a prior ruling should be limited to extraordinary circumstances such as where: 1) the decision is clearly erroneous and its enforcement would work a manifest injustice; 2) intervening controlling authority makes reconsideration appropriate; or 3) substantially different evidence was adduced at a subsequent trial. None of these circumstances are present herein.

Accordingly, and as a threshold matter, this Court concludes that both the existence and the enforceability of a 50 cent limitation of liability cap have already been determined by Judge Walsh and are the law of the case.

Application of the law of the case doctrine settles the main issue in this lawsuit and obviates a great many of the collateral evidentiary issues raised by Next Factors. In the interest of completeness, however, the Court will address Next Factors'

arguments assuming *arguendo* that the limitation of liability
issue is not already foreclosed.  As will be seen, the same
result obtains.  The Court will begin first however with the
question of how much shrimp was lost.

## I.  The Quantity of Missing Shrimp

The parties' dispute, to the extent it relates to the amount
of missing shrimp, is truly puzzling.

In the Joint Pretrial Order Shaw identifies this as a fact
in dispute, whereas Next Factors does not.  Shaw, however, urges
the Court to adopt the very poundage of missing shrimp set forth
in the documentation attached to the Xabeque claim, whereas Next
Factors in its memoranda of law now argues that Shaw has failed
to present evidence which sufficiently establishes the amount of
missing shrimp.

From the Court's perspective this is really a non-issue.
Next Factors misses the mark in that it fails to recall that the
ultimate burden of persuasion lies with the claimant.  If Next
Factors contends that the documentation attached to the Xabeque
claim is inadequate, it is Next Factors and not Shaw which must
establish the correct amount of the missing shrimp. Shaw,
conversely, misses the mark by failing to recall that a claim is
entitled to *prima facie* validity and that the burden of proof
shifts only once an objector produces evidence sufficient to
negate the *prima facie* validity of the claim.  Far from doing

18

that, Shaw argues in support of the missing poundage as set forth in the Xabeque Claim.

The foregoing notwithstanding, the Court will nevertheless address the issue of the quantity of missing shrimp.

The Court begins with the relevant proof of claim, which is Claim No. 3898. This is the claim filed by Gulf and transferred to Next Factors. It has appended to it various documents, including the Matthews Report. The record in these proceedings also consists of the trial deposition of J. Roger Parry. The synthesis of Mr. Parry's testimony is that he was given the assignment to investigate the lost shrimp by his employer, the Matthews Firm. To do so he was furnished with the claim forms submitted to Gulf by Coastal. (These forms are also appended to Claim No. 3898) Armed with this documentation Mr. Parry eventually met at the warehouse, with an individual named Ernie Ferguson, who in 1999 was Vice President of Sales at Nordic Refrigerated.

As previously noted, Mr. Parry concluded after his meeting with Mr. Ferguson that there was no explanation for the loss. He thereupon drafted a report which was issued by the Matthews firm after he had reviewed the final draft. He testified categorically that the proof of claim filed by Gulf was prepared based on his report and the documentation submitted by Coastal to Gulf.

19

The Xabeque Claim is a joint exhibit of the parties. (JX-5) It has appended to it extensive documentation. As noted, far from offering evidence to <u>negate</u> the *prima facie* validity of the claim, Shaw has offered evidence which <u>supports</u> the amount of missing shrimp as detailed in the documents attached to the Xabeque Claim. As will be discussed *infra*, there is really no need for Shaw to do so, as there is no evidence in the record which negates the *prima facie* validity of the <u>amount</u> of missing shrimp as set forth in the Xabeque claim and accompanying documentation.

Conversely, it is an anomaly bordering on the absurd for Next Factors to impugn its own claim by challenging the amount of missing shrimp as detailed in the Xabeque Claim. As previously noted, the three claims Next Factors filed on its own behalf attached no documentation. Next Factors acquired the Xabeque Claim from Gulf and its entitlement to be paid any amount stands or falls based on that claim. If the Court accepts Next Factors invitation to consider the poundage question unproven it is difficult to see how Next Factors could sustain a claim of entitlement in <u>any</u> amount.

The documentation attached to the Xabeque Proof of Claim, however, is quite detailed. In addition to the Matthews report it has appended to it the subrogation forms which reflect both the proceeds Gulf paid to Coastal on its insurance claim and the

transfer of the claim for the missing shrimp from Coastal to Gulf.  These forms, in turn have appended to them the claim adjustment forms which itemize the missing shipments by pounds and cases.  The documentation reflects, in sum, that the loss in question consisted of the loss of six separate shipments from Coastal to Nordic Refrigerated, as follows:

| Claim No. | Quantity in pounds |
|---|---|
| 58747 | 144 |
| 59058 | 1,695 |
| 565 | 5,325 |
| Fax 4/15 | 1,070 |
| 125678 | 4,420 |
| 126990 | 7,026 |
| Total | 19,680 lbs. |

The amounts recited on the two individual subrogation forms ($51,471.89 and $66,887.10) equal $118,358.99, which is the amount set forth on the face of the claim.

Accordingly, without belaboring the question any further, the Court holds that the Xabeque Claim never lost is presumption of *prima facie* validity as to the amount of missing shrimp to which the claim pertains, but that even if it had, the evidence before the Court clearly establishes that the amount is that which the claim itself recites.  Accordingly, the Court holds that the quantity of shrimp that was unaccounted for is 19,680 pounds.

II    Cap on Liability

21

In support of its position that the six missing shipments of shrimp are subject to a 50 cent liability cap, Shaw offers a variety of evidence, all of which Next Factors contends is inadmissible, leaving Shaw, says Next Factors, unable to sustain its burden of going forward on this issue.  The Court disagrees.

Shaw's evidence consists of Exhibits PX 1 through PX 11, as well as additional exhibits submitted in a supplemental appendix to Shaw's reply brief.  Next Factors objects generally to the admission of PX 1 through PX 11 on the basis that "key evidence has been destroyed by Shaw or its predecessor or successor in this matter.  The Court will separately address below Next Factors spoilation of evidence argument.  Prior to that, the Court will address certain of the other evidentiary objections interposed by Next Factors to the Shaw exhibits.

### A. **Exhibit PX-1**

Exhibit PX-1 is an affidavit of Donald Schoenl, who was the chief financial officer and director of logistics of Nordic Refrigerated at the time the loss of the shrimp was discovered. It is dated November 11, 2005 and was offered by Shaw in its answer to Next Factors' Summary Judgment Motion.  Mr. Schoenl states in his affidavit that attached thereto as Exhibit "A" is a true and correct copy of the general terms and conditions which were contained in warehouse receipts issued to Coastal by Nordic Refrigerated's for storage of the missing shrimp that are the

22

subject of the Xabeque Claim.[8]

Next Factors' first objection to PX-1 is that Exhibit "A" was not attached.  That has been corrected, rendering that objection moot.

Next Factors' second objection invokes Federal Rule of Evidence 602.  Mr. Schoenl, says Next Factors, lacked personal knowledge of the contents of the specific warehouse receipts for the loss at issue.  Shaw disputes this.  Both parties base their argument on deposition testimony given by Mr. Schoenl on June 2, 2006.  The issue is relevant for present purposes because, of the six missing shipments of shrimp, the only portion of the actual warehouse receipts which exist today are the front side of the receipts for two of the shipments.  Having considered the parties' competing positions the Court finds Shaw to have the better part of the argument.

On direct examination Mr. Schoenl testified that he was familiar with the standard warehouse receipt form in use by Nordic Refrigerated in 1999.  When he was shown a copy of such a form he stated that it appeared to him to be the form used in 1999 and issued in connection with every shipment received at Nordic Refrigerated.

Shaw emphasized that on cross examination the following

---

[8]  The Exhibit recites the 50 cent per pound cap on liability at issue herein.

exchange occurred:

> Q.  Okay.  As you sit here today are you able
> to say that this exact language in Paragraph
> 9(c) was attached to the back of what were
> marked as Parry 12 and Parry 13?
>
> A.  To the best of my knowledge, being a
> preprinted form, all receipts in that time
> frame would have had these terms and
> conditions attached to them.
>
> Q.  With this exact language?
>
> A.  Yes, ma'am.
>
> Q.  So while it was Nordic Refrigerated
> Services, LP the terms and conditions never
> changed?
>
> A.  Not to the best of my knowledge.

Schoenl Dep., pp. 30-32 (A205)


Next Factors counters that, the foregoing notwithstanding,

on direct examination Mr. Schoenl also testified, as follows:

> Q.  Has the standard form changed in any way
> from 1998, 1999 until today?
>
> A.  Minor changes, obviously, with the names
> of the Company and the verbiage under the
> terms and conditions may have been – a word
> or two may have been changed here or there.

Schoenl Dep. p. 7

Next Factors' F.R.E. 602 challenge to Mr. Schoenl's

testimony hinges on the foregoing passage.  Specifically, Next

Factors contends that Mr. Schoenl's testimony creates doubt about

whether the exact language relied upon by Shaw is the language

which appeared in the missing Coastal warehouse receipts, and is

24

too conflicting on this issue to warrant the imposition of the liability cap.  The Court disagrees, and finds instead that Next Factors' argument not only vastly overstates the case, but also relies on an overly narrow reading of F.R.E. 602.

It is true that admissible testimony is limited to matters of which the witness has acquired personal knowledge.  See, generally, Russell, Bankruptcy Evidence Manual § 602.1 (2007 ed.) Absolute certainty of either observation or recollection, however, is not required. *id.* at § 602.2.  *M.B.A.F.B. vs Cumis, Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982) The proponent of the evidence must simply introduce evidence sufficient, if believed, to support a finding by a reasonable trier of fact of personal knowledge of the matter related.  Surely that is present here.

The bulk of Mr. Schoenl's testimony is clear and unequivocal.  The passage Next Factors relies upon does not genuinely undermine his testimony, let alone eviscerate it.

In the first place, Mr. Schoenl refers to any changes to the terms and conditions of the standard warehouse receipt as being minor.  In the opinion of the Court, there is nothing minor about eliminating a cap on the Company's liability for lost shipments, and thereby opening the door to potential liability of much greater magnitude.  Rather, it is the opinion of the Court that such an alteration would represent a major sea change and that no

reasonable trier of fact would conclude otherwise.

In the second place, when referring to possible changes to the terms and conditions of the Company's warehouse receipt, Mr. Schoenl stated that "a word or two may have changed here or there." The passage of the warehouse receipt in which the 50 cent liability cap appears, and to which Mr. Schoenl addressed himself, is an entire discrete subparagraph of some length. It is unreasonable to infer from Mr. Schoenl's reference to the possible change of a word or two that a key passage in the form was entirely eliminated, or materially altered.

In sum, the Court finds PX-1 and Mr. Schoenl's related deposition testimony admissible and overrules Next Factors F.R.E. 602 objection. The Court notes further that there is <u>no</u> evidence which contradicts Mr. Schoenl's affidavit and testimony. Accordingly, the Court arrives again at the conclusion that, other things being equal, the Xabeque Claim is subject to a 50 cent per pound cap on liability. Having reached this conclusion it is unnecessary to consider the remainder of Shaw's evidence on this point, or Next Factors objections thereto, as such evidence is merely corroborative and/or cumulative. The Court will therefore turn to Next Factors' spoliation of evidence argument.

## III. <u>Spoliation</u>

Next Factors objects to every one of Shaw's exhibits on spoliation grounds. Next Factors argues that Shaw, directly or

through its affiliate, Nordic Cold Storage, LLC ("Nordic"), has failed to preserve crucial evidence surrounding the 1999 loss of shrimp from the warehouse.  In doing so, Next Factors identifies two categories of evidence that it claims Shaw destroyed: (1) documents relating to an internal undercover investigation that Nordic conducted regarding the loss; and (2) the original warehouse receipts relating to the lost shrimp.[9]  As a result, Next Factors argues alternatively for sanctions that include barring Shaw from objecting to the amount of the claim, excluding the limitation of liability evidence, drawing a negative inference that the loss of shrimp was not due to the warehouseman's negligence but rather conversion by Nordic, or shifting the burden of proving the circumstances surrounding the loss to Shaw.

Courts have the inherent power to impose sanctions against any party that has destroyed evidence that is relevant to a legal proceeding.  *See In re Wechsler*, 121 F. Supp. 2d 404, 427 (D. Del. 2000).  When determining whether to sanction a party for spoliation of evidence, the court must consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3)

---

[9] A third category addressed in Next Factors' papers, relating to records concerning Nordic's assumption of liability for the Xabeque claim, appears moot since Shaw is not contesting that it is responsible-at least in some amount-for the Xabeque claim.

27

what degree of sanction is necessary to avoid substantial
unfairness to the opposing party and to deter such conduct by
others in the future.  *See In re Quintus*, 353 B.R. 77, 83 (Bankr.
D. Del. 2006) (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13
F.3d 76, 79 (3d Cir. 1994)).  When determining the degree of
fault attributable to the party that destroyed the evidence, the
court must consider whether the party intended to impair the
other side's ability to effectively litigate its case.  *Wechsler*,
121 F. Supp. 2d at 415.  *See also Brewer v. Quaker State Oil
Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("[I]t must
appear that there has been an actual suppression or withholding
of the evidence.  No unfavorable inference arises when the
circumstances indicate that the document . . . in question has
been lost or accidentally destroyed, or where the failure to
produce it is otherwise properly accounted for.").

Applying these factors to the two categories of objections
identified above, the Court finds that sanctions for spoliation
are not warranted in this case.

**Internal Investigation**

With regard to documents relating to an internal undercover
investigation by Nordic, the Court finds no evidence that any
specific documents even existed, much less were destroyed.[10]  Next

---

[10] None of Exhibits PX1 through PX11 actually pertain to the
alleged internal investigation.  Rather, Next Factors generally
(continued...)

Factors' objection stems from the June 2, 2006 deposition testimony of Mr. Schoenl.  In that testimony, Mr. Schoenl indeed states that the former CEO hired an undercover investigator to investigate the loss of shrimp, that the former CEO handled the entire investigation, that he (Schoenl) had "heard of a report but [had] never seen it," and that he (Schoenl) was unable to locate the report upon a search of records.  *See* Schoenl Tr., at 14-15; 35; 39-40.  From this testimony, Next Factors argues that the Court ought to draw a negative inference from the purported destruction of the report, or alternatively, that the burden of proof as to the cause of the shrimp's disappearance should shift to Shaw.  The Court disagrees.  Based on the scant evidence before it, the Court is hard-pressed to find that a report was even issued, let alone destroyed.  Consequently, the Court will not impose sanctions based on these grounds.

**Warehouse Receipts**

Turning next to the missing warehouse receipts, the Court finds neither evidence of intentional wrongdoing nor prejudice to Next Factors.[11]  Next Factors argues that it has been prejudiced

_____

[10](...continued)
objects and claims that, because relevant documents do not exist, the Court should find that they were destroyed, and then grant a negative inference as to the cause of the shrimp's loss.

[11] Exhibits PX1 (the affidavit of Schoenl), PX2 (a blank invoice showing terms and conditions containing the 50 cent liability cap) and PX5 (insurance letter) pertain to the language
(continued...)

by Nordic and Shaw's failure to retain the original warehouse receipts, and that Shaw should not be able to rely on a sample form of the warehouse receipt containing the limitation of liability language.  The Court disagrees with Next Factors on several grounds.

First, the evidence demonstrates that the specific warehouse receipts in question were destroyed in the ordinary course of business and in accordance with Nordic's document retention policy-not by any intentional wrongdoing or malfeasance on the part of Shaw or Nordic.  *See Brewer*, 72 F.3d at 334 (citing 31A C.J.S. Evidence § 156(2); 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.")).  Nordic's document retention policy for these types of documents was five years.  The loss occurred in 1999.  Next Factors' subpoena to Nordic was issued on May 26, 2006- years after the documents had already been routinely

---

[11](...continued)
of the warehouse receipts.  Although Next Factors also objects to the remaining Exhibits (PX3, PX4 and PX6 through PX11) (representing various Coastal and Nordic invoices and forms) at least in part on the grounds of spoliation, the Court finds that those Exhibits pertain not to the  warehouse receipt terms and conditions but rather to the amount of lost shrimp.

destroyed.[12]

Moreover, there has been no evidence demonstrating that Shaw or even Nordic acted intentionally or recklessly in destroying evidence. *See Sears Roebuck and Co. v. Midcap*, 893 A.2d 542, 550 (De. 2006) ("The decisions of [the Delaware Supreme Court] and of the federal courts require a preliminary finding of intentional or reckless destruction of evidence as a predicate to an adverse inference instruction.")  On these grounds, therefore, the Court finds sanctions inappropriate.

Second, and equally as important, the Court finds that Next Factors has not been prejudiced by Shaw's failure to produce the original warehouse receipts due to the existence of alternative sources of the same evidence.  Mr. Schoenl testified that the standard warehouse form used in 1999 contained the 50 cent liability cap and a standard form has been produced (PX2).  Although production of the original receipts would arguably be

---

[12] Although the law is clear that "a party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit" (*see, e.g., In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2002)), the law also requires an "actual suppression or withholding"(*see Brewer*, 72 F.3d at 334) of the evidence in order for a spoliation inference to apply.  Putting aside for the moment that there has been no evidence of an actual suppression or withholding of evidence, the Court also finds questionable the argument that Shaw's duty to preserve the 1999 warehouse receipts extended beyond the company's normal document retention period due to 2001 discovery requests seeking documents relating to Shaw's omnibus objection that certain claims were "paid" or "settled at closing." (DX20)

the best evidence, they are not the only evidence concerning such information, and this Court finds the corroborating testimony of Mr. Schoenl both credible and sufficient.  Consequently, the Court will not impose sanctions based on these grounds either.

Finally, it is questionable whether Shaw-as a 19.5% owner in Nordic-had sufficient control over the records in question in order for the spoliation rule to even apply.  *See Brewer*, 72 F.3d at 334 ("For the rule to apply, it is essential that the evidence in question be within the party's control.")  On these grounds as well, therefore, the Court finds that sanctions are not warranted.

## IV. Conclusion

As discussed above, the Xabeque Claim relates to the loss of 19,680 pounds of shrimp.  Shaw assumed liability for this claim, however, Shaw's liability for this loss is subject to a 50 per pound cap.  The Xabeque Claim is accordingly fixed in the amount of $9,840.

An appropriate Order follows.

By the Court:

Stephen Raslavich
United States Bankruptcy Judge

Dated:    <u>January 19, 2007</u>

32