## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                      )
                                            )    Chapter 11
STONE & WEBSTER, INCORPORATED, et           )
al.,                                        )    Case No. 00-02142 (MFW)
                                            )
              Debtors.                      )
_____ )

### OPINION[1]

Before the Court is the Objection of the SWE&C Liquidating Trustee (the "Trustee") to claims filed by Travelers Indemnity Company and its affiliates, including Travelers Casualty and Surety Company ("Travelers"). For the reasons set forth below, the Court will sustain the Objection in part.

I.    FACTS

The Aetna Casualty and Surety Company ("Aetna") issued a series of commercial insurance policies to Stone & Webster Engineering Corporation ("S&W") for the period January 1, 1979, to December 31, 1994. (D.I. 6898 at 3.) The policies were retrospective premium ("retro-premium") policies. (Pretrial Order Admitted Facts 7, 8.) Under a retro-premium policy, the insured pays an initial premium and then pays additional premiums based on its loss experience. (6/9/15 Tr. at 71-72.) The

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

retrospective component of the insurance program was set forth in proposals and premium agreements that Aetna sent to S&W as it renewed its insurance annually and established the governing contract for each policy year (the "Retro Agreements"). (Exs. 4-19; 6/9/15 Tr. at 44.)

Generally, the Retro Agreements identified future dates when the insured's actual loss experience would be computed. (Ex. 7 at 2.) Aetna billed S&W for premium adjustments annually under the Retro Agreements from the start of the insurance program through the 1995 adjustment. (6/9/15 Tr. at 75-76; Exs. 31, 32, 33, 34, 39, 40, 41, 44, 45, 47, 48, 52, & 53.) The adjustment became final unless the insurer or the insured requested a further adjustment within 90 days. (Ex. 7 at 3-4; Ex. 11 at 4.)

In 1996, Travelers acquired Aetna's property and casualty operations and succeeded to Aetna's rights and responsibilities under the Aetna-S&W insurance program. (Pretrial Order Admitted Fact 2.) Travelers did not calculate a premium adjustment in 1996 because of disruptions associated with the merger with Aetna. (6/9/15 Tr. at 74-75.) Travelers resumed premium adjustments in 1997, performing a single adjustment for a two-year period (the "1996-97 Adjustment"). (Ex. 56.) On March 2, 1998, Travelers billed S&W $1,941,086 for the 1996-97 Adjustment. (Ex. 54 at 1.) Travelers negotiated with S&W's insurance broker over the next several months regarding disputed items in the

2

1996-97 Adjustment, which they ultimately resolved. (6/10/15 Tr. at 86.) During this period, Travelers computed the premium adjustment owed for 1998 (the "1998 Adjustment"). (Ex. 69.) On January 21, 2000, Travelers billed S&W $3,616,053, an amount reflecting the agreed sum owed for the 1996-97 Adjustment and the 1998 Adjustment. (Id.)

S&W requested additional time to pay the amount outstanding under the 1996-97 and 1998 Adjustments and agreed to sign a promissory note covering those amounts (the "Promissory Note"). (6/10/15 Tr. at 70.) The interest rate on the Promissory Note was the prime rate of nine percent. (6/10/15 Tr. at 8.) On March 2, 2000, S&W made a payment of $723,210.60 (the "Down Payment") and the remaining balance due ($2,892,842.40) was reflected as the principal amount of the Promissory Note. (6/9/15 Tr. at 43-44; Ex. 606 at ¶ 6.) S&W's treasurer signed the Promissory Note on April 3, 2000. (6/9/15 Tr. at 8.) S&W paid Travelers two installments of $301,350.95 each (the "Installment Payments") on the Promissory Note before S&W and its affiliates (the "Debtors") filed chapter 11 petitions on June 2, 2000. (6/9/15 Tr. at 109.) The amount outstanding on the Promissory Note as of the petition date was $2,311,836.82. (Ex. 3 at 5.)

Travelers filed identical proofs of claim in an unliquidated amount against each of the 73 Debtors on August 25, 2000 (the

"2000 Claim"). (Ex. 1.) On June 15, 2001, Travelers amended the 2000 Claim, asserting a liquidated amount totaling $7,604,232 (the "2001 Claim"). (Ex. 2.) The 2001 Claim amount included an "ultimate" calculation, or an estimate of what the total premium obligation would be. (6/9/15 Tr. at 43, 51, & 56.) It is Travelers' practice to calculate and submit ultimate claims when an insured files for bankruptcy because it cannot bill a bankrupt post-petition for any adjustment as the loss experience creates additional retro-premium obligations. (6/9/15 Tr. at 52.)

S&W, in its capacity as debtor-in-possession, disputed the amount of the 2001 Claim. S&W and Travelers eventually agreed to a reduced claim of $6,615,514. (6/9/15 Tr. at 84-85; Ex. 604.) On January 16, 2004, S&W's Plan of Reorganization was confirmed. (D.I. 4879.) Under the Plan, S&W and its affiliates' assets were transferred to the SWE&C Liquidating Trust. Travelers and S&W filed a motion to approve the settlement of the 2001 Claim, to which the Trustee objected. (D.I. 4587, 5453.) As a result of the Trustee's objection, the 2001 Claim settlement was never approved.

In March 2005, the Trustee filed an objection to the 2001 Claim and served discovery on Travelers in June of that year. (D.I. 5534.) Travelers objected to several of the discovery requests prompting the Trustee to file a motion to compel in October 2005. (D.I. 5793.) In May 2011, the Trustee voluntarily

withdrew his motion to compel.[2]  (D.I. 6563.)

In December 2011, the Trustee moved for summary judgment on his objection to the 2001 Claim.  (D.I. 6596.)  Judge Walsh denied the motion because of the complexity of the underlying factual issues.  (D.I. 6649.)  Judge Walsh set a pretrial hearing and discovery deadline for December 3, 2012.  (D.I. 6660.)

In November 2012, Travelers again amended its proof of claim, asserting a claim in the amount of $8,181,492.82 (the "2012 Claim").  (Exs. 3 and 4.)  The 2012 Claim consisted of three components: (1) the premium invoiced pre-petition including the amount outstanding on the Promissory Note and the 1999 premium adjustment, totaling $2,642,623.82; (2) a premium due based on S&W's actual loss experience from 1999 to 2012, amounting to $5,226,881; and (3) an estimated future premium for losses incurred but not reported ("IBNR"), amounting to $311,988. (6/9/15 Tr. at 110; Ex. 3 at 6.)

On December 10, 2014, S&W's case was reassigned.  (D.I. 6844.)  Evidentiary hearings were held on June 9, 10, and 12, 2015.  The Court took the matter under advisement and directed post-trial briefing.  A notice of completion of briefing was submitted on September 10, 2015, and the matter is ripe for decision.  (D.I. 6951.)

---

[2]  The record is unclear why the motion was withdrawn or why almost six years passed between these two events.

II.   <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this contested matter.  28 U.S.C. §§ 1334(b) & 157(b)(1).  The Court may enter a final order in matters concerning claim allowance. <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2611 (2011).

III. <u>DISCUSSION</u>

A.   <u>Section 502(d)</u>

The Trustee argues that the Promissory Note is an avoidable fraudulent transfer under section 548 and that the Installment Payments made on it are avoidable preferential transfers under section 547.  Although the two-year statute of limitations for commencing an avoidance action expired before he was appointed, the Trustee argues he is not barred from using avoidance "defensively" under section 502(d).  In other words, the Trustee is not seeking to recover money from Travelers by means of an avoidance action; rather the Trustee is seeking the disallowance of Travelers' claim.  The Trustee argues that to the extent Travelers is entitled to an allowed claim, it must be disallowed because Travelers has failed to return the Down Payment and Installment Payments (the alleged avoidable transfers) to S&W.

Travelers responds that the Trustee cannot defensively use avoidance through section 502(d) to disallow Travelers' claim because he has not obtained (and cannot obtain - because of the

running of the statute of limitations) a judicial determination that the transfers were fraudulent or preferential.  See, e.g., Giuliano v. Mitsubishi Digital Elec. Am. (In re Ultimate Acquisition Partners, LP), No. 11-10245, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) (holding that "[a] debtor or trustee wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint") (citations and internal quotations omitted).

Travelers further argues that in the event the Promissory Note and the payments made are determined to be avoidable, Travelers must have the opportunity to return such payments before its claim is disallowed.  In re KB Toys Inc., 736 F.3d 247, 252 (3d Cir. 2013) ("Accordingly, 'any claim' falling into this category of claims is disallowable until the avoidable transfer is returned.").  See also In re Asia Global Crossing, Ltd., 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006) ("[Section] 502(d) disallows the claim of a creditor that received a transfer avoidable under chapter 5 of the Bankruptcy Code unless the creditor returns the transfer to the estate.") (emphasis omitted).

Section 502(d) provides that "the court shall disallow any claim of an entity . . . that is a transferee of a transfer avoidable under section . . . 547, 548, . . . of this title, unless such entity or transferee has paid the amount, or turned

7

over any such property . . . ."  11 U.S.C. § 502(d).  Stated

simply, section 502(d) contains two requirements before a court

must disallow a claim: (1) a transfer must be avoidable under the

applicable section, and (2) the transferee must fail to pay or

turn over the avoidable money or property.

An avoidance action must be brought within the later of two

years after the commencement of the bankruptcy case or one year

after the appointment or election of a trustee (if elected within

two years of the commencement of the case).  11 U.S.C. §

546(a)(1).  Courts have split over whether a section 502(d) claim

objection may be brought if the limitation period of section

546(a) would bar the commencement of an avoidance action.

Compare El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines,

Inc.), 217 F.3d 1161, 1167-68 (9th Cir. 2000) (concluding that a

trustee may seek disallowance of a claim under section 502(d),

even if the underlying avoidance action would be time-barred by

section 546(a)) and In re Loewen Group Int'l Inc., 292 B.R. 522,

528 (Bankr. D. Del. 2003) (holding that section 544 can be used

defensively in opposition to a claim against the estate despite

running of statute of limitations in section 546(a)) with

Hoggarth v. Kaler (In re Midwest Agri Dev. Corp.), 387 B.R. 580,

586 (B.A.P. 8th Cir. 2008) (holding that a claim may only be

disallowed under section 502(d) if an entity is first adjudged

liable under the applicable avoidance section) and In re Mktg.

Assocs. of Am. Inc., 122 B.R. 367, 369-70 (Bankr. E.D. Mo. 1991) (holding that a trustee must timely assert an avoidance action before relying on section 502(d) to disallow a claim).

The Court finds it unnecessary to determine which view is correct, however.  Even if section 502(d) could be used defensively, the Trustee's argument fails because neither the Promissory Note nor the Installment Payments constitute avoidable transfers.

### 1.    Fraudulent Conveyance

The Trustee argues that the Promissory Note was a fraudulent transfer under the Bankruptcy Code and Massachusetts law.  Argus Mgmt. Grp. v. Chanin Capital Partners, LLC (In re CVEO Corp.), 320 B.R. 258, 264 (Bankr. D. Del. 2005) (finding the requirements under section 548(a)(1) and the Massachusetts Uniform Fraudulent Transfer Act to be substantially the same).  The Trustee first asserts that the Promissory Note was an actual fraudulent transfer because it was for no consideration.  See 11 U.S.C. § 548(a)(1)(A); Mass. Gen. Laws ch. 109A, § 5(a).  The Trustee contends that a lack of consideration for the Promissory Note represents a badge of fraud demonstrating that S&W incurred the obligations under the Promissory Note with actual intent to hinder, delay, or defraud other creditors.

Alternatively, the Trustee argues that the Promissory Note was a constructively fraudulent transfer because S&W received

less than reasonably equivalent value in return and S&W either
(1) was presumed to be insolvent when the Promissory Note was
executed, (2) was engaged in business or a transaction, for which
the property remaining with S&W was unreasonably small capital,
or (3) incurred debts or believed it would incur debts that went
beyond its ability to pay as such debts matured.  11 U.S.C. §
548(a)(1)(B); Mass. Gen. Laws ch. 109A, § 5(b).

Travelers responds that the Promissory Note is not a
transfer under the Code or the Massachusetts Uniform Fraudulent
Transfer Act.  Rather, it was simply S&W's affirmation of an
already existing debt incurred pursuant to the insurance program
as computed in the 1996-97 and 1998 Adjustments.  Even if S&W
incurred a new obligation via the Promissory Note, Travelers
argues that S&W did so in exchange for Travelers' forbearance on
the right to collect immediately the retro-premium due for those
adjustments.

The Court agrees with Travelers.  The Promissory Note was
executed to establish a payment plan for an antecedent debt,
amounts owed for the 1996-97 and 1998 Adjustments.  As a result,
S&W received reasonably equivalent value for the Promissory Note.
11 U.S.C. § 548(d)(2)(A) (defining "value" to include
"satisfaction or securing of a present or antecedent debt");
Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 83
(Bankr. D. Del. 2015) ("Payments made on account of valid

antecedent debts are presumptively made for reasonably equivalent value."). Therefore, the Court holds that the issuance of the Promissory Note was not a fraudulent conveyance and thus provides no basis for disallowance of Travelers' claim under section 502(d).

### 2. Preference

The Trustee argues that the Installment Payments are avoidable preferences under section 547 because they were received within 90 days of S&W's bankruptcy petition. Travelers does not dispute that the Installment Payments were received during the preference period. However, Travelers asserts that the Installment Payments were payments of a debt incurred by S&W in the ordinary course of business. See 11 U.S.C. § 547(c)(2).

Even if a transfer satisfies all the elements of section 547(b), it may not be avoided if the opposing party proves that the transfer satisfies one of the exceptions listed in section 547(c). Burtch v. Detroit Forming, Inc. (In re Archway Cookies), 435 B.R. 234, 240 (Bankr. D. Del. 2010). To prove its ordinary course of business defense, Travelers must show that the payments were: (i) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, (ii) made in the ordinary course of business or financial affairs of the debtor and the transferee, and (iii) made according to ordinary business terms. 11 U.S.C. § 547(c)(2)

11

(2004).[3]  The burden rests on the transferee to prove by a
preponderance of the evidence that the transaction meets the
ordinary course of business defense.  Miller v. Westfield Steel,
Inc. (In re Elrod Holdings Corp.), 426 B.R. 106, 110-11 (Bankr.
D. Del. 2010).

a.   Debt Incurred in Ordinary Course

The first requirement under the ordinary course of business
defense requires a showing that the original transaction creating
the debt is within the ordinary course of dealing between the
parties.  CVEO Corp., 320 B.R. at 263 (citing Official Comm. of
Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King
Distribs., Inc.), 256 B.R. 1, 114 (Bankr. M.D. Fla. 2000)).  This
requirement examines whether the underlying debt on which the
alleged preferential transfers were made was incurred by the
debtor in the ordinary course of business or financial affairs of
both parties.

Travelers argues that the underlying debt represented by the
Promissory Note was incurred under normal circumstances.  The

---

[3]  Section 547(c) was amended by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 ("BAPCPA").
Although this adversary proceeding was filed after the October
17, 2005, effective date of BAPCPA, the main case was commenced
prior to that date.  Therefore, the BAPCPA amendments are
inapplicable.  See BAPCPA, Pub. L. No. 109-8, § 1501(b)(1), 119
Stat. 23 (2005) ("[The amendments made by this Act shall not
apply with respect to cases commenced under title 11, United
States Code, before the effective date of this Act.").  See
Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.), 427
B.R. 301 (Bankr. D. Del. 2010).

Court agrees.  From the inception of the insurance program in
1979 through 1995, it is undisputed that S&W regularly paid Aetna
premium adjustments pursuant to the Retro Agreements.  S&W only
ceased paying amounts owed when its deteriorating financial
condition precluded payment of the 1996-97 and 1998 Adjustments.
In response to these adverse conditions, Travelers and S&W agreed
to the Promissory Note after S&W's insurance broker was unable to
obtain third-party financing to pay the amounts owed.  (Ex. 91 at
2.)  It was typical for Travelers to negotiate with policyholders
in such circumstances to devise a payment plan, including the
issuance of a promissory note.  (6/10/15 Tr. at 7-8.)

Importantly, the Promissory Note and the Installment
Payments made thereto only changed the payment terms of the
adjustment premium already due.  Thus, the Promissory Note simply
evidenced a payment plan agreed to by both Travelers and S&W for
pre-existing obligations under a long-standing insurance program.
See, e.g., In re Magic Circle Energy Corp., 64 B.R. 269, 273
(Bankr. W.D. Okla. 1986) ("The mere restructuring of payment
terms does not alter the fact that the underlying debt was
incurred in normal circumstances.").  For these reasons, the
Court finds that the first requirement of section 547(c)(2) is
satisfied.

b.   <u>Ordinary Course Between the Parties</u>

The second requirement of the ordinary course of business defense is a subjective test involving the consistency of transfers between the debtor and the creditor before and during the preference period.  <u>Burtch v. Prudential Real Estate and Relocation Servs., Inc. (In re AE Liquidation, Inc.)</u>, No. 08-13031, 2013 WL 3778141, at *5 (Bankr. D. Del. 2013) (citations omitted).  Courts rely on a wide range of factors in determining such consistency, including: (i) the length of time the parties engaged in the type of dealing at issue; (ii) whether the subject transfers were in an amount more than usually paid; (iii) whether the payments at issue were tendered in a manner different from previous payments; (iv) whether there appears to have been any unusual action by the creditor or debtor to collect on or pay the debt; and (v) whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition.  <u>Id.</u> (citations omitted); <u>Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)</u>, 320 B.R. 541, 548-49 (Bankr. D. Del. 2004).  No one factor is dispositive; rather courts take into account the relationship between the creditor and debtor throughout the entire preference period.  <u>Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)</u>, 463 B.R. 302, 306 (Bankr. D. Del. 2010).

14

i.   Length of Engagement

Under this factor, the Court "must consider whether the relationship between the creditor and debtor was of recent origin, as opposed to being cemented long before the onset of insolvency." AE Liquidation, 2013 WL at *5 (citations and internal quotations omitted).  In this case, Travelers began providing S&W insurance coverage in 1979, over twenty years before the Promissory Note was executed.  (Pretrial Order Admitted Fact 1.)  The extended duration of the business dealings between S&W and Aetna offers Travelers greater flexibility in fitting within the section 547(c)(2) defense.  Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217, 225 (3d Cir. 1994) ("[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of section 547(c)(2).").

With the exception of the delay caused by the merger in 1996, Travelers (and formerly Aetna) annually calculated and billed for retro-premium adjustments while S&W, in return, paid those premiums and benefitted from the handling and payment of the insured claims filed against it.  Additionally, S&W and its insurance broker typically negotiated with Aetna/Travelers

following receipt of a notice of annual adjustment to discuss
disputed items, often leading to reduction in the premium owed in
a given period.  Such relationship characteristics exemplify not
only longevity, but involved and sophisticated business relations
between the parties.  These considerations persuade the Court to
find that the length of engagement factor supports Travelers'
position.

## ii.  Similarity of Transactions

Under this factor, the Court "must compare the [t]ransfers
in the [p]reference [p]eriod to the transfers made during the
prior course of the parties' business relationship to determine
if the transactions were sufficiently similar."  AE Liquidation,
2013 WL at *5.  The Trustee insists that the Promissory Note and
Installment Payments are dissimilar to previous transfers because
never before had S&W paid Aetna pursuant to the terms of a
promissory note.  Though technically true, the Court finds the
Trustee's position concerning the application of the "similarity
of transactions" element to be too narrow.  Transfers made during
the preference period "need not . . . possess a rigid similarity
to each past transaction."  Official Comm. of Unsecured Creditors
v. Brown (In re Cherrydale Farms, Inc.), No. 99-597, 2001 WL
1820323, at *3 (Bankr. D. Del. 2001) (citations and internal
quotations omitted).  Additionally, "[T]he transaction need not
have been common; it need only be ordinary."  Id.

16

While not rigidly similar to previous payments for premium adjustments, the Promissory Note and Installment Payments were still the payment of a premium adjustment made under the insurance program.  The Court does not attribute enough weight to this variation to deem the Promissory Note and Installment Payments significantly dissimilar to previous premium payments made pursuant to the Retro Agreements.

### iii. Collection Efforts

Unusual collection activity by a creditor during the preference period can defeat an ordinary course of business defense.  AE Liquidation, 2013 WL at *7 (citing Montgomery Ward LLC v. OTC Int'l, Ltd. (In re Montgomery Ward, LLC), 348 B.R. 662 678 (Bankr. D. Del. 2006); Molded Acoustical, 18 F.3d at 225.

Travelers argues it never engaged in any unusual collection activity and the Trustee has presented no evidence indicating otherwise.  Travelers engaged in arms-length negotiations with S&W's insurance broker regarding repayment options for the outstanding premium due under the 1996-97 and 1998 Adjustments. These discussions resulted in terms which favored S&W, not Travelers: namely, the ability to pay the debt over time rather than in a lump sum.  (Ex. 91 at 2.)  See Molded Acoustical, 18 F.3d at 225 ("[I]t is the potential manipulation of the credit schedules, the threat or initiation of legal action, or other unusual behavior designed to improve the lot of one creditor at

17

<u>the expense of the others</u> at a time when bankruptcy looms on the horizon of an infirm debtor-to-be that invokes the need to subdue a creditor's predilection toward self-aggrandizing behavior.") (emphasis added).  There is no evidence that S&W made the Installment Payments in response to unusual collection efforts exerted by Travelers.  For these reasons, the Court holds this factor supports Travelers' ordinary course of business defense.

### iv.  Advantage in Light of S&W's Condition

A creditor typically attempts to take advantage of a debtor's financial condition by requesting additional collateral or security, assessing late fees, or pressuring the debtor for payment.  <u>Am. Home Mortg.</u>, 476 B.R. at 140.  Travelers argues that the Promissory Note and the Installment Payments made in connection therewith were not the result of pressure but rather the result of arms-length negotiations.

Travelers further notes that the contested transfers were made consistent with the Promissory Note's terms; each were made within one day of the due date.  Considering each Installment Payment was tendered timely, there was no occasion for Travelers to assess late fees or penalties or otherwise pressure S&W for payment.  Additionally, Travelers never requested security for the Promissory Note.

For these reasons, the Court finds that Travelers did not take advantage of S&W's financial condition when it accepted the

18

Promissory Note and the Installment Payments made on it.
Considering the preceding factors, the Court concludes that
Travelers has met its burden of demonstrating that the
Installment Payments were made in the ordinary course of the
parties' respective business or financial affairs.  11 U.S.C.
§ 547(c)(2)(B) (2004).

c.   <u>Ordinary Business Terms</u>

The third requirement of the ordinary course of business
defense is that the disputed transfers be made according to
"ordinary business terms" in the industry.  11 U.S.C. §
547(c)(2)(C) (2004).  Travelers asserts that the Installment
Payments were made according to ordinary business terms because
promissory notes are not unusual for Travelers or for the
insurance industry at large.  (6/10/15 Tr. at 7; Ex. 608 at
¶ 19.)  Furthermore, Travelers argues that provisions imposing
interest and requiring installment payments are typical terms of
promissory notes.  (6/10/15 Tr. at 8.)

Alternatively, Travelers argues that even if the Promissory
Note included terms that vary from industry norms, it should be
granted flexibility because of the parties' long-standing
business relationship.  <u>See</u> <u>Molded Acoustical</u>, 18 F.3d at 220
(holding that a creditor may deviate from the industry norms when
the parties have a long-standing business relationship).

19

In <u>Molded Acoustical</u>, the Third Circuit held that "ordinary business terms" as used in section 547(c)(2)(C)

> refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and . . . only dealing so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

<u>Id.</u> at 220 (internal quotation omitted).  Additionally, "the 'ordinary business terms' test . . . is necessarily a broad one, and the evidentiary standard is not formidable."  <u>Am. Home Mortg.</u>, 476 B.R. at 141.

Travelers has presented evidence that use of promissory notes when an insured is unable to pay for premium adjustments is customary in the insurance industry.  (<u>See</u> Ex. 608 at ¶ 19.) Though the Trustee stresses that S&W and Travelers had never before used a promissory note, the Court does not attribute significance to this fact.  The ordinary business terms test focuses on the terms of the agreement in question in relation to terms included in similar agreements in the industry, not to similar agreements previously executed by the parties.  <u>See, e.g.,</u> <u>Cherrydale Farms</u>, 2001 WL 1820323, at *3 (holding that the ordinary business terms requirement looks to general norms within the creditor's industry).

Travelers has proved that it was ordinary in the industry to accept promissory notes in similar instances and the Trustee has presented no evidence to contradict this.  (Ex. 608 at ¶ 19.)

20

For these reasons, the Court finds that the Promissory Note and the Installment Payments paid thereunder were made according to ordinary business terms.  Thus, even if the transfers were preferences, Travelers has established a defense.  Therefore, the Court concludes that the transfers are not avoidable under section 547 and provide no basis for disallowance of Travelers' claim under section 502(d).

     B.   <u>Unclean Hands</u>

The Trustee also argues that the equitable doctrine of unclean hands bars Travelers' recovery of the 2012 Claim.  The Trustee asserts two instances where Travelers' conduct implicates the unclean hands doctrine: (1) Travelers' failure to attach the Promissory Note to its 2000 and 2001 Claims and failure to produce the Promissory Note later; and (2) Travelers' failure to disclose in its proofs of claim that it was including an "ultimate" calculation.

Travelers responds that its failure to attach the Promissory Note was the result of a clerical error.  Travelers contends that had it intended to conceal the Promissory Note, it would not have listed it as an attachment on the 2000 and 2001 Claims. Travelers also disputes the Trustee's assertion that the Promissory Note was withheld, instead noting that it promptly produced the Promissory Note once the Trustee requested it.

In response to the Trustee's "ultimate" disclosure argument,

21

Travelers asserts that the 2001 Claim expressly stated that the premium due was based in part on "WC Ultimate Losses." (Exs. 1 & 2.) Travelers contends that even if the Trustee did not understand what the term meant, at the very least it put the Trustee on notice to inquire further.

"To prevail on an 'unclean hands' defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." Sonowo v. U.S., No. CIV. A. 03-1122, 2006 WL 3313799, at *3 (D. Del. Nov. 13, 2006) (citing S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 377 n.7 (3d Cir. 1992)). "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court. Moreover, neither [the Third Circuit Court of Appeals] nor the Supreme Court has required . . . that application of the unclean hands doctrine is mandatory." New Valley Corp. v. Corporate Prop. Assoc. 2 and 3 (In re New Valley Corp.), 181 F.3d 517, 525 (3d Cir. 1999) (citations omitted).

The Court concludes that Travelers' failure to attach the Promissory Note was the result of an inadvertent error which alone is insufficient to support a finding of the intent necessary to implicate the unclean hands doctrine. Neo Gen Screening, Inc. v. TeleChem Int'l, Inc., 69 F. App'x 550, 556 (3d Cir. 2003) (no finding of unclean hands without evidence that "omission was knowing or intentional").

Further, any failure to attach the Promissory Note had no direct connection to Travelers' claim amount or validity.  New Valley, 181 F.3d at 525 ("When applying the [unclean hands] doctrine, the courts in [the Third Circuit] have generally been clear that the connection between the misconduct and the claim must be close.").  The Promissory Note simply memorialized a payment plan for part of the retro-premium allegedly owed pre-petition.

The Court finds that the Trustee's assertion that Travelers knowingly concealed the ultimate calculation portion of the 2012 Claim is also unfounded.  The 2001 Claim included several references to the term "ultimate."  At the very least, these references put the Trustee on notice to inquire further into how Travelers computed its claim.  For these reasons, the Court holds that Travelers' conduct does not justify disallowance of the 2012 Claim based on the unclean hands doctrine.

C.  Legality

The Trustee argues that the Retro Agreements are illegal and unenforceable.  Specifically, the Trustee asserts that the Retro Agreements are not on forms approved by insurance regulators, rendering the proposals invalid and unenforceable.  Travelers responds that the Trustee's illegality defense is barred by the doctrine of laches because it did not raise the defense until May 2015, ten years after the Trustee's initial objection to

Travelers' proofs of claim and fifteen years after its original claim was filed.  Alternatively, Travelers argues that no evidence exists in the record that the requisite forms were not filed with state regulators.

Even if the forms were not filed, however, Travelers contends that the Retro Agreements are still enforceable between S&W and Travelers.  Travelers argues that a party that has benefitted from insurance is estopped from avoiding its obligations under unfiled or allegedly unenforceable premium agreements.  Reliance Ins. Co. v. Woodward-Clyde Consultants, 243 F. App'x 674, 675 n.3 (3d Cir. 2007); In re Ionosphere Clubs, Inc., 85 F.3d 992, 998 (2d Cir. 1996).  Travelers contends that the majority of jurisdictions considering the effect of an insurer's failure to file a state-mandated insurance policy form have concluded that such an omission does not render the policy invalid.  See FDIC v. Am. Cas. Co., 975 F.2d 677 (10th Cir. 1992); Highlands Ins. Co. v. Am. Marine Corp., 607 F.2d 1101 (5th Cir. 1979); John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d 77, 140 (D. Mass. 1999).

The Court agrees with Travelers.  In Reliance, the insurer issued policies for workers' compensation and automobile insurance.  243 Fed. App'x at 675.  Each year, the insurer and the insured signed separate premium agreements setting forth retrospective terms.  Id.  However, the insurer failed to file

24

the premium agreements with state insurance regulators.  Id.
Notwithstanding the insurer's omission, the Third Circuit held
that the insured was estopped from arguing the illegality of the
premium agreements after it had accepted the benefit of them.
Id.  See also Ionosphere, 85 F.3d at 1001 (holding debtor
estopped from arguing illegality of insurance agreement after
accepting the benefit of the contract).  As in Reliance, S&W has
accepted the benefits under the Retro Agreements, as Travelers
continues to pay claims arising under the Retro Agreements.
Therefore, the Court concludes that the Trustee is estopped from
arguing the illegality of the Retro Agreements.

     D.   Lack of Endorsement

The Trustee also argues that Aetna's failure to endorse the
Retro Agreements to the policies, as required by the express
terms of the policies, renders the Retro Agreements
unenforceable.  In support of his argument, the Trustee asserts
that only three of the sixteen Retro Agreements were properly
endorsed to the policies.

Travelers argues that even if the endorsements were omitted,
the parties did in fact modify the terms of the policies through
oral agreements and by performance.  Travelers contends that
language in the policies prohibiting a change or waiver except by
written endorsement is not dispositive under Massachusetts law if
the conduct of the parties indicates otherwise.  Travelers argues

that the nearly twenty years of performance, during which myriad
contractual obligations were honored, demonstrates a course of
conduct supporting an implied contract based on the Retro
Agreements.

Under Massachusetts law, the inclusion of a clause stating
that a policy can only be modified by a written endorsement is
not dispositive. Zurich Am. Ins. Co. v. Watts Regulator Co., 860
F. Supp. 2d 78, 87 (D. Mass. 2012) ("A provision that an
agreement may not be amended orally but only by a written
statement . . . does not necessarily bar oral modification of the
contract."). However, "The evidence of a subsequent oral
modification . . . 'must be of sufficient force to overcome the
presumption that the integrated and complete agreement, which
requires consent to modification, expresses the intent of the
parties.'" Id. at 87-88 (quoting Flynn v. Wallace, 359 Mass.
711, 715 (1971)).

The Court finds that the conduct of Aetna and S&W is
sufficient evidence to overcome the presumption that any
modification had to be in writing. That evidence includes the
renewal of the insurance program for sixteen years, the regular
billing by Aetna and payment by S&W of retro-premium adjustments,
and S&W's periodic negotiations with Aetna regarding disputed
items in the annual adjustment. This clearly evidenced a mutual
intent of the parties to modify the policy terms by incorporating

26

the terms of the Retro Agreements.  Accordingly, the Court holds
that the failure to endorse the Retro Agreements to each policy
does not render them unenforceable.

   E.   Waiver

   The Trustee argues that even if the Retro Agreements are
deemed enforceable, Travelers waived its right to collect under
them by failing to bill for any additional premium in 1996.  The
Trustee argues that it was a condition precedent to any further
obligation under the Retro Agreements that adjustments be
computed each year.

   Travelers responds that its delay in making one adjusted
premium computation did not constitute a waiver of its right to
recover that and all future retro-premiums under the Retro
Agreements.  Travelers also argues that the annual adjustment
provision in the Retro Agreement is not a condition precedent to
any further recovery.

   Under Massachusetts law, both express and implied waivers
may be "inferred by a party's conduct, where the conduct is
consistent with and indicative of an intent to relinquish
voluntarily a particular right such that no other reasonable
explanation of the conduct is possible."  KACT, Inc. v. Rubin, 62
Mass. App. Ct. 689, 695 (2004) (citations and internal quotations
omitted).  The party asserting a waiver has occurred bears the
burden of proof.  Commercial Masonry Corp. v. Bartletta Eng'g

Corp., No. PLCV200800514B, 2014 WL 1758057, at *17 (Mass. Super. Mar. 12, 2014).

In light of the parties' lengthy business relationship and the fact that the merger of Aetna and Travelers in 1996 caused a disruption in the business, the Court finds that Travelers' delay in billing for the 1996 adjustment does not represent "clear, decisive, and unequivocal" conduct of the nature required under Massachusetts law to prove an implied waiver of the right to collect any future retro-premiums. KACT, Inc., 62 Mass. App. Ct. at 695 (internal citation and quotation omitted).

The case cited by the Trustee to support his position is distinguishable. See In re Flanigan's Enters, Inc., 130 B.R. 904 (Bankr. S.D. Fla. 1991). In Flanigan's, the premium agreement at issue provided that "a calculation shall be made . . . *immediately* after the discontinuance of the policy, to determine whether there should be any adjustment of premiums." Id. at 907 (emphasis in original). Following cancellation of the insured's policy, the insurer made no adjustments for four years. Id. Only after the insured filed for bankruptcy and confirmed a plan did the insurer seek to assert a claim. Id. at 906. The court rejected the insurer's claim, reasoning that usage of the word "immediately" in the premium agreement required the insurer to notify the insured of its claim much earlier.

Several facts distinguish Flanigan's from the instant case.

28

First, the issue in _Flanigan's_ was whether the insurer should be allowed to file a late proof of claim, while in this case Travelers timely filed its proofs of claim.  Second, the language of the premium agreements in _Flanigan's_ (specifically use of the word "immediately") demanded instant action from the insured.  In contrast, the premium agreements in the instant case require Travelers to compute annual adjustments "promptly" and permits additional premium adjustments to be calculated at the request of S&W or Travelers.  (_See, e.g.,_ Ex. 7 at 2-3.)  Third, Travelers was in regular contact with S&W and its broker during 1996 and the parties negotiated the proper premium adjustment ultimately agreeing on the amount due.  This is in stark contrast to _Flanigan's_ where the insurer waited over four years even to seek an adjustment.

Even if the Court were persuaded by the Trustee's waiver defense, its argument would fail for a second reason.  S&W continued dealing with Travelers after 1996 without asserting that Travelers had waived the right to collect any further retro premiums.  (_See, e.g.,_ Exs. 55, 58, and 77.)  By doing so, the Court concludes that S&W waived its right to contest the continuation of its obligation to make retro-premium payments under the Retro Agreements.  _Egenera, Inc. v. Forest St. Bldg. 165 LLC_, No. MICV201102208F, 2013 WL 2152185, at *8 (Mass. Super. Ct. May 7, 2013) ("[A] waiver may . . . be established by conduct

of the parties who continue to deal after a deadline has passed which would have resulted in a discharge of the party's obligations.") Though S&W and its insurance broker disputed specific items associated with the 1996-97 Adjustment, they never objected to Travelers' right to continue billing under the Retro Agreements. After reaching an agreement concerning the disputed items, Travelers and S&W resumed their prior course of dealing, with Travelers calculating and billing for the 1998 Adjustment and subsequent adjustments. The Court, therefore, concludes that the Trustee has not met his burden of demonstrating that Travelers' delay in billing for the 1996-97 Adjustment constituted an implied waiver or was a condition precedent to S&W's obligation to pay any further retro-premiums.

     F.   <u>Multiple Uncertainties</u>

     The Trustee argues that the Retro Agreements are unenforceable because of purported uncertainties concerning which policies are subject to the Retro Agreements. The Trustee contends that a lack of source documentation and other clerical errors uncovered in the discovery process raises uncertainty as to whether Travelers attributed insurance claims to the proper policy.

     Travelers responds that such uncertainties are non-existent considering the evidence showing that every claim payment included in the 2012 Claim arose under a retro-premium policy

issued by Aetna.  Travelers further contends that the clerical
errors were immaterial and unrelated to the retro-premium
calculations.

The Court agrees with Travelers.  There is no evidence that
entire claims were attributed to incorrect policies.  The manager
of Travelers' account resolution department testified that the
ultimate calculation included in the 2012 Claim drew exclusively
from claims under one of the Retro Agreements.  (6/9/15 Tr. at
63; 6/12/15 Tr. at 88-89.)  The Trustee has failed to offer any
evidence contradicting that testimony.  Therefore, the Court
concludes that the Retro Agreements are enforceable.

G.   Timeliness of Proof of Claim

The Trustee argues that the 2012 Claim should be disallowed
as untimely.  Travelers responds that it filed its original claim
before the bar date and had the right to amend its claim after
the bar date.  Travelers notes that amendments to retro-premium
claims are expected and that the gap between the 2001 Claim and
the 2012 amendment is justified by the Trustee's inaction in the
interim.  Travelers further contends that the Trustee presented
no evidence that the 2012 Claim rendered the Plan infeasible or
altered the distribution to other creditors.

The Court agrees with Travelers.  As a general proposition,
amendments of timely claims following the bar date are permitted
to describe the claim with greater specificity or even to plead a

new theory of recovery on facts established in the original claim.  See In re Norris Gain Co., 131 B.R. 747, 750 (M.D. Fla. 1990).  Only "amendments" which assert an entirely new claim after the bar date are prohibited.  See, e.g., Plains Mktg., L.P. v. Bank of America, N.A. (In re SemCrude, L.P.), 443 B.R. 472, 477-78 (Bankr. D. Del. 2011) (allowing claim amendment after the bar date because amendment did not represent a new claim).

The necessity of post-bar date claim amendment is even more acute with retro-premium claims.  The White Motor Corp. case is directly on point and persuasive.  In re White Motor Corp., 59 B.R. 286 (Bankr. N.D. Ohio 1986).  In that case, the insurer's proposed claim amendment asserted the same claim for premiums included in the timely filed claim; it simply increased the amount to reflect more accurately the liability due under the policies.  Id. at 289.  The Court reasoned that because retrospective claims are based on actuarial estimates, claim amendments are necessary because the passage of time allows real amounts to be substituted for estimates, stating that "[i]t is apparent from the very nature of the within claim . . . that quantification is not readily ascertainable.  Consequently, it is imperative to allow the amendment to provide [the insurer] the opportunity to prove its actual claim."  Id.  Therefore, the Court concludes that Travelers had the right to amend its timely original claim.

32

Further, the Court concludes that the delay between
Travelers' original claim and the amended claim was not
unreasonable in light of the prolonged proceedings in this case.
For example, the Trustee did not object to Travelers' 2001 Claim
until March 28, 2005.  The initial hearing on the objection
occurred in May 2005, with the parties agreeing to conduct
discovery.  It was not until December 2011 that the Trustee moved
for summary judgment.  When Judge Walsh issued his letter ruling
in May 2012, it became apparent that an evidentiary hearing would
be required to resolve the dispute.  (D.I. 6649.)  Travelers
amended the claim approximately six months later.  Thus, while
the eleven year gap between the 2001 and 2012 Claims may suggest
delay, the history of this particular dispute instructs
otherwise.  Accordingly, the Court holds that the 2012 Claim was
not untimely.

    H.  <u>Letters of Credit</u>

    The Trustee argues that if Travelers is entitled to an
allowed claim, the claim must be reduced by $1,986,482
representing the proceeds it received pre-petition from drawing
on letters of credit.  Travelers responds that the proceeds from
the letters of credit were not property of S&W's estate and its
claim cannot be reduced by such proceeds unless and until there
is a danger of a double recovery.

    It is well-established that a letter of credit and proceeds

33

therefrom are not property of a debtor's estate.  <u>See Int'l Fin.</u>
<u>Corp. v. Kaiser Grp. Int'l Inc. (In re Kaiser Grp. Int'l Inc.)</u>,
399 F.3d 558, 566 (3d Cir. 2005); <u>OHC Liquidation Trust v.</u>
<u>Discover Re (In re Oakwood Homes Corp.)</u>, 342 B.R. 59, 67 (Bankr.
D. Del. 2006).  The Trustee's reliance on <u>Sacred Heart Hospital</u>
for the proposition that a creditor's claim must be reduced
"dollar-for-dollar" by insurance proceeds received pre-petition
omits an essential fact present there: that case concerned
insurance proceeds that <u>were</u> property of the estate.  <u>In re</u>
<u>Sacred Heart Hosp. of Norristown</u>, 182 B.R. 413, 421 (E.D. Pa.
1995).

Therefore, unless Travelers receives payment in full of the
amount owed, the proceeds from the letters of credit will not
reduce its claim.  <u>See, e.g.</u>, <u>Reconstr. Fin. Corp. v. Denver &</u>
<u>R. G. W. R. Co.</u>, 328 U.S. 495, 529 (1946) ("The rule is settled
in bankruptcy proceedings that a creditor secured by the property
of others need not deduct the value of that collateral or its
proceeds in proving his debt."); <u>Ivanhoe Bldg. & Loan Ass'n v.</u>
<u>Orr</u>, 295 U.S. 243, 247 (1935) ("A creditor holding security who
realizes upon it, does not 'owe' his debtor the amount
realized.").  The Trustee presented no evidence that unsecured
creditors will receive sufficient distributions that result in
Travelers receiving a double recovery.  Therefore, the Court
concludes that the proceeds from the letters of credit do not

reduce Travelers' 2012 Claim.

    I.    <u>Negligent Claim Handling</u>

The Trustee argues that the 2012 Claim should be disallowed because Travelers has not provided the source documentation which supports the premium owed based on S&W's loss experience from 1999 through 2012.  The Trustee asserts that the refusal to produce source documentation (including the actual claims files) has foreclosed the Trustee's opportunity to test Travelers' good faith handling and settling of the insurance claims.

Travelers replies that it produced voluminous documentation supporting the 2012 Claim, including (i) the Retro Agreements, (ii) billing files, (iii) the Promissory Note, (iv) loss run reports, and (v) other summaries and schedules.  Travelers also produced claim notes, claim summaries, and selected pay out histories.  (6/12/15 Tr. at 84.)  Travelers argues that it was not required to produce the underlying claim files on which the loss run reports, and its claim, are premised.  The Trustee disagrees.

    1.    <u>Burden of Proof</u>

The burden of proof for claims under section 502(a) rests on different parties at different times.  <u>In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992).  A claimant bears the initial burden of demonstrating it has a valid claim and the amount of that claim.  "Initially, the claimant must allege facts

sufficient to support the claim.  If the averments in his filed
claim meet this standard of sufficiency, it is 'prima facie'
valid."  Id. (citations omitted).  The burden then shifts to the
objector to produce sufficient evidence to negate a sworn fact in
the proof of claim.  Id.  If the objector does, the ultimate
burden ordinarily remains on the claimant to prove the validity
of the claim.  Id. at 174.  However, in instances where non-
bankruptcy law identifies the burden of proof, the ultimate
burden of proof for a particular claim is determined consistent
with that law.  Raleigh v. Ill. Dep't Rev., 530 U.S. 15, 20-21
(2000); 4 Alan N. Resnick & Henry J. Sommer, Collier on
Bankruptcy ¶ 502.02[3][f] (16th ed. 2015).

Travelers' original and amended proofs of claim represent
prima facie evidence of the validity of its claim, thus
satisfying its initial burden.  The Trustee was then required to
present sufficient evidence to refute the claim.  The Trustee
identified certain errors in Travelers' claim handling process
calling into question the accuracy of the 2012 Claim.  For
instance, the Trustee identified an indemnification claim
expunged by the Court, though Travelers continued to assert a
reserve in its claim for it.  (6/12/15 Tr. at 35-36; Ex. 315.)
In another instance, the Trustee's expert identified a reserve
for approximately $108,754 despite only $6,245 having been paid
on the claim since it arose on December 30, 1994.  (6/12/15 Tr.

at 95.)  In light of such evidence, the Court concludes that the
Trustee satisfied his burden in overcoming the prima facie
validity of the 2012 Claim.

Accordingly, the final burden of persuasion rests with
whomever bears it under Massachusetts state law.  See Raleigh,
530 U.S. at 20-21.  Massachusetts has adopted an evidentiary
burden-shifting framework for disputes involving negligent
insurance claim handling.  See Deerfield Plastics Co., Inc., v.
Hartford Ins. Co., 404 Mass. 484 (1989).[4]  Though each rely on
Deerfield Plastics, the parties interpret the holding in that
case differently.  The Trustee argues that Deerfield Plastics
first places the burden on the insurer to show that it acted
reasonably in making settlements where the money of the insured
is involved.  Travelers counters that the burden is first on the
insured to present evidence of negligent claim handling before
the burden shifts to the insurer to demonstrate reasonableness
and good faith.

The Court agrees with Travelers.  In Deerfield Plastics, the
insurer did not dispute that it was negligent in its claim
handling.  Id. at 485.  Thus, the insured had already met its
burden on that point.  The issue presented in Deerfield Plastics
was only who bore the burden of proof after the insured presents

---

[4]  The parties agree that Massachusetts state law governs
this dispute.  (D.I. 6802 at n.2; D.I. 6925 at n.2.)

evidence of negligent claim handling.  See New Eng. Mut. Life.
Ins. Co. v. Bear Hill Nursing Home, Inc., No. CA924260, 1995 WL
808629, at *3 (Mass. Super. Mar. 24, 1995).  Accordingly, the
Court must first determine whether the Trustee presented
sufficient evidence to satisfy its burden of showing negligent
claim handling by Travelers (or Aetna).

To meet its initial burden, however, the insured must have
access to all the relevant information underlying the claim
handling.  In a decision applying a similar burden-shifting
framework to that in Deerfield Plastics, the Court took into
consideration the conditions necessary for the insured to produce
evidence of the insurer's negligence:

> In allocating to the insured this burden of coming
> forward with evidence, we have taken into consideration
> that the insurer will ordinarily have superior
> knowledge of the facts bearing on the issue.  Of
> necessity, then, wide latitude must be given the
> insured in pretrial discovery.  It seems unlikely that
> an insured will undertake the considerable expense of
> an extended inquiry into every case file without some
> reasonable suspicion that the insurer failed in its
> implied obligation.  If the insured wishes such an
> inspection, however, modern discovery techniques are
> entirely sufficient to permit it, and the parties may
> thereby determine the existence of legitimate issues
> that should properly be brought before the court.

Port East Transfer, Inc. v. Liberty Mut. Ins. Co., 330 Md. 376,
386-87 (1993).

As the Court in Port East Transfer noted, liberal discovery
is critical to level the playing field in light of the insurer's
superior knowledge of the relevant facts.  To meaningfully test

an insurer's claim handling process, it is paramount that the insured be afforded an opportunity to examine substantially the same information the insurer relied on in resolving the underlying loss claim.  If, however, the insured is restricted to insurer-prepared summaries of source information, the ability to conduct this inquiry is restricted.

Travelers asserted in a declaration accompanying its motion in limine that production of all documents comprising the claim files would be difficult:

> The file for any particular claim will include both physical documents and computer stored information. The physical file will reside in the location where the claim is being adjusted. . . .  In order to provide a claim file to an insured, it is necessary to locate the physical file and also to download and print the electronically stored portions of the file.  This can be a substantial undertaking and can substantially disrupt claims handling activities.  Open claim files are in constant use, so delivering the original counterpart of such files in a remote location may make it extremely difficult for adjustors to carry on their work.

(Ex. 645 at ¶ 9.)  Nonetheless, on March 6, 2015, the Court ordered Travelers

> to provide the Trustee, within sixty days of the entry of this Order, the opportunity to review all documents on which the Loss Runs are premised pursuant to Federal Rule of Evidence 1006, in order to confirm that the Loss Runs are an accurate summary of the applicable writings.

(D.I. 6874 at 2.)

Travelers argues that the phrase "all documents on which the Loss Runs are premised" meant only other summarized information

39

such as claim notes, claim summaries, and other condensed financial statements. (6/12/15 Tr. at 87.) It contends that the Loss Runs (which are summaries of the amounts paid for each claim handled by Travelers accompanied by basic claim information) derive from information entered into Travelers' electronic claims management system and summarize the payment information that appears in the claim financials. (6/9/15 Tr. at 99; Exs. 74F & 74G.) Thus, it argues that it was <u>not</u> required to give the Trustee any of the underlying claim files. The Court disagrees. The documents produced by Travelers simply reflect all payments issued and other <u>financial</u> activity relating to each claim. They do not provide any evidence of the validity of the underlying loss claim or how Travelers determined that those claims should be paid. (6/10/15 Tr. at 42, 58-59; Ex. 160.)

The claim notes produced were similarly unhelpful to the Trustee. According to the Trustee's expert witness, claim notes consist of an entry system where different employees at different times will access a computer document and enter their activities. (6/12/15 Tr. at 92.) The Trustee's expert witness further testified that it is necessary when conducting a claims audit to possess the actual claim file itself in order to evaluate the claim management process, as reflected in the claim notes, against the source documents. (<u>Id.</u>) The documents produced by Travelers did not include the underlying case files or their

photographs, medical reports, apportionment worksheets or
correspondence with the claimant. (<u>Id.</u> at 92-93.) The Trustee's
expert witness testified that the latter are critical to
determining whether the claim handling was negligent. (6/12/15
Tr. at 96-97.)

Notwithstanding the Court's March 6 ruling, Travelers
elected to withhold the underlying source information, including
the actual physical claims files, that may have assisted the
Trustee in meeting his burden. It did so, although it
acknowledged that "the claim handling process for each claim is
thoroughly documented in a physical claim file that is maintained
for that claim, including witness statements, pictures,
adjustors' notes, among other things." (Ex. 644 at ¶ 10.)
Without access to the documents in the claim files, the Trustee's
ability to put forth evidence of negligent claim handling was
severely curtailed.

In light of Travelers' refusal to produce the physical claim
files to the Trustee, the Court draws an adverse inference that
had Travelers produced all relevant information, the Trustee
would have met his burden at this stage. <u>See</u> <u>Auto. Insurers</u>
<u>Bureau of Mass. v. Comm'r of Ins.</u>, 430 Mass. 285, 291 (1999) ("In
appropriate circumstances, a fact finder in a civil dispute may
draw a negative inference from the failure of the party with the
burden of proof to call a witness or produce information within

41

the party's control which would shed light on the party's
position on a material issue.") (citations omitted).

Under Deerfield Plastics, the burden now shifts back to
Travelers to demonstrate that it acted reasonably and in good
faith in handling the underlying claims.  Deerfield Plastics, 404
Mass. at 487.  Travelers did not present any evidence on this
issue, asserting instead that the Trustee had failed to satisfy
his burden of showing negligent claim handling.

The Court disagrees and concludes that Travelers has failed
to meet its burden based on its superior knowledge of the facts.
However, the Court is not prepared to disallow Travelers' entire
claim as a result.  First, the claim based on the Promissory Note
($2,311,836.82) must be allowed.  That amount was acknowledged as
owed by S&W pre-petition.  At that time, S&W resolved or waived
any negligent claim handling defenses it might have had to that
claim.  With respect to the remaining claims (the 1999-2012
premiums of $5,226,881 and the IBNR[5] of $311,988), the Court
concludes that even if the claims were negligently handled the
entire claim should not necessarily be disallowed.

In Deerfield Plastics, the Court noted that "if any
settlement was unreasonably high, 'the insurer would still be
entitled to a premium based on what would be a reasonable figure.

---

[5]   The final element of the 2012 Claim, IBNR, is an
estimated future premium for losses incurred but not reported.
(6/9/15 Tr. at 53.)

The insured has had the benefit of having its liability
discharged and should pay the correct contract price.'"
Deerfield Plastics, 404 Mass. at 488 n.6 (quoting Ins. Co. of N.
Am. v. Binnings Constr. Co., 288 So.2d 359, 361-62 (La. Ct. App.
1974)).   The Court finds in this case that Travelers is still
entitled to a reasonable amount because S&W had the benefit of
having its liability discharged.

Except for the 1979 and 1985 Policies, each Retro Agreement
included a minimum premium due regardless of S&W's actual loss
experience.   (Ex. 9 at 3; Ex. 10 at 12; 6/9/15 Tr. at 44-45.)   In
light of the circumstances presented in this case, the Court
holds that the minimum premium is a reasonable amount due to
Travelers.   Deerfield Plastics, 404 Mass. at 488 n.6.   Although
some of the Retro Agreements set a specific minimum premium, for
most Agreements the minimum premium is formula-driven.[6]   The
Court does not have the facts necessary to compute the amount
due.   Even for the policy years with a fixed minimum premium, the
Court does not know what amount S&W has already paid to Travelers

---

[6]  For example, the 1983 Retro Agreement states that the
minimum premium "shall be (1) The Retention Premium times the Tax
Multiplier or (2) the sum of: (a) The Workers' Compensation and
Employers' Liability Insurance Subject Premium developed under
Policies No. . . . [,] 1% of the General Liability Insurance
Subject Premium for all states except Texas and Louisiana
developed under Polices No. . . . [,] ( c ) 100% of the General
Liability Insurance Subject Premium developed in the states of
Texas and Louisiana under Policies No . . . [,] whichever is
greater."   (Ex. 8 at 3.)

that would be credited against the minimum premium owed for that policy year.  The parties are thus directed to consult and advise the Court if they can agree on the minimum premium still due to Travelers for any of the policy years.  In the absence of agreement, the Court will hold a further evidentiary hearing to determine this portion of Travelers' claim.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will sustain the Objection in part and allow Travelers' claim as follows: (i) $2,311,836.82 comprising the amount owed on the Promissory Note, and (ii) the aggregate minimum premium owed under the Retro Agreements, without deduction for any amounts Travelers has received under the letters of credit.

An appropriate order follows.


Dated: February 29, 2016           BY THE COURT:

                                   Mary F. Walrath
                                   United States Bankruptcy Judge